**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| HALLIBURTON ENERGY SERVICES, INC., et al., | § § § | |
| Plaintiffs, | § § | |
| VS. | § § | CIVIL ACTION NO. H-05-4160 |
| NL INDUSTRIES, et al., | § § | |
| Defendants. | § § | |

**MEMORANDUM AND ORDER**

This lawsuit seeks to determine and allocate financial responsibility for responding to and remediating hazardous substances contaminating an area in Arkansas once used for barite mining. The pending motions do not address any substantive issues, but rather whether venue is proper in this district and whether the entire case should be stayed pending arbitration among some but not all of the parties to this suit. Based on careful consideration of the pleadings, the motions, responses, replies, the parties' submissions, and the applicable law, this court denies the motion to dismiss for improper venue; grants the motion to stay the claims that are subject to contractually agreed arbitration; and denies the motion to stay the claims that are outside the arbitration agreements. The reasons for these rulings are set out below.

**I.      Background**

In December 2005, Halliburton Energy Services, Inc. and DII Industries LLC ("plaintiffs") sued NL Industries, Inc. (f/k/a National Lead Company), Tremont LLC, TRE Holding Company (f/k/a Bentonite Corporation), TRE Management Company (f/k/a Baroid Management Company) (collectively referred to as the "NL Defendants"), M-I LLC, Georgia-Pacific Corporation, and Milwhite Inc.  Halliburton alleged that it is a successor-in-interest to a subsidiary of NL Industries, which had previously owned and operated parts of the Site during the period when hazardous substances were released.  (The Site was used as for barite mining and milling from approximately 1939 to 1977.)  DII sued as a current owner of part of the site and a successor-in-interest to an NL Industries subsidiary.

In 2000, Halliburton, along with TRE Management Company and M-I, LLC, entered into an Administrative Settlement Agreement for Interim Remedial Measures, Site Investigation and Feasibility Study with the Arkansas Department of Environmental Quality (ADEQ).  In 2003, TRE Management and Halliburton entered into a Consent Administrative Order with the ADEQ.  In the 2000 Administrative Settlement Agreement and the 2003 Consent Administrative Order, Halliburton and the other signatories agreed to investigate and respond to the hazardous substances at the Site, including constructing a water treatment system and a levee to address contamination of a "pit lake."  In the lawsuit Halliburton and DII filed in this court in 2005, Halliburton alleged that it had already incurred almost $8 million in investigation, response, and remediation costs and that additional work and money would be required.  Halliburton alleged that the NL Defendants were potentially responsible for response and remediation costs as prior owners and operators or as successors-in-interest

to prior owners and operators of the Site.  Halliburton also sued M-I, a current owner of a portion of the Site and a successor-in-interest to a company that had conducted mining operations there, alleging that it was a party to, but had not paid any of the response and remediation costs under, the Administrative Settlement Agreement and Consent Administrative Order; Georgia-Pacific Corporation, which owned property and mineral interests at the Site, alleging that it had allowed NL Industries to dispose of hazardous substances there; and Milwhite, Inc., a past owner and operator of part of the Site, alleging that it held mining leases at the Site and was an operator when the hazardous substances were disposed of.

In the complaint, Halliburton alleged a right to recover its response and remediation costs under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9607(a); a right to contribution for each defendant's proportionate share of Halliburton's response and remediation costs under § 9607(a) and 9613(f)(3)(B); a right to contribution under the Arkansas Remedial Action Trust Fund Act (RATFA); and a right to recover response and remediation costs under a state common-law unjust enrichment cause of action.  Both Halliburton and DII sought a declaratory judgment that the defendants were liable for all future response and remediation costs at the Site and that Tremont Corporation was obligated to indemnify them for such costs under the terms by which its predecessor-in-interest had been restructured.  (Docket Entry No. 1).

Georgia-Pacific filed counterclaims against Halliburton and DII Industries and crossclaims against the other defendants.  (Docket Entry No. 17).  Milwhite filed

counterclaims against Halliburton and DII Industries and crossclaims against the other defendants.  (Docket Entry No. 22).  Halliburton and DII Industries dismissed their claims against M-I LLC.  (Docket Entry No. 46).[1]

On December 27, 2005, a few weeks after this lawsuit was filed, TRE Management Company—which, with Halliburton and M-I, was a party to the 2000 Administrative Settlement Agreement and the 2003 Consent Administrative Order—sued Georgia-Pacific in the federal district court for the Western District of Arkansas, where the Site is located. In that suit, TRE Management sought contribution under CERCLA and the RATFA for Georgia-Pacific's "proportionate share of all costs and expenses TRE Management has incurred and will continue to incur in performing removal actions and remedial actions at the Site."  (Docket Entry No. 38, Ex. E at 7–8).

In April 2005, before either the Texas or Arkansas lawsuit was filed, TRE Management Company and Halliburton entered into a Cost Sharing, Cooperation, and Final Allocation Process Agreement (the "2005 Cost Sharing Agreement").  This 2005 Cost Sharing Agreement included a procedure to allow the parties to cooperate in continuing to fund the response and remediation costs for the Site, "allocating on an interim basis."  The Agreement also set out a procedure for the parties to reach a "Final Allocation" of "their and others' respective shares of such past, present, and future costs, expenses, liabilities, settlements, recoveries, or unpaid shares relating to the Site."  The Agreement defined "Final

---

[1]  The plaintiffs' motion to withdraw entry of default against M-I LLC, (Docket Entry No. 37), is granted.

Allocation" as a "full, final, and binding apportionment among the Parties to the Agreement," by agreement or by arbitration, of defined categories of costs, including future costs. Under the Agreement, if mediation failed to reach "Final Allocation," the parties were required to participate in binding arbitration under the Commercial Arbitration Rules of the American Arbitration Association and the Federal Arbitration Act.

The 2005 Cost Sharing Agreement recognized that not only would there be arbitration among the signatories to resolve contribution disputes, but also contribution litigation involving nonsignatories. The 2005 Agreement limited the impact of any such litigation on the arbitration. The Agreement set out limits on the admissibility in arbitration of any "order, judgment, decree, or decision of any court in any contribution litigation under CERCLA or RATFA involving one or more Parties to this Agreement that allocates to the Parties responsibility, fair share, or liability relating to the Site." Under the Agreement, the result of such contribution litigation

> shall be ineffective, invalid, and of no force and effect as between the Parties and shall not be used or admissible as evidence in the Final Allocation Process by any Party or against any Party for any purpose other than establishing the amount of liability that has been finally allocated to non-Parties. All allocation of responsibility, fair share, or liability relating to the Site as between the Parties, and all issues or disputes between the Parties relating to whether a cost or expense is a Shared Cost, the reasonableness of any cost or expense to be allocated in the Final Allocation, and the allocability or collectibility of any cost or expenses under CERCLA or RATFA, shall be determined in the Final Allocation Process pursuant to this Agreement without reference to, or consideration of, any arguments made or conclusions reached in any such contribution litigation.

5

(Docket Entry No. 38, Ex. C at 10–11).

In March 2006, after this lawsuit and the Arkansas lawsuit had been filed, Halliburton and DII Industries entered into an arbitration agreement with the NL Defendants, consisting of NL Industries, Tremont, TRE Holding, and TRE Management, expanding the parties who agreed to arbitrate their disputes over the contribution and allocation of response and remediation costs at the Site. In this 2006 Arbitration Agreement, the parties agreed to "resolve through binding arbitration all claims between them related to the allocation of response and remediation costs incurred or to be incurred at the Site including the claims that have been asserted in the Texas Case or such claims that may be asserted in the Arkansas Case." (Docket Entry No. 38, Ex. D at 2). The arbitration was to be conducted in accordance with the relevant arbitration provisions of the 2005 Cost Sharing Agreement, including the provisions limiting the impact of contribution litigation on an arbitration. (*Id*.).

The 2006 Arbitration Agreement included a provision for seeking a stay of this lawsuit. The provision stated:

> Within ten (10) days of the Initial Effective Date, Halliburton and DII shall file in the Texas Case such papers, including this Agreement and the Allocation Agreement, as may be necessary to seek a stay of all claims asserted between the Parties to this Agreement in the Texas Case. In the event that the requested stay is not entered in the Texas Case, then this Agreement shall be terminated and Halliburton and DII may proceed with the litigation in the Texas Case. Notwithstanding the provision in this Agreement that Halliburton and DII have the obligation to seek a stay in the Texas Case, NL, Tremont, TRE Holding, and TRE Management, are not waiving, and are specifically preserving their right to contest jurisdiction and venue over NL,

Tremont, TRE Holding, and TRE Management in the Texas Case.

(Docket Entry No. 33, Ex. A, ¶ 2).

Halliburton and DII moved to stay their claims against the NL Defendants (NL Industries, Inc., Tremont, LLC, TRE Holding Corporation, and TRE Management Company) in favor of arbitration under the 2005 Cost Sharing Agreement and the 2006 Arbitration Agreement. (Docket Entry No. 33). The NL Defendants moved under Rule 12(b)(3) to dismiss all the claims and crossclaims filed against them in this litigation on the basis of improper venue and alternatively moved to stay the entire litigation pending the arbitration. (Docket Entry No. 38). The non-NL Defendants, Milwhite and Georgia-Pacific, who are not parties to the arbitration agreements, do not object to a stay limited to the claims between Halliburton and the NL Defendants, but object to a stay of the entire suit. (Docket Entry Nos. 41, 47). Halliburton objected to staying any claims that were not subject to the arbitration agreements; Halliburton and the non-NL Defendants also responded to the NL Defendants' venue challenge. (Docket Entry Nos. 41, 49, 50, 54). This court heard argument from the parties on both the venue issue and the scope of the stay. (Docket Entry No. 57).

The venue challenge and the dispute as to the scope of the stay pending arbitration are both analyzed below.

## II.    The Motion to Dismiss for Improper Venue

### A.    The Applicable Legal Standards

The NL Defendants argue that venue in the Southern District of Texas does not satisfy the specific venue provision found in CERCLA, 42 U.S.C. § 9613(b), and that the general venue statute, 28 U.S.C. § 1391, does not apply.  Halliburton and the non-NL Defendants assert that venue is proper if it satisfies either the general or the specific venue statutes because the specific CERCLA venue provision supplements the general provisions of § 1391.

Once a defendant has raised a proper objection to venue, the plaintiff bears the burden of proof to establish that the chosen venue is proper.  *Seariver Mar. Fin. Holdings Inc. v. Pena*, 952 F. Supp. 455, 458 (S.D. Tex. 1996) (citing WRIGHT, MILLER & COOPER, FEDERAL PRACTICE & PROCEDURE: JURISDICTION 2D § 3826 at 259); *see also Univ. Rehabilitation Hosp., Inc. v. Int'l Co-op.*, No. 05-1827, 2006 WL 1098905, *1 (W.D. La. Apr. 24, 2006); *Dupree v. Valero Energy Corp.*, No. Civ. A. 03-1834, 2003 WL 22466234, *1 (E.D. La. Oct. 29, 2003); *McCaskey v. Continental Airlines, Inc.*, 133 F. Supp. 2d 514, 523 (S.D. Tex. 2001); *Bigham v. Envirocare of Utah, Inc.*, 123 F. Supp. 2d 1046, 1048 (S.D. Tex. 2000). If there is no evidentiary hearing, courts allow a plaintiff to carry the burden by establishing facts, taken as true, that establish venue.  *McCaskey*, 133 F. Supp. 2d at 523; *Bigham*, 123 F. Supp. 2d at 1048; *see also Wilson v. Belin*, 20 F.3d 644, 648 (5th Cir. 1994).  The court accepts undisputed facts in the plaintiff's pleadings as true and resolves conflicts in the plaintiff's favor.  *McCaskey*, 133 F. Supp. 2d at 523.

**B.    Analysis**

This is a federal question case.  The general venue provision, § 1391(b), states that

> [a] civil action wherein jurisdiction is not founded solely on
> diversity of citizenship may, except as otherwise provided by
> law, be brought only in (1) a judicial district where any
> defendant resides, if all defendants reside in the same State, (2)
> a judicial district in which a substantial part of the events or
> omissions giving rise to the claim occurred . . . , or (3) a judicial
> district in which any defendant may be found, if there is no
> district in which the action may otherwise be brought.

28 U.S.C. § 1391(b).  Section 1391(c) defines the residence of a corporation for the purpose

of the venue statute:

> For purposes of venue under this chapter, a defendant that is a
> corporation shall be deemed to reside in any judicial district in
> which it is subject to personal jurisdiction at the time the action
> is commenced.  In a State which has more than one judicial
> district and in which a defendant that is a corporation is subject
> to personal jurisdiction at the time an action is commenced, such
> corporation shall be deemed to reside in any district in that State
> within which its contacts would be sufficient to subject it to
> personal jurisdiction if that district were a separate State, and, if
> there is no such district, the corporation shall be deemed to
> reside in the district within which it has the most significant
> contacts.

28 U.S.C. § 1391(c).

The CERCLA venue provision reads, in pertinent part:

> Venue shall lie in any district in which the release or damages
> occurred, or in which the defendant resides, may be found, or
> has his principal office.

42 U.S.C. § 9613(b).  The NL Defendants argue that the specific CERCLA venue provision

triggers § 1391(b)'s "except otherwise provided by law" provision, limiting the plaintiffs to

CERCLA's venue options.  (Docket Entry No. 38 at 4; Docket Entry No. 54 at 5).  As to the

first option, the release or damage did not take place in the Southern District of Texas, but

in Arkansas.  As to the second option, the NL Defendants argue that they do not reside, may

not be found, and do not have their principal offices in the Southern District of Texas.  The

NL Defendants emphasize that the CERCLA venue statute requires that *the* defendant—not

*any* defendant—must reside, be found, or have his principal office in the district where suit

was filed.  The NL Defendants contend that venue must be determined exclusively under the

CERCLA special venue provision, § 9613(b), without reference to the general venue

provision, § 1391.

Halliburton and the non-NL Defendants contend that the CERCLA venue provision

supplements the general venue provision and that venue is proper in this district if this case

meets the requirements of either § 9613(b) of CERCLA or § 1391 of the general venue

statute.  (Docket Entry No. 50 at 5; Docket Entry No. 54 at 4).  They argue that venue is

satisfied under the specific CERCLA venue provision, § 9613(b), using the definition of

"reside" found in § 1391(c), and under the general venue provision of § 1391(b).  (*Id*.).[2]

Although neither the Supreme Court nor a court of appeals has addressed this issue

in the context of the CERCLA statute, the Supreme Court has held that § 1391(c), the general

venue provision defining corporate "residence," should be read into specific venue provisions

"in the absence of contrary restrictive indications in" the specific venue statute.  *Pure Oil Co.

v. Suarez*, 384 U.S. 202, 205 (1966).  In *Pure Oil*, the Court considered the relationship

---

[2] Halliburton argues that the NL Defendants' motion to dismiss for improper venue is moot because
they have agreed to arbitrate the claims.  The arbitration provisions of the 2006 Cost Sharing Agreement and
the 2006 Arbitration Agreement do not cover all the parties and claims asserted in this case.  In the arbitration
agreements, the NL Defendants preserved their right to contest jurisdiction and venue in this case. (Docket
Entry No. 33, Ex. A, ¶ 2).  The NL Defendants' venue challenge is properly before this court.

between § 1391(c)'s criteria for corporate "residence" to the specific venue provision in the Jones Act. The specific venue provision stated that "[j]urisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located." 384 U.S. at 203 (quoting former 46 U.S.C. § 688). The Court applied an earlier version of § 1391(c), which allow a corporation to be sued "in any judicial district in which it is incorporated or licensed to do business or is doing business, and such judicial district shall be regarded as the residence of such corporation for venue purposes." 28 U.S.C. § 1391(c)(1964). The *Pure Oil* Court reasoned that when Congress enacted § 1391(c), it intended to "broaden the general venue requirements in actions against corporations by providing a forum in any judicial district in which the corporate defendant 'is doing business.' " *Pure Oil Co.*, 384 U.S. at 204 (citing Moore, COMMENTARY ON THE JUDICIAL CODE 193–94 (1949); 1 Barron & Holtzoff, FEDERAL PRACTICE AND PROCEDURE § 80, at 386 (Wright rev. 1960)). The Court noted that "[i]t seems manifest that this change was made in order to bring venue law in tune with modern concepts of corporate operations. The question here involves the reach of these changes. . . . Although there is no elucidation from statutory history as to the intended effect of § 1391(c) on special venue provisions, the liberalizing purpose underlying its enactment and the generality of its language support the view that it applies to all venue statutes using residence as a criterion, at least in the absence of contrary restrictive indications in any such statute." *Pure Oil Co.*, 384 U.S. at 204–05 (footnote omitted).

11

The Court found no such restrictive indications in the Jones Act, which "was not primarily directed at venue, but rather at giving seamen substantive rights and a federal forum for vindication.  In so doing, [the Jones Act] provided a more generous choice of forum than would have been available at that time under the general venue statute."  *Id.* at 205 (citations omitted).  The Court also noted that when the Jones Act venue provision was enacted, it was broader than § 1391, the general venue statute.  Because the Jones Act venue provision referred to corporate "residence," the Court concluded that it was appropriate to apply the later-expanded general provisions governing corporate residence in § 1391(c) to the Jones Act special venue provision.

The Supreme Court rejected Pure Oil's argument that it could not be sued in Florida, but only in its state of incorporation, Ohio, or in the state in which it maintained its principal place of business, Illinois.  *Id.* at 203.  Applying the criteria for corporate residence set out in § 1391(c) to the Jones Act venue provision, Pure Oil could be sued in Florida, where it had transacted a substantial amount of business.

Courts interpreting other special venue statutes have applied *Pure Oil*'s reasoning to incorporate the § 1391(c) criteria for corporate residence to special venue provisions.  Courts have held that § 1391(c) supplements special venue provisions in statutes addressing antitrust, patent, civil rights, ERISA, automobile dealers, and RICO.  *See Bd. of County Comm'rs of Custer County v. Wilshire Oil Co. of Tex.*, 523 F.2d 125, 131 (10th Cir. 1975) (holding that § 1391(c) supplements the antitrust venue provision, 15 U.S.C. § 22); *Iranian Shipping Lines, S.A. v. Moraites*, 377 F. Supp. 644, 647-48 (S.D.N.Y. 1974) (same); *Phila.*

*Hous. Auth. v. Am. Radiator & Standard Sanitary Corp.*, 291 F. Supp. 252, 260–61 (E.D. Pa. 1968) (same); *Snyder v. E. Auto Distribs., Inc.*, 357 F.2d 552, 555 (4th Cir. 1966) (holding that § 1391(c) supplements the venue provision of the automobile dealers' statute, 15 U.S.C. § 1222); *Farmers Bank v. Bell Mortgage Corp.*, 452 F. Supp. 1278, 1280–81 (D. Del. 1978) (holding that § 1391(c) supplements the RICO venue provision, 18 U.S.C. § 1965); *Bosch v. Haynes Corp.*, No. 1:05-CV-418, 2005 WL 2313597, *3 (W.D. Mich. Sept. 22, 2005) (holding that § 1391(c) supplements the patent special venue provision, 28 U.S.C. § 1400(b)); *Meteoro Amusement Corp. v. Six Flags*, 267 F. Supp. 2d 263, 266 (N.D.N.Y. 2003) (same); *Koh v. Microtek Int'l, Inc.*, 250 F. Supp. 2d 627, 631 (E.D. Va. 2003) (same); *Brightway Adolescent Hosp. v. Hawaii Mgmt. Alliance Ass'n*, 139 F. Supp. 2d 1220, 1225 (D. Utah 2001) (holding that § 1391(c) supplements the ERISA special venue provision, 29 U.S.C. § 1132(e)(2)); *Stumpf v. Med. Benefits Adm'rs*, No. 8:99CV185, 2001 WL 1397326, *2 (D. Neb. Mar. 14, 2001) (same); *McCracken v. Auto. Club of S. Cal., Inc.*, 891 F. Supp. 559, 562 (D. Kan. 1995) (same).  In deciding whether § 1391(c) applies to special venue provisions, courts examine the text, structure, and legislative history of those provisions to determine whether Congress intended specifically to limit venue as stated in the special venue provision; absent such evidence, courts generally hold that Congress, aware of *Pure Oil* and the broad approach to venue for corporations established in § 1391(c), intended to add venue options for plaintiffs under the specific law.

Situations in which courts find that Congress intended to restrict venue under a special provision so as to preclude the application of § 1391(c) are rare.  One court rejected an

attempt to incorporate § 1391(c) into the Title VII special venue provisions then in effect. Those provisions established specific bases for venue: (1) where the unlawful employment practice is alleged to have been committed; (2) where the plaintiff would have worked but for the alleged unlawful employment practice; and (3) where the employment records relevant to such practice are maintained and administered. *Stebbins v. State Farm Mut. Auto Ins. Co.*, 413 F.2d 1100, 1102 & n.7 (D.C. Cir. 1969) (citing and quoting former 42 U.S.C. § 2000e-5(f)).  The statute also had a fourth venue option: "But if the respondent is not found within any such district, such an action may be brought within the judicial district in which the respondent has his principal office."  *Id.*  The court determined that because the statute specifically mentioned "principal office" and did not rely on "residence" as used in § 1391(c) (and used to trigger incorporation of § 1391(c) into other special venue provisions), Congress meant to limit venue to the four options provided in Title VII.  *Stebbins*, 413 F.2d at 1102–03.  Courts have similarly held that the narrowness of the Staggers Railroad Act's special venue provision, combined with legislative history indicating that Congress wanted to limit where railroads could be sued, evidences an intent to restrict venue for actions arising under that statute.[3]  *See Basic, Inc. v. Norfolk S.*, 684 F. Supp. 123, 125 (E.D. Pa. 1988)

---

[3] The special venue provision reads,

A civil action under this section may only be brought —

    (i) against the originating rail carrier, in the judicial district in which the point of origin is located;

    (ii) against the delivering rail carrier, in the judicial district in which the principal place of business of the person bringing the action is located if the delivering rail carrier operates a railroad or a route through such judicial district, or in the judicial district in which the point of destination is located; and

    (iii) against the carrier alleged to have caused the loss or damage, in the judicial district in which such loss or damage is said to have occurred.

49 U.S.C. § 11707(d)(2)(A).

(quoting the Congressional record, which included a complaint about the preamendment law that "venue is virtually uncontrollable and frequently, inconvenient") (citations omitted).

Applying *Pure Oil* and subsequent decisions to the present case leads to the conclusion that the § 1391(c) criteria for corporate residence applies to the CERCLA venue statute. The use of the term "reside" in § 9613(b) supports the view that the § 1391(c) definition applies. Under *Pure Oil*, the § 1391(c) corporate residence provision applies to all venue statutes using residence as a criterion in the absence of contrary restrictive indications in any such statute. *Pure Oil Co.*, 384 U.S. at 204–05. The CERCLA statute and its venue provision do not contain "contrary restrictive indications" that would preclude the use of the § 1391(c) definition of residence. Neither the statute nor the legislative history support a restrictive view of CERCLA's venue provision. To the contrary, the statute was intended to allow all potentially responsible parties for remediation and response costs to be joined in a single forum. *See, e.g.*, *United States v. Bestfoods*, 524 U.S. 51, 56 (1998) ("As its name implies, CERCLA is a comprehensive statute that grants the President broad power to command government agencies and private parties to clean up hazardous waste sites.") (quoting *Key Tronic Corp. v. United States*, 511 U.S. 809, 814 (1994)); *Bestfoods*, 524 U.S. at 56 n.1 ("The remedy that Congress felt it needed in CERCLA is sweeping: *everyone* who is potentially responsible for hazardous-waste contamination may be forced to contribute to the costs of cleanup.") (quoting *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 21 (1989) (plurality opinion of Brennan, J.) (emphasis in original)); *compare Basic, Inc.*, 684 F. Supp. at 125 (relying in part on legislative history in which members of Congress explicitly stated

15

a desire to limit the venue for claims brought under the Staggers Railroad Act to view the special venue provision as supplanting the general venue requirements).  At a minimum, § 1391(c) applies to define where the corporate defendants sued in this case reside for the purpose of § 9613(b).

The Halliburton and non-NL Defendants also argue that venue is proper if it satisfies either § 1391(b) or § 9613(b).  The NL Defendants urge that the phrase "except as otherwise provided by law" in § 1391(b) means that the special venue provision in CERCLA trumps the general venue provisions of § 1391(b).  The relevant language reads, "A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in . . . " the options set out in subsections (b)(1) to (b)(3).  42 U.S.C. § 1391(b).  The most straightforward reading is that unless another statute applies and adds venue options, a federal-question case may only be brought in one of the three choices specified in § 1391(b).  Under this reading, whether venue is proper under both 28 U.S.C. § 1391(b) and the special venue statute depends on whether the venue provisions "otherwise provided by law" are mandatory and supplant the § 1391(b) choices or whether they are permissive and supplement the § 1391(b) choices.

If the special venue provisions "otherwise provided" by § 9613(b) are permissive, they supplement, but do not supplant, the general venue provisions of § 1391(b).  If they are mandatory, the venue choices specified under CERCLA would supplant, not supplement, § 1391(b).  In *Cortez Byrd Chips, Inc. v. Bill Harbert Construction Co.*, 529 U.S. 193 (2000), the Supreme Court analyzed the special venue provisions in the Federal Arbitration Act and

16

concluded that they were permissive, allowing a motion to confirm, vacate, or modify an award to be filed either where the award was made or in any district that was proper under the general venue statute.  Although the Court began its analysis with the statutory language, it was not determinative.  In the present case, the statutory language similarly does not provide a clear answer.  Although the language of § 9613(b) uses the word "shall"—venue "shall" lie in the specified districts—"shall" can mean either "must," "may," or "should." Section 9613(b) does not include any specific words of restriction or exclusivity.  The word "only" does not appear.  In *Cortez*, the Court emphasized that the special venue provision of the FAA was meant to broaden, not restrict, the venue alternatives available under the general venue statute.  The Court reasoned that this pointed away from the restrictive reading of the FAA special venue provisions and confirmed the "view that the liberalizing effect of the provisions in the day of their enactment was meant to endure through treating them as permitting, not limiting, venue choice today."  529 U.S. at 203–04.  Similarly, when Congress enacted CERCLA, its special venue provision was more expansive than the general venue provisions of § 1391.  When CERCLA was enacted in 1980 and included the special venue provision permitting a defendant to be sued in any district where it may be found, it was broader than 28 U.S.C. § 1391(b), which was not amended to permit venue in a district in which a defendant "may be found" until after CERCLA's effective date.  *Compare* Pub. L. No. 101-650 *with* Pub. L. No. 96-510.  The fact that the special venue provision was intended to be broader than the general venue provision, in combination with the expansive purpose of CERCLA to provide a forum to resolve claims involving all the potentially

17

responsible parties, supports treating the provisions as supplemental rather than exclusive. *See Cortez*, 529 U.S. at 203 (stating the case law does not show that special venue statutes are deemed to be restrictive; rather, the cases simply show that analysis of special venue provisions must be specific to the statute); *Icon Indus. Controls Corp. v. Cimetrix, Inc.*, 921 F. Supp. 375, 379, 382–83 (W.D. La. 1996) (applying *Pure Oil* to the Clayton Act and holding that the Act's special venue provisions supplement the general venue provisions).

This court concludes that the special venue provisions of § 9613(b) supplement § 1391(b), so that venue may be satisfied under either statute. Venue in this district is readily established under § 1391(b). Subsection (b)(1) permits venue in any district of a state if all defendants live in the same State; subsection (b)(2) permits venue in a "judicial district where any defendant resides, if all defendants arise in the same State."[4] The § 1391(c) definition of where a corporation "resides" applies. Georgia-Pacific and Milwhite both reside in the Southern District of Texas. The NL Defendants filed an affidavit executed by J. Mark Hollingsworth, vice president and general counsel of Valhi, Inc., which owns, controls, or manages the legal proceedings of the NL Defendants. (Docket Entry No. 38, Ex. 1, ¶ 1). Hollingsworth testified that none of the NL Defendants resides, may be found, or maintains their principal offices in this district. (*Id.* at ¶ 7). This evidence, however, shows that the NL Defendants all reside in Texas. Section 1391(b)(1) makes venue proper in this district.

---

[4] 28 U.S.C. § 1391(b)(2) and (3) do not apply. Section 1391(b)(2) provides for venue in a district which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is located. Section (b)(3) provides a backstop, allowing venue in which any defendant may be found "if there is no [other] district in which the action may otherwise be brought."

Because Halliburton and the non-NL Defendants also argue that venue is proper in this district under § 9613(b), this court considers this argument as well. Halliburton and the non-NL Defendants assert that the NL Defendants reside in this district, using the criteria for corporate residence found in § 1391(c). The NL Defendants dispute this conclusion. They submitted affidavits denying that they reside or may be found in this district. (Docket Entry No. 38, Exs. 1–2, Affs. of J. Mark Hollingsworth and Andrew B. Nace, with attachments). The NL Defendants also submitted the 2000 Administrative Settlement Agreement they executed with Arkansas state officials, which list TRE Management's locations as Denver, Colorado, and Little Rock, Arkansas. (Docket Entry No. 38, Ex. 1A, ¶ 3). The NL Defendants also submitted the 2005 Cost Sharing, Cooperation, and Final Allocation Process Agreement executed by TRE Management Company and Halliburton, signed by TRE Management officials from Dallas, Texas and Little Rock, Arkansas, (Docket Entry No. 38, Ex. 1C at 21–22), and the 2006 Arbitration Agreement, signed by NL Defendants' representatives in Dallas, Texas, (Docket Entry No. 38, Ex. 1D at 4–5).

Halliburton responded by submitting several documents that undermine the NL Defendants' arguments about their contacts with and residence in the Southern District of Texas.[5] In 2004, NL Industries maintained its registered agent and registered office in

_____

[5] Halliburton also argues that the NL Defendants have waived any objection to venue by signing an agreement to arbitrate these claims in Houston. (Docket Entry No. 50 at 3–5). This argument fails because the NL Defendants expressly preserved their right to challenge this court's jurisdiction and venue in the arbitration agreement. (*See* Docket Entry No. 51, Ex. A, ¶ 2) ("Notwithstanding the provision in this Agreement that Halliburton and DII have the obligation to seek a stay in the Texas Case, NL, Tremont, TRE Holding, and TRE Management, are not waiving, and are specifically preserving their right to contest jurisdiction and venue over NL, Tremont, TRE Holding, and TRE Management in the Texas Case.").

Houston, Texas.  (Docket Entry No. 51, Ex. C).  NL Industries did not change the location of its registered agent and office until March 15, 2006, after this lawsuit was filed.  (*Id.*).  NL Industries's 2002 annual report directs information requests to a Houston, Texas address. (Docket Entry No. 51, Ex. J).

Tremont LLC moved its registered agent and office from Dallas to Austin; the record does not show that Tremont has a registered agent or office in Houston.  (Docket Entry No. 51, Ex. D).  TRE Holding Corporation and TRE Management Company have their registered agent and office in Dallas, Texas.  (Docket Entry No. 51, Exs. E, F).  Under § 1391(c), a corporate defendant resides in any judicial district in which it is subject to personal jurisdiction when the action is commenced.  Because Texas has more than one judicial district, a corporation resides in any district with which it has sufficient contacts to subject it to personal jurisdiction if that district were a separate State.  If the corporate defendants could be subject to personal jurisdiction in this district if it were viewed as a separate State, they reside in this district under § 1391(c), and venue is proper under § 9613(b).  *Cf. L.G. Elecs.*, 131 F. Supp. 2d at 809–10.

The NL Defendants challenged venue under § 9613(b) and disputed the application of § 1391(b) or (c), but they did not challenge personal jurisdiction.  Halliburton urges that the NL Defendants have waived any challenge to personal jurisdiction in this district, arguing that if personal jurisdiction is waived, venue is proper.  Rule 12(h)(1) sets up two ways in which a defendant can waive the defense of personal jurisdiction.  One is to make a motion

under Rule 12 and omit the defense.  The other is to fail to raise the defense in a motion, in a responsive pleading, or in a Rule 15(a) amendment.  FED. R. CIV. P. 12(h)(1).

Halliburton argues that because the NL Defendants filed a Rule 12 motion challenging venue but not the lack of personal jurisdiction, they waived the defense.  This argument raises the waiver provision of the first portion of Rule 12(h)(1).  In response, the NL Defendants did not argue that by challenging venue, they necessarily and implicitly challenged personal jurisdiction, insofar as the venue test for a corporate defendant incorporates personal jurisdiction.  Instead, the NL Defendants argued that the CERCLA venue provision is mandatory and exclusive and does not include the personal jurisdiction-based venue provisions of § 1391(c), an argument this court has found unpersuasive.  Even if the NL Defendants had made an "implied assertion" argument, it would construe Rule 12 in a way that its language does not support.  The procedural rule does not carve out an exception for venue challenges by corporate defendants.

The NL Defendants' failure to assert a venue challenge in their answer or their Rule 12 motion waives a challenge to personal jurisdiction in this district.  As a result, they lose their venue argument because they are deemed to reside in the district in which they are subject to personal jurisdiction.  Even if the NL Defendants did not waive a personal jurisdiction challenge, this court would conclude that Halliburton has successfully shown that NL Industries is subject to personal jurisdiction in this district and may be sued here.  The record is less clear as to the Tremont entities.  There is no evidence in the record, other than the execution of the contracts and agreements, as to the contacts between Tremont LLC, TRE

21

Holding Corporation, and TRE Management Company on the one hand and the Southern District of Texas on the other. If venue in this district could not be satisfied under § 1391(b)(1), and if the NL Defendants had not waived their personal-jurisdiction challenge to venue as to the Tremont entities in this district, this court would still not have found venue improper. Instead, this court would have granted Halliburton's motion to conduct discovery into the jurisdictional contacts of the Tremont entities with the Southern District of Texas. But because this court concludes that § 1391(b) is a valid basis for jurisdiction; that the record establishes that all defendants reside in Texas and at least one defendant resides in this district; and that the NL Defendants waived or forfeited a challenge to personal jurisdiction in the Southern District of Texas, this court finds that venue is proper in this district and denies the motion to dismiss for improper venue.

## III.    The Motion to Stay Pending Arbitration

### A.    The Legal Standards

Section 3 of the FAA provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3.

Under § 3, "a stay is mandatory upon a showing that the opposing party has commenced suit upon any issue referable to arbitration under an agreement in writing for such arbitration . . . ." *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992). The Fifth Circuit has interpreted this language to mean that a district court cannot deny a stay when one is properly requested. *Id.* If all of the issues raised before the district court are arbitrable, dismissal of the case is appropriate. *Id.* (quoting *Sea-Land Serv., Inc. v. Sea-Land of Puerto Rico, Inc.*, 636 F. Supp. 750, 757 (D.P.R. 1986)).

### B.    Analysis

Under § 3, the claims that are subject to the parties' arbitration agreements must be stayed pending the arbitration. The issue is whether to extend the stay to include claims that are not subject to arbitration. The NL Defendants have requested a stay of all the claims in this lawsuit pending completion of the arbitration. (Docket Entry No. 38). Halliburton has moved for a stay of all the claims between the parties to the arbitration agreements but contends that the claims asserted by and against the nonsignatories should not be stayed. (Docket Entry Nos. 38, 50). Milwhite and Georgia-Pacific, who are not parties to the arbitration agreements, object to a stay of the claims relating to them, arguing that they will be prejudiced by the delay, by the inability to obtain discovery while the parties to the arbitration are developing their claims and defenses, and by being subjected to the effect of arbitration agreements that they did not sign.[6] (Docket Entry Nos. 41, 47, 49).

---

[6] No party has challenged the validity of the 2005 and 2006 Arbitration Agreements. At oral argument, Halliburton initially argued that the NL Defendants vitiated the Arbitration Agreements by challenging venue in this district, but withdrew this claim later in the argument. A straightforward reading

Section 3 of the FAA authorizes a court to stay litigation pending arbitration; § 4 authorizes a court to compel arbitration between signatories of an arbitration agreement.  In *Hill v. G.E. Power Systems*, 282 F.3d 343 (5th Cir. 2002), the Fifth Circuit explained that § 3 authorizes courts to stay litigation even as to nonsignatories, while § 4 applies only to signatories. *Id.* at 347.  This court cannot compel nonsignatories to arbitrate claims absent an arbitration agreement; it can, however, exercise its discretion to stay all litigation between signatories and nonsignatories pending completion of arbitration to prevent the litigation from undermining the arbitration.  *See id.* at 348; *Harvey v. Joyce*, 199 F.3d 790, 795 (5th Cir. 2000).

In *Subway Equipment Leasing v. Forte*, 169 F.3d 324 (5th Cir. 1999), a defendant who had signed an arbitration agreement with the plaintiff sought a stay of litigation under § 3 of the FAA as to itself and as to the claims against other defendants who had no right to arbitrate the claims against them.  *Id.* at 329.  The court reaffirmed its precedent that an order to stay covering claims against all defendants was proper, even if some of the defendants had not signed arbitration agreements, if litigation could not proceed on the claims without adversely affecting the signatories' right to arbitration.  *Id.* (citing *Sam Reisfeld & Son Import Co. v. S.A. Eteco*, 530 F.2d 679, 681 (5th Cir. 1976) (holding that an order to stay litigation covering claims against all defendants was appropriate, even though two defendants were not part of the arbitration agreement); *Kroll v. Doctor's Assocs., Inc.*, 3 F.3d 1167, 1171 (7th Cir.

---

of the agreement shows that the NL Defendants preserved their right to challenge venue and jurisdiction in this court in the Agreements.  The Arbitration Agreements are valid.

1993) ("a decision about whether to grant a stay should be motivated by the court's 'concern that litigation against a party not bound by an arbitration provision may impair an arbitrator's consideration of claims against a party that is compelled to arbitrate'").

In *Waste Management*, the Fifth Circuit addressed whether a nonsignatory could invoke an arbitration agreement and seek a stay under § 3.  The court listed three factors that precedent had identified for invoking § 3 on a nonsignatory's application:   "(1) the arbitrated and litigated disputes must involve the same operative facts; (2) the claims asserted in the arbitration and litigation must be 'inherently inseparable'; and (3) the litigation must have a 'critical impact' on the arbitration."  *Waste Mgmt., Inc. v. Residuos Industriales Multiquim, S.A. de C.V.*, 372 F.3d 339, 343 (5th Cir. 2004) (citations omitted).   "The question is not ultimately one of weighing potential harm to the interests of the non-signatory, but of determining whether proceeding with litigation will destroy the signatories' right to a meaningful arbitration."  *Id.* (citing *Adams v. Ga. Gulf Corp.*, 237 F.3d 538, 541 (5th Cir. 2001)).  Although in this case some of the signatories—the NL Defendants—are seeking a stay over the objections of both other signatories with claims against nonsignatories (Halliburton) and nonsignatories with crossclaims and counterclaims against signatories (Georgia-Pacific and Milwhite), the *Waste Management* factors are consistent with the factors identified in *Subway* and inform this court's analysis of the appropriate scope of the stay.

There are four sets of claims in this case: (1) the claims between the plaintiffs and the NL Defendants; (2) the plaintiffs' claims against Georgia-Pacific and Milwhite; (3) Georgia-

Pacific's and Milwhite's crossclaims against each other, M-I, LLC and the NL Defendants; and (4) Georgia-Pacific's and Milwhite's counterclaims against the plaintiffs.  The plaintiffs and the NL Defendants have agreed to arbitrate "all claims between them related to the allocation of response and remediation costs incurred or to be incurred at the [Hot Springs County, Arkansas] Site including the claims that have been asserted in the Texas Case or such claims that may be asserted in the Arkansas case."  (Docket Entry No. 51, Ex. A at 1). The stay as to those claims is mandated by the FAA.

Whether a stay should be imposed as to the claims that go beyond the arbitration agreement is within this court's discretion. *See Worldcrisa Corp. v. Armstrong*, 129 F.3d 71, 76 (2d Cir. 1997) ("We have recognized that district courts, despite the inapplicability of the FAA, may stay a case pursuant to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel and for litigants.") (internal quotations and citations omitted).  The stay that the NL Defendants seek would prevent litigation of the crossclaims and counterclaims by and against Georgia-Pacific and Milwhite.  These claims are based on many, although not all, of the same operative facts as the claims subject to arbitration.  The facts as to each party's involvement in, and responsibility for, the hazardous substances at the Site will vary, but there will be considerable overlap.  The overarching legal issues are the same in the arbitration and the litigation:  identifying the parties responsible for responding to and remediating the Site and allocating the response and remediation costs.  Although not all the contribution claims in the litigation are inherently inseparable from the claims subject to arbitration – the liability

26

of one potentially responsible party is not necessarily derivative of the liability of another – the claims are closely related.  The critical issue is whether permitting the claims that are not subject to arbitration to go forward in this court would have a critical impact on the arbitration among the signatories to the arbitration agreement.

The NL Defendants argue that if they must defend the crossclaims by Georgia-Pacific and Milwhite at the same time as they proceed in arbitration against Halliburton, the arbitration would "likely follow or be swayed by the court's findings of fact and conclusions of law." (Docket Entry No. 38 at 8).  But the Arbitration Agreements the NL Defendants signed preclude the arbitrators from giving effect to or being influenced by the events or results of the litigation.  (Docket Entry No. 50 at 9).  "The scope of an arbitration clause, like any contract provision, is a question of the intent of the parties."  *S.A. Mineracao da Trindade-Samitri v. Utah Int'l, Inc.*, 745 F.2d 190, 193 (2d Cir. 1984) (citing *Necchi S.P.A. v. Necchi Sewing Mach. Sales Corp.*, 348 F.2d 693, 696 (2d Cir. 1965); *accord Smith v. Transp. Workers Union of Am., AFL-CIO Air Transp. Local 556*, 374 F.3d 372, 374 (5th Cir. 2004) (citations omitted).  The parties to the 2005 and 2006 Arbitration Agreements anticipated that litigation involving the contribution obligations of nonsignatories would proceed in addition to arbitration proceedings resolving contribution obligations among the signatories.  The Arbitration Agreements provided that the parties would seek to stay only the litigation of the claims that were subject to arbitration.  The Arbitration Agreements also specifically provided that no arguments raised in, or court orders resulting from, litigation involving nonsignatories could have a preclusive or significant impact on the arbitration.

27

Given those provisions, the NL Defendants have not shown how permitting the nonarbitrable claims to continue will destroy the signatories' opportunity to arbitrate the arbitrable claims. At this time, there is an insufficient basis to stay the litigation to the extent it involves claims not subject to the arbitration agreements. *Cf. Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20 (1983) (noting that "federal law *requires* piecemeal resolution [of legal disputes] when necessary to give effect to an arbitration agreement") (emphasis in original; footnote omitted); *accord Hibbard Brown & Co., Inc. v. ABC Family Trust*, 959 F.2d 231, No. 91-1225, 1992 WL 69314, *3 (4th Cir. Apr. 8, 1992) ("[T]he Supreme Court expressly held in *Moses H. Cone Hosp.* that the risk of alienating related claims is a necessary misfortune resulting from federal law enforcing arbitration agreements.") (citations omitted); *see also Aluminum Co. of Am. v. Beazer E., Inc.*, 124 F.3d 551, 556 (3d Cir. 1997) (permitting the parties to try CERCLA liability claims while agreeing "that all non-liability issues, including determination of how much money any of the parties were entitled to collect from one another, would not be resolved by the court but would instead be settled in private arbitration or mediation").

The parties have not cited, and this court has not found, cases addressing stays of litigation pending arbitration involving arbitration agreements that, as in the present case, anticipated and limited the effect of pending or completed litigation on arbitration. To the contrary, the arbitration agreements in the cases cited by the NL Defendants do not appear to contain such language. *See Waste Mgmt., Inc.*, 372 F.3d at 340 (referring to "a broad agreement to arbitrate under the auspices of the International Chamber of Commerce");

28

*Subway Equip. Leasing Corp.*, 169 F.3d at 327 (requiring the signatories to arbitrate "[a]ny

controversy or claim arising out of or relating to this contract or the breach thereof")

(alteration in original).  There are CERCLA cases in which arbitration of some contribution

claims as to some parties has preceded contribution litigation as to other parties, but these

cases do not reveal whether the parties' arbitration agreements were similar to the agreements

Halliburton and the NL Defendants signed.  *See, e.g.*, *Ill. Tool Works, Inc. v. Coltec Indus.,*

*Inc.*, 31 F. Supp. 2d 1044 (N.D. Ill. 1998) (approving an arbitrator's CERCLA decision over

certain objections); *Rhone-Poulenc, Inc. v. Gould Elecs., Inc.*, No. C98-2871 THE, 1998 WL

704420 (N.D. Cal. Oct. 7, 1998) (same); *United States v. Gencorp, Inc.*, 935 F. Supp. 928

(N.D. Ohio 1996) (approving consent decree following arbitration, which was followed by

additional litigation to determine responsibility for clean-up costs); *United States v. Acton*

*Corp.*, 733 F. Supp. 869 (D.N.J. 1990) (same).

There is a risk that with both litigation and arbitration proceeding simultaneously, the

Arbitration Agreement signatories could be subject to contradictory discovery and scheduling

orders.[7]  The parties did not cite the risk of inconsistent discovery demands in the litigation

as opposed to the arbitration in their motions and briefs, but did raise it at oral argument.

There is a risk that discovery demands in the litigation may be inconsistent with limits on

---

[7]  Most cases dealing with discovery conflicts between simultaneously proceeding litigation and
arbitration address situations in which one arbitrating party invokes judicial enforcement of discovery against
another arbitrating party, *see, e.g.*, *Miss. Power Co. v. Peabody Coal Co.*, 69 F.R.D. 558, 566–68 (S.D. Miss.
1976), or against a third party, *see Integrity Ins. Co. v. Am. Centennial Ins. Co.*, 885 F. Supp. 69, 73
(S.D.N.Y. 1995).  In this case, potential for conflict exists between the arbitrating parties and the
nonarbitrating parties.

discovery in the arbitration. When contracting parties stipulate that disputes will be arbitrated, they agree to submit to arbitration procedures rather than court procedures. Full-scale discovery is not automatically available in arbitration. The unavailability of the full range of discovery devices and rights, with their attendant burdens and benefits, is a basic difference between arbitration and litigation. If an arbitrator either refuses to permit, or limits, discovery, courts will seldom order additional discovery in aid of arbitration if a party seeks such aid, to avoid wasteful dual discovery and to give effect to the arbitration process that the parties bargained for. But the nonsignatories did not agree to arbitration; they have a right to discovery under the Federal Rules of Civil Procedure, and Halliburton and the NL Defendants have a similar right to discovery as to the nonsignatories' crossclaims and counterclaims.

This court recognizes that there is a potential for conflict between the extent and timing of discovery between the litigation and the arbitration. There is a related risk that the timing of the litigation could be inconsistent with the arbitration schedule. The issue is whether this potential conflict is a sufficient basis to stay the litigation of claims that are not subject to arbitration—as well as the claims that are subject to arbitration—until the arbitration is finished.

This court concludes that given the express language in the 2005 and 2006 Arbitration Agreements insulating the arbitration from pending or completed litigation, the mere potential for conflicting discovery demands and schedules is an insufficient basis to stay the entire litigation pending completion of the arbitration. This court will, of course, stay the

litigation of the claims that are subject to arbitration.  But the present record does not show that allowing the litigation of the claims that are not subject to arbitration to proceed will disrupt, conflict with, or undermine the arbitration so as to deprive the signatories of their arbitration rights.  Instead, this court will take detailed and specific steps to monitor and manage the litigation to minimize the risk of conflicts between the litigation and the arbitration.  If despite these steps there are conflicts between the litigation and the arbitration that undermine the signatories' arbitration right, this court will reconsider its decision and exercise its discretion to stay all the claims in this case pending completion of the arbitration.[8]

This court will tailor the scheduling and docket control order in this case and closely monitor the discovery demands and responses to minimize any conflicts with, or disruptions to, the arbitration.  In order to achieve this, the parties must appear in court every 30 days for a regularly scheduled status conference.  The conferences will be held at **4:30 PM** on the following dates:

- Monday, August 28, 2006

- Monday, September 25, 2006

- Monday, October 23, 2006

- Monday, November 20, 2006

- Tuesday, January 2, 2007

---

[8] Georgia-Pacific's motion to realign the parties, (Docket Entry No. 47), is denied; the fact that the NL Defendants and Halliburton are proceeding to arbitration does not make them aligned as to the claims that are not subject to arbitration.

31

- Monday, February 5, 2007

- Monday, March 5, 2007

- Monday, April 2, 2007

- Tuesday, May 1, 2007

- Monday, June 4, 2007

If there is no issue that requires the court's involvement, the parties may notify the case manager and the hearing will be passed, but in its place the parties must submit a written report describing the status of the arbitration in relationship to the litigation.  If any party believes that a hearing is required before or in addition to a regularly scheduled hearing, that party may notify the other parties and case manager and a hearing will be set as soon as the court's schedule permits.

## IV.   Conclusion

The NL Defendants' motion to dismiss or transfer for improper venue is denied.  At this time, the  motion to stay the claims that are subject to arbitration under the parties' 2005 and 2006 Arbitration Agreements is granted and denied as to the claims that are not subject to arbitration.

The parties must appear in court every 30 days for a regularly scheduled status conference.  The conferences will be held at **4:30 PM** on the following dates: August 28, 2006; September 25, 2006; Monday, October 23, 2006; November 20, 2006; January 2, 2007; February 5, 2007; March 5, 2007; April 2, 2007; May 1, 2007; and June 4, 2007.  If there is no issue that requires the court's involvement, the parties may notify the case

manager and the hearing will be passed, but in its place the parties must submit a written report describing the status of the arbitration in relationship to the litigation.  If any party believes that a hearing is required before or in addition to a regularly scheduled hearing, that party may notify the other parties and case manager and a hearing will be set as soon as the court's schedule permits.

SIGNED on July 25, 2006, at Houston, Texas.

Lee H. Rosenthal
United States District Judge