**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| HALLIBURTON ENERGY SERVICES, INC., *et al.*, | § § § | |
| Plaintiffs, | § § | |
| VS. | § § | CIVIL ACTION NO. H-05-4160 |
| NL INDUSTRIES, *et al.,* | § § | |
| Defendants. | § | |
| | | |
| TRE MANAGEMENT COMPANY, | § § | |
| Plaintiffs, | § § | |
| VS. | § § | CIVIL ACTION NO. H-06-3504 |
| GEORGIA-PACIFIC CORPORATION, *et al.*, | § § § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

This opinion addresses motions to vacate and to confirm arbitration awards issued under the parties' postdispute arbitration agreement. The awards resolve which of the parties is responsible for paying response and remediation costs incurred under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9607, and the Arkansas Remedial Action Trust Fund Act (RATFA), Ark. Code Ann., 8-7-513. The following pending motions are resolved in this opinion:

    1.    The motion filed by NL Industries, Inc. ("NL"), Tremont, LLC ("Tremont"), TRE Holding Corporation ("TRE Holding"), and TRE Management Company

("TRE Management") (together, the "Tremont Parties") to confirm the arbitration awards issued on June 29, 2007 and September 10, 2007.[1] (Docket Entry No. 172).

2. The motion filed by Halliburton Energy Services, Inc. and DII Industries, LLC (together, "Halliburton") to vacate the arbitration awards issued on June 29, 2007 and September 10, 2007. (Docket Entry No. 176).

This court has carefully considered the motions in light of the pleadings, the motions and briefs, the record, and the applicable law. Mindful of the fact that the arbitrators have "wide latitude," *Am. Laser Vision, P.A. v. Laser Vision Inst., L.L.C.*, 487 F.3d 255, 257 (5th Cir. 2007) (per curiam), and the fact that the awards required the arbitrators to wrestle with what they characterized as "arcane issues of contract interpretation and environmental site allocation," this court grants the Tremont Parties' motion to confirm the arbitration awards

---

[1] Before the arbitration panel issued its second award on September 10, 2007, the Tremont Parties filed a motion to confirm the first award, issued on June 29, 2007. (Docket Entry No. 149). The Tremont Parties' arguments for enforcing the June 29, 2007 award are included in their later motion to confirm both that award and the September 10, 2007 award. The Tremont Parties' initial motion to confirm the first award is also resolved by this opinion.

After the Tremont Parties filed their initial motion to confirm, Halliburton filed a motion to vacate the first award, (Docket Entry No. 161), a motion to stay the second phase of the arbitration, (Docket Entry No. 159), and an "alternative request for relief in opposition to the Tremont Parties' motion to confirm" the June 29, 2007 award that argued that in the event the court denied the motion to vacate and the motion to stay, the motion to confirm ought to be denied as premature, (Docket Entry No. 162). In Halliburton's original motion to vacate the June 29, 2007 award, Halliburton argued, among other things, that the award should be vacated under 9 U.S.C. § 10(a) because it was allegedly procured by undue means. Specifically, Halliburton alleged that it was unable to use a key witness because the Tremont Parties had harassed him and made him unwilling to testify. The Tremont Parties responded to this argument in their opposition to the motion to stay, arguing that they had not engaged in misconduct, that Halliburton was the party who had engaged in misconduct, and that Halliburton had waived any claims on this issue by objecting to the panel questioning the witness. (Docket Entry No. 163). This court previously denied the original motion to vacate and the motion to stay the second phase of the arbitration. (Docket Entry No. 165). Halliburton did not raise this alleged misconduct as a ground for vacatur in its second motion to vacate both arbitration awards. (Docket Entry No. 176). Because this court has previously denied Halliburton's original motion to vacate the first award, and because Halliburton did not raise the argument for vacatur based on misconduct in its second motion for vacatur or seek relief on that basis, it does not require further discussion.

2

and denies Halliburton's motion to vacate the arbitration awards.[2] The reasons are explained in detail below.

## I.     Background

This court's July 2006 Memorandum and Opinion set out the relevant procedural background in detail. As in the January 2007 Memorandum and Order, that background is only summarized here. Briefly, Halliburton filed this suit in 2005 after entering into an Administrative Settlement Agreement in 2000 ("Administrative Settlement") and a Consent Administrative Order in 2003 with the Arkansas Department of Environmental Quality ("ADEQ"). In this suit, Halliburton alleged that it was entitled to recover money it had spent investigating and remediating environmental contamination at a site near the towns of Magnet Cove and Malvern, Arkansas ("the Site"). The Site was used for barite mining from the 1930s to the 1970s by the Baroid Sales Division of National Lead Company and by Magnet Cove Barium Corporation ("Magcobar").[3] (Docket Entry No. 176 at 2). According to Halliburton, the Site was also the location of a National Lead barite milling operation. (*Id.*). Halliburton explains that Magcobar transported its unprocessed ore off-site to Malvern for milling. (*Id.*). The mining and milling operations on the Site generated contaminated waste. (*Id.*). The surface mining operations resulted in an open pit that collected water,

---

[2] Also pending is the Tremont Parties' motion for sanctions against Georgia-Pacific Corporation and Milwhite, Inc. (Docket Entry No. 148). Counsel for the Tremont Parties advised that the issue giving rise to the motion was resolved. The motion for sanctions, and Milwhite, Inc.'s motion for leave to file a response to the motion for sanctions, (Docket Entry No. 160), are denied as moot.

[3] Magcobar was later acquired by Dresser Industries.

3

including acidic runoff generated from the waste.  (*Id.*).  According to Halliburton, the mine

pit is a lake "approximately 90 acres in surface area and more than 400 feet deep at its

deepest point."  (*Id.* at 3).

In 1988, NL entered into a series of transactions under a restructuring plan ("1988

Plan").  Through this plan, NL spun off its petroleum services business and transferred it to

a separate entity known as Baroid Corporation ("Old Baroid").  In 1990, pursuant to another

restructuring plan ("1990 Plan"), Old Baroid split up the titanium and bentonite business

from the Petroleum Services Business, defined as petroleum services operations, including

"Petroleum Services Assets" and "Petroleum Services Obligations."  Old Baroid retained the

titanium and bentonite business, spun off the Petroleum Services Business, and transferred

the Petroleum Services Business to a company named New Baroid.  Under the 1990 Plan,

a subsidiary of Old Baroid ultimately retained the titanium and bentonite business and New

Baroid received the Petroleum Services Business.   New Baroid is a predecessor of

Halliburton.  Old Baroid is a predecessor of the Tremont Parties.

Under the 2000 Administrative Settlement with the ADEQ, Halliburton and TRE

Management agreed to investigate the Site condition, submit a report to the ADEQ, and

complete a feasibility study on ways to remediate the environmental contamination on the

Site.  In the meantime, Halliburton and TRE Management had to perform "Interim Remedial

Measures" under the Administrative Settlement.  Under the Consent Administrative Order

executed in May 2003, TRE Management Company and Halliburton constructed and paid

for a water treatment system to treat and discharge water from the pit lake.

In April 2005, before this litigation began over responsibility for paying the costs of cleaning up the Site, TRE Management Company and Halliburton entered into a Cost Sharing, Cooperation, and Final Allocation Process Agreement (the "2005 Cost Sharing Agreement"). This 2005 Cost Sharing Agreement included a procedure to allow the parties to cooperate in continuing to fund the response and remediation costs for the Site, "allocating on an interim basis." The Agreement also set out a procedure for the parties to reach a "Final Allocation" of "their and others' respective shares of such past, present, and future costs, expenses, liabilities, settlements, recoveries, or unpaid shares relating to the Site." The Agreement defined "Final Allocation" as a "full, final, and binding apportionment among the Parties to the Agreement," by agreement or by arbitration, of defined categories of costs, including future costs. Under the Agreement, if mediation failed to reach "Final Allocation," the parties were required to participate in binding arbitration under the Commercial Arbitration Rules of the American Arbitration Association and the Federal Arbitration Act. The 2005 Cost Sharing Agreement recognized that there could be both arbitration among the signatories to resolve contribution disputes and contribution litigation involving nonsignatories. The Agreement set out limits on the admissibility in arbitration of any "order, judgment, decree, or decision of any court in any contribution litigation under CERCLA or RATFA involving one or more Parties to this Agreement that allocates to the Parties responsibility, fair share, or liability relating to the Site." Under the Agreement, the result of such contribution litigation

shall be ineffective, invalid, and of no force and effect as

between the Parties and shall not be used or admissible as
evidence in the Final Allocation Process by any Party or against
any Party for any purpose other than establishing the amount of
liability that has been finally allocated to non-Parties.  All
allocation of responsibility, fair share, or liability relating to the
Site as between the Parties, and all issues or disputes between
the Parties relating to whether a cost or expense is a Shared
Cost, the reasonableness of any cost or expense to be allocated
in the Final Allocation, and the allocability or collectibility of
any cost or expenses under CERCLA or RATFA, shall be
determined in the Final Allocation Process pursuant to this
Agreement without reference to, or consideration of, any
arguments made or conclusions reached in any such contribution
litigation.

(Docket Entry No. 221, Ex. D at 10–11).  Although the results of litigation could not be used

in an arbitration, the results of the arbitration would be admissible in litigation.

In 2005, Halliburton filed this suit against the Tremont Parties as the prior owners

operators of the Site when hazardous substances were released or as successors-in-interest

to owners or operators.  Halliburton also sued Georgia-Pacific Corporation, which owned

property and mineral interests at the Site, and Milwhite Inc., a past owner and operator of the

Site.  Halliburton asserted cost-recovery and contribution claims under CERCLA, 42 U.S.C.

§§ 9607(a) and 9613(f)(3)(B), contribution claims under RATFA, ARK. CODE ANN. §§ 8-7-

503 and 520, and a right to recover response and remediation costs under a state common-

law unjust enrichment cause of action.  Halliburton also sought a declaratory judgment that

the defendants were liable for future response and remediation costs at the Site and that

Tremont Corporation was obligated to indemnify Halliburton for these costs under the

contracts used to restructure the corporate predecessors-in-interest.  Georgia-Pacific and

Milwhite counterclaimed against Halliburton and crossclaimed against each other and against the codefendant Tremont Parties, seeking contribution and indemnity.

On December 27, 2005, a few weeks after this lawsuit was filed, TRE Management Company—which was also a party to the 2000 Administrative Settlement Agreement and the 2003 Consent Administrative Order—sued Georgia-Pacific in the federal district court for the Western District of Arkansas, where the Site is located.  In that suit, TRE Management sought contribution under CERCLA and RATFA for Georgia-Pacific's "proportionate share of all costs and expenses TRE Management has incurred and will continue to incur in performing removal actions and remedial actions at the Site."  (Docket Entry No. 38, Ex. E at 7–8).

In March 2006, after this lawsuit and the Arkansas lawsuit had been filed, Halliburton and the Tremont Parties entered into an agreement expanding the entities included in the agreement to arbitrate the allocation of response and remediation costs at the Site.  In this 2006 Arbitration Agreement, the parties agreed to "resolve through binding arbitration all claims between them related to the allocation of response and remediation costs incurred or to be incurred at the Site including the claims that have been asserted in the Texas Case or such claims that may be asserted in the Arkansas Case."  (Docket Entry No. 221, Ex. E at 2). The parties to the 2006 Arbitration Agreement include Halliburton Energy Services, Inc.; DII Industries, LLC; NL Industries, Inc.; Tremont, LLC; TRE Holding Corporation; and TRE Management Company.  The arbitration was to be conducted in accordance with the 2005 Cost Sharing Agreement, including the provisions on related contribution litigation.  (*Id.*, Ex.

7

E at 2).

## II.     The Arbitration Awards

The arbitration was conducted by a panel of three arbitrators ("the panel").  The arbitration was conducted in two phases, which were closely related and involved overlapping issues.  The panel considered "millions of pages of documents in the form of over 600 exhibits,"  heard ten live witnesses, read many affidavits, and viewed at least seven videotaped witnesses.  At the end of first phase, which the arbitrators and parties called the Contract Phase, the arbitrators issued a lengthy award focusing on the meaning and application of the 1990 Plan.  At the end of the second phase, termed the Allocation Phase, the arbitrators issued a second award addressing the allocation of the response and remediation costs among the parties to the 2005 Cost Sharing Agreement.  Both awards were "reasoned" and both were unanimous.

### A.     The Contract Award

The panel listed the "core issues" it analyzed in the Contract Phase:

> 1. Are the terms "surplus real property" and "Mining property, Malvern, Arkansas," ambiguous, thus requiring the Panel's consideration of extrinsic evidence to ascertain the intent of the parties?
>
> 2. What was the intent of the 1990 Plan insofar as the disposition of the "Mining property, Malvern, Arkansas?"
>
> 3. Which entity(-ies) own the various parcels comprising the "Mining property, Malvern, Arkansas," i.e., the so-called "190 acres," the "100 acres," the "Duratone plant" and the "Powder House?"

4. Was there a mutual or unilateral mistake justifying reformation of the 1990 Plan and, if so, does the 2002 Delaware Supreme Court decision in *Halliburton Company et al v Highlands Insurance Group, Inc., et al* preclude the Panel from reforming the contract?

5. Regardless of property ownership, does any party owe one or more of the opposing parties indemnification pursuant to the 1990 Plan of Restructuring?

(Docket Entry No. 172, Ex. 2 at 2).  The terms "surplus real property" and "Mining property, Malvern, Arkansas" were important in interpreting the 1990 Plan, which split up the Petroleum Services Business and the bentonite/titanium business of Old Baroid, and transferred the Petroleum Services Business, including the "Petroleum Services Assets" and "Petroleum Services Obligations," to New Baroid, a Halliburton predecessor.  Exhibit A to the 1990 Plan defined "Assets Which Shall Not Constitute 'Petroleum Services Assets.'"  Exhibit A listed "surplus real property and related improvements" as assets excluded from the Petroleum Services Assets being transferred as part of the Petroleum Services Business to New Baroid.  Among those "surplus" real properties was "Mining property, Malvern, Arkansas."  Because the transfer of ownership as well as indemnification liability under the 1990 Plan focused on the transfer of the Petroleum Services Assets and Obligations, and because it was asserted that the Site at issue in the arbitration was at least partially contained in the "Mining property, Malvern, Arkansas," the panel analyzed the meaning of the terms "Mining property, Malvern, Arkansas" and "surplus real property."  The panel closely examined the 1990 Plan and the surrounding circumstances to determine the parties' intent

9

in transferring property and liabilities under the 1990 Plan, the ownership of the property transferred, and the indemnification obligations associated with the property.

The panel interpreted the restructuring contracts using Delaware law.  (*See* Docket Entry No. 172, Ex. 2 at 2).  The panel found that the phrases "surplus real property" and "Mining property, Malvern, Arkansas" in the contracts were ambiguous, allowing the panel to consider extrinsic evidence to determine the parties' intent.  (*Id.*, Ex. 2 at 3).  The panel focused on the parties' activities for the two months after the 8/31/1990 effective date of the 1990 Plan, which the parties agreed was the controlling document.  (*Id.*, Ex. 2 at 2).

The panel heard extensive testimony and received voluminous documents and briefs. During the Contract Phase, the witnesses included:

- Steven L. Watson, an executive affiliated with NL Industries, Inc. and (Old) Baroid Corporation prior to the time of the 1988 and 1990 Plans of Restructuring;

- J. Landis Martin, Chairman of (Old) Baroid Corporation at the time of the 1990 Plan of Restructuring;

- Ann Manix, a member of the Board of Directors of (Old) Baroid Corporation from April 1990 through the effective date of the 1990 Plan, and beginning in 1990, a director of New Baroid Corporation;

- William Lindquist, the tax manager for Baroid Corporation's titanium metals business, the Titanium Metals Corporation ("TIMET"), during the time of the 1990 Restructuring;

- Joseph Compofelice (via video), former CFO of Baroid Corporation;

- Joseph Taylor (via video), a Halliburton executive;

- Harold Simmons (via video), a member of the Board of Directors of Baroid Corporation beginning in 1988, Chairman of the Board of Directors of Old

Baroid from 1988–1990, and former director and Chairman of the Board of Directors of NL Industries, Inc.

- Paul Mills (via video), an employee of Halliburton who formerly worked for the Baroid division of NL Industries;

- John Firestone (via video), a former plant manager of the Duratone Plant;

- Edward Groff (via video), an attorney employed by Halliburton's legal department; and

- Andrew Brodkey (via video), former general counsel of BHP Copper Company (allegedly the largest copper mining company in the United States), and current director of mining sales for CB Tertro Dallas (a real estate company involved in purchasing and selling mines).

The panel concluded that the 1990 Plan, related documentation, and credible testimony established that "the [parties'] overall intent was to separate the petroleum services operations of the 'old' Baroid Corporation and its titanium metals operations and bentonite mining operations into two publicly-traded companies." (Docket Entry No. 172, Ex. 2 at 3). The panel found that this was accomplished by "a reverse spinoff of the petroleum services operation into the recently formed New Baroid Corporation (8/15/1990), which was to assume virtually [all] of the assets and obligations of the pre-existing petroleum services business of old Baroid Corporation." (*Id.*, Ex. 2 at 3–4). An exhibit to the 1990 Plan listed exceptions to the assets to be assigned to New Baroid, defined as "Assets Which Shall Not Constitute Petroleum Services Assets." (*Id.*, Ex. 2 at 4). The panel found that "[t]hose Assets were included in five sub-categories, the first of which included 11 items described as 'surplus real property and related improvements,'" one of which was "Mining property, Malvern, Arkansas." (*Id.*, Ex. 2 at 4). The panel noted that "Mining property, Malvern,

Arkansas" was not defined in the 1990 Plan.  (*Id.*, Ex. 2 at 4).  "Curiously, there was no real property description, chain of title information, metes and bounds descriptions or even a map which would depict the meaning of the phrase."  (*Id.*, Ex. 2 at 4).

The panel defined the dispute as largely centered on whether the open barite mining Pit was part of continuing petroleum services operations or whether it was "surplus."  (*See* Docket Entry No. 172, Ex. 2 at 5).  The resolution of that issue was important to determining whether the Pit and associated environmental liabilities were transferred to New Baroid or remained with Old Baroid in the 1990 Plan of Restructuring.  Because Exhibit A to the 1990 Plan excluded "surplus real property," including "Mining property, Malvern, Arkansas," from the Petroleum Services Assets being transferred to New Baroid, and because New Baroid acquired the Petroleum Services Business through the 1990 Plan, it was important to determine whether the Pit was part of "Mining property, Malvern, Arkansas."  The panel heard testimony on the meaning of "surplus."  (*See id.*, Ex. 2 at 5).  The testimony included evidence about a piece of property at a site in Potosi, Missouri that was identified as "surplus" in the same manner as the property in Malvern, Arkansas in the 1990 Plan's Exhibit A.  (*Id.*, Ex. 2 at 6).  After considering the evidence, the panel concluded that "surplus real property" meant "property which was not needed for the current operations of the petroleum service business."  (*Id.*, Ex. 2 at 6).

The panel then reviewed the parties' actions following the August 1990 execution of the 1990 Plan to determine "how the parties operated to demonstrate their intent with regard to the disposition of the 'Mining property, Malvern, Arkansas.'"  The panel set out the

following chronology of corporate transactions that occurred within 60 days after the Plan's

effective date:

      1. 8/15/1990 - New Baroid Corporation is incorporated.

      2. 8/31/1990 - Plan of Restructuring is effective.

      3. 9/12/1990 - Warranty deed transferring 190 acres from Baroid Drilling Fluids, Inc. ("BDFI") to Bentonite Corporation.

      4. 9/20/1990 - Bob Leidich drafts name change document for Baroid Management Company.

      5. 9/26/1990 - New Baroid Corporation Credit Agreement with the Chase Manhattan Bank.

      6. 10/3/1990 - Baroid Management Company changes its name to TRE Management Company through a filing with the Delaware Secretary of State.

      7. 10/5/1990 - Baroid Management Company is created as a wholly owned subsidiary of New Baroid Corporation.

      8. 10/19/1990 - Corrective Deed is filed by Robert Leidich which indicates that Baroid Management Company is proper grantee and not Bentonite Corporation.

      9. 10/29/1990 - Baroid Corporation Information Statement.

(Docket Entry No. 172, Ex. 2 at 6–7). Based on this chronology, the panel concluded that

the "proper titleholder" to the 190 acres transferred by the Warranty Deed and the Corrective

Deed in 1990, including most of the Pit, was the "new" Baroid Management Company. (*Id.*,

Ex. 2 at 7). The panel based this conclusion on the fact that "at the time of the Corrective

Deed dated October 19, 1990, old Baroid Management Company had already formally

changed its name to TRE Management Company by virtue of its Secretary of State filing on

13

October 3, 1990." (*Id.*, Ex. 2 at 7). The panel held: "Consequently, the only Baroid Management Company existing on October 19, 1990, was the new Baroid Management Company. Accordingly, the Corrective Deed clearly transferred the pit property to new Baroid Management Company." (*Id.*, Ex. 2 at 7). The panel also found that because Robert Leidich was involved in all of the transactions, the possibility of a mistake as to the "true" Baroid Management Company was highly unlikely. (*Id.*, Ex. 2 at 7).

The panel also examined the ownership of other parts of the Site that were in dispute, including the Duratone Plant and the "100 Acres." (*Id.*, Ex. 2 at 9). The panel concluded that Halliburton Energy Services, Inc. ("HESI") owned this property but that under paragraph 11 of the 1990 Plan, Halliburton was entitled to indemnification as to the 100 Acres. (Docket Entry No. 172, Ex. 2 at 10). In analyzing the indemnification obligation for the 100 Acres, the panel again emphasized that obligations associated with "surplus real property" were among those "Obligations Which Shall Not Constitute 'Petroleum Services Obligations.'" (*Id.*, Ex. 2 at 14). The panel found that indemnification obligations owed by Old Baroid to New Baroid would become the obligations of Old Baroid's successors, and that the indemnification obligations owed to NL under the 1988 Plan, or owed by New Baroid to Old Baroid under the 1990 Plan, would become the obligations of New Baroid's successors. (*Id.*, Ex. 2 at 14–15). Noting that Halliburton had admitted that HESI is the successor to New Baroid, the panel concluded that Tremont, LLC was the successor to Old Baroid. (*Id.*, Ex. 2 at 15). As New Baroid's successor and the owner of the real estate at issue, HESI was obligated to indemnify Old Baroid's successors, but not as to the 100 Acres because it was

"surplus property" not transferred to New Baroid in 1990. (*Id.*, Ex. 2 at 10, 16).  The panel determined that HESI was obligated to indemnify NL for liabilities described in paragraph 2.2 of an Amended and Restated Cross-Indemnification Agreement, including, without limitation, paragraph 2.2(a) and (b), with the exception of the 100 Acres.  (*Id.*, Ex. 2 at 16).  The panel concluded that as Old Baroid's successor, Tremont, LLC, was obligated to indemnify HESI under paragraph 11 of the 1990 Plan for obligations relating to the 100 Acres.  (Docket Entry No. 172, Ex. 2 at 11, 16).

In July 2007, after the panel issued the Contract Award, the parties reached a Stipulation Regarding Response Costs.  The panel explained:

> Through a Stipulation Regarding Response Costs effective July 12, 2007, the Parties stipulated that Tremont, LLC has paid 50% of the total amount of $17,300,000 in Shared Costs and Reserve Costs as such terms are defined in the Cost Sharing Agreement.
>
> The Parties stipulated that Halliburton Energy Services, Inc. (HESI) has paid 50% of the total amount of $17,300,000 in Shared Costs and Reserve Costs.  The Parties also agreed that the balancing provided in Section 8 of the Cost Sharing Agreement is based upon [the] $17,300,000 figure.
>
> Through a Stipulation Regarding Attorneys Fees and Legal Costs and Pre and Post Judgment Interest effective August 16, 2007, the Parties agreed that the total amount of recoverable attorney fees and AAA costs is $500,000.

(Docket Entry No. 172, Ex. 1 at 2).  In addition to setting forth the agreed amount of attorneys' fees and arbitration costs, the Stipulation Regarding Attorneys Fees and Legal Costs and Pre- and Post Judgment Interest stated that the parties agreed that "the pre- and post judgment interest rates shall be set at a simple rate of six percent (6%) per annum."

(Docket Entry No. 181, Ex. NN).  The parties further agreed that "any pre-judgment interest awarded shall be calculated from December 9, 2005 though August 31, 2007," and that "[n]otwithstanding this Stipulation, each party reserves its rights to contend that pre-judgment interest should not be awarded to the other party."  (*Id.*, Ex. NN).

### B.    The Allocation Award

The second phase of the arbitration, the "Allocation Phase," resolved "the respective allocation related to response costs" under CERCLA and RATFA.  The panel considered submissions to the ADEQ; expert reports and testimony from Dr. Stephens and Matt Low (on Halliburton's behalf) about the geology/hydrogeology conditions of the Site and about allocation methodology; expert reports and testimony from Dr. Davis and Dr. Johns (on the Tremont Parties' behalf) about the generation of low pH water (ARD); fact testimony from Margaret Denise Ashley Tuck, senior special projects manager for the global Health, Safety, and Environment group of Halliburton Energy Services, and Robert Sherman, global HSE manager for Halliburton, responsible for overseeing due diligence and remediation for Halliburton; maps; documents; and depositions.  The panel again considered a voluminous record of documents, testimony, and briefs.

The panel issued its "Allocation Award" on September 10, 2007.  (Docket Entry No. 172, Ex. 1).  In its award, the panel noted that the parties had agreed that the following factors were relevant to determining allocation:

> 1.    The ability of the parties to demonstrate that their contribution to the site can be distinguished;

16

2.      The amount of hazardous waste involved;

3.      The degree of toxicity of the hazardous waste involved;

4.      The degree of involvement by the parties in the generation, transportation, treatment, storage or disposal of the hazardous waste;

5.      The degree of care exercised by the Parties with respect to the hazardous waste concerned, taking into the account the characteristics of the hazardous waste; and

6.      The degree of cooperation of the parties with the federal, state and local officials to prevent any harm to the public health or the environment.

(*Id.*, Ex. 1 at 4–5).

The panel found the last factor, cooperation with government authorities, to be neutral; both the Tremont Parties and Halliburton had made reasonable efforts to cooperate with the ADEQ. (*Id.*, Ex. 1 at 7). With respect to the first factor, the ability to distinguish contributions to the Site's conditions, the panel concluded that divisibility was not an appropriate allocation method. (*See id.*, Ex. 1 at 7–8). The panel emphasized that the Site presented "unusual obstacles in determining allocation," given that the Pit Lake, the "primary environmental harm," was fed by periodic precipitation resulting in low pH water from the "spoils areas" entering the lake; the terrain was uneven; there was a history of significant changes to the landscape; and there was a history of separate mining operations. (*Id.*, Ex. 1 at 5). As a result, the divisibility evidence regarding the 100 Acres presented by an expert for the Tremont Parties was "insufficient to meet the standard in CERCLA case law." (*Id.*, Ex. 1 at 6). The panel adopted a "generation of spoils" allocation theory, approving Dr.

Stephens's expert opinion that "the NL parties generat[ed] approximately 90.5% of the spoils and Halliburton (Magcobar) generat[ed] approximately 9.5% of the spoils." (Docket Entry No. 172, Ex. 1 at 8).  However, the panel also recognized that CERCLA permits private parties to allocate responsibility through indemnification agreements. (*Id.*, Ex. 1 at 10).  The panel rejected Halliburton's arguments that the parties' Cost Sharing Agreement required the panel to apportion costs under CERCLA without regard to any contractual indemnity obligations between the parties. (*Id.*, Ex. 1 at 10).  The panel rejected Halliburton's argument that the panel could not consider indemnification obligations under the 1988 and 1990 Plans but was first required to apportion response costs solely under CERCLA. (*Id.*, Ex. 1 at 10). In analyzing the parties' predecessors' contracts, which provided for indemnification obligations "with respect to liabilities and obligations associated and transferred with the Petroleum Services Business at issue, and which were assumed by the successors to that business," the panel found that the contracts "contained a clear and unequivocal expression of intent to cover the costs of the liability in question, i.e., all costs associated with remediating the leased properties and the 100 acres." (*Id.*, Ex. 1 at 12).  The panel concluded that the parties to the 1988 and 1990 Plans "intended that the successors to the Petroleum Services Business were accepting responsibility for, and indemnifying their predecessors against, all such liability and associated costs." (*Id.*, Ex. 1 at 12).

The panel analyzed whether the Tremont Parties had any responsibility for the response costs relating to the leased properties at the Site and relating to the 100 Acres.  As to both, the panel determined that Halliburton was obligated to indemnify the Tremont

Parties for the response costs, past and future.   The panel found that the testimony consistently explained that all of NL's historical liabilities associated with the Petroleum Services Business were transferred to New Baroid in 1990.  (*See* Docket Entry No. 172, Ex. 1 at 16).   The panel concluded that "the leased properties and licenses of NL, and subsequently 'Old' Baroid, were indeed an integral part of the petroleum services business of NL, and the resultant liabilities and obligations were assumed by NLPS and New Baroid, respectively, as a result of the plans of restructuring."  (*Id.*, Ex. 1 at 19).   The panel summarized the restructuring plans as follows: "Old Baroid was obligated to indemnify New Baroid with regard to all such liabilities and obligations related to the Titanium and Bentonite Businesses, and likewise New Baroid was obligated to indemnify Old Baroid with respect to all liabilities and obligations attributable to the Petroleum Services Business."  (*Id.*, Ex. 1 at 28).

As to the leased properties and the licenses related to the Site, the panel concluded that they were included in the Petroleum Services Business and operations transferred to New Baroid, rejecting Halliburton's argument that the leased properties and licenses should be considered "surplus real property."  (*Id.*, Ex. 1 at 17–18).   The panel concluded that the liabilities and obligations for the leased properties and licenses were assumed by New Baroid.  (*Id.*, Ex. 1 at 19).   The panel rejected Halliburton's argument that its liability relating to specific property depended on proof that the property had actually transferred to NL as part of the 1988 restructuring.  (*Id.*, Ex. 1 at 20–21).   The panel also rejected Halliburton's argument that any license or leasehold interest that expired or terminated before 1988 was

19

not subject to indemnification obligations.  (*See* Docket Entry No. 172, Ex. 1 at 27).  The panel concluded that "all of the leased properties and license agreements, whether expired or terminated prior to 1988, arose out of, or were otherwise attributable to, the past, present or future ownership or operations of the petroleum services business to which HESI is the successor."  (*Id.*, Ex. 1 at 27).

As to the 100 Acres, the panel recognized that it had concluded in the Contract Phase of the arbitration that this property was "surplus real property" included within the "Mining property, Malvern, Arkansas," and "excluded from transfer to New Baroid."  (*Id.*, Ex. 1 at 28).  The panel had found in the Contract Phase that although Halliburton owned the 100 Acres, the liabilities associated with the 100 Acres were subject to the indemnification obligations of the Tremont Parties' predecessor (Old Baroid).  (*See id.*, Ex. 2 at 10–11).  The panel had concluded that although Halliburton owned this property, under paragraph 11 of the 1990 Plan, Halliburton was entitled to indemnification as to obligations associated with the 100 Acres.[4]  (*Id.*, Ex. 2 at 10–11).  The panel made this determination on indemnification

---

[4] Paragraph 11 of the 1990 Plan provides:

> The Company [Old Baroid] shall indemnify and hold New Baroid harmless from, against and in respect of all Obligations, and all costs and expenses (including attorneys, fees) related thereto, arising out of, or which are otherwise attributable to (a) the Company's past, present or future operations, other than those Obligations which constitute Petroleum Services Obligations, and (b) the transactions contemplated hereby, other than New Baroid's Obligations under the New Baroid Credit Facility and those Obligations which constitute Petroleum Services Obligations. Without limiting the generality of the foregoing, the Company shall indemnify New Baroid for the following:
>
> (i) all Obligations arising out of, or which are otherwise attributable to, sites or facilities or with respect to operations not attributable to the Petroleum Services Business, including claims arising out of or relating to

by concluding that the 1990 Plan established that at least some portion of "Mining property, Malvern, Arkansas" was "surplus" and excluded from the transfer of the Petroleum Services Business to New Baroid, and that "[t]he only remaining property that could qualify under any meaningful definition of the term 'surplus' is the 100 acres which was not transferred to new Baroid Management Corporation in October 1990." (*See id.*, Ex. 2 at 10). The panel found that "this paragraph 11 indemnification by Tremont would apply regardless of the current title ownership of the 100 acres property." (Docket Entry No. 172, Ex. 2 at 11). In the Allocation Phase, however, the panel emphasized that the conclusion on paragraph 11 indemnification had resulted from the focus in the Contract Phase on ownership interests. (*Id.*, Ex. 1 at 27–28). In the Allocation Phase, by contrast, the focus was on the allocation of liability among the parties acquiring the businesses transferred in the 1988 and 1990 restructuring agreements. The panel concluded that the 1990 Plan:

> contemplated the separation of NL's Petroleum Services Business, on the one hand, and NL's Titanium and Bentonite

---

the offsite deposit, placement or disposal by the Company or the Titanium or Bentonite Businesses of any materials of any character whatsoever generated at such sites or by such operations;

(ii) all Obligations relating to any products the manufacture of which, or accounts receivable relating thereto, are not attributable to the Petroleum Services Business;

(iii) all Obligations relating to health care and life insurance benefits for all employees of the Company or any of its subsidiaries, including employees at sites or facilities or of operations attributable to the Petroleum Services Business, who retire prior to the Effective Date; and

(iv) all Obligations relating to benefits accrued under retirement plans, pension plans or any employee benefit plans of the Company for employees or former employees at sites or facilities or of operations not attributable to the Petroleum Services Business.

(Docket Entry No. 176, Ex. 5 at 8).

Businesses, on the other, into two publicly traded companies. . . . The obvious import of the respective indemnity obligations of both Old Baroid and New Baroid under the 1990 Plan was to allocate all liabilities and obligations associated with the respective businesses to the parties acquiring that business.

Consequently, Old Baroid was obligated to indemnify New Baroid with regard to all such liabilities and obligations related to the Titanium and Bentonite Businesses, and likewise New Baroid was obligated to indemnify Old Baroid with respect to all liabilities and obligations attributable to the Petroleum Services Business. Thus, to the extent that any liability attributable to the 100 Acres is associated with the business retained by Old Baroid, indemnification of HESI as the successor to New Baroid would be warranted. Conversely, any liability associated with the petroleum services operations transferred to New Baroid would trigger HESI's indemnity obligations to Old Baroid (Tremont).

(*Id.*, Ex. 1 at 28–29). The panel concluded that the evidence showed that the 100 Acres was used solely for passive disposal of spoils and tailings from past mining and milling operations of NL, which were part of the Petroleum Services Business transferred to New Baroid and ultimately HESI. (*Id.*, Ex. 1 at 29). As a result, Halliburton was required to indemnify the Tremont Parties for costs relating to the 100 Acres. (*Id.*, Ex. 1 at 29–30). The panel did not change its conclusion from the Contract Phase to the Allocation Phase that Halliburton owns the 100 Acres. (*Compare* Docket Entry No. 172, Ex. 2 at 10 ("Title to the so-called 100 acres is also currently vested in Halliburton Energy Services, Inc. . . . ."), with Docket Entry No. 172, Ex. 1 at 28 ("Concerning ownership of the 100 Acres, however, the evidence was clear that title is vested in HESI.")). Nor did the panel change its conclusion that the indemnification obligation depended in part on whether obligations associated with

the 100 Acres were "Petroleum Services Obligations" transferred as part of the Petroleum Services Business to New Baroid.  (*Compare* Docket Entry No. 172, Ex. 2 at 11 ("[A]ll obligations associated with the 100 acres would constitute 'Obligations Which Shall Not Constitute 'Petroleum Services Obligations,'' and would therefore be subject to old Baroid Company's (Tremont) indemnification of New Baroid under paragraph 11 of the 1990 Plan,") with Docket Entry No. 172, Ex. 1 at 29–30 ("[T]he Panel is satisfied that the 100 Acres constitutes one of the 'sites or facilities or . . . operations attributable to the Petroleum Services Business,' and that liability at issue in this arbitration with respect to the Site derives from 'claims arising out of or relating to the deposit, placement or disposal of any material of any character whatsoever generated at such sites or by such operations,' thereby subject to the indemnification obligations owed by HESI to the Tremont Parties under paragraph 12.(i). of the Plan.")).  The determination in the Allocation Phase that obligations associated with the 100 Acres were in fact transferred to New Baroid (Halliburton) as a Petroleum Services Obligation implicated indemnity obligations under paragraph 12 of the 1990 Plan.[5]

---

[5] Paragraph 12 of the 1990 Plan provides:

> New Baroid shall indemnify and hold the Company [Old Baroid] harmless from, against and in respect of, all Obligations, and all costs and expenses (including attorneys' fees) related thereto, which constitute Petroleum Services Obligations.  Without limiting the generality of the foregoing, New Baroid shall indemnify the Company for the following:
>
> (i) all Obligations arising out of, or which are otherwise attributable to, sites or facilities or with respect to operations attributable to the Petroleum Services Business, including claims arising out of or relating to the deposit, placement or disposal of any material of any character whatsoever generated at such sites or by such operations;
>
> (ii) all Obligations relating to products the manufacture of which, or accounts receivable relating thereto, are attributable to the Petroleum Services Business;

The panel declined to allocate responsibility with respect to entities that were not parties to the arbitration agreements even if these entities were parties to the related contribution litigation. The panel concluded that it did not have authority under the agreements to make findings as to the liability of nonsignatories. (Docket Entry No. 172, Ex. 1 at 34).

The panel also allocated attorneys' fees. The parties stipulated that the attorneys' fees were $500,000 per side and that the amounts were reasonable. (*Id.*, Ex. 1 at 35). The panel found that Tremont, LLC was entitled to reimbursement for attorneys' fees and legal expenses in the amount of $500,000. (*Id.*, Ex. 1 at 38).

The panel concluded that Halliburton was required to reimburse the Tremont Parties for response costs in the amount of $8,650,000. (*Id.*, Ex. 1 at 37). The panel also awarded Tremont, LLC $897,231.52 in prejudgment interest, as well as postjudgment interest. (*Id.*, Ex 1 at 37). The panel awarded the Tremont Parties $500,000 in attorneys' fees and legal expenses. (*Id.*, Ex. 1 at 38). The panel awarded a total of $10,047,231.50 to the Tremont Parties, plus costs incurred after June 30, 2007 and legal expenses incurred after August 31, 2007. (Docket Entry No. 172, Ex. 1 at 39). The panel found that postjudgment interest

---

(iii) all Obligations relating to retirement health care and life insurance benefits for all employees of the Company or its subsidiaries at sites of facilities or of operations attributable to the Petroleum Services Business who retire on or after the Effective Date; and

(iv) subject to Section 11(iii) above, any liabilities relating to benefits accrued under retirement plans, pension plans or any employee benefit plans of the Company for employees or former employees at sites or facilities attributable to the Petroleum Services Business.

(Docket Entry No. 176, Ex. 5 at 8–9).

would accrue at a rate of 6% per year on the total judgment, beginning September 1, 2007. (*Id.*, Ex. 1 at 39).

## III.    The Motions to Confirm and Vacate the Arbitration Awards

The Tremont Parties moved to confirm the arbitration awards under the Federal Arbitration Act, the parties' arbitration agreement, and this court's orders relating to the arbitration of claims between Halliburton and the Tremont Parties.  (Docket Entry No. 172). Halliburton responded and moved to vacate the arbitration awards.  (Docket Entry No. 176). Halliburton's motion asserts the following errors in the arbitration awards:

> 1. The panel manifestly disregarded the law regarding contract interpretation.
>
> 2. The panel manifestly disregarded Arkansas law regarding real property deeds.
>
> 3. The panel manifestly disregarded federal statutory law in awarding prejudgment interest to the Tremont Parties.
>
> 4. The panel manifestly disregarded procedural law by disregarding its bifurcation of the arbitration into two distinct phases.
>
> 5. The panel manifestly disregarded procedural law by reopening the evidence in the Allocation Phase to allow supplementation of the record relating to the Contract Phase.
>
> 6.  The panel manifestly disregarded procedural law because one of the arbitrators failed to disclose a previous relationship with NL Industries, Inc.

(*See generally* Docket Entry No. 176).   The Tremont Parties' briefing in support of confirming the awards focuses on the following arguments:

> 1. Halliburton has failed to recognize consistent precedent that requires an "exceedingly deferential" standard to be applied to the review of arbitrators' decisions.

2. The panel properly interpreted the relevant contracts and did not manifestly disregard the law of contract construction.

3. The panel properly interpreted Arkansas real property law.

4. The panel properly awarded interest in favor of the Tremont Parties.

5. Even if the panel manifestly disregarded contract and real estate law, Halliburton has not suffered "substantial prejudice."

6. The panel did not disregard procedural law because the two awards are not inconsistent, there was no violation of the panel's bifurcation order, and there is no merit to Halliburton's assertion that it was error to clarify the Contract Award in the Arbitration Award.

7. Halliburton's assertion that one of the arbitrators failed to disclose a previous relationship with one of the parties lacks merit.

(*See generally* Docket Entry No. 181).  These motions and responses are analyzed below.

## IV.   The Legal Standard for Confirming or Vacating an Arbitration Award

The Federal Arbitration Act provides four statutory grounds for vacating an award:

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; [and]

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

26

9 U.S.C. § 10(a).

In addition to the statutory grounds for vacatur, the Fifth Circuit has authorized vacatur if an arbitrator manifestly disregards clearly applicable law. *Brabham v. A.G. Edwards & Sons Inc.*, 376 F.3d 377, 387 (5th Cir. 2004) ("[J]udicial review of an award's rationality must be confined to situations in which the party challenging the award can prove that clearly applicable law or the parties' contract indisputably dictates a contrary result."). The Supreme Court very recently reemphasized the narrowness of the grounds for vacatur. In *Hall Street Assocs., L.L.C. v. Mattel, Inc.*, No. 06-989, __ S. Ct. __, 2008 WL 762537, at *2 (March 25, 2008), the court stated that the statutory bases for vacatur under the Federal Arbitration Act are exclusive. The Court rejected an argument that a statement from *Wilko v. Swan*, 346 U.S. 427 (1953), that "the interpretations of the law by the arbitrators in contrast to manifest disregard [of the law] are not subject, in the federal courts, to judicial review for error in interpretation," expanded both judicial grounds for vacatur and contracting parties' ability to add grounds for vacatur beyond those provided in the FAA. *See Hall Street Assocs.*, 2008 WL 762537, at *5. The Court held that the use of the phrase "manifest disregard" in the *Wilko* case was vague. *Id.* The Court stated that it was unclear in *Wilko* whether the "term 'manifest disregard' was meant to name a new ground for review," or whether "it merely referred to the § 10 grounds collectively, rather than adding to them." *Id.* (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 656 (1985) (Stevens, J., dissenting)). The Court continued: "Or, as some courts have thought, 'manifest disregard' may have been shorthand for § 10(a)(3) or § 10(a)(4), the

27

subsections authorizing vacatur when the arbitrators were 'guilty of misconduct' or 'exceeded their powers.'" *Id.* (citing *Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*, 341 F.3d 987, 997 (9th Cir. 2003)).  The Court noted that in the past, it had "merely taken the *Wilko* language . . . without embellishment, *see First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 942 (1995) . . ., and now that its meaning is implicated, we see no reason to accord it the significance that Hall Street urges."  *Hall Street Assocs.*, 2008 WL 762537, at *5.  The *Hall Street Associates* Court emphasized the limited review afforded to arbitration decisions.  "Instead of fighting the text [of the FAA], it makes more sense to see the three provisions, §§ 9–11, as substantiating a national policy favoring arbitration with just the limited review needed to maintain arbitration's essential virtue of resolving disputes straightaway.  Any other reading opens the door to the full-bore legal and evidentiary appeals that can 'rende[r] informal arbitration merely a prelude to a more cumbersome and time-consuming judicial review process,' *Kyocera*, 341 F.3d at 998; *cf. Ethyl Corp. v. United Steelworkers of Am.*, 768 F.2d 180, 184 (7th Cir. 1985), and bring arbitration theory to grief in post-arbitration disputes."  *Id.* at *7.

The Supreme Court's decision in *Hall Street Associates* calls into question whether the manifest disregard standard is a ground for vacatur separate from the statutory grounds for vacatur under the FAA, as the Fifth Circuit has previously stated, or a way of summarizing two or more of those statutory grounds.  In the context of considering whether private parties may contract for greater review of an arbitration decision by a district court than is provided for in the FAA, the Court stated that the statutory bases are exclusive

28

grounds for vacatur.  *Hall Street Assocs.*, 2008 WL 762537, at *4.  The Court declined to
extend the "manifest disregard" standard to permit parties to contract for greater judicial
review of arbitration awards than the FAA recognizes.  *See id.* at *5.

Although the Fifth Circuit has previously stated that "manifest disregard" is separate
from the statutory bases for vacatur, the courts have repeatedly admonished that
"extraordinarily narrow" judicial review is an essential, and inherent, feature of contractually
agreed binding arbitration, necessary to avoid undermining the "twin goals of arbitration .
. . settling disputes efficiently and avoiding long and expensive litigation."  *In the Matter of
the Arbitration Between: Trans Chem. Ltd. & China Nat'l Mach. Imp. & Exp. Corp.*, 978 F.
Supp. 266, 303 (S.D. Tex. 1997) (citation omitted), *aff'd*, 161 F.3d 314 (5th Cir. 1998).  The
Fifth Circuit recently described the extremely deferential review given to arbitrators'
decisions in a way that is not inconsistent with *Hall Street Associates*:

> Judicial review of an arbitration award is exceedingly
> deferential.  Vacatur is available only on very narrow grounds,
> and federal courts must defer to the arbitrator's decision when
> possible.  An award must be upheld as long as it is rationally
> inferable from the letter or purpose of the underlying agreement.
> Even the failure of an arbitrator to correctly apply the law is not
> a basis for setting aside an arbitrator's award.  It is only when
> the arbitrator strays from interpretation and application of the
> agreement and effectively dispense[s] his own brand of
> industrial justice that his decision may be unenforceable.

*Am. Laser Vision*, 487 F.3d at 258–59 (internal quotation marks and citations omitted).  The
court continued: "Vacatur based on an arbitrator's manifest disregard of the law . . . is
extremely narrow, insisting on 'more than error or misunderstanding with respect to the law.

The error must have been obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator.'" *Id.* at 259 (quoting *Prestige Ford v. Ford Dealer Computer Servs., Inc.*, 324 F.3d 391, 395–96 (5th Cir. 2003)).   "[O]nce a manifest disregard is established, the court also 'must find that the award resulted in a 'significant injustice'' in order to grant relief." *Id.* (quoting *Kergosien v. Ocean Energy, Inc.*, 390 F.3d 346, 355 (5th Cir. 2004)).

Because the Supreme Court did not expressly decide whether the "manifest disregard" standard remains a separate basis for federal court review of arbitration decisions in at least some circumstances; because the Fifth Circuit has often approved of reviewing arbitration awards for "manifest disregard," *see, e.g.*, *Am. Laser Vision*, 487 F.3d at 259 (5th Cir. 2007); and because Halliburton sought vacatur on the basis of the Fifth Circuit's "manifest disregard" standard, out of an abundance of caution this court analyzes the parties' arguments using "manifest disregard" as both a summary of some of the statutory grounds and as an additional ground for vacatur.

In *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995), the Supreme Court stated that a court may set aside an arbitration award "only in very unusual circumstances," and cited *Wilko v. Swan*, 346 U.S. 427, 436–37 (1953), *overruled on other grounds*, *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477 (1989), for the proposition that "parties [are] bound by [an] arbitrator's decision not in 'manifest disregard' of the law." 514 U.S. at 942.  The Fifth Circuit has described *First Options* as the Supreme Court's "clear approval of the 'manifest disregard' of the law standard in the review of arbitration awards

under the FAA." *Williams v. Cigna Fin. Advisors Inc.*, 197 F.3d 752, 759 (5th Cir. 1999)

(citing *Montes v. Shearson Lehman Bros., Inc.*, 128 F.3d 1456, 1459 (11th Cir. 1997); *Barnes*

*v. Logan*, 122 F.3d 820 (9th Cir. 1997); *Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1486

(D.C. Cir.1997); *M & C Corp. v. Erwin Behr GmbH & Co., KG*, 87 F.3d 844 (6th Cir.1996);

IAN R. MACNEIL ET AL., 4 FED. ARBITRATION LAW § 40.7.1 at 40:43 (Supp. 1999)).

A party asserting "manifest disregard" of the law must meet a high standard. The

Fifth Circuit applies a two-step test:

> First, where on the basis of the information available to the court
> it is not manifest that the arbitrators acted contrary to the
> applicable law, the award should be upheld.
>
> Second, where on the basis of the information available to the
> court it is manifest that the arbitrators acted contrary to the
> applicable law, the award should be upheld unless it would
> result in significant injustice, taking into account all the
> circumstances of the case, including power of arbitrators to
> judge norms appropriate to the relations between the parties.

*Williams*, 197 F.3d at 762 (quoting MACNEIL, 4 FEDERAL ARBITRATION LAW § 40.7.2.6, at

40:95 (Supp. 1999) (footnote omitted)).

In contrast to vacatur based on manifest disregard of the law, vacatur on the basis that

the award does "not draw its essence from the contract is a statutory ground for vacatur,

derived from 9 U.S.C. § 10(a)(4), which permits vacatur when the arbitrator exceeds his

powers. The test is whether the award, however arrived at, is rationally inferable from the

contract. [A]ny doubts concerning the scope of arbitrable issues should be resolved in favor

of arbitration." *Am. Laser Vision*, 487 F.3d at 259 (internal quotation marks and citations

omitted); *see also Apache Bohai Corp. LDC v. Texaco China BV*, 480 F.3d 397, 404–05 (5th Cir. 2007) (citations omitted).  In deciding whether an arbitration panel exceeded its authority as a basis for vacatur under the FAA, the district court resolves all doubts in favor of arbitration.  *Executone Info. Sys., Inc. v. Davis*, 26 F.3d 1314, 1320–21 (5th Cir. 1994) (citing *Valentine Sugars, Inc. v. Donau Corp.*, 981 F.2d 210, 213 (5th Cir. 1993)).  In reviewing an award, a court is not limited to the panel's explanation of the award.  *Id.* at 1325.  A district court "'looks only to the result reached.  The single question is whether the award, however arrived at, is rationally inferable from the contract.'"  *Id.* (quoting *Anderman/Smith Operating Co. v. Tenn. Gas Pipeline Co.*, 918 F.2d 1215, 1219 n.3 (5th Cir. 1990)).  In *Am. Laser Vision*, the Fifth Circuit concluded:

> We will not second-guess multiple, implicit findings and conclusions underpinning the award.  We do not decide if the award was free from error.  We decide only that it is not the kind of extraordinary award that ineluctably leads to the conclusion that the arbitrator was "dispensing his own brand of industrial justice."  There are advantages and disadvantages in contracting for private resolution of a dispute announced without explanation of reason.  When a party does so and loses, federal courts cannot rewrite the contract and offer review the party contracted away.

*Am. Laser Vision*, 487 F.3d at 260; *see also Apache Bohai*, 480 F.3d at 405 ("'[I]t is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different than his.'") (quoting *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 598–99 (1960)).  An arbitrator's factual

findings "are unreviewable," *Apache Bohai*, 480 F.3d at 407, and "must be accepted as true," *id.* at 409 (citation omitted).

Vacatur on the basis that the arbitrators engaged in misconduct is another statutory basis for vacatur, drawing its authority from 9 U.S.C. § 10(a)(3). Vacatur on this basis is also necessarily narrow and grants deference to the procedural decisions made by an arbitrator. "'To constitute misconduct requiring vacation of an award, an error in the arbitrator's determination must be one that is not simply an error of law, but which so affects the rights of a party that it may be said that he was deprived of a fair hearing.'" *Laws v. Morgan Stanley Dean Witter*, 452 F.3d 398, 399 (5th Cir. 2006) (quoting *El Dorado Sch. Dist. No. 15 v. Continental Cas. Co.*, 247 F.3d 843, 848 (8th Cir. 2001)). When an arbitrator's procedural decision is challenged on the basis of misconduct, courts recognize the nature of arbitration as distinguished from litigation:

> Arbitration proceedings are not constrained by formal rules of procedure or evidence. By agreeing to arbitration, a party trades the procedures and opportunities for review of the courtroom for the simplicity, informality, and expedition of arbitration. Arbitrators should be expected to act affirmatively to simplify and expedite the proceedings before them. They need provide only a fundamentally fair hearing. Courts reviewing arbitral awards may not superimpose rigorous procedural limitations upon the conduct of the arbitrators.

*Mantle v. Upper Deck Co.*, 956 F. Supp. 719, 730–31 (N.D. Tex. 1997) (internal citations omitted).

These standards are applied to each argument Halliburton makes to vacate the award and to the Tremont Parties' response.

**V.** **The Argument that the Panel Manifestly Disregarded Delaware Contract Law**

**A.** **The Parties' Positions**

Halliburton acknowledges that the panel identified the correct legal standard for interpreting contracts under Delaware law, including whether and when to consider extrinsic evidence to interpret ambiguous terms. (Docket Entry No. 176 at 10–11). But Halliburton argues that when the panel determined that the terms "Mining property, Malvern, Arkansas" and "surplus real property" were ambiguous, it "*created* an ambiguity where none existed." (*Id.* at 11 (emphasis in original)). Halliburton asserts that the panel manifestly disregarded Delaware law on contract interpretation because the relevant contracts unambiguously define the entire Site as subject to the Tremont Parties' indemnification obligation and the panel should not have considered extrinsic evidence to reach a different interpretation. (*Id.* at 1–2). Halliburton argues that the 1990 Plan unambiguously requires the Tremont Parties to indemnify Halliburton for obligations not attributable to the Petroleum Services Business. (*Id.* at 9). Exhibit A to the 1990 Plan lists "Assets Which Shall Not Constitute 'Petroleum Services Assets," including certain "surplus real property." (*Id.*, Ex. 5). Exhibit A includes in items listed as "surplus real property" the entry for "Mining property, Malvern, Arkansas." (*Id.*, Ex. 5). According to Halliburton, it has no obligation for response or remediation costs relating to that property; instead, the Tremont Parties are responsible for those environmental liabilities. (Docket Entry No. 210 at 7–8). Halliburton argues that the panel found an ambiguity where none existed because the property at issue was expressly excluded from "Petroleum Services Asset[s]." (*Id.* at 8–9). Halliburton argues that the panel's result was

34

not the intention expressed in the 1990 Plan and could only be reached by improperly considering extrinsic evidence to decide whether the property was transferred to Halliburton's or the Tremont Parties' predecessors and who had the indemnification obligation.

Halliburton asserts that the panel continued its manifest disregard of the law in the Allocation Phase by reversing its finding in the Contract Phase that the Tremont Parties were required to indemnify Halliburton for liabilities relating to the 100 Acres, and instead concluding that Halliburton was responsible to Tremont, LLC for all costs and expenses related to the Site, including the 100 Acres. (Docket Entry No. 176 at 12).  As it argued with respect to the Contract Phase, Halliburton asserts that the panel's finding ignores the language of the 1990 Plan and improperly considers extrinsic evidence. (*Id.*).  According to Halliburton, "[i]n order to be a Petroleum Services Obligation, an obligation had to be attributable to a Petroleum Services Asset." (*Id.*).  Halliburton inists that "the 1990 Plan specifically provides that the entirety of the Site is *not* a Petroleum Services Asset." (*Id.*).

The Tremont Parties argue that the panel explained why it found two undefined terms—"surplus real property" and "Mining property, Malvern, Arkansas"—to be ambiguous, making it appropriate to consider extrinsic evidence. (Docket Entry No. 181 at 26).  The Tremont Parties argue that the panel properly applied Delaware law in concluding that the contracts accomplishing the restructuring transactions were ambiguous and that Halliburton's conduct was appropriately considered in determining the parties' intentions. (*Id.*).  The Tremont Parties argue that an arbitration panel's decision on whether to find a

contract term ambiguous and how to consider extrinsic evidence of the term's meaning is not "manifest disregard" that would warrant vacatur. (*See id.* at 28–29). The Tremont Parties argue that the question of the parties' intent under their contracts is a question of fact that is not a basis for vacatur. (*Id.* at 29).

The Tremont Parties argue that the 1988 and 1990 restructuring contracts establish that Halliburton assumed responsibility for all liabilities related to the Petroleum Services Business and that these liabilities included environmental liabilities at the Site. (*See id.* at 7–9). The Tremont Parties argue that Halliburton's motion omitted critical facts relating to which entity was required to indemnify for environmental liabilities relating to the disputed properties. The following are among the critical facts the Tremont Parties identify:

> 1. None of the Tremont Parties actually received any property at or near the Site as a result of the 1990 Plan, but Halliburton did.
>
> 2. None of the Tremont Parties actually used any property at or near the Site since 1990, but Halliburton has.
>
> 3. None of the Tremont Parties paid any taxes for property at or near the Site since the 1990 Plan, but Halliburton has paid all taxes for all site property since 1990.
>
> 4. None of the Tremont Parties made a decision to keep all the property at or near the Site, but Halliburton made that decision in 1994.

(Docket Entry No. 181 at 2–3). The Tremont Parties point to evidence that Halliburton made statements to shareholders consistent with the panel's conclusions as to the properties and liabilities that Halliburton's predecessors received in the restructuring transactions. (*Id.* at 9–11). The Tremont Parties also point out evidence showing that as part of the 1990

restructuring, New Baroid obtained a $200 million line of credit with Chase Manhattan Bank and entered into a Credit Agreement that stated that New Baroid's environmental liabilities included "inactive mining facilities, located in Malvern, Arkansas . . . ." (*Id.* at 12).

The Tremont Parties refute Halliburton's argument regarding the meaning of "mining property, Malvern, Arkansas" on Exhibit A to the 1990 Plan by arguing that "[a]t no place does Exhibit A exempt 'the Site'" from the "Petroleum Services Assets" being transferred to New Baroid.  (*Id.* at 16).  The Tremont Parties argue that "Mining property, Malvern, Arkansas" was never defined in the 1990 Plan, and that Halliburton's contention that this reference makes all property located near Magnet Cove, Arkansas "surplus" property is erroneous.  (*Id.*).  The Tremont Parties explain that the panel considered testimony about another site listed in Exhibit A and, based on that testimony, looked at whether Halliburton was actually using the property in deciding if it was "surplus" or retained by Halliburton after the restructuring.  (*See id.* at 17–18).  The Tremont Parties argue that the Site at issue here was not surplus because it was both needed and used in the Petroleum Services Business that was transferred to Halliburton's predecessor.  (Docket Entry No. 181 at 19).  The Tremont Parties argue that Halliburton pumped millions of gallons of toxic wastewater from Halliburton's Duratone Plant into the Site.  (*Id.* at 13).  According to the Tremont Parties, Halliburton needed the Site because it had no other location in which to discharge the wastewater from its Duratone Plant.  The only other option would have been to bring tanker trucks to the plant to remove gallons of wastewater per day at a cost of more than $400,000 per year.  (*See id.*).  The Tremont Parties contend that this unattractive alternative led

37

Halliburton to keep the Site, pay taxes on it, make conscious decisions to retain it, and transfer it among various Halliburton entities. (*Id.* at 14).

The Tremont Parties acknowledge that there was evidence introduced in the arbitration containing statements that the Tremont Parties thought they owned some property near Magnet Cove, Arkansas. (*Id.* at 19). This evidence included the Tremont Parties' SEC filings and access agreements with government agencies. The Tremont Parties assert that the people making those statements were under clear direction simply to have the property cleaned of contamination and to worry about who owned the property or was responsible for the costs later. (*Id.*).

### B.    Analysis

The 1990 Plan of Restructuring is governed by Delaware law. (Docket Entry No. 221, Ex. B, ¶ 15). Under Delaware law, contracts must be construed as a whole to give effect to the parties' intentions. *E.I. duPont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985) (citations omitted). If a contract is not ambiguous, "the parties' intent is ascertained by giving the language its ordinary and usual meaning." *Northwestern Nat'l Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996) (citing *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992)). When there is ambiguity, a court may consider "testimony pertaining to antecedent agreements, communications and other factors which bear on the proper interpretation of the contract," but if the contract is clear and unambiguous, the court may not "consider parol evidence 'to interpret it or search for the parties' intent[ions] . . . .'" *Pellaton v. Bank of New York*, 592 A.2d 473, 478 (Del.

38

1991) (citations omitted).  A contract is not ambiguous simply because there is disagreement between the parties as to its proper construction.  Rather, a contract is ambiguous "only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."  *Rhone-Poulenc Basic Chems. Co.*, 616 A.2d at 1196 (citation omitted).  "Courts will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty."  *Id.* (citation omitted).  When a contract is ambiguous, a court may consider extrinsic evidence to determine the parties' intent, and such evidence includes "'overt statements and acts of the parties, the business context [of the contract], prior dealings between the parties, business custom, and usage in the industry.'"  *Dittrick v. Chalfant*, No. 2156-VCL, 2007 WL 1039548, at *4 (Del. Ch. April 4, 2007) (citation omitted), *aff'd*, 936 A.2d 255 (Del. 2007).  The panel clearly recognized and correctly stated Delaware contract law in its Contract Award.  (*See* Docket Entry No. 172, Ex. 2 at 2–3) (explaining Delaware law regarding admissibility of extrinsic evidence in contract interpretation).

The relevant indemnity obligations that the panel was faced with deciphering stemmed from the 1988 and 1990 Plans of Restructuring.  Under the 1988 Plan, an associated Amended and Restated Formation Agreement, and other related agreements, NL Industries, Inc. spun off its wholly owned subsidiary, Baroid Energy Services, Inc., as NL Petroleum Services, Inc. ("NLPS") and transferred its Petroleum Services Business to NLPS.[6]  NLPS

---

[6] The Formation Agreement associated with the 1988 Plan described the transfer of assets from NL to NLPS as: "all of its properties, assets, and rights of any kind, whether tangible or intangible, real or personal, related to its petroleum services business or Titanium Metals Corporation of America ('TMCA')

agreed to assume liabilities and obligations arising out of the Petroleum Services Business.

Under a Cross-Indemnification Agreement dated September 16, 1988, NLPS agreed to

indemnify NL with respect to all liabilities assumed under the Formation Agreement as well

as "claims of liability at sites or facilities or with respect to operations transferred to NLPS

pursuant to the Formation, including claims arising out of or relating to the deposit,

placement or disposal of any material of any character whatsoever on such sites or facilities."

(Docket Entry No. 185, Ex. G, Contract Phase Arbitration Exhibit C-32).   The panel

explained that "all NL property located at the Malvern mining site was transferred to a

wholly owned subsidiary named Baroid Drilling Fluids, Inc. ('BDFI')," and that "NLPS was

eventually named Baroid Corporation."  (Docket Entry No. 172, Ex. 2 at 13).

In 1990, Baroid Corporation entered into a new plan of restructuring, changing its

name to Tremont Corporation, forming New Baroid Corporation, and spinning off New

Baroid Corporation as a separate company.   Under the 1990 Plan, Baroid Corporation

separated its Petroleum Services Business and its titanium and bentonite businesses into two

separate publicly traded companies.  Baroid Corporation transferred its Petroleum Services

Business to New Baroid, including what were termed "Petroleum Services Assets" and

"Petroleum Services Obligations."  New Baroid agreed to indemnify Old Baroid with respect

to Petroleum Services Obligations.  The 1990 Plan specified that none of the assets or

---

(collectively, the 'Assets'), including, but not limited to, all outstanding shares of capital stock of TMCA and the subsidiaries engaged in the petroleum services business of NL, including each of NL's subsidiaries described on the attached 'Subsidiaries Schedule.'"   (Docket Entry No. 185, Ex. G, Contract Phase Arbitration, Exhibit C-33).

obligations set forth on Exhibit A to the Plan would constitute Petroleum Services Assets or Petroleum Services Obligations.  Exhibit A to the 1990 Plan listed assets that would not constitute Petroleum Services Assets as certain "surplus real property and related improvements," including "Mining property, Malvern, Arkansas."  Exhibit A also listed obligations that would not constitute Petroleum Services Obligations, including "[a]ll obligations attributable to [Baroid Corporation's] assets, facilities or operations which do not constitute Petroleum Services Assets, including without limitation, those set forth above."  The panel noted that "any indemnification obligations owed by old Baroid to New Baroid . . . would flow to the successor(-s) of old Baroid Corporation . . ." and that "indemnification obligations owed to NL under the 1988 Plan, or owed by New Baroid to old Baroid under the [1990] Plan, would become the obligations of the successors to new Baroid."  (Docket Entry No. 172, Ex. 2 at 14–15).  "The Halliburton Parties have admitted that HESI is the successor to New Baroid."  (*Id.*, Ex. 2 at 15).  The panel was left with the task of determining the meaning of the contract terms, including whether the Site was included in the transfer of the Petroleum Services Business and who was left with indemnity obligations for the Site.

After reviewing "extensive briefing, hundreds of exhibits, deposition testimony, live testimony and arguments submitted by the parties," (*id.*, Ex. 2 at 2), the panel concluded that the terms "surplus real property" and "Mining property, Malvern, Arkansas" were inherently ambiguous and that consideration of extrinsic evidence was appropriate.  (*Id.*, Ex. 2 at 3).  In reaching this conclusion, the panel reasoned that the 1990 Plan as well as related documents and uncontroverted testimony conveyed "the overall intent . . . to separate the

41

petroleum services operations of the 'old' Baroid Corporation and its titanium metals operations and bentonite mining operations into two publicly-traded companies."   (*Id.*, Ex. 2 at 3).   The panel found that under the 1990 Plan, New Baroid was to assume virtually all the assets and obligations of the preexisting Petroleum Services Business of Old Baroid.   (*Id.*, Ex. 2 at 4).   Any exclusions from the Petroleum Services Assets to be assigned to New Baroid were set out in Exhibit A to the 1990 Plan of Restructuring.   Exhibit A listed "Assets Which Shall Not Constitute 'Petroleum Services Assets,'" including "surplus real property and related improvements."   (Docket Entry No. 172, Ex. 2 at 4).   Among the entries on Exhibit A was "Mining property, Malvern, Arkansas." (*Id.*, Ex. 2 at 4).

The panel stated: "Curiously, there was no real property description, chain of title information, metes and bounds descriptions or even a map which would depict the meaning of the phrase" "Mining property, Malvern, Arkansas." (*Id.*, Ex. 2 at 4).   The panel continued: "It is clear that the Malvern, Arkansas [mining property] consisted of several parcels, some of which constituted operating assets," as opposed to "surplus" property.   (*Id.*, Ex. 2 at 5). For example, a portion of the Malvern property known as the Duratone Plant remained an operating facility.   (*Id.*, Ex. 2 at 5).

The panel heard testimony that "surplus" property was property intended for sale or that could easily be sold so that Tremont could increase its cash reserves to make acquisitions.   (*Id.*, Ex. 2 at 5).   The panel heard what it credited as persuasive testimony that another site identified as "surplus real property" on Exhibit A was considered "surplus" and part of the Tremont Parties' side of the 1990 restructuring because that site could be sold

without interfering with current operations and used to generate cash. (*See* Docket Entry No. 172, Ex. 2 at 6). The panel concluded that "surplus real property" meant property that was not needed for the current operations of the Petroleum Services Business. (*Id.*, Ex. 2 at 6).

The controversy centered around the open barite mining Pit, located on the Site and adjacent to a Baroid Drilling Fluids Magnet Cove Chemical Plant. A large portion of the Pit was transferred to Baroid Management Company in mid-October 1990. (*Id.*, Ex. 2 at 5). The panel was presented with evidence that the Pit was used for waste from the Duratone Plant, supporting the argument that the Pit was an asset necessary for the operation of that Plant and not "surplus." (*Id.*, Ex. 2 at 5). The panel evaluated the chronology of events involved in the transfer of the 190 acres encompassing most of the Pit, including the issuance of a Corrective Deed, and concluded that the proper titleholder was the "new" Baroid Management Company because at the time of the Corrective Deed, the "old" Baroid Management Company had already changed its name to TRE Management Company. (*Id.*, Ex. 2 at 6–7).

In evaluating the chronology of the transfer of property, the panel noted that on December 27, 1988, NL conveyed approximately 310 acres to BDFI, and that the transfer included all of the owned property now at issue between the parties. (*Id.*, Ex. 2 at 9). BDFI then conveyed the previously discussed 190 acres to Bentonite Corporation on September 12, 1990, and the 1990 Corrective Deed transferred a portion of that property to Baroid Management Company. (Docket Entry No. 172, Ex. 2 at 9). The panel noted that a variety of mergers and other transactions resulted in that property being transferred to DII Industries,

43

LLC, a successor to Dresser, which had conveyed the property to HESI in 2002.  (*Id.*, Ex. 2 at 9).  Although DII had attempted, a few months after the transfer to HESI, to make corrections to the property descriptions and transfers via a 2003 corrective deed, the panel found this 2003 corrective deed to be "very curious, self-serving and ineffective insofar as the Panel's rulings in this [Contract] award are concerned."  (*Id.*, Ex. 2 at 9).  The panel concluded that Halliburton was the owner of the property referred to as the Duratone Plant and the property referred to as the Powder House.  (*Id.*, Ex. 2 at 9).  The panel also concluded that the part of the Site referred to as the 100 Acres was owned by Halliburton, but that Halliburton was entitled to indemnification with respect to the 100 Acres.  (*Id.*, Ex. 2 at 10).  Because "Mining property, Malvern, Arkansas" was listed as "surplus real property," the panel concluded that the intention must have been that some property in Malvern was surplus.  (*Id.*, Ex. 2 at 10).  The panel determined that "[t]he only remaining property that could qualify under any meaningful definition of the term 'surplus' is the 100 acres which was not transferred to new Baroid Management Corporation in October 1990."[7]  (Docket Entry No. 172, Ex. 2 at 10).

The panel then considered the indemnification obligations flowing from the 1988 Plan and the 1990 Plan.  (*Id.*, Ex. 2 at 13).  Following the chain of title, the panel concluded that Halliburton was responsible for any indemnity obligations owed by New Baroid to Old Baroid.  (*Id.*, Ex. 2 at 13).  After a detailed analysis of the 1988 Plan and the 1990 Plan, the

---

[7] The panel also found that this interpretation was consistent with the definition of "surplus property," "which is property not required by current operations and [which] had the potential for easy sale to generate cash for Tremont."  (Docket Entry No. 172, Ex. 2 at 10).

panel concluded that the indemnification obligations owed to New Baroid included "all of old Baroid's 'Obligations, and all costs and expenses (including attorneys['] fees) related thereto, arising out of, or which are otherwise attributable to (a) [old Baroid's] past, present or future operations, other than those Obligations which constitute Petroleum Services Obligations . . . .'" (*Id.*, Ex. 2 at 14 (quoting Arbitration Ex. R-1 at 11)). The panel explained that "Exhibit A [to the 1990 Plan] defined 'Obligations Which Shall Not Constitute 'Petroleum Services Obligations,'' to include 'Obligations Attributable To (old Baroid's) Assets, Facilities Or Operations Which Do Not Constitute Petroleum Services Assets . . .'" (*Id.*, Ex. 2 at 14). The panel noted that those obligations not constituting Petroleum Services Obligations included those attributable to "surplus real property." (*Id.*, Ex. 2 at 14). "[C]onsidering the indemnity obligations called for under the 1988 and 1990 restructuring transactions, the Panel [found] that HESI is the successor to New Baroid and the owner of the subject real estate. Accordingly, HESI is obligated to provide indemnity to the successors to old Baroid, as defined in ¶¶1.(a), 2., and 12 of the 1990 Plan, with the exception of the 100 acres. HESI is also obligated to indemnify NL Industries for those liabilities described in paragraph 2.2 of the Amended and Restated Cross-Indemnification Agreement, including without limitation paragraph 2.2(a) and (b), with the exception of the 100 Acres." (Docket Entry No. 172, Ex. 2 at 16). The panel further concluded that, "as the successor to old Baroid Corporation, Tremont LLC is obligated to indemnify HESI for all indemnity obligations defined in paragraph 11 of the [1990] Plan, as those obligations relate to the 100 acres." (*Id.*, Ex. 2 at 16).

45

A review of the record and of the panel's Contract Award establishes the panel's correct understanding of the applicable Delaware contract law. The panel set forth the appropriate standard in its opinion and the opinion reflects a careful consideration of the relevant contracts, testimony, and other evidence. The panel clearly set forth the applicable law regarding contract interpretation, reasonably determined that certain terms in the contracts were ambiguous,[8] and considered it appropriate under the applicable case law to consider extrinsic evidence of the parties' intent regarding ownership and indemnification obligations. The panel's careful, reasoned analysis does not amount to a manifest disregard of the law. The record shows that the panel was hardly applying its "own brand of industrial justice." *See Am. Laser Vision*, 487 F.3d at 258.

Given the deferential review standard for an arbitration award, it is not appropriate for this court to second-guess the arbitrators' determinations on the issues surrounding the contract interpretation. The parties have not cited a case in which a court vacated an arbitration award based on manifest disregard because of an asserted error in applying the law of contract interpretation and in considering extrinsic evidence. As the Fifth Circuit has stated, "[w]e will not second-guess multiple, implicit findings and conclusions underpinning

---

[8] Halliburton contends that the contract was not ambiguous and specifically excluded the entirety of the Site from the transfer of the Petroleum Services Business. (*See* Docket Entry No. 176 at 11). Halliburton's argument is based on its assertion that the contract does not divide "Mining property, Malvern, Arkansas" into two parcels, but instead excludes all of the property from the transfer of the Petroleum Services Business. (*See id.*). Halliburton's argument equates "Mining property, Malvern, Arkansas" to the Site. But, that is the exact point of contention with which the panel grappled because the contract did not define the metes and bounds of "Mining property, Malvern, Arkansas," making it, in the panel's view, an ambiguous term. Thus, the panel did not divide the property into two parcels; the panel evaluated the evidence to determine the meaning of "Mining property, Malvern, Arkansas" and concluded in the Contract Phase that it excluded certain portions of the Site.

the award.  We do not decide if the award was free from error."[9]  *Am. Laser Vision*, 487 F.3d

at 260; *see also Kergosien v. Ocean Energy, Inc.*, 390 F.3d 346, 358 (5th Cir. 2004) ("'When

an arbitrator resolves disputes regarding the application of a contract, and no dishonesty is

alleged, the arbitrator's 'improvident, even silly, factfinding' does not provide a basis for a

reviewing court to refuse to enforce the award.'") (quoting *Major League Baseball Players

Ass'n v. Garvey*, 532 U.S. 504, 510 (2001)); *Torch E & P Co. v. J.M. Huber Corp.*, No. H-

06-1786, 2006 WL 3761814, at *3 (S.D. Tex. Dec. 20, 2006) ("The question of interpretation

of the [Agreement] is a question for the arbitrator.  *It is the arbitrator's construction which

was bargained for*; and so far as the arbitrator's decision concerns the construction of the

contract, the courts have no business overruling him because their interpretation of the

contract is different than his.") (citing *Kergosien*, 390 F.3d at 353), *aff'd*, No. 07-20032,

2007 WL 1991044 (5th Cir. July 6, 2007) (per curiam) (unpublished).

This is not a case in which the panel knew of a clearly applicable legal standard and

refused to apply it.  *See Williams*, 197 F.3d at 762 (quoting IAN R. MACNEIL ET AL., 4

FEDERAL ARBITRATION LAW § 40.7.2.6, at 40:95 (Supp. 1999) (footnote omitted)).  Instead,

the panel recognized the correct legal standard, analyzed many exhibits and extensive

---

[9] Halliburton focuses its arguments on manifest disregard for the law, but another potential basis for vacatur implicit in Halliburton's briefing is vacatur of an award that does not draw its essence from the contract.  *See Am. Laser Vision*, 487 F.3d at 259.  "The test is whether the award, however arrived at, is rationally inferable from the contract."  *Id.*  This court concludes that the panel's interpretation of the relevant contracts does not warrant vacatur under this test either.  The Contract Award contains careful analysis of the contracts at issue and the consideration of extrinsic evidence came only after the panel reasonably concluded that certain contractual terms were ambiguous.  This court concludes that such consideration of extrinsic evidence does not render the panel's construction of the contract to not be rationally inferable from the contract.

testimony, and issued a reasoned opinion interpreting the contracts. Under such circumstances, this court may not second-guess the panel's decision. Halliburton has failed to carry its burden to show that the panel's decisions interpreting the contracts in the Contract Phase of the arbitration resulted from "manifest disregard" of Delaware contract law.[10]

This court also rejects Halliburton's contention that the panel manifestly disregarded applicable contract law in the Allocation Phase. In its motion to vacate, Halliburton argues that the panel improperly relied on *Beazer East, Inc. v. Mead Corp.*, 412 F.3d 429 (3d Cir. 2005), in deciding that allocation of remediation costs was determined by the contracts transferring the relevant properties and businesses. (Docket Entry No. 176 at 12 n.5). Halliburton argues that the panel erred in determining that "because any Mining Spoils contained on the 100 Acres resulted from mining activity that was a part of NL's Petroleum Services Business, any contamination was a Petroleum Services Obligation, requiring the Halliburton Parties to indemnify Tremont, LLC." (*Id.* at 12 (citing Docket Entry No. 176, Ex. 3 at 12–30)). The Tremont Parties argue that *Beazer East* supports the proposition that CERCLA did not require the panel to allocate response costs based on the parties' relative contributions of waste rather than on the parties' contractual allocation agreements. (*See* Docket Entry No. 181 at 34–35).

In *Beazer East*, the court held:

---

[10] In addition, the panel's interpretation does not work "significant injustice." The evidence shows that Halliburton used the portions of the Site at issue to dispose of waste that would otherwise have cost large sums of money to dispose of elsewhere. (*See* Docket Entry No. 181, Ex. S, Deposition of Paul Mills, at 174–76 (discussing the cost of approximately $400,000 per year to dispose of water if it was not dumped in the Pit)).

> [P]rioritization of the "polluter pays" principle in equitable allocation proceedings is inconsistent with CERCLA's contribution provision.  That provision authorizes the district courts to "allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1).  Courts examining this language and its history have concluded that Congress intended to grant the district courts significant flexibility in determining equitable allocations of response costs, without requiring the courts to prioritize, much less consider, any specific factor.

*Beazer East*, 412 F.3d at 446.  The court continued:

> Accordingly, the "polluter pays" principle has no canonical or transcendent importance under § 9613(f)(1); it is certainly not the "primary policy" of contribution claims, as implied by the District Court.  It is simply one of many factors that may or may not bear on a given equitable allocation determination.  Specifically, there is no basis in CERCLA's text or history for prioritizing *a priori* the parties' relative contributions of waste over their contractual intent to allocate environmental liability among themselves.  To the contrary, CERCLA expressly authorizes private indemnity agreements, and the District Court's insistence on elevating relative waste contribution is fundamentally inconsistent with CERCLA's policy of favoring private indemnity agreements.

*Id.* at 446–47 (internal citations omitted).  Halliburton is incorrect in its argument that the panel was not permitted to consider the parties' contractual agreements to allocate responsibility for response or remediation costs for environmental liabilities.  This court cannot vacate either of the awards on the basis of manifest disregard of contract law.

This court also cannot vacate either of the awards under the rubric of the applicable statutory grounds.  The only applicable statutory grounds for vacatur based on allegedly misapplied Delaware contract law would be that the arbitrators engaged in misconduct or

exceeded their authority.  Neither ground provides a basis for vacatur here.

Halliburton has not shown that it did not receive a fair hearing on the contractual issues.  The voluminous record from both the Contract Phase and the Allocation Phase would indicate that Halliburton had an adequate opportunity to present exhibits, testimony, and argument regarding its position on the proper interpretation of the contracts.  The fact that Halliburton was not deprived of a fair hearing regarding the proper application of contract law prevents vacatur on the grounds of arbitrator misconduct.  *See Laws v. Morgan Stanley Dean Witter*, 452 F.3d 398, 399 (5th Cir. 2006) ("'To constitute misconduct requiring vacation of an award, an error in the arbitrator's determination must be one that is not simply an error of law, but which so affects the rights of a party that it may be said that he was deprived of a fair hearing.'") (quoting *El Dorado Sch. Dist. No. 15 v. Continental Cas. Co.*, 247 F.3d 843, 848 (8th Cir. 2001)).

Nor did the panel exceed its powers in interpreting the contracts.  Even if this court would arrive at a different interpretation, that is not a basis for vacating an arbitration award as long as the award is rationally inferable from the arbitration contract and the contract interpreted by the arbitrators.  *See Am. Laser Vision*, 487 F.3d at 259 ("The test is whether the award, however arrived at, is rationally inferable from the contract.  [A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.") (internal quotation marks and citations omitted).  As described earlier, the panel's awards are rationally inferable from the contracts.  After careful and reasoned consideration of the contracts, the panel found it necessary to consider extrinsic evidence to interpret relevant

50

terms in the contracts.  The panel arrived at an interpretation rationally inferable from the contracts that provided the basis for the arbitration proceeding and from the contracts interpreted by the panel.  This court cannot vacate the panel's contract interpretation on the basis of either manifest disregard of the law or on the statutory bases.

## VI.  The Argument that the Panel Manifestly Disregarded Arkansas Real Property Law

Halliburton argues that the panel manifestly disregarded Arkansas law on property deeds in concluding that the owner of the 190 acres was the "new" Baroid Management Company, incorporated on October 5, 1990.  (Docket Entry No. 176 at 14–15).  A Warranty Deed transferred 190 acres of the Site from Baroid Drilling Fluids, Inc. to Bentonite Corporation, but a Corrective Deed stated that the property was transferred to Baroid Management Company, rather than Bentonite Corporation.  Halliburton asserts that the panel ignored the fact that under Arkansas law, a corrective deed relates back to the date of the first deed.  Because the Corrective Deed incorporated the Original Deed, which was recorded in Arkansas real property records on September 17, 1990, Halliburton argues that the panel should have looked at the Baroid Management Company in existence at the time of the Original Deed, the "old" Baroid Management Company.  (*Id.* at 15–16).

The Tremont Parties respond that the panel's conclusion as to ownership was consistent with Arkansas property law, noting that Halliburton obtained a title commitment from an Arkansas title company to insure the property and paid all the taxes on that property after 1990.  The Tremont Parties incorporate the arguments they made in their Opposition

to Halliburton's Emergency Motion to Stay the Second Phase of the Bifurcated Arbitration,

dated July 23, 2007.  (Docket Entry No. 181, Ex. MM).  In the opposition to the motion to

stay, the Tremont Parties distinguished the cases on which Halliburton relied to support its

argument on how Arkansas law treats the relation back of corrective deeds.  (*Id.*, Ex. MM

at 17–18).

The panel based its conclusion that Halliburton's predecessor owned the 190 acres on

the following chronology:

> 1. 8/15/1990 - New Baroid Corporation is incorporated.
>
> 2. 8/31/1990 - Plan of restructuring is effective.
>
> 3. 9/12/1990 - Warranty deed transferring 190 acres from Baroid Drilling Fluids, Inc. (BDFI) to Bentonite Corporation.
>
> 4. 9/20/1990 - Bob Leidich drafts name change document for Baroid Management Company.
>
> 5. 9/26/1990 - New Baroid Corporation Credit Agreement with the Chase Manhattan Bank.
>
> 6. 10/3/1990 - Baroid Management Company changes its name to TRE Management Company through a filing with the Delaware Secretary of State.
>
> 7. 10/5/1990 - Baroid Management Company is created as a wholly owned subsidiary of New Baroid Corporation.
>
> 8. 10/19/1990 - Corrective Deed filed by Robert Leidich states that Baroid Management Company is proper grantee and not Bentonite Corporation.
>
> 9. 10/29/1990 - Baroid Corporation Information Statement.

(Docket Entry No. 172, Ex. 2 at 6–7).  The fact that these corporate transactions occurred

close to the effective date of the 1990 Plan led the panel to conclude that the proper titleholder of the 190 acres (and therefore most of the Pit), was the "new" Baroid Management Company. (*Id.*, Ex. 2 at 7). "This conclusion is warranted because, at the time of the Corrective Deed dated October 19, 1990, old Baroid Management Company had already formally changed its name to TRE Management Company by virtue of its Secretary of State filing on October 3, 1990. Consequently, the only Baroid Management Company existing on October 19, 1990 [the filing date of the Corrective Deed], was the new Baroid Management Company. Accordingly, the Corrective Deed clearly transferred the pit property to new Baroid Management Company." (*Id.*, Ex. 2 at 7). The panel stated that this conclusion was further bolstered by "the fact that the TRE Management name change is specifically referenced on Exhibit A to the 1990 Plan and the new Baroid Management Company is listed on Exhibit B. The initial Credit Agreement with Chase Manhattan Bank of 9/26/1990 also references that the mine is a New Baroid liability." (*Id.*, Ex. 2 at 7).[11] The panel's opinion goes on to discuss other pieces of evidence consistent with the conclusion that the Corrective Deed transferred the property to New Baroid Management Company. (*Id.*, Ex. 2 at 7–8).

There is little case law in Arkansas on whether a corrective deed relates back to the date of the original deed. The two cases Halliburton cites, *Mason v. Jarrett*, 234 S.W.2d 771

---

[11] The panel noted that since the same person was involved in all of the transactions, it is "highly unlikely" that there was a mistake as to the "true" Baroid Management Company. (*See* Docket Entry No. 172, Ex. 2 at 7–8) ("Since all of these transactions occurred within only a few weeks, it is almost inconceivable that Mr. Leidich would make such a mistake given his intricate involvement and personal knowledge of the transactions.").

(Ark. 1950), and *Dempsey v. Merchants Nat'l Bank of Fort Smith*, 729 S.W.2d 150 (Ark. 1987), do not directly address this issue.  In *Mason*, the court held that "[a] correction, or reformation, deed does *now* perfectly what was done *then* imperfectly."  *Mason*, 234 S.W.2d at 773 (emphasis in original).  The plaintiff in that case claimed that he owned and was entitled to possess certain property.  *Id.* at 772.  The plaintiff claimed that the property was deeded to him on March 13, 1943 and that a corrective deed dated July 23, 1949 fixed an error in the description of the property being conveyed.  *See id.*  The defendants argued that the plaintiff had no title until he obtained the corrective deed.  *Id.* at 773.  The court rejected the defendants' argument, finding that a corrective deed confirmed the title that already existed.  The court summarized:

> Upon the reformation of an instrument, the general rule is that it relates back to, and takes effect from, the time of its original execution, especially as between the parties thereto and as to creditors at large and purchasers with notice.  Accordingly, upon the correction by the court of a deed which defectively describes premises the equitable title to which is in the vendee, his legal title relates back to its execution and delivery.

*Id.* (quoting 45 AM. JUR. 591).  The court held that "in the case at bar, the plaintiff actually owned the lands involved—though under an incorrect description—before he filed this action; and the correction deed, when executed, related back to the plaintiff's original deed of March 13, 1943, and was not a new or after-acquired title . . . ."  *Id.* at 774.

Dempsey, the other case Halliburton cites, presented "a question of priority between a materialman's lien and a mortgage" in foreclosure actions.  *Dempsey*, 729 S.W.2d at 150.  A mortgage was filed before work began on the building site, but the mortgage was actually

on different property. *Id.* A corrected deed and mortgage were later filed. *Id.* The Arkansas Supreme Court held that if a materialman has no actual notice of a mortgage, the materialman's lien has priority over that mortgage. *Id.* at 151. The mortgagor argued that the materialman's lien did not attach when the work began because the property owners did not have title to the land until the correction deed and mortgage were filed, citing *Mason*. The court rejected this argument because *Mason* held that a correction deed relates back "to the date of the first deed *with an incorrect description*." *Id.* at 152 (emphasis added). The result in *Dempsey* was that although the corrective deed related back to the date of the original deed for the purpose of conveying title to the property, the mortgage did not relate back for the purpose of giving the mortgage priority in foreclosure over the materialman's liens.

Neither *Mason* nor *Dempsey* directly addresses whether a corrective deed changing the name of the party receiving the property relates back to the time of the original deed, particularly if there are intervening changes to the corporate names and corporate identity of the parties involved in the transaction. *Mason* and *Dempsey* instead address whether a corrective deed that fixes an incorrect property description relates back to the date of the original deed. The facts that neither *Mason* nor *Dempsey* directly addresses the issue before the panel and that a plausible basis to distinguish those cases can be made defeat Halliburton's argument that the panel's decision "turns controlling and established Arkansas law on its head." The only two potentially applicable cases are not directly on point. Halliburton has not identified "controlling and established" Arkansas real property law that

55

the panel manifestly disregarded.  *See Brabham v. A.G. Edwards & Sons Inc.*, 376 F.3d 377, 381–82 (5th Cir. 2004) (to vacate an award for manifest disregard, "[t]he arbitrators must have 'appreciate[d] the existence of a *clearly governing principle* but decided to ignore or pay no attention to it.'  Furthermore, 'the governing law ignored by the arbitrators *must be well defined, explicit, and clearly applicable*.'") (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930, 933, 934 (2d Cir. 1986)) (emphasis added).  Even if this court would have decided the corrective deed issue differently, it cannot vacate the award.  *See id.* at 385 ("Uncertainty about arbitrators' reasoning cannot justify vacatur, for a court must resolve all doubts in favor of arbitration.") (citing *Action Indus., Inc. v. U.S. Fid. & Guar. Co.*, 358 F.3d 337, 343 (5th Cir. 2004)).

 Halliburton also argues that the New Baroid Management Company could not have taken title to the 190 acres on the date of the Original Deed because the New Baroid Management Company did not exist on that date.  (*See* Docket Entry. No. 176 at 16 n.8).  Halliburton cites *Warren v. Wheatley*, 331 S.W.2d 843, 846 (Ark. 1960), for the proposition that "before a grantee can take title to real property the grantee must be a legal entity."  The panel did not find that title was conveyed to the New Baroid Management Company before its existence.  To the contrary, the panel's Contract Award suggests that the New Baroid Management Company took title on the execution of the Corrective Deed, a finding that is not a manifest disregard of clearly applicable Arkansas real property law, as discussed above.

In addition, as with the argument that the panel improperly applied Delaware contract law, the alleged improper application of Arkansas real property law also cannot provide a

56

basis for vacatur under one of the statutory grounds.  As in their application of Delaware contract law, the arbitrators did not prevent Halliburton from having a fair hearing on the corrective deed and real property transfer issues, preventing vacatur on the basis of arbitrator misconduct.  Nor is there a basis to conclude that the arbitrators exceeded their authority in interpreting the Corrective Deed and Arkansas law.  Because this court must draw all inferences in favor of the arbitration awards, those awards cannot be vacated based on the panel's application of Arkansas real property law.  *See Executone*, 26 F.3d at 1320–21 ("In deciding whether the arbitrat[ion] [panel] exceeded its authority, we resolve all doubts in favor of arbitration.") (citing *Valentine Sugars, Inc. v. Donau Corp.*, 981 F.2d 210, 213 (5th Cir. 1993)).

The motion to vacate the arbitration awards on the ground of misapplication of Arkansas real property law is denied, both under the manifest disregard standard and under the statutory bases for vacatur.

## VII.   The Argument that the Panel Manifestly Disregarded the Law in Awarding Prejudgment Interest

### A.      The Parties' Arguments

As another basis for vacatur, Halliburton argues that the panel manifestly disregarded CERCLA by awarding prejudgment interest to the Tremont Parties.  Section 107(a)(4) of CERCLA states that prejudgment interest "'shall accrue from the later of (i) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned.'" (Docket Entry No. 176 at 16–17 (citing 42 U.S.C. § 9607(a)(4))).  According to Halliburton,

the Tremont Parties did not make a written demand, precluding any prejudgment interest award.  (*Id.* at 17).  Halliburton argues that the Tremont Parties have not satisfied the CERCLA requirements for obtaining prejudgment interest because they did not make a written demand to Halliburton for a "specified amount" of response costs.  Although the Tremont Parties have submitted letters that they assert satisfied CERCLA's requirements, Halliburton contends that these letters were not submitted to the panel and do not demand a specific amount.  (Docket Entry No. 221 at 5–6).

The Tremont Parties respond that the panel properly awarded them interest because Halliburton agreed in the stipulation entered into before the Allocation Phase that prejudgment interest would be calculated at 6% *per annum* from December 9, 2005 through August 31, 2007.  (Docket Entry No. 181 at 31 (citing Ex. NN)).  With respect to CERCLA's demand requirement for prejudgment interest, the Tremont Parties argue that Halliburton was on notice for years that the Tremont Parties sought recovery under the indemnity contracts and under CERCLA.  (Docket Entry No. 214 at 2–5).  The Tremont Parties argue that the relevant case law shows that they gave adequate notice under CERCLA to entitle them to prejudgment interest.  (*Id.* at 3–5 (citing *K.C. 1986 Ltd. P'ship v. Reade Mfg.*, 472 F.3d 1009 (8th Cir. 2007); *Am. Cyanamid Co. v. Capuano*, 381 F.3d 6 (1st Cir. 2004)).  The Tremont Parties also argue that interest could have been awarded under Delaware law, rather than under CERCLA, and that Delaware law allows prejudgment interest in contractual indemnity cases.  (*Id.* at 31–32).  In addition, the Tremont Parties contend that the AAA Rules provide the panel with discretion in awarding prejudgment interest.  (*Id.* at 32; *see also* Docket Entry

58

No. 214 at 6–7).  The Tremont Parties point out that Halliburton has not identified any section of the RATFA that would prohibit the arbitrators from awarding prejudgment interest, or any section of the 2005 Cost Sharing Agreement providing that CERCLA interest rules override RATFA or the parties' contracts.  (Docket Entry No. 214 at 5–6).  The Tremont Parties argue that the panel interpreted the 2005 Cost Sharing Agreement in good faith as allowing prejudgment interest and that Halliburton has not identified a basis for this court to set aside the panel's contract interpretation.  (*Id.* at 7–8 (citing *Kergosien v. Ocean Energy, Inc.*, 390 F.3d 353 (5th Cir. 2004))).

In its reply in support of its motion to vacate, Halliburton argues that the Tremont Parties' reliance on the stipulation as to the amount of prejudgment interest is misplaced because that stipulation specifically reserved the parties' right to contest an award of prejudgment interest.  (Docket Entry No. 210 at 14).  Halliburton also argues that neither Delaware law nor the AAA Rules regarding prejudgment interest address the controlling CERCLA requirements.  (*Id.*).  Halliburton contends that because the Tremont Parties failed to comply with CERCLA's demand requirements for a prejudgment interest award, the award cannot stand.  (*Id.*).  Halliburton argues that the absence of an express prohibition on prejudgment interest in RATFA does not create an affirmative right to prejudgment interest, particularly because Arkansas law generally does not permit recovery of prejudgment interest.  (Docket Entry No. 221 at 4).  Similarly, Halliburton argues that the absence of an express prohibition on prejudgment interest in the AAA Rules or in Delaware contract law cannot contradict CERCLA requirements because the parties agreed in their 2005 Cost

59

Sharing Agreement that liability for the response costs would be determined under CERCLA. (*Id.* at 4).  Halliburton argues that the parties' arbitration agreement precludes the panel from awarding prejudgment interest under Delaware law or the AAA Rules because the agreement stated that the arbitration process would determine the allocation of any cost or expense under CERCLA or RATFA.  (*Id.* at 9).  Halliburton argues that CERCLA provided the only basis for awarding prejudgment interest and the Tremont Parties did not meet the CERCLA demand requirement for such an award.  (*See id.* at 8).  Halliburton contends that to the extent that the panel may have awarded prejudgment interest under the AAA Rules or Delaware law, that award would not be entitled to deference because the panel would have exceeded its authority.  (*Id.* at 10).

In their reply brief, (Docket Entry No. 227), the Tremont Parties argue that Halliburton waived any claim that the panel did not have authority to award prejudgment interest under Delaware contract law because Halliburton did not raise that argument to the panel and never sought clarification from the panel as to the basis for the prejudgment interest award.  (*Id.* at 2).  The Tremont Parties contend that because Halliburton repeatedly argued that the AAA Rules governed the arbitration and that the 1990 Plan had to be interpreted under Delaware contract law, Halliburton should not now be allowed to contend the opposite with respect to prejudgment interest.  (*Id.* at 3–4).  The Tremont Parties further argue that because the panel did not state its basis for awarding prejudgment interest, there can be no manifest disregard of the law.  (*Id.* at 6–7).

**B.    Analysis**

Halliburton has argued that the panel improperly awarded prejudgment interest from December 9, 2005 through August 31, 2007 under CERCLA because the Tremont Parties did not present a written demand for specific response costs. (Docket Entry No. 176 at 17 (citing *In re Bell Petroleum Servs., Inc.*, 3 F.3d 889, 908 (5th Cir. 1993)). The relevant section of CERCLA states that "interest shall accrue from the later of (i) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned." 42 U.S.C. § 9607(a)(4). While *Bell Petroleum* did state that the "statute plainly requires a written demand for specified response costs as a prerequisite to an award of pre-judgment interest," the court set the bar for meeting the written demand requirement at a low level. *Bell Petroleum*, 3 F.3d at 908. The writing at issue in that case was the complaint. The court concluded that the complaint, which did not specify an exact amount, was a sufficient written demand for payment of response costs to support a prejudgment interest award after the date the complaint was filed. The court rejected the argument that letters sent before the complaint, indicating that an unspecified reimbursement would be sought at some unspecified future time, satisfied the CERCLA written demand requirement. *Id.* The court held that "with respect to costs incurred before the complaint was filed, prejudgment interest should be assessed from the date the complaint was filed," and that "[w]ith respect to costs, if any, incurred after the complaint was filed, prejudgment interest should be assessed on those costs from the date of the expenditures." *Id.*

The panel did not specify what they relied on in awarding prejudgment interest in this case. The Tremont Parties sent letters to Halliburton in 1999 seeking contribution,

reimbursement, and indemnification of the costs incurred in cleaning up the Site but not giving a specific amount. (*See* Docket Entry No. 214, Exs. A and B). The parties' 2005 Cost Sharing Agreement and the complaints filed in the litigation made clear that each party was demanding contribution, reimbursement, and indemnity for the response costs. (*See* Docket Entry No. 181, Ex. A at 6). The parties stipulation on attorneys' fees, costs, and pre- and post-judgment interest, specified when prejudgment interest would begin to run and at what rate. (Docket Entry No. 181, Ex. NN).

The written demand required under CERCLA ensures that the party receiving the demand is on notice and triggers the accrual of prejudgment interest. *See Bell Petroleum*, 3 F.3d at 908. In this case, the parties agreed on the date when prejudgment interest would begin to accrue. The panel did not need to determine when the Tremont Parties made the earliest written demand for payment of CERCLA response costs to decide whether prejudgment interest began to accrue from that date or from the date of the expenditures. In addition, as the Tremont Parties point out, there are multiple bases for awarding prejudgment interest in addition to CERCLA. The 1990 Plan was governed by Delaware law, which permits awards of prejudgment interest on monetary damages. *See Trans World Airlines, Inc. v. Summa Corp.*, Civ. A. No. 1607, 1987 WL 5778, at *1 (Del. Ch. Jan 21, 1987) ("awards of monetary damages by Delaware courts bear interest from the date of the onset of liability 'as a matter of right.'") (citations omitted) (unpublished), *aff'd*, 540 A.2d 403 (Del. 1988) . The AAA Rules permit an award of prejudgment interest. *See* American Arbitration Association, Commercial Arbitration Rules and Mediation Procedures,

http://www.adr.org/sp.asp?id=22440, Rule R-43(d) (stating that the award of an arbitrator can include "interest at such rate and from such date as the arbitrator(s) may deem appropriate").  RATFA contains no prohibition on awarding prejudgment interest.  (*See* Docket Entry No. 214 at 2).  It is unclear whether CERCLA's requirements for prejudgment interest trump the grounds for awarding interest under Delaware law[12] or the AAA Rules. (Docket Entry No. 214 at 2, 6–7).  The panel's award does not specify the bases on which it awarded prejudgment interest.  This court may not second-guess how the panel arrived at its decision.  *See Am. Laser Vision*, 487 F.3d at 260 ("We will not second-guess multiple, implicit findings and conclusions underpinning the award.  We do not decide if the award was free from error.  We decide only that it is not the kind of extraordinary award that ineluctably leads to the conclusion that the arbitrator was 'dispensing his own brand of industrial justice.'").

In sum, it is not clear whether CERCLA is the only applicable basis for an award of prejudgment interest because while the parties' contract specified that allocation of clean-up

---

[12] Halliburton has pointed out that neither party suggested to the arbitrators that prejudgment interest could be awarded under Delaware law.  However, the parties agree that construction of the 1990 Plan is governed by Delaware law.  In addition, the Tremont Parties arguably requested interest under Delaware contract law in their statement of claims filed in the arbitration.  (*See* Docket Entry No. 227, Ex. A at 38 (describing the law of contract interpretation in Delaware and arguing that Halliburton's breach of the 1990 Plan makes Halliburton liable for Site costs, legal fees, and interest)).  The panel could have awarded prejudgment interest in its interpretation of the contracts, separate and apart from its allocation of costs and expenses under CERCLA.  This court need not decide whether such an award would be correct because the panel has issued an award of prejudgment interest without explaining its reasons.  *See Univ. Commons-Urbana, Ltd. v. Universal Constructors Inc.*, 304 F.3d 1331, 1337 (11th Cir. 2002) (For vacatur under the manifest disregard standard, "'there must be some showing in the record, other than the result obtained, that the arbitrators knew the law and expressly disregarded it.'") (quoting *O.R. Sec., Inc. v. Prof'l Planning Assocs., Inc.*, 857 F.2d 742, 747 (11th Cir. 1988)).

costs was to be determined under CERCLA, it did not specify that prejudgment interest also had to be determined under CERCLA.  It also is not clear that the Tremont Parties failed to meet the prerequisites of obtaining prejudgment interest under CERCLA.  *See K.C. 1986 Ltd. P'ship v. Reade Mfg.*, 472 F.3d 1009, 1019 (8th Cir. 2007) (finding that the third-party complaints that stated specific amounts without separating out the specific amounts sought from each third-party defendant was sufficient notice under CERCLA "to put the parties on notice of the amounts at issue and the accrual of prejudgment interest.").  The panel did not specify the basis for its award of prejudgment interest.  The result alone does not provide a ground to find manifest disregard of clearly applicable law.  *See Univ. Commons-Urbana*, 304 F.3d at 1337 ("[W]e have no indication of the arbitrators' reasons . . ., and, thus, we have no reason to believe that they disregarded the law . . .") (citing *O.R. Sec.*, 857 F.2d at 747 ("'In fact, when the arbitrators do not give their reasons, it is nearly impossible for the court to determine whether they acted in disregard of the law.'")).

Vacatur also is not appropriate on the statutory bases that the prejudgment interest award resulted from arbitrator misconduct or the arbitrators exceeding their authority. Halliburton was on notice that the Tremont Parties were seeking contribution costs under CERCLA, that Delaware contract law was at issue in the case, that the AAA Rules were applied to the arbitration, and that prejudgment interest was at issue.  The parties had entered a stipulation on the rate and accrual date for prejudgment interest.  Given this background and the fact that there were multiple bases on which the panel might have awarded interest, it cannot be said that an error in awarding prejudgment interest was such a mistake as to

64

deprive Halliburton of a fair hearing.  Halliburton has not shown misconduct warranting vacatur.  Nor can this court conclude that the panel exceeded its authority in awarding interest.  The panel was charged with resolving all allocation claims between the parties to the arbitration agreement.  The panel did not exceed its authority in including prejudgment interest in its final allocation.

Halliburton's argument that the award of prejudgment interest requires vacatur fails.

## VIII.  The Argument that the Panel Manifestly Disregarded Procedural Law

### A.  The Assertion that the Panel Improperly Modified the Contract Award in the Allocation Phase

#### 1.  The Parties' Arguments

Halliburton argues that the panel manifestly disregarded procedural law by ignoring its own bifurcation of the arbitration into the Contract Phase and the Allocation Phase, by reopening evidence in the Allocation Phase to allow supplementation of the record relating to the Contract Phase, and by modifying its holding in the Contract Phase during the Allocation Phase.  (Docket Entry No. 176 at 18).  Specifically, Halliburton argues that because the panel found in the Contract Phase that the Tremont Parties were obligated to indemnify Halliburton for all liabilities associated with the 100 Acres, it was improper for the panel to rule in the Allocation Phase that Halliburton was responsible for indemnifying the Tremont Parties for liabilities associated with the 100 Acres.  (*Id.* at 19).  Halliburton argues that it prepared for the Allocation Phase based on the rulings from the Contract Phase, and that it was disadvantaged when the panel "did an about-face" in the Allocation Phase.

(*Id.*).  Halliburton contends that by revisiting and changing the ruling on indemnification liability for the 100 Acres, the panel exceeded its authority under AAA Rules and violated the *functus officio* doctrine, preventing an arbitrator from revising a final arbitration award. (*Id.* at 20).  Halliburton argues that had it known that liability issues for remediation and response costs for the 100 Acres were still open in the Allocation Phase, it would have prepared differently.  Halliburton also argues that its due process rights were violated by the panel's procedural errors.  (*Id.* at 22).

The Tremont Parties contest Halliburton's assertion of "manifest disregard" of procedural law.  The Tremont Parties argue that the Allocation Award is not inconsistent with the Contract Award, in which the panel found that Halliburton had to indemnify the Tremont Parties for response costs arising out of operations of the Petroleum Services Business with the exception of the 100 Acres.  (Docket Entry No. 181 at 37).  In the Allocation Award, the panel found that Halliburton was responsible for response costs for the entire Site.  The panel changed its conclusion as to whether the 100 Acres was included in Halliburton's indemnification obligations not because it changed the criteria for deciding the indemnification issue, but because it examined more closely the evidence on how to apply those criteria.  (*See id.* at 37).  The Tremont Parties also contend that even if the awards are inconsistent, that would not be a basis for vacatur.  (*Id.* at 38).  The Tremont Parties argue that the panel's consideration of affidavits addressing which party was responsible for liabilities relating to "leased property" in the Allocation Phase was also proper because the AAA Rules allow a panel to accept affidavit testimony after a hearing has concluded;

66

Halliburton told the panel that the issue of responsibility for "leased property" had to be decided in the Allocation Phase; and AAA Rules provide the arbitrators considerable discretion on such procedural issues as how to present evidence and whether to separate the hearings and decisions into phases. (*Id.* at 38–39). Finally, the Tremont Parties argue that the panel's clarification of the Contract Award in the Allocation Award is not grounds for vacatur because the Contract Award was an "interim" award that the panel had authority to modify and because Halliburton has not shown "substantial injustice." (*Id.* at 41).

### 2. Contractual Limits on Authority to Modify Arbitration Award

In support of its position that the panel exceeded its authority in modifying the Contract Award in the Allocation Phase, Halliburton cites *Smith v. Transport Workers Union of Am., AFL-CIO Air Transport Local 556*, 374 F.3d 372 (5th Cir. 2004) (per curiam). (Docket Entry No. 176 at 20). That case is easily distinguishable from the facts of this case. In *Smith*, the court affirmed vacatur of an arbitration award "[b]ecause the arbitration *agreement clearly restricts the authority of the arbitrators to amend* or correct their award." *Smith*, 374 F.3d at 374 (emphasis added). The arbitration agreement in *Smith* stated: "'The arbitrators *sua sponte* may amend or correct their award within three business days after the award, but the parties shall not have a right to seek correction of the award.'" *Id.* (quoting the arbitration agreement). Despite that clear limit in the agreement, the arbitration panel modified the award more than a month after the initial award. *See id.* The Fifth Circuit noted that arbitration is a matter of contract and that "the plain wording of the arbitration agreement contemplates that the arbitrators will not consider correcting the arbitral award at

all at the behest of the parties, and forbids a correction or amendment on the arbitrators['] own motion more than three business days after the award." *Id.* at 374–75. Based on the restrictive language of the arbitration agreement, the court concluded that the modification was beyond the arbitrators' power. *Id.* at 375.

In contrast, the arbitration agreement in this case contains no specific limit on the panel's authority to modify its Contract Award in the Allocation Phase. There is no basis to conclude that the panel acted outside the scope of the arbitration agreement.

### 3.     The *Functus Officio* Doctrine

Halliburton's argument that the panel's redetermination of the Tremont Parties' liability for the 100 Acres response costs violates the *functus officio* doctrine is also misplaced. In support of its argument, Halliburton cites to *Pace Union, Local 4-1 v. BP Pipelines (N. Am.)*, 191 F. Supp. 2d 852 (S.D. Tex. 2002). In *Pace Union*, the court noted the limited applicability of the *functus officio* doctrine: "[A]s other courts have previously recognized, the doctrine of functus officio has been substantially diminished by the federal courts over the years, so much so that today it is arguably 'hanging on by its fingernails and whether it can even be said to exist in labor arbitration is uncertain.'"[13] *Pace Union*, 191 F.

---

[13] Halliburton has stated that the *functus officio* doctrine has been accepted by the Fifth Circuit. (Docket Entry No. 176 at 20 n.11 (citing *Brown v. Witco Corp.*, 340 F.3d 209, 218 (5th Cir. 2003)). But the case cited by Halliburton noted the limited applicability of the doctrine: "Although the doctrine of *functus officio* was strictly enforced at common law (often to thwart the effectiveness of arbitration), in the wake of the Supreme Court's pro-arbitration decision in *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448 (1957), the doctrine has not been as strictly enforced in labor dispute cases arising under Section 301 of the LMRA." *Brown*, 340 F.3d at 218–19. The court continued: "Furthermore, there are a number of well-recognized exceptions to the *functus officio* rule. An arbitrator can (1) correct a mistake which is apparent on the face of his award; (2) decide an issue which has been submitted but which has not been completely adjudicated by the original award; or (3) clarify or construe an arbitration award that seems complete but proves to be

Supp. 2d at 856.

The *Pace Union* court framed the *functus officio* doctrine as involving the appropriateness of remanding a collateral dispute involved in an arbitration award to the original arbitrator, as opposed to requiring the parties to air their collateral dispute through the grievance machinery. *See id.* at 856–60. The court noted that the Fifth Circuit had previously found that remand to the original arbitrator is appropriate only "'when an award is patently ambiguous, when the issues submitted were not fully resolved, or when the language of the award has generated a collateral dispute.'" *Id.* at 857 (quoting *Oil, Chem. & Atomic Workers Int'l Union, Local 4-367 v. Rohm & Haas, Texas Inc.*, 677 F.2d 492, 495 (5th Cir. 1982)). The court analyzed a First Circuit opinion that had held that *functus officio* did not apply because "'the unresolved remedy issue was within the scope of the parties' original submission to the arbitration board. . . . The Company was certainly on notice that, incident to any finding of wrongful discharge, the original arbitrators, who were specifically asked to determine the appropriate remedy, would have to define, to whatever extent seemed necessary, the scope of the lost wage remedy provided by the bargaining agreement.'" *Id.* at 858 (quoting *Locals 2222, 2320-2327, Int'l Bhd. of Elec. Workers v. New England Tel. and Tel. Co.*, 628 F.2d 644, 649 (1st Cir. 1980)). In *Pace Union*, the court held that the Union and BP had submitted "*two separate but related inquires* for final resolution before [the arbitrator], i.e., whether BP had just cause for discharging [the employee], and if not,

---

ambiguous in its scope and implementation." *Id.* at 219. The court concluded that the arbitrator's "Clarification Letter" at issue fell within an exception to the *functus officio* rule. *Id.*

what the appropriate remedy would be." *Id.* at 859.  In light of these submissions, the court held: "By virtue of this submission, BP explicitly consented to and was on notice that Arbitrator Goodstein, upon determining that Jackson had been wrongfully discharged, would impose a remedy to redress such wrong." *Id.*  The court continued: "That [the arbitrator] may have fashioned the remedy in such a way as to leave certain issues unresolved and/or create certain collateral questions does not alter the fact that the current dispute between the Parties falls squarely within the scope of Arbitrator Goodstein's initial charge." *Pace Union*, 191 F. Supp. 2d at 859.

Halliburton also cited to *Teamsters Local 312 v. Matlack, Inc.*, 916 F. Supp. 482 (E.D. Pa. 1996), *aff'd*, 118 F.3d 985 (3d Cir. 1997), to support its *functus officio* argument. (Docket Entry No. 176 at 20).  That case noted that the doctrine "is predicated on the need for finality.  It is also designed to prevent improper influences on an arbitrator to change his or her mind once a final decision is rendered."  *Matlack*, 916 F. Supp. at 485 (citation omitted).  In that case, it was undisputed that the arbitrator had issued a final award.  *Id.*  The court recognized the limited applicability of the doctrine, noting that the Third Circuit had never applied it to arbitration awards under collective bargaining agreements, and that the Circuit had recognized a number of exceptions to the doctrine.  *Id.* at 485–86.  In discussing the doctrine's limits, the court also recognized that "procedural decisions by arbitrators are solely within their discretion and not subject to second guessing by the courts."  *Id.* at 486.  The court analogized to another case that involved a situation where the arbitrator had made a mistake in his initial award and then attempted to provide a procedural mechanism to fix

70

the mistake, offering the aggrieved party the option of accepting the award or voiding it and rearbitrating. *Id.* (citing *United Steelworkers of Am. v. Ideal Cement Co., Div. of Ideal Basic Indus., Inc.*, 762 F.2d 837, 841 (10th Cir. 1985)). When the aggrieved party in *Ideal Cement* chose to void the award, the opponent sought to have the award enforced in district court. *Id.* The *Ideal Cement* court did not decide whether the *functus officio* doctrine was applicable, but held that procedural matters are within an arbitrator's discretion and that courts should not second guess arbitrators' procedures used to protect the integrity of the arbitration process. *Id.* (citing *Ideal Cement*, 762 F.2d at 841). In *Matlack*, the arbitrator had told the parties he would postpone a final decision on the merits, but failed to do so and issued an award after hearing from only one party. *Matlack*, 916 F. Supp. at 486. The court held that "neither functus officio nor any doctrine of finality can be invoked to enforce the award under these circumstances." *Id.* "While the arbitrator's error was not intentional, his error nonetheless resulted in fundamental unfairness." *Id.* at 486–87.[14]

The limited nature of the *functus officio* doctrine makes it inappropriate to extend it to the facts of this case, involving a panel that bifurcated the issues it was charged with

---

[14] Halliburton argues that *Matlack*, 916 F. Supp. at 486, supports vacatur because the court vacated the substantive portion of the award finding that the arbitrator had made a procedural error. (Docket Entry No. 176 at 21–22). But in *Matlack*, the court declined to enforce an award where the arbitrator recognized that he had mistakenly addressed the merits after promising the parties additional time for briefing. That is quite different from the situation here, where the panel addressed issues within the scope of what it was charged with resolving. The fact that the panel may have crafted a procedural mechanism to correct a potential error while the arbitration was still pending and which it may have perceived would cause fundamental unfairness does not stray from the principle in *Matlack* that awards will not be enforced on the doctrine of *functus officio* where the enforcement will result in fundamental unfairness. The panel's adjustment of the Contract Award in the Allocation Award is consistent with *Matlack* because it arguably prevented what the arbitrators perceived to be a mistake from the Contract Award from being enforced.

resolving and allegedly modified one of its rulings in the first phase during the resolution of closely related issues in the second phase.  Even if the doctrine as applied in *Pace Union* could be analogized to this case, that would tend to support the panel's modification of one of the rulings in the Contract Phase during the Allocation Phase.  In *Pace Union*, BP had submitted two separate but related issues for resolution.  The court held that BP could not object when a question arose as to one of those issues, resulting in remand to the original arbitrator.  *See Pace Union*, 191 F. Supp. 2d at 859.  In the present case, Halliburton agreed to the submission of both the contract issues and allocation issues to the arbitration panel. As in *Pace Union*, the contract and allocation issues were separate but closely related.  The panel's order bifurcating the proceedings did not purport to define with precision which questions were to be decided in the Contract Phase and which were to be decided in the Allocation Phase.  The close relationship of the issues in the two phases led the panel to continue to examine the facts and the evidence that bore on the questions addressed in the first phase during the second phase.  The panel did not redefine the criteria for determining how to answer the questions addressed in the Contract Phase, but did refine the application of those criteria that changed the answer to one of those questions, which party was obligated to indemnify the other for liabilities associated with the 100 Acres. The doctrine of *functus officio* does not provide a basis for vacatur.

### 4.    The Arbitrators' Ability to Modify Interim Orders

Halliburton's argument that the panel lacked authority to make any modifications to the Contract Award in the Allocation Phase and that the panel could not reopen the evidence

72

from the Contract Phase in the Allocation Phase appears to be premised on characterizing the Contract Award as a "final" award.  The law is not clear as to when an arbitration award is considered "final" in this context.  Courts considering the issue usually focus on finality for the purpose of determining whether an award is ripe for review by a district court, as opposed to whether it is final for the purpose of precluding the arbitrators from making any changes. There is no rigid rule for determining finality for the purpose of district court review.

"'Normally, an arbitral award is deemed 'final' provided it evidences the arbitrators' intention to resolve *all* claims submitted in the demand for arbitration.'"  *Hart Surgical, Inc. v. Ultracision, Inc.*, 244 F.3d 231, 233 (1st Cir. 2001) (quoting *Fradella v. Petricca*, 183 F.3d 17, 19 (1st Cir. 1999)).  However, the *Hart Surgical* case noted that "[s]everal circuits have . . . recognized exceptions to this general rule."  *Id.* at 233–34 (citations omitted).  For example, the Second Circuit upheld a court's power to review an arbitration award on a counterclaim without resolution of the claim, noting that "'an award which finally and definitely disposes of a separate independent claim may be confirmed although it does not dispose of all the claims that were submitted to arbitration.'"  *Id.* at 234 (quoting *Metallgesellschaft A.G. v. M/V Capitan Constatne*, 790 F.2d 280, 283 (2d Cir. 1986)).  The First Circuit had previously approved of the Second Circuit's approach when it affirmed a district court's power to review a partial award rendered in the first phase of an arbitration. *Id.* (citing *Bull H/N Info. Sys., Inc. v. Hutson*, 229 F.3d 321, 328 (1st Cir. 2000)).  Another Second Circuit case has held that "'if the parties have asked the arbitrators to make a final partial award as to a particular issue and the arbitrators have done so, the arbitrators have no

73

authority, absent agreements by the parties, to redetermine that issue.'" *Id.* (quoting *Trade & Transport, Inc. v. Natural Pet. Charterers Inc.*, 931 F.2d 191, 195 (2nd Cir. 1991)).  In *Hart Surgical*, the court held that "the definiteness with which the parties have expressed an intent to bifurcate is an important consideration," noting that courts have distinguished between whether the panel decides on its own to issue an "interim" award or whether there was a formal bifurcation. *Id.* at 235 (citing *Michaels v. Mariforum Shipping, S.A.*, 624 F.2d 411, 413–14 (2d Cir. 1980)).

In *Hart Surgical*, the plaintiff began arbitration proceedings in accordance with an arbitration clause in the parties' contract.  244 F.3d at 232.  The parties agreed to bifurcate the arbitration into liability and damages phases, and the arbitration panel approved of the agreement. *Id.*  Following a trial on the liability issues, the panel issued an award holding that the defendants had wrongfully terminated the distribution agreement they had entered with the plaintiff. *Id.*  The defendants moved in federal district court to vacate the award. *Id.*  Pursuant to an unopposed motion, the court stayed consideration of the motion to vacate pending resolution of the damages phase or settlement. *Id.* at 232–33.  After it became apparent that the damages phase of the arbitration would not be completed within the contemplated time, the defendants requested a lift of the stay. *Id.* at 233.  The court asked for briefing as to why the case should not be dismissed on the ground that the arbitration award on liability was not final under the FAA. *Hart Surgical*, 244 F.3d at 233.  The court defined the issues as follows: "The first [issue] is whether an award concerning a discrete portion of an arbitration action, or a partial award, is reviewable by the district court.  If so,

74

the second and more specific question is whether this power to review extends to a partial

award on liability in a bifurcated proceeding." *Id.*  The court held that the liability award was

final based on the specific facts involved.  The parties had submitted in a discrete proceeding

all the evidence pertaining to liability.  *Id.* at 235.  The arbitrators "'conclusively decided

every point required by and included in' this submission as their 'authority and

responsibility' demanded." *Id.*  The court noted that the issue is "a complicated one that is

sure to recur in different contexts." *Id.*  The court explained:

> There is very little case law in point and the Second Circuit
> cases that are most relevant are seemingly at odds.  Though we
> hold that the district court can review the partial award in this
> case, we think it best to limit our holding to the situation in
> which there is a formal, agreed-to bifurcation at the arbitration
> stage.  We reserve judgment on what would happen if, for
> example, in the absence of bifurcation the arbitrator issued an
> initial decision on liability and one party then sought district
> review.  The outcome in such a scenario might depend on the
> circumstances, and we prefer not to prejudge that result.[15]

*Id.* at 235–36.

Another court has also emphasized the importance of the intentions of the parties and

the arbitrators as to whether an award that did not resolve all issues would be final.  In *Trade*

*& Transport, Inc. v. Natural Pet. Charterers Inc.*, 931 F.2d 191, 193–94 (2d Cir. 1991), the

court stated that "when an arbitration award is rendered as a final award or, as in this

---

[15]  "The holding [in *Hart Surgical*] was limited to cases in which the parties had formally agreed to bifurcate the arbitration.  The court's reasoning in *Hart* was subsequently extended to situations where bifurcation was informally agreed to."  *Crawford Group, Inc. v. Holekamp*, No. 4:06-CV-1274 CAS, 2007 WL 844819, at *4 (E.D. Mo. March 19, 2007) (citing *Providence Journal Co. v. Providence Newspaper Guild*, 271 F.3d 16 (1st Cir. 2001)).

instance, a partial final award, the arbitrators become functus officio as to the issue upon which the Final or Partial Award was made," *id.* at 193–94, and "if the parties have asked the arbitrators to make a final partial award as to a particular issue and the arbitrators have done so, the arbitrators have no further authority, absent agreement by the parties, to redetermine that issue," *id.* at 195.

Another court has held that whether an award is final for the purpose of district-court reviewability focuses on the language of the award and the intent of the arbitrators. *See Crawford Group, Inc. v. Holekamp*, No. 4:06-CV-1274 CAS, 2007 WL 844819, at *5 (E.D. Mo. March 19, 2007). In *Crawford Group*, the arbitration panel noted in its "interim" award that both parties agreed that the panel would decide the issues of attorneys' fees and related expenses after a determination on the merits, and the court found that "[t]he language of the interim award thus indicates that both the parties and the arbitrators agreed that the arbitration would be bifurcated." *Id.* at *3. The court noted that the final award did not alter or change the liability or damages conclusions reached in the interim award and only addressed ancillary issues. *Id.* The court held that because both the interim award and the final award indicated that the interim award was a final decision on the merits for all of the most significant issues, the arbitrators intended the interim award to be final as to the substantive issues. *Id.* at *5.

Yet another court considering its ability to confirm an interim arbitration award also focused on whether finality was established by the agreement to bifurcate. *See Andrea Doreen, Ltd. v. Bldg. Material Local Union 282*, 250 F. Supp. 2d 107 (E.D.N.Y. 2003). In

*Andrea Doreen*, the parties agreed to bifurcate the liability and remedy phases of the arbitration. *Id.* at 110. After the liability phase, the court treated a summary judgment motion as implicitly seeking to confirm the arbitration award. *Id.* at 110–11. The court noted that "[g]enerally, an arbitration award is final when no further litigation is necessary on the issue and the arbitrator intended that the award be final." *Id.* at 111 (citing *Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc.*, 157 F.3d 174, 177 (2d Cir. 1998)). The court stated: "Normally, for an arbitration award to be deemed final, the arbitrator must have determined damages in addition to liability." *Id.* at 112 (citing *Michaels v. Mariforum Shipping, S.A.*, 624 F.2d 411, 413–14 (2d Cir. 1980)). However, the court held that because the parties agreed to bifurcate liability issues and damages issues, the arbitrator's decision on liability was final and could be confirmed. *Id.* (citing *McGregor Van De Moere, Inc. v. Paychex, Inc.*, 927 F. Supp. 616, 618 (W.D.N.Y. 1996); *Corporate Printing Co. v. N.Y. Typographical Union No. 6*, No. Civ. A. 93-6796, 1994 WL 376093, at *5 (S.D.N.Y. July 18, 1994)). The court also noted "once a final partial decision is made as to a particular issue, 'the arbitrators have no further authority, absent agreement by the parties, to redetermine that issue.'" *Id.* (citing *Trade & Transport*, 931 F.2d at 195; *McGregor Van De Moere*, 927 F. Supp. at 618; *Corporate Printing Co.*, 1994 WL 376093, at *5). The court concluded that nothing in the record suggested that the parties and the arbitrator believed the decision on liability would not be final. *Id.* As a result, the court determined that it had the ability to, and did, confirm the interim award, stating that "[i]t is not the function of this Court to review the arbitration record for legal or factual errors because that would defeat a primary purpose of

77

arbitration—to dispose of disputes quickly thus avoiding the expense and delay of extended court proceedings, notwithstanding any diminution in the quality of justice." *Id.* at 115–16 (citing *Diapulse Corp. v. Carba, Ltd.*, 626 F.2d 1108, 1110 (2d Cir. 1980); *Saxis Steamship Co. v. Multifacs Int'l Traders Inc.*, 375 F.2d 577, 582 (2d Cir. 1967); *Compania Chilena De Navegacion Interoceanica v. Norton, Lilly & Co. Inc.*, 652 F. Supp. 1512, 1515 (S.D.N.Y. 1987)).

In contrast to the cases considering "finality" in the context of a court's ability to confirm an interim arbitration award, the Second Circuit has directly considered an arbitrator's ability to reconsider issues decided in an earlier phase of a bifurcated proceeding. *See generally Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*, 304 F.3d 200 (2d Cir. 2002). *Westerbeke* involved a breach of contract claim on which Westerbeke prevailed in arbitration. *Id.* at 203. Westerbeke moved to confirm the award; Daihatsu Motor Company moved to vacate. *Id.* The Second Circuit disagreed with the district court's holding that the arbitrator had manifestly disregarded applicable law in awarding expectancy damages, finding that the district court did not give proper deference to the arbitrator's factual determinations. *Id.* at 203–04. The arbitrator had bifurcated the proceedings into a liability phase and a damages phase, with the liability phase focused on whether a particular engine was an "engine" within the meaning of one section of a "Component Sales Agreement." *Id.* at 205. The arbitrator issued an interlocutory order on his liability rulings. *Id.* at 205–06. The key dispute turned on whether the interlocutory order had interpreted the section of the parties' contract as creating an agreement to negotiate or as creating a contract with a

78

condition precedent.  *See Westerbeke*, 304 F.3d at 211.  Noting that the interlocutory order

could be read to have interpreted the section either way, the court concluded: "We need not

deconstruct the Interlocutory Award in order to figure out how the arbitrator construed the

CSA [Component Sales Agreement], however, as the arbitrator clarified his findings in the

Final Award."  *Id.*  The court rejected Daihatsu's request to ignore the findings in the final

award as contrary to the interlocutory award, stating that "[a]s a preliminary matter, internal

inconsistencies within an arbitral judgment are not grounds for vacatur."  *Id.* (citing *Saint*

*Mary Home, Inc. v. Serv. Employees Int'l Union, Dist. 1199*, 116 F.3d 41, 44–45 (2d Cir.

1997)).[16]

        In *Westerbeke*, Daihatsu argued that the arbitrator had acted in manifest disregard of

New York's "law of the case" doctrine when he "abandoned his earlier ruling that Daihatsu

breached the CSA by refusing to negotiate for the sale of the E-070 engine."  *Id.* at 218–19.

The court held that the arbitrator did not abandon his previous liability holding, largely

because the interlocutory order could reasonably have been interpreted as consistent with the

---

        [16] The court nonetheless concluded that there was no inherent inconsistency between the findings in the interlocutory award and the final award.  *See Westerbeke*, 304 F.3d at 212.  The court noted that "[t]o the extent that there was any remaining ambiguity with respect to the arbitrator's construction of Article 3.2 following the issuance of the Final Award, we still would adopt our present understanding of the arbitrator's findings.  We are obliged to give the arbitral judgment the most liberal reading possible.  When reviewing an award where the arbitration tribunal has failed to detail its underlying factual findings, for example, we will confirm the award if we are able to discern any colorable justification for the arbitrator's judgment, even if that reasoning would be based on an error of fact or law."  *Id.* at 212 n.8.  The court further noted that "where the arbitral tribunal has handed down an opinion open to more than one possible reading, we will confirm the award so long as, under one of these readings, the judgment rests upon a colorable interpretation of law."  *Id.* (citing *United Steelworkers v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 598 (1960)).  Later in the opinion, the court again expressed the limited standard of review: "[W]e have serious reservations about the soundness of the arbitrator's reading of this contract.  Yet our standard of review constrains us to affirm an arbitrator's judgment even if 'a court is convinced he committed serious error.'"  *Id.* at 216 n.10 (quoting *Pike v. Freeman*, 266 F.3d 78, 86 (2d Cir. 2001) (quotation marks omitted)).

final award.  *See id.*  However, the court concluded that even "[a]ssuming the arbitrator did

revisit his liability holding at the Final Award phase of the case, Daihatsu's argument would

still fail in a number of respects."  *Id.*  Even assuming that the arbitrator was bound to follow

the procedural rule of the "law of the case" doctrine, the court "doubt[ed] that an arbitrator's

manifest disregard of the 'law of the case' doctrine could ever support vacatur of an arbitral

judgment" because "'[l]aw of the case' is a discretionary doctrine."  *Westerbeke*, 304 F.3d

at 219 (citations omitted).  The court explained that "this 'amorphous' rule of practice is a

far cry from the well-defined substantive legal principles that constitute clearly applicable

governing law."  *Id.*  The court noted that the "law of the case" doctrine only applies if "'the

parties had a 'full and fair' opportunity to litigate the initial determination.'"  *Id.* (quoting

*People v. Bilsky*, 734 N.E.2d 341 (N.Y. 2000)).  Because the liability phase of the arbitration

had addressed whether the E-070 engine fell within the scope of the disputed contract

section, and had not addressed what type of contract was created by that section, the latter

issue was not fully and fairly litigated in the liability phase.  *Id.*  The court concluded that the

fact that the arbitrator had stated at the outset of the Final Award that the Interlocutory

Award remained binding was not sufficient to show that the arbitrator was aware of the

applicability of the "law of the case" doctrine, let alone evidence of intentional or manifest

disregard.  *See id.*

  In the present case, the parties agreed to arbitrate their dispute in front of a panel of

arbitrators, and the panel entered a procedural order stating the following:  "The arbitration

hearing shall be bifurcated.  A separate hearing shall be held on all issues of fact and law

relating to (1) Claimants' and Respondents' respective contract claims, corporate successor claims and merger claims (hereinafter collectively the 'Contract Claims') and (2) Claimants' and Respondents' respective remaining claims (the 'Allocation Claims')."  (Docket Entry No. 176, Ex. 1 at 1).  The order does not purport to characterize the finality of the initial phase award.  As the panel recognized in its decision on the Allocation Phase, the evidence necessary to decide the Contract Claims and the Allocation Claims overlapped and the specific questions relevant to both phases overlapped.

In its reply brief in support of its motion to vacate, Halliburton implies that the panel violated the "law of the case" doctrine, although it does not expressly state this argument. (*See* Docket Entry No. 210 at 13 (arguing that the Tremont Parties had previously asserted the finality of the Contract Award, and quoting the Tremont Parties' counsel's statement from the Allocation Phase, "When I read your findings 1 and 2, which say Halliburton has responsibility for all the petroleum service operations except for the 100 acres, ***it's a decided issue.  It's now sort of law of the case.***") (quoting Arbitration Transcript,[17] Allocation Phase, Vol. III, p. 640) (emphasis added by Halliburton)).[18]  As the Tremont Parties point out, nothing in the AAA Rules prevented the panel from considering contract issues that related

---

[17] The parties have submitted the transcripts from both phases of the arbitration on different occasions.  For ease of reference, when this court refers to the transcript from either phase, it is referring to the CD submitted by the Tremont Parties labeled "Tremont/Halliburton Transcripts of Contract and Allocation Hearings."

[18] Just after this statement in the Allocation Phase, the Tremont Parties' counsel recognized that the "law of the case" doctrine might not have the same force in arbitrations as it does in federal court.  (*See* Arbitration Transcript, Allocation Phase, Vol. III, p. 640 ("It's an arbitration, but in a normal scenario it would be law of the case.")).

to the Allocation Phase, even if those issues also had to be considered in the Contract Phase. (*See* Docket Entry No. 181 at 39).

Like the party seeking vacatur in *Westerbeke*, Halliburton has not established a basis for vacating the awards because one of a number of rulings in the first-phase Contract Award was modified in the second-phase Allocation Award. It is not clear that the Contract Award was "final" for the purpose of permitting confirmation before the Allocation Award issued.[19] Halliburton has failed to establish that the panel could not reconsider issues from the Contract Phase during the Allocation Phase, when both were within the same arbitration, involved overlapping issues, and the issues before the arbitrators could not be resolved until the completion of both phases.

### 5.    The Deference Given to Procedural Decisions

Halliburton's argument that the panel manifestly disregarded procedural law also fails because courts must give particular deference to the procedures used by arbitrators. *See Blanchard and Co., Inc. v. Heritage Capital Corp.*, No. 3:97-CV-0690-H, 2000 WL 1281205, at *3 (N.D. Tex. Sept. 11, 2000) ("Such complaints regarding the procedure of the arbitration are certainly not within the limited power of review [of arbitration awards] that

---

[19] Halliburton previously argued that the Contract Award was not final and could not be confirmed before the Allocation Phase in its Alternative Request for Relief in Opposition to the Tremont Parties' Motion to Confirm Arbitration Award Dated June 29, 2007. (*See* Docket Entry No. 162 at 4 ("Because the panel has not rendered a 'mutual, final and definite' award upon the subject matter submitted, the Motion to Confirm is based upon an interlocutory award and should be denied or dismissed as premature.")).

The Tremont Parties also previously took a position contrary to their current position, arguing that the Contract Award was final and could be confirmed before the Allocation Phase in their Reply Memorandum Re: Motion to Confirm Arbitration Award of June 29, 2007. (*See* Docket Entry No. 166 at 3 ("[T]he Arbitration Panel's [Contract Phase] decision has decided discrete issues that are not subject to change or revision.")).

this court exercises.") (citing *United Steelworkers of Am. v. Ideal Cement Co., Div. of Ideal Basic Indus., Inc.*, 762 F.2d 837, 841 (10th Cir. 1985), for the proposition that "federal courts are to give great deference to arbitrator's decisions on matters of procedure").   The *Blanchard* case noted that "[b]ecause an arbitration proceeding is much less formal than a trial in court, '[i]n handling evidence an arbitrator need not follow all the niceties observed by the federal courts.  He need only grant the parties a fundamentally fair hearing.'"   *Id.* (quoting *Totem Marine Tug & Barge, Inc. v. N. Am. Towing, Inc.*, 607 F.2d 649, 651 (5th Cir. 1979)).

Even if a reviewing court questions the procedures the panel followed, vacatur for procedural defects may not result unless the effect was to deprive a party of due process.  *See In the Matter of the Arbitration Between: Trans Chem. Ltd. & China Nat'l Mach. Imp. & Exp. Corp.*, 978 F. Supp. 266, 303 (S.D. Tex. 1997) ("'[W]hatever indignation a reviewing court may experience in examining the record, it must resist the temptation to condemn imperfect proceedings without a sound statutory basis for doing so.'") (quoting *Forsythe Int'l, S.A. v. Gibbs Oil Co. of Texas*, 915 F.2d 1017, 1022 (5th Cir. 1990)), *aff'd*, 161 F.3d 314 (5th Cir. 1998); *see also Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*, 341 F.3d 987, 998 (9th Cir. 2003) ("The grounds [for vacatur] afford an extremely limited review authority, a limitation that is designed to preserve due process but not to permit unnecessary public intrusion into private arbitration procedures.").   As the *Kyocera* court noted, "Congress's decision to permit sophisticated parties to trade the greater certainty of correct legal decisions by federal courts for the speed and flexibility of arbitration determinations

is a reasonable legislative judgment that we have no authority to reject." *Kyocera*, 341 F.3d at 998.

Based on the deference given to arbitrators' procedural decisions, this court rejects Halliburton's argument that the panel violated its bifurcation order so as to require vacatur. An arbitrator's failure to follow his own rulings is not in itself grounds for vacatur. *See Alpert v. Bennett Law Firm, P.C.*, No. H-06-1642, 2007 WL 2409354, at *5–6 (S.D. Tex. Aug. 21, 2007). In *Alpert*, the defendant sought vacatur in part because the arbitrator "failed both to follow the AAA rules and to enforce his own rulings related to the arbitration proceedings." *Id.* at *5. The court noted:

> Arbitration "is a speedy and informal alternative to litigation, and, by its very nature, is intended to resolve disputes without confinement to many of the procedural and evidentiary strictures that protect the integrity of formal trials." "Rigorous procedural limitations" should not be imposed on the process, and a court "must resist the temptation to condemn imperfect proceedings without a sound statutory basis for doing so."

*Id.* (quoting *Prestige Ford v. Ford Dealer Computer Servs., Inc.*, 324 F.3d 391, 394 (5th Cir. 2003) (internal citations omitted)); *see also Blake v. Transcomm. Inc.*, No. Civ.A. 01-2073-CM, 2004 WL 955893, at *7 (D. Kan. Feb. 4, 2004) (noting that courts "will defer to the procedural methods employed by an arbitrator to best determine the outcome of an arbitration" and finding that "even though the arbitrator may not have followed the AAA Rules in a precise manner, the arbitrator's actions were not in manifest disregard of the law."). An arbitrator's failure to follow certain procedures is not a basis for vacatur because of the "strong presumption in favor of confirming an arbitration award" and the absence of

84

a legal standard for imposing vacatur based on violations of AAA Rules.  *Alpert*, 2007 WL 2409354, at *6.

The fact that an arbitration award contains inconsistencies is similarly not sufficient for vacatur.  *Saint Mary Home, Inc. v. Serv. Employees Int'l Union, Dist. 1199*, 116 F.3d 41, 44–45 (2d Cir. 1997) ("Internal inconsistencies in the opinion are not grounds to vacate the award notwithstanding the Home's plausible argument that the arbitrator's decision was misguided or our own concerns regarding the arbitrator's conclusion.  In contracting for arbitration of disputes . . ., the parties bargained for a decision by the arbitrator, not necessarily a good one, and that is what they received.") (citing *United Paperworks Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987)).

Halliburton's assertion that the panel's manifest disregard of procedural law should result in vacatur cannot succeed because Halliburton has not shown that it was deprived of due process.  Halliburton has not shown that the panel failed to provide the procedural protections applicable in arbitration.  "The parties must have an opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  *Kahara Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 299 (5th Cir. 2004) (quoting *Iran Aircraft Indus. v. Avco Corp.*, 980 F.2d 141, 146 (2d Cir. 1992)).  "'The right to due process does not include the complete set of procedural rights guaranteed by the Federal Rules of Civil Procedure.'"  *Id.* (quoting *In the Matter of the Arbitration Between: Trans Chem. Ltd. & China Nat'l Mach. Imp. & Exp. Corp.*, 978 F. Supp. 266, 310 (S.D. Tex. 1997), *aff'd*, 161 F.3d 314 (5th Cir. 1998)).

During the Allocation Phase, Halliburton's counsel acknowledged that the issue of indemnification for the leased properties had to be resolved in that Phase. (*See* Arbitration Transcript, Allocation Phase, Vol. II, p. 607 ("I don't want to, for purposes of the opening statement, spend a lot of time on leased properties, but it's an issue that needs to be addressed and resolved and it should be taken into account in any allocation scheme.")).  Halliburton itself raised contract issues related to allocation issues in its opening statement in the Allocation Phase.  The record does not show that Halliburton's due process rights were violated by the panel's consideration of some of the contract issues in the Allocation Phase. To the contrary, despite an argument by the Tremont Parties that Halliburton had waived its right to present evidence in the Allocation Phase regarding leased properties because it had failed to put forth evidence about the leased properties in the earlier Contract Phase, the panel permitted Halliburton to present evidence on the leased properties in the Allocation Phase, noting that arbitration is not restricted by strict adherence to the procedural rules applicable in federal court.[20]  (Docket Entry No. 172, Ex. 1 at 30).  Halliburton itself requested, and was given, an opportunity to raise some of the contract issues related to allocation in the Allocation Phase.

In addition, Halliburton was afforded, and took advantage of, the opportunity to address issues of ownership and indemnification responsibility for environmental liabilities

---

[20] In addition, the panel noted that although it allowed the Tremont Parties to submit "clarifying" affidavits in the Allocation Phase over Halliburton's objection, "Respondents [Halliburton] filed their own Proffer of Proof in response on August 3, 2007, and likewise filed a counter affidavit from Tracy Elkins regarding the leased properties, which likewise was accepted beyond the originally scheduled filing dates." (Docket Entry No. 172, Ex. 1 at 16 n.3).

associated with the 100 Acres during the Contract Phase.  (*See* Arbitration Transcript, Contract Phase, Vol. I at 218 (In Halliburton's opening statement, its counsel argued: "Pursuant to paragraph 11 of the 1990 plan, HESI is entitled to full indemnity from Tremont and therefore should have no historical liability for the 100 acres regardless of whether HESI is found to be the current owner of that property.")).  The Allocation Award notes that the panel had focused on ownership interests in various parcels of property at the Site during the Contract Phase.  (Docket Entry No. 172, Ex. 1 at 27–28). Although the panel focused primarily on property ownership issues during the Contract Phase, the Contract Award recognized that responsibility for the Site flowed from the transfer of the Petroleum Services Business in the restructuring contracts.  (Docket Entry No. 172, Ex. 2 at 13 ("All indemnification obligations flow from the original Plan of Restructuring of NL Industries Inc. dated September 16, 1988 ('1988 Plan'), and the [1990] Plan.  With respect to the Halliburton Parties, the Panel understands that, prior to the merger of Halliburton and Dresser in 1998, one of the preceding Dresser entities had acquired the assets and liabilities of New Baroid that had been involved in the petroleum services business. . . .  Consequently, to the extent that indemnity obligations owed by New Baroid to Old Baroid and its successors in connection with the petroleum services business transferred to D II, HESI has acquired and is responsible for those obligations.")).  The panel's holding in the Allocation Phase that Halliburton is responsible for indemnifying the Tremont Parties with respect to the 100 Acres because that parcel was part of the Petroleum Services Business is consistent with the determination in the Contract Phase regarding the parties' intent as expressed in the various

contracts. Thus, the Allocation Award is consistent with what the panel professed to be doing in the Contract Phase—determining ownership and indemnity issues in accordance with the parties' stated intent to transfer the Petroleum Services Business to New Baroid. The panel did not change the criteria for determining what ownership interests and indemnification obligations transferred during the 1988 and 1990 restructurings; to the extent the panel's holding with respect to the 100 Acres was modified in the Allocation Award, that award clarified the application of those criteria with respect to the 100 Acres.

Even if this court disapproves of the procedure in which the panel adjusted its holding as to which party had to indemnify the other for remediation and response costs for environmental liabilities for the 100 Acres in the Allocation Phase, given the deference given to arbitrators' procedural decisions and given that Halliburton had the opportunity to present ample evidence on the 100 Acres in the Contract Phase, this court cannot vacate the awards on the ground of manifest disregard of procedural law. Halliburton was afforded the right to be heard on that issue. Its due process rights were not violated.

In sum, Halliburton has not met the burden of showing a manifest disregard of procedural law so as to support vacatur.[21] Halliburton has not shown either a disregard of

---

[21] Halliburton has argued that the panel erred by permitting the Tremont Parties to resubmit testimony and evidence from the Contract Phase during the Allocation Phase, and by permitting the Tremont Parties to introduce affidavits to clarify testimony from the Contract Phase. (Docket Entry No. 176 at 22). The deference given to procedural decisions made by arbitrators prevents this court from granting vacatur on this basis. In addition, the AAA Rules vest the arbitrator with the authority to determine the admissibility of post-hearing testimony and the limits of bifurcation of arbitration proceedings. *See* American Arbitration Association, Commercial Arbitration Rules and Mediation Procedures, http://www.adr.org/sp.asp?id=22440, Rule R-32 (describing the procedure for submission of documents or other evidence to the arbitrator following the hearing, upon agreement of the parties or direction by the arbitrator); *Id.* at Rule R-30 (discussing the arbitrator's authority to direct the order of proof, bifurcate proceedings, and direct the parties'

clearly applicable procedural law or that substantial injustice resulted. Although Halliburton argues that it would have prepared differently if it had known that responsibility for response costs associated with the 100 Acres was still in question, (Docket Entry No. 176 at 22), it is not clear that its preparation would have differed in any substantial way, or how different preparation would have brought about a different result in the Allocation Award. The record of the extensive submissions, arguments, and briefs precludes a finding that Halliburton suffered substantial injustice by the panel's consideration of issues relating to indemnification liability for the 100 Acres in the Allocation Phase.

### 6.      Vacatur for Arbitrators' Alleged Misconduct

While Halliburton has focused its arguments for vacatur for procedural errors on an alleged manifest disregard of procedural law, another potential basis for vacatur for procedural errors is 9 U.S.C. § 10(a)(3), which permits vacatur "where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced." This ground for vacatur also affords wide latitude to arbitrators in governing the procedure of the arbitration, and does not permit vacatur for errors in the law. *See Laws v. Morgan Stanley Dean Witter*, 452 F.3d 398, 399 (5th Cir. 2006). "'To constitute misconduct requiring vacation of an award,

---

focus). As the Tremont Parties point out, Halliburton's counsel raised the issue of leased properties during opening arguments for the Allocation Phase. (*See* Arbitration Transcript, Allocation Phase, Vol. II, p. 607 ("I don't want to, for purposes of the opening statement, spend a lot of time on leased properties, but it's an issue that needs to be addressed and resolved and it should be taken into account in any allocation scheme.")). The panel's acceptance of supplemental evidence on that issue is not a violation of due process.

an error in the arbitrator's determination must be one that is not simply an error of law, but which so affects the rights of a party that it may be said that he was deprived of a fair hearing.'"  *Id.* (quoting *El Dorado Sch. Dist. No. 15 v. Continental Cas. Co.*, 247 F.3d 843, 848 (8th Cir. 2001) (internal quotation marks omitted)).  In *Laws*, the plaintiff requested vacatur on the grounds that the arbitration panel had committed misconduct by denying him a continuance.  *Id.*  The court rejected that argument because the plaintiff did not argue or show that he had suffered prejudice by the delay.  *Id.* at 400.  The court held: "Absent even a representation that the materials produced on the eve of arbitration were important to his case or that a continuance might have altered the outcome of the arbitration, we cannot conclude that Laws was deprived of a fair hearing."  *Id.*  The court also found that even if the plaintiff could show that he would have benefitted from a continuance, he still would not be able to show misconduct because he was still afforded a fair hearing, as the record showed that there were multiple bases on which the panel might have denied the continuance.  *Id.*

In contrast to the situation in *Laws*, the Fifth Circuit has found vacatur appropriate for arbitrator misconduct where an arbitration panel has expanded the scope of the arbitration beyond what the parties agreed to and heard *ex parte* evidence in violation of AAA Rules.  *See Totem Marine Tug & Barge, Inc. v. N. Am. Towing, Inc.*, 607 F.2d 649 (5th Cir. 1979).  In *Totem Marine Tug*, the court found that the arbitrators had engaged in misconduct by calling counsel for one of the parties, obtaining information from that counsel, and adopting that information as the basis for computations in the award, all without informing the other side.  *See id.* at 652–53.  The court vacated the award because the misbehavior of the

arbitrators in this regard caused prejudice to the plaintiff.  *Id.* at 653.

Procedural aberrations are not sufficient to warrant vacatur under this prong of the FAA unless a party was deprived of a fundamentally fair hearing.  In *Mantle v. Upper Deck Co.*, 956 F. Supp. 719, 730 (N.D. Tex. 1997), the court rejected the assertion that the arbitrator engaged in misconduct by reviewing subpoenaed documents after he had agreed and previously ruled that he would not look at the documents and by depriving a party of the right to assert privileges.  The court explained:

> The procedural aberrations on which defendants rely to support vacatur are insufficient to establish affirmative misconduct or willful misbehavior.  Arbitration proceedings are not constrained by formal rules of procedure or evidence.  By agreeing to arbitration, a party trades the procedures and opportunities for review of the courtroom for the simplicity, informality, and expedition of arbitration.  Arbitrators should be expected to act affirmatively to simplify and expedite the proceedings before them.  They need provide only a fundamentally fair hearing.  Courts reviewing arbitral awards may not superimpose rigorous procedural limitations upon the conduct of the arbitrators.

*Id.* at 730–31 (internal citations omitted).  The court found that the defendants' arguments for vacatur "essentially ask this court to give the force of binding contracts to informal agreements made by an arbitrator and the parties concerning the handling of evidence.  This would unduly infringe upon the broad discretion vested in arbitrators with respect to procedural matters."  *Id.* at 731.  The court rejected the assertion that the arbitrator engaged in misconduct by violating his own order regarding quashing the subpoena because "[e]ven assuming that such an error could require vacatur," the claim was contradicted by the

defendants' own submissions. *Id.* Finally, the court rejected the assertion that depriving the defendant of the opportunity to assert privileges amounted to misconduct warranting vacatur, noting that "[s]ubmission of disputes to arbitration always risks procedural and evidentiary shortcuts," and that there was no reason to believe that the defendants were deprived of a fair hearing. *Id.* (citing *Forsythe Int'l S.A. v. Gibbs Oil Co. of Texas*, 915 F.2d 1017, 1022 (5th Cir. 1990)).

Similarly, in *Weinberg v. Silber*, 140 F. Supp. 2d 712, 719 (N.D. Tex. 2001), *aff'd*, No. 02-10381, 2003 WL 147530 (5th Cir. Jan. 6, 2003) (unpublished), the court refused to overturn an arbitration award for arbitrator misconduct where the arbitrator's procedures were objected to because of the "open-ended nature of the . . . arbitration," and because the arbitrator solicited evidence from the parties almost six months after the arbitration hearing. The court noted that "'[t]he type of 'misconduct' covered by this subsection [9 U.S.C. § 10(a)(3)] has been construed to mean 'not bad faith,' but 'misbehavior though without taint of corruption or fraud, is born of indiscretion.'" *Id.* (quoting *Maiocco v. Greenway Capital Corp.*, No. Civ. A. 97-MC-0053, 1998 WL 48557, at *5 n.7 (E.D. Pa. Feb. 2, 1998) (citations omitted)). The court found that there was no evidence to show which arbitration rules applied, and that even though there was "no question that the ongoing arbitration process employed in this case was unstructured and far-sweeping, . . . arbitration resolves disputes without confinement to many of the procedural and evidentiary strictures that protect the integrity of formal trials." *Id.* at 721. In addition, the court found that any procedural errors had been waived because there was no objection made to the arbitrator, finding that "[i]f a

92

party does not protest to the arbitrator, courts generally will not give him a second chance to do so in a motion to vacate." *Id.* (citations omitted).

Failing to grant additional adjournments and cutting off live testimonial evidence has also been held insufficient for vacatur under 9 U.S.C. § 10(a)(3). *See Marshall & Co., Inc. v. Duke*, 941 F. Supp. 1207, 1210–11. (N.D. Ga. 1995), *aff'd*, 114 F.3d 188 (11th Cir. 1997). The court in *Marshall & Co.* explained that "[t]his statutory basis for vacatur does not, however, invite hindsight evaluations of the correctness of the judgment of an arbitration panel in managing the presentation of evidence during an arbitration." *Id.* at 1211. Specifically, "it is arbitrator *misconduct* or *misbehavior* that warrants vacatur, not a difference of opinion with respect to the ideal resolution of procedural issues that arose during the course of an arbitration." *Id.* The court found that with an extremely voluminous arbitration record consisting of thousands of pages of testimony and exhibits, the "defendants cannot seriously argue that the panel's refusal to grant another adjournment effectively prevented them from being heard." *Id.* at 1212.

Given the deference given procedural decisions in determining whether an arbitrator engaged in misconduct warranting vacatur, this court concludes that it would not be appropriate to vacate the arbitration awards for the alleged procedural errors on this basis. The allegations of violation of the bifurcation order, clarification of the Contract Award in the Allocation Award, and admission of supplemental evidence relating to contractual issues in the Allocation Phase are much closer to the types of conduct for which the courts have deferred to arbitrators in *Laws*, *Mantle*, *Weinberg*, and *Marshall & Co.*, than to reliance on

93

ex parte presentation of evidence in *Totem Marine Tug*.  As discussed with respect to the allegation of manifest disregard for these alleged procedural defects, there was necessarily overlap between the contract issues and the allocation issues.  The arbitrators were better situated than this court to have determined the proper procedures for resolving the complex and intertwined legal issues, including procedures such as bifurcation, the proper presentation of evidence, and the propriety of amending/correcting contract issues in the Allocation Phase.  As discussed previously, Halliburton has not shown that these alleged procedural defaults prevented it from being heard such that it did not receive a fundamentally fair hearing.  The result under Section 10(a)(3) of the FAA is the same as the result under the manifest disregard standard—the alleged procedural errors do not provide a ground for vacatur.[22]

### B.    The Claim That An Arbitrator Failed to Disclose Prior Dealings With the Parties

Halliburton has asserted that the panel also disregarded procedural law regarding the arbitrators' responsibility to disclose prior dealings with the parties.  (Docket Entry No. 176 at 18 n.10).  Halliburton points out that "[p]ursuant to the AAA Rules, 'Any person appointed . . . as an arbitrator shall disclose to the AAA any circumstance likely to give rise

---

[22] The alleged procedural errors also do not permit vacatur under 9 U.S.C. § 10(a)(4) for actions that exceed the arbitrators' authority.  The arbitrators were charged with resolving the claims between the parties, and the consideration of contractual issues was within that authority, whether it took place in the Contract Phase, the Allocation Phase, or both.  In addition, it cannot be said that the Panel exceeded its authority by crafting procedural mechanisms it deemed most effective to reach a result as to the many legal issues this case presented. *See SAL Fin. Servs., Inc. v. Nugent*, No. 3:06-CV-2051-D, 2007 WL 719230, at *4 (N.D. Tex. March 9, 2007) ("But the mere fact that an arbitration panel commits a legal or procedural error does not mean that it has exceeded its authority.") (citing *Teamsters Local No. 5 v. Formosa Plastics Corp.*, 363 F.3d 368, 371 (5th Cir. 2004)).

to justifiable doubt as to the arbitrator's impartiality or independence, including . . . *any past or present relationship with the parties or their representatives*.  Such obligation shall remain in effect throughout the arbitration.'" (*Id.* (quoting AAA Rule -16) (emphasis added by Halliburton)).  According to Halliburton, "Scott Brinkmeyer, one of the three panelists, failed to disclose to the parties, in response to direct inquiries from the parties, any information concerning his past involvement in extensive and protracted litigation against NL during the late 1990's." (*Id.*).

The Tremont Parties contest Halliburton's assertion that the awards should be vacated because one of the arbitrators allegedly failed to disclose a case in which he served as counsel to a party *opposed* to NL Industries.  (Docket Entry No. 181 at 40–41).  The Tremont Parties focus on language in the relevant AAA Rule requiring an arbitrator to disclose any circumstance "likely to give rise to justifiable doubt as to the arbitrator's impartiality or independence . . . ." (*Id.* at 40 (citing American Arbitration Association, Commercial Arbitration Rules and Mediation Procedures, http://www.adr.org/sp.asp?id=22440, Rule R-16)).  The Tremont Parties argue that an arbitrator's past work for a nonparty against a party would not give rise to doubt as to that arbitrator's impartiality or independence, particularly if the arbitrator did no work for any party to the arbitration or any party affiliate.  (*Id.*).  The Tremont Parties assert that even if the failure to disclose violated AAA Rules, it is not sufficient to set aside the awards.  (*Id.* at 40–41).  The Tremont Parties point to a recent Fifth Circuit case holding that an arbitration award cannot be vacated for a trivial nondisclosure. (*Id.* (citing *Positive Software Solutions, Inc. v. New Century Mortgage Corp.*, 476 F.3d 278

(5th Cir. 2007)).[23]

This court rejects Halliburton's assertion that Scott Brinkmeyer's failure to disclose

his past involvement in litigation against NL during the late 1990s is a basis for vacatur.

Failure to disclose a previous relationship is not itself enough to vacate an arbitration award.

*See ANR Coal Co. v. Cogentrix of N. Carolina, Inc*., 173 F.3d 493, 495 (4th Cir. 1999)

("[A]n arbitrator's failure to disclose, in and of itself, provides no basis to vacate an award

. . . ."). In *ANR Coal*, the party seeking vacatur argued that the arbitrator had violated AAA

Rules by failing to disclose previous relationships with the parties. *Id.* at 497. The court first

noted that the AAA rule on disclosure "does not require a potential arbitrator to disclose

*every* interest or relationship with a party that could conceivably be regarded as a basis for

bias. Rather, it only requires disclosure of an interest or relationship 'likely to affect

_____

[23] Specifically, the Tremont Parties point to language in the *Positive Software Solutions* case stating: "'The resulting standard is that in nondisclosure cases, an award may not be vacated because of a trivial or insubstantial prior relationship between the arbitrator and the parties to the proceeding.'" (Docket Entry No. 181 at 40 (quoting *Positive Software Solutions*, 476 F.3d at 283)). In *Positive Software Solutions*, the court held: "No case we have discovered in research or briefs has come close to vacating an arbitration award for nondisclosure of such a slender connection between the arbitrator and a party's counsel. In fact, courts have refused vacatur where the undisclosed connections are much stronger." *Positive Software Solutions*, 476 F.3d at 284. The court also cautioned: "Awarding vacatur in situations such as this would seriously jeopardize the finality of arbitration. Just as happened here, losing parties would have an incentive to conduct intensive, after-the-fact investigations to discover the most trivial of relationships, most of which they likely would not have objected to if disclosure had been made. Expensive satellite litigation over nondisclosure of an arbitrator's 'complete and unexpurgated business biography' will proliferate." *Id.* at 285.
The *Positive Software Solutions* court was analyzing a motion to vacate an arbitration award for "evident partiality" under 9 U.S.C. § 10(a)(2), not under the AAA Rules. The court noted that it was not applying the disclosure standard under the AAA Rules: "The American Arbitration Association ('AAA'), whose rules governed this proceeding, requires broad prophylactic disclosure of 'any circumstance likely to affect impartiality or create an appearance of partiality,' so that the parties may rely on the integrity of the selection process for arbitrators. Whether [arbitrator] Shurn's nondisclosure ran afoul of the AAA rules, however, is not before us and plays no role in applying the federal standard embodied in the FAA." *Id.* at 285 n.5. In this case, in contrast to *Positive Software Solutions*, the parties have focused on whether the award should be vacated for manifest disregard of AAA Rules.

impartiality.'" *Id.* at 498.  The court concluded:

> Even if [arbitrator] Brewer's failure to disclose had violated
> [AAA] Rule 19, that would not, by itself, require or even permit
> a court to nullify an arbitration award.  When parties agree to be
> bound by the AAA rules, those rules do not give a federal court
> license to vacate an award on grounds other than those set forth
> in 9 U.S.C. § 10.  Thus, although the AAA rules provide
> significant and helpful regulation of the arbitration process, they
> "are not the proper starting point for an inquiry into an award's
> validity." . . . The material and relevant facts an arbitrator fails
> to disclose may demonstrate his "evident partiality" under 9
> U.S.C. § 10(a)(2).  However, nondisclosure, even of such facts,
> has no independent legal significance and does not in itself
> constitute grounds for vacating an award.

*Id.* at 499 (internal citations omitted).  The court declined to vacate the award based on

nondisclosure, finding that "ANR has failed to cite a single case holding that a failure to

disclose in violation of the arbitration rules constitutes an independent basis for vacatur

absent proof that, in addition, the nondisclosure proves one of the statutory grounds for

vacatur." *Id.* at 499–500.  The court summarized: "[W]e hold that an arbitrator's failure to

reveal facts may be relevant in determining evident partiality under 9 U.S.C. § 10(a)(2), but

that mere nondisclosure does not in itself justify vacatur." *Id.* at 500.

Similarly, in *Merit Ins. Co. v. Leatherby Ins. Co.*, 714 F.2d 673, 679 (7th Cir. 1983),

the court held that "people who arbitrate do so because they prefer a tribunal knowledgeable

about the subject matter of their dispute to a generalist court with its austere impartiality but

limited knowledge of subject matter."  The *Merit Ins.* court concluded that "the test in this

case is not whether the relationship was trivial; it is whether, having due regard for the

different expectations regarding impartiality that parties bring to arbitration than to litigation,

the relationship between Clifford and Stern was so intimate—personally, socially, professionally, or financially—as to cast serious doubt on Clifford's impartiality." *Id.* at 680. The court found it unlikely that the AAA would have disqualified the arbitrator, and held: "[E]ven if the failure to disclose was a material violation of the ethical standards applicable to arbitration proceedings, it does not follow that the arbitration award may be nullified judicially." *Id.* The court also held that "[t]he arbitration rules and code do not have the force of law." *Id.* Because a statutory basis is required for vacatur, and the statutory standard of "evident partiality" is high, the court found that the grounds for setting aside an arbitration award on the basis of bias are narrower than the grounds for disqualification under the arbitration rules. *Id.* at 681. The *Merit Ins.* court concluded that "[t]he standards for judicial intervention are therefore narrowly drawn to assure the basic integrity of the arbitration process without meddling in it," *id.*, and that "the mood is one of reluctance to set aside arbitration awards for failure of the arbitrator to disclose a relationship with a party." *Id.* at 682 (citations omitted).

Halliburton focused on the argument that Scott Brinkmeyer's failure to disclose a prior involvement as counsel in litigation against one of the arbitrating parties amounted to manifest disregard of AAA Rules, not on a claim of evident partiality. But the record makes it clear that the alleged failure to disclose would not meet the standard of evident partiality. In addition, AAA Rules do not have the force of law, *see Merit Ins.*, 714 F.2d at 680, and as the *Merit Ins.* case and the *ANR Coal* case establish, failure to disclose in violation of AAA Rules is not a sufficient basis for vacating an arbitrator's decision.

98

Halliburton has not met the evident partiality standard of the statute and has not shown manifest disregard of clearly applicable law warranting vacatur based on nondisclosure.[24] Halliburton's request for vacatur on this basis is denied.

## IX.   Conclusion

None of the alleged errors asserted by Halliburton provides this court with a basis for vacating the arbitration awards.  The Tremont Parties' motion to confirm the arbitration awards dated June 29, 2007 and September 10, 2007 is granted.  (Docket Entry No. 172). The Tremont Parties' previous motion to confirm the arbitration award of June 29, 2007 is subsumed within the subsequent motion to confirm the June 29, 2007 and September 10, 2007 awards, and is also granted.  (Docket Entry No. 149).  Halliburton's motion to vacate the arbitration awards is denied.  (Docket Entry No. 176).

The Tremont Parties' motion for sanctions is denied as moot.  (Docket Entry No. 148). Milwhite Inc.'s motion for leave to file a response to the Tremont Parties' motion for sanctions is also denied as moot.  (Docket Entry No. 160).

SIGNED on March 31, 2008,  at Houston, Texas.

_Lee H. Rosenthal_

Lee H. Rosenthal
United States District Judge

---

[24]   Brinkmeyer's alleged failure to disclose his involvement in previous litigation against NL also would not be cause for vacatur for arbitrator misconduct pursuant to 9 U.S.C. § 10(a)(3).  Halliburton has not shown that the failure to disclose this tenuous relationship resulted in an unfair hearing.  Failure to disclose is not a sufficient basis standing alone for vacatur.  *See Power Servs. Assocs., Inc. v UNC Metcalf Servicing, Inc.*, 338 F. Supp. 2d 1375, 1381–82 (N.D. Ga. 2004) (holding that even if the arbitrator should have disclosed a particular relationship, his failure to do so did not amount to "evident partiality" or "misconduct" requiring vacatur under the FAA).