**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| HALLIBURTON ENERGY SERVICES, INC., *et al.*, | § § § | |
| Plaintiffs, | § § | |
| VS. | § § | CIVIL ACTION NO. H-05-4160 |
| NL INDUSTRIES, *et al.,* | § § | |
| Defendants. | § | |

| | | |
|---|---|---|
| TRE MANAGEMENT COMPANY, | § § | |
| Plaintiffs, | § § | |
| VS. | § § | CIVIL ACTION NO. H-06-3504 |
| GEORGIA-PACIFIC CORPORATION, *et al.*, | § § § | |
| Defendants. | § | |

## MEMORANDUM AND OPINION

Halliburton—Halliburton Energy Services, Inc. ("HESI") and DII Industries, LLC ("DII")—moves under Federal Rule of Civil Procedure 60(b) for relief from this court's order confirming the awards resulting from the arbitration with the Tremont Parties—TRE Holding Corporation ("TRE Holding"), TRE Management Company ("TRE Management"), NL Industries, Inc. ("NL"), and Tremont LLC ("Tremont")—and from the final judgment entered on the claims resolved at the arbitration. (Docket Entry No. 341). Halliburton has also moved for discovery relating to its request for relief from judgment. (Docket Entry No. 342). The Tremont Parties oppose both motions. (Docket Entry No. 350). Also pending are Halliburton's motion for a

protective order on postjudgment discovery into Halliburton's assets, (Docket Entry No. 304), and the Tremont Parties' cross-motion for an order preventing Halliburton from transferring or dissipating assets, (Docket Entry No. 309).

Based on the motions, the responses, the record, and the applicable law, this court denies Halliburton's motion for relief under Rule 60(b) and its related motion for discovery. This court also denies the Tremont Parties' motion for an order preventing Halliburton from transferring or dissipating any assets and grants Halliburton's motion for a protective order.[1] The reasons are set out in detail below.

**I.      Background**

The factual and procedural background of this case has been described in detail in this court's previous opinions and orders, including those issued in July 2006, March 2008, July 2008, and August 2008. Only the background relevant to the pending motions resolved by this opinion is summarized here.

On March 31, 2008, this court entered a Memorandum and Opinion confirming the two awards resulting from the arbitration between Halliburton and the Tremont Parties (the "Confirmation Order").[2] (Docket Entry No. 239). The arbitration awards allocated responsibility between Halliburton and the Tremont Parties for past and future costs of investigating and remediating environmental contamination at a site near Magnet Cove and Malvern, Arkansas (the

---

[1] Halliburton has also filed a motion for leave to file excess pages. (Docket Entry No. 340). Although the motion states that the Tremont Parties had not decided if they oppose the motion, an amended certificate of conference states that the motion is unopposed. (Docket Entry No. 348). Halliburton's motion for leave, (Docket Entry No. 340), is granted.

[2] The arbitration was divided into two phases, a "Contract Phase" that resulted in an interim award dated June 29, 2007 ("Contract Award"), and an "Allocation Phase" that resulted in the final award dated September 10, 2007 ("Allocation Award").

"Site").  The arbitration panel concluded that Halliburton, rather than the Tremont Parties, was responsible for the costs.

In allocating the costs, the panel considered whether the Site constituted "surplus property" excluded from the transfer of petroleum services business assets and liabilities to Halliburton's predecessor.  In 1988, NL entered into a series of transactions under a restructuring plan (the "1988 Plan"), through which NL spun off its petroleum services business and transferred it to a separate entity known as Baroid Corporation ("Old Baroid").  In 1990, pursuant to another restructuring plan effective August 31, 1990 (the "1990 Plan"), Old Baroid split the titanium and bentonite business from the "Petroleum Services Business," defined as petroleum services operations that included "Petroleum Services Assets" and "Petroleum Services Obligations."  Old Baroid retained the titanium and bentonite business, spun off the Petroleum Services Business, and transferred it to a company named New Baroid.  Under the 1990 Plan, a subsidiary of Old Baroid ultimately retained the titanium and bentonite business and New Baroid received the Petroleum Services Business.  New Baroid is a predecessor of Halliburton.  Old Baroid is a predecessor of the Tremont Parties.

The terms "surplus real property" and "Mining property, Malvern, Arkansas" were important in interpreting the 1990 Plan.  Exhibit A to the 1990 Plan defined "Assets Which Shall Not Constitute 'Petroleum Services Assets.'"  Exhibit A listed "surplus real property and related improvements" as assets excluded from the Petroleum Services Assets transferred as part of the Petroleum Services Business to New Baroid.  Among those "surplus" real properties was "Mining property, Malvern, Arkansas."  The panel closely examined the 1990 Plan and the surrounding circumstances to determine the parties' intent in transferring property and liabilities under the 1990 Plan, the ownership of the property transferred, and the indemnification obligations associated with

3

the property.  The panel allocated the costs associated with the Site to Halliburton.  This court confirmed the arbitration awards in its Confirmation Order.

On July 2, 2008, this court entered final judgment under Federal Rule of Civil Procedure 54(b) on the claims resolved in the arbitration (the "Partial Final Judgment").  (Docket Entry No. 277).  Halliburton appealed the Confirmation Order and the Partial Final Judgment.  (Docket Entry No. 286).  This court entered an order staying the monetary portion of the Partial Final Judgment, conditioned on Halliburton posting a supersedeas bond, and denying Halliburton's request to stay the nonmonetary portion of the judgment.  (Docket Entry No. 291).  Halliburton subsequently filed its supersedeas bond.  (Docket Entry No. 293).  On July 17, 2008, Halliburton filed a motion for new trial or to alter or amend the judgment.  (Docket Entry No. 295).  This court denied that motion. (Docket Entry No. 303).

On Friday, January 2, 2009, Halliburton filed the instant motion for relief from judgment (the "Rule 60 motion") and its motion for discovery.  (Docket Entry Nos. 341, 342).  Oral argument in the Fifth Circuit on Halliburton's appeal of the Confirmation Order and the Partial Final Judgment was set for Tuesday, January 6, 2009.  (Docket Entry No. 341 at 7).  On the day before oral argument, Halliburton filed a motion in the Fifth Circuit to stay the appeal, or in the alternative, to stay issuance of an opinion, and for limited remand to allow this court to consider the Rule 60 motion.  *Halliburton Energy Servs., Inc. v. NL Indus. Inc.*, No. 08-20277, 2009 WL 33648, at *1 (5th Cir. Jan. 7, 2009) (per curiam) (unpublished).  The Fifth Circuit denied the motion to stay the appeal and, the day after the argument, affirmed this court's judgment.  *See id.*  The Fifth Circuit "express[ed] no view on the merits of the [Rule 60 motion]," ceded jurisdiction, and stated that this court "now has whatever jurisdiction it would have had, absent an appeal, to consider post-judgment

4

motions." *Id.* (citations omitted).[3]

In its Rule 60 motion, Halliburton requests relief from judgment under Rule 60(b)(2), (3), (5), and (6).  The basis for Halliburton's motion is its recent discovery of documents *in its own files* that it claims conclusively establish a key issue determined in the arbitration.  (*See* Docket Entry No. 341 at 6–7).  Halliburton claims that it "has discovered numerous business records created by and/or for the Tremont Parties that specifically establish which portions of the Site were considered to be 'surplus real property' that were transferred to the Tremont Parties."  (*Id.* at 7).  Halliburton acknowledges that it had these documents in its own files.  (*See id.* at 28–30).  But Halliburton asserts that these documents *may* have also been in the possession of the Tremont Parties, and that they failed to produce these documents during arbitration.  (*Id.* at 7).  Halliburton contends that the newly submitted documents "are diametrically opposed to the positions taken by the Tremont Parties in the arbitration" and "conclusive of the Tremont Parties' ownership of the Malvern property . . . ."  (*Id.*).  In its motion for discovery, Halliburton "seek[s] discovery relating to the knowledge of the Tremont Parties as to the existence of the [newly submitted] documents, the decision to withhold the [newly submitted] documents, . . . [and] the knowledge and intent of the Tremont Parties in connection with the production or specifically lack of production of the newly discovered documents."  (Docket Entry No. 342 at 1–2).

In response, the Tremont Parties assert that Halliburton is not entitled to relief under Rule 60(b)(2), (3), (5), or (6); that Halliburton's motions are untimely under both the Federal Arbitration

---

[3] In its Rule 60 motion, Halliburton notified this court that it had filed a motion to stay the appeal at the Fifth Circuit, or in the alternative, to stay issuance of an opinion, and for a limited remand to allow consideration of its Rule 60 motion.  (Docket Entry No. 341 at 9).  Halliburton requested that this court refrain from ruling on its Rule 60 motion "until such time as the Fifth Circuit has issued such a limited remand."  (*Id.*).  Given the Fifth Circuit's order, Halliburton's request is moot.

Act (FAA) and Rule 60(c); and that Halliburton has not shown that the result would have been

affected even if the newly submitted documents had been presented during the arbitration or

confirmation proceedings.  (*See generally* Docket Entry No. 350).  The Tremont Parties also argue

that Halliburton's motion for discovery should be denied, emphasizing that Halliburton had the

newly submitted documents throughout the relevant time.  (*Id.* at 47).

## II.    The Rule 60(b) Standard

Rule 60(b) of the Federal Rules of Civil Procedure provides in relevant part as follows:

> On motion and just terms, the court may relieve a party or its legal
> representative from a final judgment, order, or proceeding for the
> following reasons:
>
> . . .
>
> (2) newly discovered evidence that, with reasonable diligence could
> not have been discovered in time to move for a new trial under Rule
> 59(b);
>
> (3) fraud (whether previously called intrinsic or extrinsic),
> misrepresentation, or other misconduct by an opposing party;
>
> . . .
>
> (5) the judgment has been satisfied, released, or discharged; it is
> based on an earlier judgment that has been reversed or otherwise
> vacated; or applying it prospectively is no longer equitable; or
>
> (6) any other reason that justifies relief.

FED. R. CIV. P. 60(b).  The scope of review under Rule 60(b) is narrower than on a direct appeal.

*Aucoin v. K-Mart Apparel Fashion Corp.*, 943 F.2d 6, 8 (5th Cir. 1991).  Rule 60(b) allows the trial

court to "correct obvious errors or injustices."  *Fackelman v. Bell*, 564 F.2d 734, 736 (5th Cir. 1977).

A party moving under Rule 60(b) must show "unusual or unique circumstances."  *Pryor v. U.S.*

*Postal Serv.*, 769 F.2d 281, 286 (5th Cir. 1985).  Relief under Rule 60(b) is an extraordinary remedy;

"'the desire for a judicial process that is predictable mandates caution in reopening judgments.'"

*In re Pettle*, 410 F.3d 189, 191 (5th Cir. 2005) (quoting *Carter v. Fenner*, 136 F.3d 1000, 1007 (5th Cir. 1998)).

## III.   The Newly Submitted Documents

The newly submitted documents are Exhibits 2–11 to Halliburton's Rule 60 motion. Halliburton describes the documents as follows:

- Exhibit 2 – "Baroid Corporation Surplus Property Analysis dated September 30, 1989, listing Malvern property as 'surplus property.'" (Docket Entry No. 341 at 13).

- Exhibit 3 – "Baroid Corporation Memorandum dated October 2, 1990, from Bill Evon to, among others, Janet Smith, Associate General Counsel of NL[,] and Jay Young, Principal Environmental Engineer of NL, with a copy to Robert Hortvet at Valhi [(a 'publicly held company that had direct or indirect control over both Tremont and New Baroid until the Baroid/Dresser merger in 1993–94')], listing the Malvern property as 'surplus' property owned by Baroid Corporation and noting that Baroid was negotiating a sale of that property to the State." (*Id.* & n.4 (footnote omitted)).

- Exhibit 4 – "Asset listing dated November 8, 1990, for 'TRE Management Company (formerly Baroid Management Company)'[4] listing the Malvern property as having

---

[4] According to Halliburton, "[t]his is particularly significant in light of the fact that the Corrective Deed filed on October 25, 1990 identifies Baroid Management Company as the proper grantee on the September 12, 1990, Warranty Deed and included a copy of the Certificate of Amendment of Certificate of Incorporation of Baroid Management Company showing the change of name to TRE Management Company." (Docket Entry No. 341 at 13 n.5).  One issue resolved in the arbitration was whether this Corrective Deed transferred a certain 190 Acres encompassing much of the Site to the old Baroid Management Company, which had changed its name to TRE Management Company during the time period between the original Warranty Deed and the Corrective Deed, or to the new Baroid Management Company, which was created as a wholly owned subsidiary of New Baroid Corporation (Halliburton) between the time of the

a value of $629,699.53.  This document also shows a facsimile transmission from Valhi in August 2002, establishing that the Tremont Parties had possession of this document following the implementation of the 1990 Plan." (*Id.* at 13–14 (footnote omitted)).

- Exhibit 5 – "Baroid Corporation Memorandum dated December 6, 1990, from Bill Evon to, among others, NL's Janet Smith and Jay Young, with a copy to Valhi's Robert Hortvet, listing the Malvern property as 'surplus' property owned by 'TRE,' and noting that 'all surplus properties have been transferred to TRE Management Co.'" (*Id.* at 14).

- Exhibit 6 – "Baroid Corporation Surplus Property valuation dated December 31, 1990, showing the Malvern property on a list of 'Tremont Book NOL' as having a value of $629,700." (*Id.*).

- Exhibit 7 – "Baroid Corporation 'Analysis of Surplus Property' showing the Malvern property as being 'surplus property' transferred to 'Tremont' as of December 31, 1990." (*Id.*).

- Exhibit 8 – "Tremont Corporation 'Historical Analysis of Surplus Property' dated January 14, 1991, listing the Malvern property." (Docket Entry No. 341 at 14).

- Exhibit 9 – "Baroid Corporation Memorandum dated March 4, 1991, from Bill Evon to, among others, NL's Janet Smith, with a copy to Valhi's Robert Hortvet, attaching

---

Warranty Deed and the Corrective Deed.  The panel determined that the Corrective Deed transferred the 190 Acres to the new Baroid Management Company because that was the only Baroid Management Company in existence at the time of the Corrective Deed.  Presumably, Halliburton's argument is that Exhibit 4, which is dated a little over two months after the effective date of the 1990 Plan, and which lists Malvern property as belonging to TRE Management Company (formerly Baroid Management Company), is evidence that the 190 Acres in the Corrective Deed was actually transferred back to the old Baroid Management Company.

a 'Surplus Owned Real Property Analysis' listing the Malvern property as 'surplus' property owned by 'TRE,' and noting that Baroid was negotiating a sale of that property to the State."[5]   (*Id.*).

- Exhibit 10 – "Baroid Corporation Memorandum dated June 5, 1991, from Bill Evon to NL's Janet Smith and Jay Young and Tremont's General Counsel, David Garten, attaching a list 'of properties owned by Tremont Corporation' including 193.68 acres of 'old mine site, raw land' in Hot Spring[s] County, Arkansas."   (*Id.*).

- Exhibit 11 – "Baroid Corporation Memorandum dated August 14, 1991, from Bill Evon to, among others, NL's Janet Smith and Jay Young, Tremont's David Garten, and TRE Management Company Vice President Susan Alderton, with a copy to Valhi's Robert Hortvet, attaching 'TRE Management Co. Surplus Owned Property – Status Report' listing vacant land[6] in Hot Spring County, Arkansas owned by 'TRE,' and noting that Baroid was negotiating a sale of that property to the State." (*Id.* at 14–15).

The parties dispute the significance of the newly submitted documents; whether the Tremont Parties had the documents in their possession during the arbitration; and whether the Tremont Parties intentionally withheld the documents or engaged in other discovery misconduct in the arbitration proceeding.  Halliburton primarily argues that the documents provide contemporaneous evidence that the Tremont Parties accepted responsibility for the Site shortly after the 1990 Plan, and that the

---

[5] The Malvern property listed is also described as "Needs Environmental Remediation."  (*See* Docket Entry No. 341, Exhibit 9 at 2).

[6] The description of "vacant land" is different than the descriptions used in some of the other exhibits, which refer to the Malvern property as "old mine site, raw land" (*see* Docket Entry No. 341, Ex. 10); or "mill/mine," (*see* Docket Entry No. 341, Ex. 3, 5, 8, and 9).

Malvern property was transferred to the predecessors of the Tremont Parties through the restructurings. Halliburton argues that the documents contradict testimony and other documentary evidence on which the panel relied. Halliburton argues that there is reason to believe that the Tremont Parties had these documents in their possession during the arbitration, noting that key representatives of Tremont/NL had received many of the documents when they were written seventeen years earlier. In response, the Tremont Parties state that they diligently searched for all relevant documents in the arbitration, that they have no reason to believe that they possessed the newly submitted documents at the time of the arbitration and did not withhold them, that the newly submitted documents would not have made any difference in either the arbitration or this court's confirmation proceedings, and that these documents are cumulative or could only have been used for impeachment.

There is no dispute that Halliburton found the documents at issue in its own files. There is no dispute that Halliburton had these documents in its files while it was preparing for the arbitration, responding to and promulgating discovery for the arbitration, during the arbitration, and during the post-award litigation. The Tremont Parties point out that the newly submitted documents were created by employees of the business that Halliburton now controls and "were at all times in the possession and control of Halliburton." (Docket Entry No. 350 at 2). The Tremont Parties also argue that Halliburton has not shown that these documents were in the possession and control of the Tremont Parties during any relevant time. (*Id.* at 3). The Tremont Parties assert that the fact that some of the documents were copied to employees of one of the Tremont Parties or their affiliates more than seventeen years ago does not show that the Tremont Parties had the documents during the arbitration. (*Id.*).

The Tremont Parties emphasize a July 1997 letter from Dresser Industries, Inc. ("Dresser") to NL describing the transfer of certain documents from Dresser to NL (the "July 1997 letter").  The Tremont Parties argue that this letter shows that Halliburton entities had the documents at issue and had them for years before, and during, the arbitration:

> Halliburton's argument that the Tremont Parties must now have Exhibits 2–11 is directly contradicted by the very document that Halliburton relies on—the July 9, 1997 letter agreement by which Dresser Industries, Inc. ("Dresser") returned certain documents to NL.  The footnote to this July 9, 1997 letter agreement states that Halliburton was returning to NL certain pre-1988 spin-off documents, and that the post-1988 spin-off documents (along with certain pre-1988 spin-off documents) were being retained by the Halliburton side.  All of the documents contained within Exhibits 2–11 are post-1988 spin-off documents.

(*Id.* (footnote omitted)).

The Tremont Parties also argue that "NL retained no documents or employees in connection with the former petroleum services business."  (*Id.* at 10).  The Tremont Parties state that "under the 1990 Restructuring of NL's former petroleum services business, New Baroid [now Halliburton] was subsequently provided with all of the former NL petroleum services assets and all of the records that related to the former petroleum services business of NL," and that "Tremont retained no documents or employees in connection with the former petroleum services business."  (*Id.* at 11).  The Tremont Parties point out that New Baroid subsequently merged into Dresser and then into Halliburton, and that "Exhibits 2–11, along with all other petroleum service business documents, subsequently became the property of Halliburton."  (Docket Entry No. 350 at 11).  Finally, the Tremont Parties argue that the July 1997 letter establishes that Dresser was retaining post-1988 spin-off records, and that "[t]here is not a scintilla of evidence that any post-1988 spin-off records were delivered back to NL, or any of the other Tremont Parties for that matter."  (*Id.*).

11

The Tremont Parties contend that Halliburton has presented no adequate excuse for failing to find the newly submitted documents earlier, and point out that Halliburton's stated reason for not finding the July 1997 letter indicating the existence of additional documents is that "'it was kept in a separate file in the desk of a former records employee.'"  (*Id.* at 14).  The Tremont Parties also state that Patricia Suttles, a legal assistant in Halliburton's legal department, was aware of the July 1997 letter and the documents.  (*Id.*).  The Tremont Parties submit the affidavit of Paige Savage, a legal assistant for Andrew Nace (Associate General Counsel of NL responsible for the Site), stating that Ms. Suttles emailed a copy of the July 1997 letter to Ms. Savage on January 12, 2007, before the arbitration hearings began.  (*Id.*; *id.*, Ex. I).  The Tremont Parties conclude that "Ms. Suttles was well aware of the July 9, 1997 records agreement, and the fact that Halliburton had retained more than 581 boxes of NL petroleum services documents."  (Docket Entry No. 350 at 15).  The Tremont Parties also submit the affidavit of Mr. Nace, stating that he spoke with Halliburton representatives well before the arbitration, and that the representatives made clear to him that they were aware of the July 1997 letter and of the fact that Halliburton had retained the petroleum services documents. (*Id.*).  The Tremont Parties conclude: "For Halliburton to now contend that it first learned of the July 9, 1997 letter agreement by opening the drawer of a terminated employee, completely disregards the undisputed January 12, 2007 email of Patricia Suttles consciously forwarding the July 9, 1997 letter agreement to the Tremont Parties."  (*Id.*).

## IV.     The Timeliness of Rule 60 Motion

The Tremont Parties contend that Halliburton's Rule 60 motion is untimely under the FAA and Rule 60(c).  The Tremont Parties argue that the Rule 60 motion is really a new motion to vacate the arbitration award under section 10(a) of the FAA.  (Docket Entry No. 350 at 42).  According to the Tremont Parties, the FAA provides the sole means for challenging misconduct in the

12

administration of the arbitration award.  Section 12 of the FAA requires notice of a motion to vacate to be made "'within three months after the award is filed or delivered.'"  (*Id.* (quoting 9 U.S.C. § 12)).  The final arbitration award was issued on September 10, 2007.  "The plain language of § 12 does not provide for any exceptions to the three-month window and says nothing about tolling."  *Olson v. Wexford Clearing Servs. Corp.*, 397 F.3d 488, 490 (7th Cir. 2005).  Halliburton's motion to vacate was timely filed under the FAA but did not raise any of the issues raised in the Rule 60(b) motion, which was only filed after the motion to vacate was unsuccessful and the awards were confirmed.  (Docket Entry No. 350 at 42).

The Tremont Parties also argue that Halliburton's motion is untimely under Rule 60(c).  A Rule 60(b) motion be made within a reasonable time.  Motions under Rule 60(1), (2), and (3) must be made no more than a year after the entry of the judgment, order, or date of the proceeding.  (*Id.* at 43).  The final arbitration award was entered more than a year before Halliburton's Rule 60 motion.  Although Halliburton moved within one year of the judgment, the Tremont Parties argue that the motion was not filed within a reasonable time because Halliburton had all the newly submitted documents in its possession since 1990 and its outside counsel was aware of them since at least September 2008,[7] but did not move for relief from judgment until 6:30 p.m. on the Friday before a Tuesday oral argument in the Fifth Circuit.  (*Id.* at 43).

In *Merit Insurance Co. v. Leatherby Insurance Co.*, 714 F.2d 673 (7th Cir. 1983), the court emphasized the importance of the short deadlines for challenging arbitration awards.  In that case, the arbitration panel entered its award in December 1980, the award was confirmed in

---

[7] It is unclear from the affidavit of Jenny Martinez, Halliburton's trial counsel, when she learned of the newly submitted documents.  In her affidavit, she states that during September, October, and November 2008, she reviewed an index of documents, and that in December 2008, she and several others reviewed the boxes containing the newly submitted documents.  (Docket Entry No. 341, Ex. 27 at 3–4).

November1981, and the first Rule 60(b) motion was rejected a month later.  *Id.* at 676–77.  The losing party appealed both the confirmation order and the denial of the Rule 60(b) motion.  While the appeal was pending, the losing party filed a second Rule 60(b) motion in May 1982, based on an alleged discovery the previous month that one of the arbitrators had worked under the plaintiff's president and principal stockholder at another insurance company.  *Id.* at 677.  The appeal was dismissed and the district court granted the second Rule 60(b) motion in November 1982.  The Seventh Circuit reversed the district court's decision to set aside the judgment confirming the arbitration award.  The appellate court found it "significant that the issue of disqualification was raised here by a Rule 60(b) motion to set aside the award, filed some 18 months after the award had been issued by the arbitration panel (though only six months after it was confirmed by the district court)."  *Id.* at 682.  The court explained that "[t]he framers of Rule 60(b) set a higher value on the social interest in the finality of litigation," and that "[a] motion under Rule 60(b) seeks an extraordinary remedy, especially where as in this case the motion is based on the catch-all provision of Rule 60(b), Rule 60(b)(6)."  *Id.* (internal citation omitted).  In a later opinion in the same case, considering an appeal from the denial of the party's third Rule 60(b) motion, which renewed the arguments of its first motion,[8] the Seventh Circuit stated:

> For Leatherby to take two bites at the apple, by waiting to see how it fared in defending the district court's grant of its second Rule 60(b) motion before deciding whether to attack the district court's denial of its first motion, and then, after losing in this court, making that denial the subject of another appeal, is an abuse of orderly appellate procedure.  *See, e.g.*, *Raxton Corp. v. Anania Associates, Inc.*, 668 F.2d 622, 624 (1st Cir. 1982).  We shall tolerate no further delay in winding up this protracted litigation, which has made a mockery of

---

[8] An earlier appeal of the decision on the first Rule 60(b) motion had been dismissed at the appellant's request on the district court's indication that it was likely to grant the second Rule 60(b) motion.

> the promise of arbitration to give those who choose it a swift and
> effective alternative to judicial dispute resolution.

*Merit Ins. Co. v. Leatherby Ins. Co.*, 737 F.2d 580, 582 (7th Cir. 1984).  The decision in *Merit Insurance Co.* supports finding Halliburton's Rule 60 motion untimely.

In *American Telephone & Telegraph Co. v. United Computer Systems, Inc.*, Nos. 91-56444, 92-55220, 92-56034, 92-55666, 5 F.3d 534, 1993 WL 360778 (9th Cir. Sept. 15, 1993) (unpublished table decision) ("*AT&T*"), the court considered whether a Rule 60(b)(3) motion could be used to circumvent the FAA's time limits on a motion to vacate.  The *AT&T* court discussed *LaFarge Conseils et Etudes, S.A. v. Kaiser Cement & Gypsum Corp.*, 791 F.2d 1334 (9th Cir. 1986).  In *LaFarge*, the petition to vacate the award was timely filed and denied.  The losing party moved under Rule 60(b)(3) within a year but not within the three-month period set under the FAA.  The court in *LaFarge* held that the moving party could "'*not now collaterally attack the award under the guise of a motion to set aside the judgment confirming the award.*'"  *AT&T*, 1993 WL 360778, at *3 (quoting *LaFarge*, 791 F.2d at 1339) (emphasis added).  The *AT&T* court distinguished *LaFarge*, noting that the movant in that case had "failed to identify any fraud, misrepresentation or misconduct in the district court proceedings, but rather *alleged only fraud in the underlying arbitration*.  It is for that reason that we barred the movant from attacking the arbitration award 'under the guise' of a Rule 60 motion."  *Id.* (citing *LaFarge*, 791 F.2d at 1338–39) (emphasis added).  By contrast, "[a]lthough AT & T alleged fraud in the arbitration, it also alleged fraud in the district court proceedings to confirm or vacate the award."  *Id.*  "Where, as here, the party seeking relief from judgment alleged fraud in the proceedings to confirm or vacate an arbitration award, *LaFarge* is no obstacle."  *Id.*  The court rejected the argument that after the three-month statutory period under the FAA, an arbitration award is unassailable.  *Id.*  The court summarized:

15

> AT & T filed its original motion to vacate the arbitration award within the time period specified in section 12 and within the analogous time period required under California law.  AT & T timely appealed the denial of its motion.  When AT & T discovered the alleged fraud, it sought and obtained an order remanding the case to the district court.  On remand, the district court considered AT & T's Rule 60 motion.  Thus, the proceedings on the Rule 60 motion for relief from judgment were a continuation of the proceedings initiated by AT & T within the statutory period.  If the district court did not abuse its discretion in vacating the confirmation order, it properly considered AT & T's motion to vacate the arbitration award.

*Id.* at *4.

The *AT&T* case cuts both ways in analyzing whether Halliburton's Rule 60 motion is timely.  On the one hand, Halliburton appears to be challenging the Tremont Parties' discovery conduct during the arbitration, not the district court proceedings.  Under *AT&T,* this weighs in favor of finding the motion untimely because it was filed long after the final arbitration award issued.  On the other hand, if the Rule 60 motion could be characterized as a continuation of the original vacatur proceeding because—unlike the movant in *AT&T*—Halliburton did appeal the denial of its original motion to vacate, that could support finding the motion timely.

The Tremont Parties cite *Mungin v. Florida East Coast Railway Co.*, 318 F. Supp. 720, 735 (M.D. Fla. 1970), *aff'd*, 441 F.2d 728 (5th Cir. 1971), for the proposition that "'[w]here a party, through his silence or inaction, and with knowledge of the facts, or with such knowledge available to him and not used, allows intervening events to occur pursuant to the judgment which radically alter the position of the parties, and no convincing explanation of his delay in raising his objections is forthcoming, the motion under Rule 60(b) is not timely and I so find that this motion comes too late.'"  (Docket Entry No. 350 at 45).  The Tremont Parties argue that Halliburton's reason for delay—that it recently discovered the July 1997 letter in the drawer of a former employee which led

to the search that found the newly submitted documents—"is uprooted by the undisputed email from Patricia Suttles to the exact contrary."[9]  (*Id.*).  The Tremont Parties also argue that Halliburton has failed to explain why it allowed the appeal to go forward and waited to file its Rule 60(b) motion until just before oral argument, when it admits it knew about the July 1997 letter in September 2008. (*Id.*).

"In considering whether a Rule 60(b)(6) motion is timely, a court should scrutinize the particular circumstances of the case and balance the interest in finality with the moving party's reasons for delay."  *Horphag Research Ltd. v. Henkel Corp.*, No. 00 Civ. 0438 (MBM), 2004 WL 117601, at *3 (S.D.N.Y. Jan. 26, 2004).  In *Horphag*, the petitioner filed its Rule 60(b) motion nine months after an order finding that res judicata barred the petitioner's claim to an offset from an arbitration award, six months after denial of the petitioner's motion for reconsideration and three months after the arbitrators declined the petitioner's invitation to issue a statement about whether they had adjudicated the issue.  *Id.*  The court held that "[b]ecause Horphag has spent most of the last nine months attempting to obtain relief from the October 23 Order's res judicata ruling, . . . Horphag's Rule 60(b) motion [was] timely."  *Id.*

Taking these authorities together, Halliburton's motion appears untimely, but the issue is not

---

[9] Halliburton argues that the only immediately apparent relevance of the July 1997 letter was to documents related to new claims Tremont asserted in separate litigation.  It was not until Halliburton reviewed the "Northbelt Index" of 38,378 boxes that it discovered the newly submitted documents.  (*See* Docket Entry No. 359 at 2–3).  According to the Rule 60 motion, while working with Halliburton's inside counsel on Tremont's new claims, Halliburton's trial counsel "became aware" of the July 1997 letter, which indicated that 21,108 boxes of documents potentially relevant to the new claims were in NL's possession and that 648 boxes were in Halliburton's possession.  (Docket Entry No. 341 at 28).  After discovering the July 1997 letter, Halliburton's trial counsel began corresponding with the records department in Halliburton's legal department.  (*Id.*).  After providing the records department with "several search terms," Halliburton's trial counsel received an index of boxes for each search term.  (*Id.* at 28–29).  Upon inquiring how these indices were obtained, Halliburton's trial counsel received a large index of all boxes related to Baroid and Dresser in Halliburton's possession, including the Northbelt Index.  (*Id.* at 29).  Halliburton's trial counsel reviewed the Northbelt Index and documents referenced in the index that it deemed relevant.  (*Id.*).  This appears to be how Halliburton's trial counsel discovered the newly submitted documents.

17

completely clear.  A threshold question is whether the three-month period in section 12 of the FAA applies to the Rule 60(b) motion, or whether the time limits in Rule 60(c) apply.  A related question is whether the period begins to run on the date the final arbitration award was issued (September 10, 2007); the date the Confirmation Order was issued (March 31, 2008); or the date the Partial Final Judgment was issued (July 2, 2008).  If the three-month period in the FAA applies because the motion is considered to be only an attack on the arbitration awards and not an attack on the district court proceedings, then the motion is untimely whether the triggering event is the date of the Allocation Award, the date of the Confirmation Order, or the date of the Partial Final Judgment. Even if Halliburton's motion is characterized as an attack on the district court proceedings, it was not brought within a reasonable time under Rule 60.  To the extent Halliburton is moving under Rule 60(b)(2) or (3), the one-year time period has expired if that period runs from the date of the arbitration award.

However, it can be argued that the period should run from the date of the Confirmation Order or the date of the Partial Final Judgment if the motion is characterized as an attack on the district court proceedings.  Under either of those scenarios, the motion was made within one year of the judgment.  Even then, Halliburton's motion is likely untimely because the delay was unreasonable. Halliburton's legal department knew about the July 1997 letter, which showed that Halliburton had additional boxes of potentially relevant documents in its possession, at least two years earlier, even if Halliburton's outside counsel was unaware of these documents until recently.

The purpose behind the time limits also support finding Halliburton's filing untimely.  "'The purpose of the short periods described in the federal and state arbitration statutes for moving courts to vacate an award is to accord the arbitration award finality in a timely fashion.'  This purpose would be severely undermined if the limitations period prescribed in the FAA § 12 were tolled every

time a losing party filed the functional equivalent of a motion for reconsideration."[10]  *Olson*, 397

F.3d at 492 (internal citation omitted).  But because the answer is unclear, and to provide a complete

analysis now in order to avoid the risk of having to do so later, this court examines Halliburton's

motion on the merits.  The result of that examination makes it clear that Halliburton cannot prevail

on this Rule 60(b) motion.  There is no basis for the relief Halliburton seeks.

## V.      Review of an Arbitration Award Through a Rule 60(b) Motion

The FAA provides four statutory grounds for vacating an award:

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; [and]

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

When this court confirmed the arbitration award, the Fifth Circuit used manifest disregard

---

[10] In *Olson*, the plaintiff/appellant's arbitration claim against one of the defendants had been dismissed.  The panel denied a motion for reconsideration and a subsequent motion for consent to file a second amended statement of claims.  397 F.3d at 489.  The district court dismissed the plaintiff's petition to vacate the arbitration order, finding the motion untimely because more than three months had passed since the panel decided to dismiss the defendant.  *See id.* at 489–90.  The plaintiff argued on appeal that the arbitration panel's denial of his motion to amend his statement of claims was the relevant date for starting the three-month period under section 12.  *Id.* at 492.  The Seventh Circuit found that "[t]he FAA speaks in terms of 'awards,' and we have found no authority suggesting that a letter denying one party's motion to amend is properly characterized as an award."  *Id.*  The court analogized to a Rule 60(b) motion, explaining that the filing of a motion to reconsider outside the 10-day window after judgment does not toll the time for filing an appeal.  *Id.*  The court stated: "We see no reason why the same reasoning should not apply in the arbitration context, particularly given the FAA's underlying policy of expeditious dispute resolution."  *Id.*

of clearly applicable law as a ground for vacating an arbitration award. *See, e.g.*, *Am. Laser Vision, P.A. v. Laser Vision Inst., L.L.C.*, 487 F.3d 255, 259 (5th Cir. 2007) ("Vacatur based on an arbitrator's manifest disregard of the law is a judicially created ground of relief.") (citing *Prestige Ford v. Ford Dealer Computer Servs., Inc.*, 324 F.3d 391, 395–96 (5th Cir. 2003)).   In the Confirmation Order, this court pointed out that in *Hall Street Associates, L.L.C. v. Mattel, Inc.*, 128 S. Ct. 1396 (2008), the Supreme Court reemphasized the narrowness of the grounds for vacatur. (Docket Entry No. 239 at 27).   This court explained:

> In *Hall Street Assocs., L.L.C. v. Mattel, Inc.*, No. 06-989, __ S. Ct. __, 2008 WL 762537, at *2 (March 25, 2008), the court stated that the statutory bases for vacatur under the Federal Arbitration Act are exclusive.   The Court rejected an argument that a statement from *Wilko v. Swan*, 346 U.S. 427 (1953), that "the interpretations of the law by the arbitrators in contrast to manifest disregard [of the law] are not subject, in the federal courts, to judicial review for error in interpretation," expanded both judicial grounds for vacatur and contracting parties' ability to add grounds for vacatur beyond those provided in the FAA.   *See Hall Street Assocs.*, 2008 WL 762537, at *5.   The Court held that the use of the phrase "manifest disregard" in the *Wilko* case was vague.   *Id.*   The Court stated that it was unclear in *Wilko* whether the "term 'manifest disregard' was meant to name a new ground for review," or whether "it merely referred to the § 10 grounds collectively, rather than adding to them."   *Id.* (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 656 (1985) (Stevens, J., dissenting)).   The Court continued: "Or, as some courts have thought, 'manifest disregard' may have been shorthand for § 10(a)(3) or § 10(a)(4), the subsections authorizing vacatur when the arbitrators were 'guilty of misconduct' or 'exceeded their powers.'"   *Id.* (citing *Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*, 341 F.3d 987, 997 (9th Cir. 2003)).   The Court noted that in the past, it had "merely taken the *Wilko* language . . . without embellishment, *see First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 942 (1995) . . ., and now that its meaning is implicated, we see no reason to accord it the significance that Hall Street urges."   *Hall Street Assocs.*, 2008 WL 762537, at *5.   The *Hall Street Associates* Court emphasized the limited review afforded to arbitration decisions.   "Instead of fighting the text [of the FAA], it makes more sense to see the three provisions, §§ 9–11, as substantiating a national policy favoring arbitration with just the

20

limited review needed to maintain arbitration's essential virtue of resolving disputes straightaway.  Any other reading opens the door to the full-bore legal and evidentiary appeals that can 'rende[r] informal arbitration merely a prelude to a more cumbersome and time-consuming judicial review process,' *Kyocera*, 341 F.3d at 998; *cf. Ethyl Corp. v. United Steelworkers of Am.*, 768 F.2d 180, 184 (7th Cir. 1985), and bring arbitration theory to grief in post-arbitration disputes." *Id.* at *7.

(*Id.* at 27–28).

In the Confirmation Order, this court stated that the "decision in *Hall Street Associates* calls into question whether the manifest disregard standard is a ground for vacatur separate from the statutory grounds for vacatur under the FAA, as the Fifth Circuit has previously stated, or a way of summarizing two or more of those statutory grounds." (*Id.* at 28)  However, this court noted that *Hall Street* was decided in a limited context:

> *In the context of considering whether private parties may contract for greater review* of an arbitration decision by a district court than is provided for in the FAA, the Court stated that the statutory bases are exclusive grounds for vacatur.  The Court declined to extend the "manifest disregard" standard *to permit parties to contract for greater judicial review* of arbitration awards than the FAA recognizes.

(*Id.* at 28–29 (internal citation omitted) (emphasis added)).  Because it was unclear whether *Hall Street* eliminated manifest disregard as a separate ground for vacatur in all circumstances, this court analyzed the arguments for confirmation and vacatur under both the statutory grounds and the previously recognized common-law ground of manifest disregard:

> Because the Supreme Court did not expressly decide whether the "manifest disregard" standard remains a separate basis for federal court review of arbitration decisions in at least some circumstances; because the Fifth Circuit has often approved of reviewing arbitration awards for "manifest disregard," *see, e.g.*, *Am. Laser Vision*, 487 F.3d at 259 (5th Cir. 2007); and because Halliburton sought vacatur on the basis of the Fifth Circuit's "manifest disregard" standard, out of an abundance of caution this court analyzes the parties' arguments using

> "manifest disregard" as both a summary of some of the statutory
> grounds and as an additional ground for vacatur.

(*Id.* at 30).

Since the Confirmation Order issued, a Fifth Circuit panel has specifically considered whether *Hall Street* eliminated manifest disregard as a separate ground for vacatur in the context of judicial review of an arbitration award. *See Citigroup Global Markets, Inc. v. Bacon*, --- F.3d ---, 2009 WL 542780, at *1 (5th Cir. Mar. 5, 2009) ("On appeal, we consider whether manifest disregard of the law remains a valid ground for vacatur of an arbitration award in light of the Supreme Court's decision in *Hall Street* . . . ."). The *Citigroup Global Markets* court held:

> We conclude that *Hall Street* restricts the grounds for vacatur to those
> set forth in § 10 of the Federal Arbitration Act (FAA or Act), 9
> U.S.C. § 1 *et seq.*, and consequently, manifest disregard of the law is
> no longer an independent ground for vacating arbitration awards
> under the FAA.   *Hall Street* effectively overrules our previous
> authority to the contrary . . . .

*Id.* The Fifth Circuit concluded that *Hall Street* required it to overrule prior circuit authority holding that manifest disregard was a separate, nonstatutory ground for vacatur. *Id.* at *9. ("To the extent that our previous precedent holds that nonstatutory grounds may support the vacatur of an arbitration award, it is hereby overruled."). In so ruling, the Fifth Circuit disagreed with a panel in the Sixth Circuit. *See id.* at *6–7 (rejecting *Coffee Beanery, Ltd. v. WW, L.L.C.*, 350 F. App'x 415, 419 (6th Cir. 2008), which construed *Hall Street* to apply only to contractual expansion of the grounds for review). The Fifth Circuit also noted the Second and Ninth Circuit cases finding that manifest disregard survived *Hall Street*—*Stolt-Nielsen SA v. AnimalFeeds Int'l Corp.*, 548 F.3d 85, 93–95 (2d Cir. 2008), and *Comedy Club Inc. v. Improv West Assocs.*, 553 F.3d 1277, 1289 (9th Cir. 2009)—did so only by finding that manifest disregard was shorthand for the statutory grounds for vacatur. *See Citigroup Global Markets*, 2009 WL 542780, at *6–8.

22

The Tremont Parties argue that *Citigroup Global Markets* requires this court to deny Halliburton's Rule 60 motion.  (*See* Docket Entry No. 360 at 1–2).  "Halliburton is asking for this Court to look outside the exclusive regimes set forth by the FAA and to incorporate the dictates of Rule 60 of the Federal Rules of Civil Procedure to override the FAA.  *Citigroup Global Markets* implicitly states that Halliburton is not entitled to such review." (*Id.* at 2).  Halliburton responds that it is not asking this court "to blend the standards applicable to Rule 60(b) relief with those for granting vacatur of an arbitration award." (Docket Entry No. 361 at 2).  Instead, Halliburton argues that it is asking this court first to act under Rule 60(b) to set aside the Confirmation Order and Partial Final Judgment, and then to grant Halliburton leave to amend its earlier unsuccessful motion to vacate the arbitration awards to add the statutory ground that "the awards were 'procured by corruption, fraud, or undue means . . . .'" (*Id.*).  Halliburton contends that because it would then be seeking vacatur under one of the statutory grounds, the manifest disregard standard is not implicated. (*Id.*).

Halliburton proposes a two-step process.  First, Halliburton proposes that "because this Court entered the [Confirmation Order] and the Partial Final Judgment based upon the Confirmation Order, it is beyond question that this Court has discretion to exercise its post-judgment jurisdiction under Fed. R. Civ. P. 60(b) to vacate both the Confirmation Order and the Partial Final Judgment." (Docket Entry No. 357 at 2–3).  Halliburton asserts that "[b]y properly exercising its discretion to set aside the Confirmation Order and the Partial Final Judgment, this Court will return this case to a position in which there are pending arbitration awards that have been neither confirmed nor vacated by the Court." (*Id.* at 3–4).  Halliburton asserts that "[a]s the second step in granting Halliburton's requested relief, this Court should also grant leave for Halliburton to file an amended motion to vacate the arbitration awards to add the statutory basis for vacatur that the arbitration

awards were wrongfully obtained by fraud or undue means." (*Id.* at 4).  Next, Halliburton asserts that this court should, "based upon the appropriate deferential review standard, and based upon the evidence already presented, together with evidence to be gathered during Halliburton's limited requested discovery, grant the amended motion for vacatur." (*Id.*).  Halliburton contends that "[b]y engaging in this two-step process, this Court will act within its discretion, and, at the same time, apply the proper standard for assessing whether vacatur of the arbitration awards is proper." (*Id.*).

As authority for the first step in this proposed procedure, Halliburton cites to *Baltia Air Lines, Inc. v. Transaction Mgmt., Inc.*, 98 F.3d 640, 642 (D.C. Cir. 1996), for the proposition that "Rule 60(b) is an appropriate vehicle by which to challenge a judgment confirming an arbitration award." (*Id.* at 3).  In *Baltia Air Lines*, the party that lost in arbitration and in the confirmation proceeding moved under Rule 60(b) for relief from the judgment confirming the arbitration awards. 98 F.3d at 641–42.  The party alleged that newly discovered evidence showed that the original contract had been fraudulently obtained, that the opposing party's representatives had perjured themselves during the arbitration, and that the opposing party's lawyer had made misrepresentations to the district court during the confirmation proceedings.  *Id.* at 642.  The district court dismissed the Rule 60(b) motion and the appellate court affirmed, stating that "[a]lthough Rule 60(b) is an appropriate vehicle by which to challenge a judgment confirming an arbitration award," the motion was untimely under Rules 60(b)(2) and (b)(3); Rule 60(b)(6) could not be used to circumvent the requirements of Rules 60(b)(2) and (b)(3); and while fraud on the court remained a potential avenue for relief, the moving party had not shown fraud.  *Id.*

As the Tremont Parties point out, under Rule 81(a)(6), the Federal Rules of Civil Procedure apply except to the extent Title 9 of the United States Code provides otherwise.  *See* Fed. R. Civ. P. 81(a)(6)(B) ("These rules, to the extent applicable, govern proceedings under the following laws,

except as these laws provide other procedures: . . . (B) 9 U.S.C., relating to arbitration . . . .").  The FAA provides "other procedures" for confirming and vacating an award.  *See* 9 U.S.C. § 9 ("[T]he court *must grant* such an order [confirming the award] unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title.") (emphasis added); 9 U.S.C. § 10 (providing grounds for vacatur); 9 U.S.C. § 11 (providing grounds for modifying or correcting an award).  Rule 60(b) cannot be used to circumvent the specific "other procedures" in the FAA. Although *Baltia Air Lines* conclusorily stated that a Rule 60(b) motion may be used to challenge a judgment confirming an arbitration award, the motion in that case was time-barred.  The *Baltia Air Lines* court did not face or examine the limits on the use of Rule 60(b) to challenge conduct in an arbitration proceeding rather than in the district court.  The offhand comment in *Baltia Air Lines* does not expand or circumvent the specific procedures set out in the FAA to challenge an arbitration award or support Halliburton's proposed procedure for doing so.

Halliburton also relies on *Haskins v. Brown*, No. 86-4013, 836 F.2d 1347, 1988 WL 238 (6th Cir. Jan. 4, 1988) (unpublished table decision) (per curiam).  Halliburton states that in that case, the appellate court acknowledged a district court's power under Rule 60(b) to vacate a prior judgment confirming an arbitration award.  (Docket Entry No. 357 at 3).  As the Tremont Parties point out, the appellate court dismissed the appeal for lack of jurisdiction.  (*See* Docket Entry No. 358 at 4). In *Haskins*, after the arbitration award was confirmed, one party sought relief from the judgment under Rule 60(b) because "of an alleged lack of intent to comply with the award on the part of appellant."  1988 WL 238, at *1. The district court, without a hearing, "set aside its order enforcing the award, the arbitrators' decision, and the parties' stipulation as to the finality of the arbitrators' decision."  *Id.*  The Sixth Circuit stated that "[i]t is well settled that the grant of a new trial is not a final appealable order," but acknowledged that the Second Circuit had recognized an exception to

25

that rule if the district court lacked jurisdiction to grant a new trial. *Id.* (citation omitted). The Sixth Circuit considered whether, if the Second Circuit's exception were to apply, the district court had jurisdiction to grant relief under Rule 60(b). *Id.* The court stated: "Rule 60(b) provides a list of those instances where relief may be had from a final judgment by the grant of a new trial. If there is a showing of mistake, inadvertence, surprise or manifest injustice, then the district court may exercise its jurisdiction to vacate a final award." *Id.* at *2. The court concluded that because the district court had jurisdiction to vacate the arbitration award and grant a new trial under Rule 60(b) for "manifest injustice," the appellate court lacked jurisdiction. *Id.* This short, unpublished opinion dismissing the appeal for lack of jurisdiction did not substantively analyze whether Rule 60(b) could be used to circumvent the statutory grounds for vacatur. It merely stated that the district court had jurisdiction to grant a new trial under Rule 60(b). Halliburton's argument that this opinion shows that Rule 60(b) can be used to overcome a judgment and order confirming a final arbitration award is not persuasive.

In discussing the second step of its proposed procedure, Halliburton acknowledges that it "has been unable to find any case that addresses facts directly in line with those presented in this case." (Docket Entry No. 357 at 4). Halliburton relies on *Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378 (11th Cir. 1988), to argue that a party may "file an amended motion to vacate based upon its discovery of previously undiscovered fraud relating to an arbitration award." (*Id.*). In *Bonar*, the Eleventh Circuit considered an appeal from the district court's denial of a motion to vacate an arbitration award based on allegations that the opposing party's expert had falsified his credentials in the arbitration. 835 F.2d at 1381. The loser had already filed a motion to vacate the award under the FAA based on other grounds when it discovered the alleged perjury and moved to amend its motion to vacate or modify the arbitration award to add the ground that the award was procured

through fraud.  *Id.*  The opposing party moved to confirm the arbitration awards and to strike as untimely the amended motion to vacate.  *Id.*  The district court granted the motion to confirm the award, denied the motion to vacate or modify, and entered final judgment.  *Id.*  The Eleventh Circuit considered "whether an amended motion to vacate an arbitration award, filed outside of the three month period and raising additional grounds for vacation, is deemed timely if the original motion to vacate was timely."  *Bonar*, 835 F.2d at 1381–82.  In finding that the amended motion was timely, the court viewed the original motion to vacate as analogous to the start of a new cause of action. *See id.* at 1382.  The court stated: "[A]lthough technically called a 'motion,' the papers filed by a party seeking to confirm or vacate an arbitration award function as the initial pleadings in post-arbitration proceedings in the district court.  Consequently, Rule 15, which governs amended and supplemental pleadings in a civil action should also apply to amended motions to vacate arbitration awards."  *Id.*  The court found that the opposing party "filed no motion, memorandum, or other paper in the district court that could be construed as a responsive pleading until after . . . [the] amended motion to vacate the arbitration award."  *Id.*  As a result, the moving party was entitled to amend without leave of court.  *Id.*  The court also explained that the focus of the original motion to vacate was the conduct and result of the arbitration proceedings, and that the issue raised in the amended motion arose out of the same transaction or occurrence as the original motion to vacate. *See id.*  The court concluded that the "amended motion to vacate relates back to the date of its original motion to vacate, and is itself a timely motion."  *Bonar*, 835 F.2d at 1382 (footnote omitted).

Halliburton argues that, as in *Bonar*, it timely moved to vacate the arbitration awards and should be allowed to use this Rule 60 motion to amend its earlier motion to vacate under Rule 15. (*See* Docket Entry No. 357 at 6).  Halliburton acknowledges that unlike the responding party in

27

*Bonar*, the Tremont Parties did file a response to Halliburton's original motion to vacate.  (*See id.*).

Halliburton argues that this only means that it needs leave of court to file the amended motion to

vacate and leave should be freely granted "'when justice so requires.'"  (*See id.* (quoting FED. R.

CIV. P. 15(a)(2))).

The differences between this case and *Bonar* are much more extensive than Halliburton

asserts.  In *Bonar*, the amended motion to vacate was filed before any action had been taken on the

original motion, either by the opposing party or the court.  Here, in sharp contrast, Halliburton's

hypothetical amended motion to vacate would follow the Tremont Parties' extensive responsive

pleadings, this court's detailed Confirmation Order and Partial Final Judgment, this court's denial

of Halliburton's motion for new trial, and the Fifth Circuit's decision affirming the Confirmation

Order and Partial Final Judgment.  Halliburton's hypothetical amended motion to vacate can hardly

be characterized as simply a motion to file amended pleading, for which leave should be freely

granted.[11]

In addition, *Bonar*'s analysis shows the futility of allowing Halliburton to file an amended

---

[11] Halliburton contends that other courts have adopted the reasoning in *Bonar*, (*see* Docket Entry No. 357 at 6), but the cases Halliburton cites are readily distinguishable.  For example, in *Passa v. City of Columbus*, No. 2:03-CV-81, 2008 WL 687168, at *6 (S.D. Ohio. Mar. 11, 2008), the court looked to *Bonar* and applied Federal Rule of Civil Procedure 15 to analyze whether a second motion to vacate would be considered timely.  The *Passa* court noted that "[t]he grant or denial of a request to amend is left to the broad discretion of the trial court," and that "[a] court must find 'some significant showing of prejudice to the opponent' in order to deny leave to amend."  *Id.* (citations omitted).  The court found that the opposing party did not explain how it would be prejudiced by consideration of the second motion to vacate, that the opponent was on notice when the first motion was filed that the plaintiff intended to challenge the arbitration award at issue, and that the opponent had substantively responded to the arguments raised in the second motion.  *Id.*  Taking all of those facts together, the court concluded that consideration of the second motion to vacate did not prejudice the opposing party.  *See id.*  In contrast, under the facts of the present case, there would clearly be prejudice to the Tremont Parties in allowing a new motion to vacate the arbitration awards, where there have already been conclusive decisions at both the district court and appellate level confirming those awards.

Similarly, in *Stulberg v. Intermedics Orthopedics, Inc.*, No. 94 C 4805, 1999 WL 759608, at *7 (N.D. Ill. Aug. 31, 1999), the court found that the original motion to vacate "clearly expressed [the movants'] intent to add new objections," and that as a result, finding the new objections timely "is fair to all parties and serves the interests of judicial economy."  In contrast, here, Halliburton did not express intent to amend its original motion to vacate until after its original motion had been denied and that denial affirmed on appeal.  Clearly, finding Halliburton's hypothetical amended motion at this stage to be timely would not be "fair to all parties" or "serve[] the interests of judicial economy."

motion to vacate, even if this court could somehow characterize its Rule 60 motion in that fashion and find the amended motion to vacate timely.  In *Bonar*, after finding that the amended motion to vacate was timely, the court emphasized that the alleged fraud on which it was based "must not have been discoverable upon the exercise of due diligence prior to or during the arbitration."  *Bonar*, 835 F.2d at 1383 (citations omitted).  The moving party in that case showed that "it could not have discovered the perjury before or during the arbitration hearing.  *Id.* at 1384.  In sharp contrast, Halliburton cannot argue that it could not have discovered the documents at issue or the alleged fraud—the Tremont Parties' failure to produce those documents—before or during the arbitration hearing.  The newly submitted documents were *in Halliburton's own files* during the relevant period.  Even *if* the Tremont Parties also had the newly submitted documents in their files and even *if* the Tremont Parties intentionally withheld them in the arbitration—neither of which Halliburton shows—Halliburton could have discovered the documents (and the Tremont Parties' failure to produce them) during the arbitration simply by looking in its own files.

The courts have not read *Bonar* as Halliburton does.  The Eleventh Circuit, in considering a motion to modify or correct an arbitration award under section 11 of the FAA, has cited *Bonar* for the proposition that arbitration awards cannot be modified based on fraud that could have been discovered earlier.  In *AIG Baker Sterling Heights, LLC v. Am. Multi-Cinema, Inc.*, the court cited *Bonar* in noting that "judicial review of arbitration decisions is 'among the narrowest known to the law,'" and that "[t]hat narrow review is why a court cannot vacate an arbitration award for fraud based on information available before or during the arbitration that the parties, through lack of diligence, failed to discover."  508 F.3d 995, 1001 (11th Cir. 2007) (citing *Bonar*, 835 F.2d at 1383) (additional citation omitted).  The *AIG Baker Sterling Heights* court held that the district court had erred in modifying the award, lamenting that while "[t]he parties elected to settle their dispute by

arbitration rather than litigation," the appeal was pending "after more than three years of litigation." *Id.*

As further support for its argument that this court should exercise its discretion to grant Halliburton's Rule 60 motion and then grant it leave to file an amended motion to vacate using the newly submitted documents, Halliburton also cites *Bonar* for the proposition that the fraud standards in Rule 60(b) and the fraud standards for vacatur under the FAA are the same. (Docket Entry No. 357 at 8). In *Bonar*, the court noted:

> The standard for determining whether a party should be relieved of a final judgment under 60(b)(3) is nearly identical to the standard for determining whether an award should be vacated for fraud under § 10(a). This is not surprising considering that both statutes serve the same function of permitting the reopening of an otherwise final judgment upon a demonstration of fraud in the proceedings, and both counteract the strong policy favoring the finality of awards and judgments. Thus, cases arising under Rule 60(b)(3) are persuasive authority in deciding cases under § 10(a).

835 F.2d at 1383 n.8 (internal citations omitted). This language does not give Halliburton the support it seeks. The language may support an inference that just as cases decided under Rule 60(b)(3) may provide guidance for deciding cases under section 10(a) of the FAA, cases decided under section 10(a) of the FAA may provide guidance for deciding whether to grant a request to overturn a judgment under Rule 60(b)(3) based on alleged fraud. But this language does not provide authority to use a Rule 60(b) motion to circumvent or expand the FAA's limits on judicial review of an arbitration award.

Halliburton also cites *Bonar* to argue that it should not be penalized for the Tremont Parties' alleged failure to produce the newly submitted documents. Halliburton relies on the *Bonar* court's statement, "'[w]e refuse to penalize [the movant] for exercising the thoroughness and caution that appellees themselves did not exercise.'" (Docket Entry No. 357 at 7 (quoting *Bonar*, 835 F.2d at

30

1382 n.6)).   Halliburton contends that it "should not be penalized for ultimately discovering documents that the Tremont Parties should have known existed, and should have disclosed, during the arbitration process." (*Id.* (footnote omitted)).   The statement in *Bonar* about refusing to penalize the alleged victim of fraud for exercising thoroughness and caution that the other party had failed to exercise does not apply here.   Halliburton has not shown that the documents were in the Tremont Parties' possession at the time of the arbitration or that the Tremont Parties committed misconduct in failing to produce the documents.   And Halliburton could have discovered the fraud it alleges by looking in its own files.   The *Bonar* court pointed out that although the moving party exercised due diligence, it could not have discovered the fraud during the arbitration.   *Bonar*, 835 F.2d at 1383. Halliburton's discovery of the documents at issue in its own files over a year after the final arbitration award was entered cannot be characterized as the "thoroughness and caution" that the *Bonar* court found the victim of the fraud exercised in that case.   In short, Halliburton's reliance on *Bonar* is unpersuasive on both the facts and the law.

Halliburton asks this court to use Rule 60(b) to overturn its judgment confirming the arbitration awards over a year after the final award was entered, on grounds that were not asserted in the motion to vacate the awards.   Halliburton interprets Rule 60(b) as providing authority for a court to overturn arbitration awards not only after they were confirmed and judgment was entered, but after the judgment was affirmed on appeal.   Halliburton does not explain why it should be in a better position to overturn the awards after confirmation, judgment, and unsuccessful appeal, than it was in during the confirmation proceeding.   And to the extent Halliburton seeks to overturn the Confirmation Order and Partial Final Judgment based on grounds in Rule 60(b) that are not provided for vacatur under the FAA, Halliburton has not shown any justification for using Rule 60(b) to

31

overturn an order and judgment confirming an arbitration award on grounds that could not have been used to vacate the award in the first place.

Halliburton has not attacked the district court proceedings. Halliburton's focus is on alleged misconduct at the arbitration proceedings. Yet Halliburton asks this court to view the Confirmation Order and Partial Final Judgment as subject to a separate review process from the arbitration awards themselves, compounding the anomalous nature of the approach it proposes. The authority Halliburton relies on to support its proposed procedure is neither on point nor persuasive. Halliburton does not take into account authority that a court cannot use Rule 60(b) to expand the FAA's grounds for vacatur. *Cf. e.spire Commc'ns, Inc. v. CNS Commc'ns*, 39 F. App'x 905, 912 (4th Cir. 2002) ("Because the FAA contains exclusive procedures for vacating arbitration awards, Rule 60(b)(1) is inapplicable.") (footnote omitted) (unpublished) (per curiam); *LaFarge Conseils et Etudes, S.A. v. Kaiser Cement & Gypsum Corp.*, 791 F.2d 1334, 1339 (9th Cir. 1986) (holding that "Kaiser may not now collaterally attack the award under the guise of a motion to set aside the judgment confirming the award," and noting that "[n]ewly discovered evidence does not justify vacation of an [arbitration] award") (citation omitted); *Merit Ins. Co. v. Leatherby Ins. Co.*, 714 F.2d 673, 680–81 (7th Cir. 1983) ("If Leatherby is to get the arbitration award set aside [under Rule 60(b),] *it must bring itself within the statute* [the FAA] and the federal rule [Rule 60(b)].") (emphasis added); *Washington-Baltimore Newspaper Guild, Local 35 v. Washington Post Co.*, 442 F.2d 1234, 1239 (D.C. Cir. 1971) (affirming denial of a motion under Rule 60(b)(6) based on "newly available evidence," and concluding that "neither Rule 60(b) nor any judicially constructed parallel thereto was meant to be applied to final arbitration awards . . . ."); *Smith v. Shell Chem. Co.*, 333 F. Supp. 2d 579, 582–83 (M.D. La. 2004) (concluding, in the context of a motion under Rule 60(b)(3) where

32

no final judgment had yet been entered on the arbitration award, that "the relief sought by plaintiff is actually a request to vacate the arbitration award, and such relief is governed by the [FAA]"); *Cong. Sec., Inc. v. Fiserv Sec., Inc.*, No. 02 Civ. 3740(RJH), 2004 WL 829028, at *2 (S.D.N.Y. Apr. 15, 2004) ("[N]either Rule 60(b) nor any other rule involving 'newly discovered evidence' is available to vacate an arbitration award, which is the apparent intent of Petitioners' motion. Although Rule 60(b) may be used to modify a judgment confirming an arbitration award, '[i]t is well-established that Rule 60(b) does not apply' to the arbitration award itself.") (quoting *Clarendon Nat'l Ins. Co. v. TIG Reinsurance Co.*, 183 F.R.D. 112, 117 (S.D.N.Y. 1998)).

This court finds no support for the two-step procedure Halliburton proposes. The limits on reviewing the arbitration awards cannot be so easily avoided.

Halliburton's approach is further undercut by the lack of any record support for the result it urges. Even if Halliburton's proposed procedural solution could be used, it would not result in vacating the arbitration awards. As discussed in detail below, even if Rule 60(b) was available here, Halliburton has not met the requirements for relief.

## VI.    Rule 60(b)(3)

Halliburton primarily seeks relief under Rule 60(b)(3), based on alleged fraud or misconduct committed by the Tremont Parties in withholding documents during the arbitration. "[A] party may engage in Rule 60(b)(3) misconduct if he fails to disclose evidence he knows about and the production of such evidence was clearly called for." *Montgomery v. Hall*, 592 F.2d 278, 279 (5th Cir. 1979). "A party making a Rule 60(b)(3) motion must establish by clear and convincing evidence (1) that the adverse party engaged in fraud or other misconduct and (2) that this misconduct prevented the moving party from fully and fairly presenting his case." *Gov't Fin. Servs. One Ltd.*

*P'ship v. Peyton Place, Inc.*, 62 F.3d 767, 772 (5th Cir. 1995) (internal quotation marks omitted) (quoting *Washington v. Patlis*, 916 F.2d 1036, 1039 (5th Cir. 1990), and *Montgomery v. Hall*, 592 F.2d 278, 278–79 (5th Cir. 1979)).  "'The purpose of the rule is to afford parties relief from judgments which are unfairly obtained, not those which may be factually incorrect.'"  *Id.* (quoting *Diaz v. Methodist Hosp.*, 46 F.3d 492, 496 (5th Cir. 1995)).

Halliburton contends that the Tremont Parties' withholding of the newly submitted documents constituted severe discovery misconduct.  (Docket Entry No. 341 at 25).  Halliburton argues that this discovery misconduct meets the first prong for relief under Rule 60(b)(3).  (*Id.*).  Halliburton also argues that withholding the documents prevented it from fairly presenting its case because had it known about the documents, it would have presented its case differently.  (*Id.*)  Halliburton argues that there would have been no need for speculation about the interpretation of the 1990 Deed and Corrective Deed because the documents show that TRE Management Company (Old Baroid) was the intended grantee.  (*Id.*).  Halliburton asks this court to conclude that if the panel had known about the newly submitted documents in the arbitration, the Tremont Parties' witnesses could not have testified that there was no intent to transfer the property to TRE Management; the panel could not have ruled that the 190 Acres was non-surplus; and the panel could not have ruled that the parties intended "all" historical liabilities associated with NL's Petroleum Services Business to be assumed by Halliburton.  (*Id.*).  For want of these documents, Halliburton argues, the arbitration was lost.  Halliburton overstates.

### A.    Fraud or Other Misconduct

Halliburton relies on *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1339 (5th Cir. 1995).  In *Rozier*, the court found that the plaintiff was prevented from fully and fairly presenting her case as

34

a result of the defendant's failure to produce a document relating to a different car model than the model at issue in the litigation. *Rozier*, 573 F.2d at 1345.  In *Rozier*, the party accused of fraud produced an affidavit from its in-house legal counsel stating that he did not know about the document when the company answered relevant interrogatories but he became aware of the document a week before the trial began. *Rozier*, 573 F.2d at 1340–41.  The court accepted the statements of trial counsel that they were personally unaware of the withheld document until the motion to vacate was filed almost a year after the trial, *id.* at 1342 n.10, but that did not change the result, because in-house counsel was aware of the document.  The court concluded:

> [F]ar from being a cumulative tidbit of evidence already subsumed in the case presented to the jury, [the withheld document] might have been the catalyst for an entirely different approach to the case on a theory that the plaintiff, lacking the document, let die before it reached the jury.  Under the circumstances, we hold that Ford's wrongful withholding of information prevented Mrs. Rozier from fully and fairly presenting her case.

*Id.* at 1345.  The court held: "Under the unique facts of this case, the policy of deterring discovery abuses which assault the fairness and integrity of litigation must be accorded precedence over the policy of putting an end to litigation."  *Id.* at 1346.

The facts in *Rozier* are very different from the facts shown in this record.  In *Rozier*, "defendant Ford was aware of a document in its files relevant to the plaintiff's case, sought by the plaintiff through interrogatories, and included within a discovery order, but [Ford] failed to disclose the document or to amend its response to an interrogatory, falsely stating that it was unable to locate such a document."  *Id.* at 1349.  In contrast, Halliburton has failed to show that the Tremont Parties intentionally and fraudulently withheld the newly submitted documents during the arbitration.  In contrast, Halliburton itself had the documents that it argues should have been presented in the

arbitration.  In contrast, there is no showing that the newly submitted documents would have affected the arbitration.

The Tremont Parties submitted the affidavit of Joan Prusse, who was assistant general counsel for Tremont Corporation from approximately 1997 through 2003.  Her responsibilities included the Site.  (Docket Entry No. 350, Ex. A).[12]  Ms. Prusse stated in her affidavit that during her involvement with the Site, a thorough search of the records in Tremont Corporation's possession was conducted and the relevant documents were sent to a document repository maintained by Halliburton.  (*Id.*, Ex. A at 2).  Ms. Prusse stated that she had never previously seen the newly submitted documents, that she did not intentionally withhold any documents from Halliburton, and that she is unaware of anyone withholding documents from Halliburton.  (*Id.*, Ex. A at 2).

The Tremont Parties have also submitted the affidavit of Andrew B. Nace, who currently serves as associate general counsel for NL and whose responsibilities include the Site.  (Docket Entry No. 350, Ex. B).  Mr. Nace stated that he had not seen the newly submitted documents before Halliburton's Rule 60 motion.  (Docket Entry No. 350, Ex. B at 4).  Mr. Nace stated that in addition to the searches by TRE Management Company that produced the documents sent to Halliburton's document repository while Ms. Prusse oversaw the Site, Mr. Nace directed a search of NL's records to find all documents required by the Arbitration Agreement.  (*Id.*, Ex. B. at 2).  Mr. Nace further testified that when he signed letters in the arbitration stating that TRE Management had produced or made available all relevant, nonprivileged records in its possession, he believed them to be true

---

[12] The Tremont Parties' opposition was accompanied by an appendix containing the exhibits associated with its opposition to the Rule 60 motion and the motion for discovery.  Because of the large number of exhibits, the appendix is filed in separate docket entries from the opposition.  The opposition appears at Docket Entry No. 350, and the exhibits to the opposition are filed in the appendix at Docket Entry Nos. 351–53.  For ease of reference, citations to the exhibits in the appendix will be cited to the opposition docket entry and the exhibit label rather than the docket entry associated with the actual exhibit.  For example, Exhibit AA would be cited as "Docket Entry No. 350, Ex. AA" even though Exhibit AA actually appears at Docket Entry No. 353.

and correct and continues to believe that they are true and correct.  (*Id.*, Ex. B at 3).  Mr. Nace stated

in his affidavit that he spoke to representatives of Halliburton on more than one occasion, including

Ms. Suttles, about  the July 1997 letter.  (*Id.*, Ex. B at 3).  Mr. Nace also stated that on January 12,

2007, Ms. Suttles emailed a copy of the July 1997 letter to a paralegal for NL.  (*Id.*, Ex. B at 3–4;

*see also id.*, Ex. D to Ex. A (affidavit of Paige Savage, paralegal for NL, stating that Ms. Savage

received the July 1997 letter in an email from Ms. Suttles on January 12, 2007)).  Finally, Mr. Nace

stated that he believes that "during the time period of the arbitration[,] Halliburton was fully aware

of the July 9, 1997 letter and the documents that Halliburton now claims it did not know existed."

(Docket Entry No. 350, Ex. B at 4).

The Tremont Parties also submitted the affidavit of Joan Lewis, a legal assistant at NL,

stating that she conducted an additional search for the newly submitted documents in response to

Halliburton's Rule 60 motion.  (Docket Entry No. 355, Ex. A).  Ms. Lewis stated that she searched

the boxes listed in a redacted index attached to Halliburton's Rule 60 motion describing twenty-

eight[13] of the approximately 21,100 boxes in NL's possession (according to the July 1997 letter),

with the exception of one box that the document storage company reported was checked out in 1997

by a Debbie Ross and never returned.[14]  (*See id.*, Ex. A at 2).  Ms. Lewis stated that she did not find

the newly submitted documents in these boxes.  (*Id.*, Ex. A at 2).

Halliburton asserts that the argument that it knew about, and had access to, the approximately

---

[13]  Ms. Lewis's affidavit states that the exhibit lists 29 boxes, but that one of them is listed twice, "so there are
only 28 boxes actually listed on Exhibit 19."  (Docket Entry No. 355, Ex. A at 2).

[14]  The Tremont Parties contend that Debbie Ross was a Dresser employee and that the box was never returned
after she checked it out.  (Docket Entry No. 350 at 26).  They attach an affidavit stating that NL did not employ Debbie
Ross, (*see id.*, Ex. O); an affidavit stating that Tremont, TRE Holding, TRE Management, and Contran Corporation did
not employ Debbie Ross, (*see id.*, Ex. P); and memos dated December 6, 1991 and January 31, 1992 from Debbie Ross,
evidencing that she was employed by the Halliburton side following the 1990 Plan, (*see id.*, Ex. Q).

21,100 boxes that were returned to NL under the July 1997 letter "misses the point" because "Halliburton has never represented that [the newly submitted documents] are contained in the 21,000 boxes that were returned to NL in 1997." (Docket Entry No. 359 at 2). Halliburton also admits that at least Ms. Suttles in Halliburton's legal department knew about the July 1997 letter but argues that the letter's only relevance was that it "put Halliburton's counsel on notice of the existence of thousands of boxes of documents potentially relevant to the Tremont Parties' new claims." (*Id.*). Halliburton explains:

> However, it was not the 1997 letter, but the "Northbelt Index," that led to the discovery of Exhibits 2–11. The Northbelt Index encompassed 38,378 boxes of documents, significantly more documents than referenced in the 1997 letter. Ms. Martinez discovered Exhibits 2–11 (in boxes containing corporate and tax information) as a result of searching the boxes listed in the Northbelt Index in connection with the new claims. Thus, the Tremont Parties overstate the importance and relevance of the 1997 letter. While the 1997 letter does provide further proof that the Tremont Parties had far more documentation in their possession than they ever produced or made available in the arbitration, it does not establish any basis for Halliburton's prior knowledge of Exhibits 2–11.

(*Id.* at 2–3).

Halliburton also argues that even after the Tremont Parties' supplemental filing submitting the affidavit of Ms. Lewis, they "still have not stated that they have searched the full records of NL, Tremont, Valhi or any other affiliate to ascertain (1) if they still have Exhibits 2–11; (2) if they have destroyed them; or (3) if anyone connected with the Tremont Parties knew of the Exhibits during the Arbitration."[15] (*Id.* at 3). Halliburton argues that "[t]his is critical because Exhibits 2–11

---

[15] Halliburton argues that Ms. Lewis's affidavit shows only that the newly submitted documents were not in one part of the total boxes returned to NL in 1997. The exhibit with the index that Ms. Lewis used to identify boxes to search only listed twenty-eight out of the more than 21,000 boxes returned to NL in 1997. (Docket Entry No. 359 at 3). The exhibit at issue—Exhibit 19—is the subject of a confidentiality dispute in the action involving Tremont's new claims. (*See* Case No. 08-CV-1063, Docket Entry No. 48). By separate order in that action, this court is denying, based on the present record, Halliburton's motion challenging Tremont's designation of the Tremont Index as confidential.

establish that these documents were created by, created for, or sent to persons at Valhi, NL and Tremont," and that "[i]t is only logical that, given these facts, these records would have been kept by at least one, and probably all of these entities."  (*Id.*).

Halliburton's arguments and the record do not approach a showing that the Tremont Parties engaged in fraud or other misconduct.  The Tremont Parties did state, during the arbitration and in this proceeding, that they searched for documents responsive to discovery and believed that they had produced all relevant documents.  Since Halliburton filed its Rule 60 motion, the Tremont Parties conducted additional searches to see if the newly submitted documents were in the Tremont Parties' files as well as in Halliburton's files.  The Tremont Parties did not find the documents.  Halliburton argues that the Tremont Parties have never stated that they searched the files of all affiliates to determine if the newly submitted documents were in their possession.  But Halliburton has not submitted anything that contradicts the affidavits submitted by the Tremont Parties showing that they conducted extensive searches in good faith during the arbitration proceeding.  Halliburton's assertion that the documents were originally created for or copied to people affiliated with one or more of the Tremont Parties does not show that the Tremont Parties retained the documents over seventeen years later, particularly given that many documents appear to have changed hands between the Tremont Parties and Halliburton, or their predecessors, in the years following the restructurings.[16]

---

[16] It has been noted that "misconduct" under Rule 60(b)(3) "'can cover even accidental omissions.'"  *See MMAR Group, Inc. v. Dow Jones & Co., Inc.*, 187 F.R.D. 282, 285 (S.D. Tex. 1999) (quoting *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 923 (1st Cir. 1988)).  The *MMAR Group* court stated that "'[i]t takes scant imagination to conjure up discovery responses which, though made in good faith, are so ineptly researched or lackadaisical that they deny the opposing party a fair trial,'" and that "'[a]ccidents—at least avoidable ones—should not be immune from the reach of the rule.'"  *Id.* (quoting *Anderson*, 862 F.2d at 923).  Halliburton has not shown the type of accidental misconduct described in *MMAR Group* because it has not contradicted the evidence submitted by the Tremont Parties indicating that they engaged in thorough investigations to comply with discovery requests in good faith.

In addition, Halliburton's allegations of discovery misconduct are not plausible.  Halliburton argues that the Tremont Parties intentionally withheld certain documents with the knowledge that Halliburton likely had *those same documents* in its possession.  *Cf. State Street Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 176 (2d Cir. 2004) ("As the district court aptly explained, '[i]t is certainly unique to argue that [a] plaintiff concealed a document from [the] defendants that [the] defendants possessed all along in their own files.'") (quoting *State Street Bank & Trust Co. v. Inversiones Errazuriz, Limitada*, No. 01 Civ. 3201(RLC), 2003 WL 1907955, at *1 (S.D.N.Y. Apr. 18, 2003)).  The fact that Halliburton has not presented any evidence of fraud or misconduct, coupled with the fact that Halliburton's allegations are not plausible, supports the conclusion that Halliburton has not met the first prong for relief under Rule 60(b)(3).

### B.     Halliburton's Opportunity to Fully and Fairly Present Its Case

Halliburton has not shown by clear and convincing evidence that any failure on the part of the Tremont Parties to produce the newly submitted documents prevented Halliburton from fully and fairly presenting its case.  Although Halliburton contends that the Tremont Parties should have been aware of the newly submitted documents, it also appears that Halliburton should have been aware of the newly submitted documents.  Patricia Suttles, the senior legal assistant at HESI that was responsible for collecting documents for this case, had personal knowledge of the restructurings.  In her affidavit, Ms. Suttles explains her involvement with the various companies on both sides of the restructurings:

> In 1985 I was employed by NL Industries, Inc. working for one of the subsidiary companies, Sperry-Sun Drilling Services, Inc.  I was then transferred to the law department as manager of litigation services in May of 1988.  Following the December 1988 reorganization of NL, I remained with Baroid Corporation as manager, litigation services.  Following the Baroid Corporation/Dresser Industries, Inc. merger in January of 1994, I was employed by Dresser Industries, Inc.

40

("Dresser") as manager, litigation services.   Since the
Dresser/Halliburton merger in September of 1998, I have been
employed by Halliburton Energy Services, Inc. ("HESI") as a senior
legal assistant.

(Docket Entry No. 341, Ex. 25 at 1).  Ms. Suttles had extensive personal experience with and

knowledge of the corporate history of Halliburton.

In *Rozier*, the court emphasized, in connection with considering whether Ford had

wrongfully withheld a particular document, that the in-house legal staff at Ford learned of the

document before trial, and that this supported a finding of misconduct even though Ford's trial

counsel were unaware of the document at issue.  *See Rozier*, 573 F.2d at 1340–41, 1341 n.10.  The

*Rozier* court found that the party had knowledge of documents even though its outside trial counsel

were not aware of those documents.

The case law has repeatedly emphasized that a party is not prevented from fully and fairly

presenting its case if it had access to the information at issue.  Halliburton points to *Triple Tee Golf,*

*Inc. v. Nike, Inc.*, 485 F.3d 253 (5th Cir. 2007), in which the defendant failed to produce relevant

patent applications that were responsive to a discovery request.  The Fifth Circuit found that the

district court had erred in holding that the later-found patent applications were not relevant and

reversed summary judgment and the denial of postjudgment relief.  The patent applications appeared

to be, at least initially, in the withholding party's possession and not in the possession of the

plaintiff.  *See Triple Tee Golf*, 485 F.3d at 260 (noting that the defendants had objected to producing

"pending, *unpublished* patent applications," that the patent applications at issue were published by

the Patent Office on January 13, 2005 and June 23, 2005, and that the discovery deadline was June

14, 2005) (emphasis added).

In *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364

41

F.3d 274, 306–07 (5th Cir. 2004), the court refused to vacate an arbitration award based on alleged fraud because the information allegedly withheld was not solely within the opposing party's control. The court cited *Biotronik Mess-Und Therapiegeraete GmbH & Co. v. Medford Medical Instrument Co.*, 415 F. Supp. 133, 137–38 (D.N.J. 1976), in which "[t]he court stated that while the party opposing enforcement urged fraud, the real complaint was that the party prevailing in the arbitration should have presented evidence favorable to its opponent's case." *Karaha Bodas*, 364 F.3d at 307. The *Karaha Bodas* court noted that the *Biotronik* court had rejected the fraud argument, "stating that 'a party cannot complain about the nonproduction of evidence when it failed to offer such evidence itself.'" *Id.* (quoting *Biotronik*, 415 F. Supp. at 138). The *Karaha Bodas* court also relied on *Catz American Co. v. Pearl Grange Fruit Exchange Inc.*, 292 F. Supp. 549, 553 (S.D.N.Y. 1968), in which the court rejected a challenge to the arbitration award based on failure to produce certain witnesses, explaining that "the witnesses were not solely within the prevailing party's control and there was other evidence in the record supporting the other party's position . . . ." *Karaha Bodas*, 364 F.3d at 307 (citing *Catz*, 292 F. Supp. at 553). The *Karaha Bodas* court concluded that because there was no evidence in the record of an intent to mislead the arbitration panel, the failure to produce the insurance policy at issue did not violate public policy and the district court did not err in refusing to deny enforcement of the award or in refusing to grant a new trial under Rule 60(b). *Id.*

Similarly, in *Atkinson v. Prudential Property Co.*, 43 F.3d 367 (8th Cir. 1994), the court refused to grant relief under Rule 60(b)(3) on the basis of a failure to produce a document because the movant had access to that document. The court found that "[w]hile failure to produce evidence requested in discovery may under some circumstances be grounds for vacating judgment, Atkinson has submitted no evidence that the failure to do so in this case was due to misconduct on the part of

defendants." *Id.* at 373 (internal citation omitted).  The court also found that the movant was not prevented from fully and fairly litigating his claim:

> *This is not a case in which defendants withheld information that they alone possessed.  A copy of the letter was in Atkinson's possession the entire time*, having been addressed to him and a copy of it having been lodged in his own files.  *He had had a fair opportunity to discover it simply by going through his own files.*  As already pointed out, moreover, production of the letter would have made absolutely no difference in the result.

*Id.* (emphasis added).

The Eleventh Circuit reached a similar result in *Taylor v. Texgas Corp.*, 831 F.2d 255, 260 (11th Cir. 1987).  In that case, the court pointed out that if the moving party had knowledge of the relevant facts, that party could not argue that it was prevented from fully and fairly presenting its case.  *See id.* ("[G]iven the fact that Texgas itself knew that it had been making pension payments to Taylor, even if its counsel were not aware of that fact, Texgas cannot show that Taylor's failure to mention the pension payments prevented Texgas 'from fully and fairly presenting its case.'").

In *American Telephone & Telegraph Co. v. United Computer Systems, Inc.*, the court noted that in proving entitlement to relief under Rule 60(b)(3), the movant must show that the fraud was not discoverable by due diligence before or during the proceedings, and that the fraud was materially related to the submitted issue.  5 F.3d 534, 1993 WL 360778, at *4 (9th Cir. Sept. 15, 1993) (unpublished table decision) (quoting *Pacific & Arctic Ry. & Navigation Co. v. United Transp. Union*, 952 F.2d 1144, 1148 (9th Cir. 1991)).  The court noted:

> Most, if not all, of the information used by AT & T to discover the changes in corporate identity was available to AT & T prior to or during the proceedings to confirm the arbitration award.  AT & T launched an appropriate investigation only after: (1) a multimillion dollar award was rendered against it; (2) the award was confirmed; and (3) AT & T was confronted with the prospect of a second arbitration proceeding.

*Id.* at \*5.  The court concluded that the district court had abused its discretion in granting the Rule 60(b)(3) relief from its prior judgment confirming the award.  Because the confirmation order was not obtained by fraud, the district court erred in vacating the underlying arbitration award.  *Id.* at \*6.

No matter how much Halliburton protests that it did not have actual notice of the newly submitted documents during the arbitration, the fact remains that Halliburton found the documents in its own files.  The cases make clear that this prevents a finding that Halliburton was precluded from fully and fairly presenting its case.  *See, e.g.*, *State Street Bank & Trust Co.*, 374 F.3d at 176 ("Where a movant admits that a letter that the other party supposedly concealed was already present in the movant's files, it 'cannot claim that it was prevented from fully presenting its case.'") (quoting *Progressive Cas. Ins. Co. v. Liberty Mutual Ins. Co.*, 1996 WL 524339, at \*2 (S.D.N.Y. Sept. 13, 1996)); *Diaz v. Methodist Hosp.*, 46 F.3d 492, 497 (5th Cir. 1995) (holding that there was no error in denying a Rule 60(b)(3) motion because the plaintiff had independent access to the information at issue, the information was not under the exclusive control of the opposing party, and it was "likely that a more focused effort by Appellant could have uncovered this evidence prior to trial").  Halliburton has not shown entitlement to relief under Rule 60(b)(3).

## VII.   Rule 60(b)(2)

"To succeed on a motion for relief from judgment based on newly discovered evidence, our law provides that a movant must demonstrate: (1) that it exercised due diligence in obtaining the information; and (2) that the evidence is material and controlling and clearly would have produced a different result if present before the original judgment."  *Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 639 (5th Cir. 2005) (quoting *Goldstein v. MCI WorldCom*, 340 F.3d 238, 257 (5th Cir. 2003) (citation omitted)).  "A judgment will not be reopened if the evidence is merely cumulative or impeaching and would not have changed the result."  *Id.* (citing *Trans Miss. Corp. v. United States*,

494 F.2d 770, 773 (5th Cir. 1974)).

### A.    Due Diligence

Halliburton argues that it was duly diligent in its search for documents and produced over 1,100,000 pages during the arbitration.  (Docket Entry No. 341 at 26).  Halliburton cites no cases supporting a finding of due diligence when the documents not produced were located in the moving party's own files.  Halliburton instead argues that it is entitled to relief even in the absence of due diligence because the documents are "conclusive."  (*Id.* at 27).  Halliburton contends that an exception to the diligence requirement exists to prevent a miscarriage of justice.  (*Id.* at 26 (citing *Ferrell v. Trailmobile, Inc.*, 223 F.2d 697, 698 (5th Cir. 1955))).

In *Ferrell*, the court stated:

> If, in fact, practically conclusive evidence shows that the appellant had actually paid all eighteen installments for the purchase of the trailer, it is obvious that the judgment should be set aside to prevent a manifest miscarriage of justice.  In such a case, the ends of justice may require granting a new trial even though proper diligence was not used to secure such evidence for use at trial.

223 F.2d at 698.  The motion under Rule 60(b) was made "on the ground that the judgment had been paid."  *Id.* at 699.

In *Central States, Southeast and Southwest Areas Pension Fund v. Central Cartage Co.*, 69 F.3d 1312 (7th Cir. 1995), the court explained that *Ferrell* did not create an exception to the requirement of exercising due diligence under Rule 60(b)(2):

> Central Cartage asks us to disregard the limitations of Rule 60(b)(2).  It tells us that *Ferrell v. Trailmobile, Inc.*, 223 F.2d 697 (5th Cir. 1955), made an exception to Rule 60(b)(2) for "conclusive" evidence, an understanding of *Ferrell* that also appears in *United States v. McGaughey*, 977 F.2d 1067, 1075–76 (7th Cir. 1992).  But *Ferrell* itself does not say this—at least not explicitly.  The question on the table was whether a judgment of foreclosure should be vacated

> because the underlying debt had been paid; the court explained that
> *conclusive evidence of the debt's payment would defeat foreclosure*.
> Modification of judgments to take account of developments such as
> payment is the domain of Rule 60(b)(5), not Rule 60(b)(2).  *Ferrell*
> did not refer to any particular subsection of Rule 60(b).  Although it
> did rely on equitable considerations, that approach is expressly
> authorized by Rule 60(b)(5).  One of its clauses presents the question
> whether it is "equitable that the judgment should have prospective
> application".  Cases in the fifth circuit since *Ferrell* have declined to
> extend its approach to Rule 60(b)(2) and have held that a litigant
> relying on new evidence as a reason to alter a judgment must
> demonstrate that the evidence could not have been obtained, in time,
> by diligent preparation.  *See Johnson Waste Materials v. Marshall*,
> 611 F.2d 593 (5th Cir. 1980).

*Cent. States*, 69 F.3d at 1314 (emphasis added); *see also Lightfoot v. Dist. of Columbia*, 555 F. Supp. 2d 61, 69 (D.D.C. 2008) ("The Fifth Circuit subsequently held that its holding in *Ferrell* applies to Rule 60(b)(5) and not subsection (b)(2), which expressly requires due diligence.") (citing *Johnson Waste*, 611 F.2d at 599).  The *Central States* court decided to follow the Fifth Circuit's holding in *Johnson Waste*, "in insisting that Rule 60(b)(2) be applied according to its text," *Cent. States*, 69 F.3d at 1314, and held that "there is no exception to Rule 60(b)(2) for 'conclusive' evidence," *id.* at 1315.  *See also Lans v. Gateway 2000, Inc.*, 110 F. Supp. 2d 1, 8 n.12 (D.D.C. 2000) ("'[T]he authority for an exception to the requirements of Rule 60(b)(2) when the newly-discovered evidence is 'conclusive' is shaky at best.  The most sensible approach is to ignore *Ferrell* to the extent that it implies an exception to the due diligence requirement of Rule 60(b)(2).  To the extent that *Ferrell* meant to create such an exception, it is wrongly decided.'") (quoting 12 JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 60.42[10] (3d ed. 1999)).

As the *Central States* case points out, the Fifth Circuit limited the *Ferrell* holding in its subsequent decision in *Johnson Waste Materials v. Marshall*, 611 F.2d 593 (5th Cir. 1980).  In *Johnson Waste*, the district court cautioned the defendants that "'it is not the function of an

independent action to relitigate actions finally determined in another action between the same parties, especially so when that initial action has been determined worthy of affirmance by a Court of Appeals . . . .'"  611 F.2d at 596 n.6.  The district court denied relief, noting that denying the motion for summary judgment "would not only be a violation of the newly discovered evidence rule, but might well encourage litigants to withhold pertinent documents in one trial and when later ruled against, seek to reopen it at a later date by then producing the evidence, thus presenting each alternative defense in a separate action." *Id.* at 597.  The Fifth Circuit noted that it had previously characterized a motion under Rule 60(b)(2) as "'an extraordinary motion' and [had] demanded that the requirements of the rule . . . be strictly met." *Id.*  The court found that the defendant failed to exercise due diligence to secure the evidence at the time of trial, stating: "Given Fernandez' testimony that he 'just couldn't find' the cancelled checks at the time of trial because he 'just had misplaced them at home' and other statements to that effect, we agree with the lower court that the evidence was not 'newly discovered' but merely 'newly produced.'" *Id.* at 598.  The court held that the due diligence requirement of Rule 60(b)(2) had not been met, stating that "the gist of [the defendant's] testimony was that he knew he had the records but had simply misplaced them.  That he 'didn't quite look good enough' because of 'rumors that some girl had taken some papers' does not in our view excuse his failure to exercise due diligence." *Id.* at 599.

The *Johnson Waste* court found that relief was appropriate under Rule 60(b)(5), however, because that section does not require that the evidence be "newly discovered" or that the movant have exercised due diligence to discover it. *Johnson Waste*, 611 F.2d at 599.  The court concluded that it would not read such requirements into Rule 60(b)(5) when the motion was based on prior payment of a judgment debt. *Id.*  The court explained:

> There is much less reason to require due diligence when a party has

47

> conclusive evidence that he has paid a portion of the judgment than when a party presents "newly discovered evidence." In the former instance, the judgment beneficiary in fact receives everything to which he is entitled; he is simply denied recovery of a windfall. On the other hand, where a court grants a new trial based on "newly discovered evidence" (other than evidence of payment), the judgment beneficiary will almost certainly be deprived of the judgment in his favor.

*Id.* In *Johnson Waste*, there was "no doubt that the records produced by defendants . . . constitute[d] 'practically conclusive evidence' of payment of over half of the amount that the trial court determined the employees were owed." *Id.* The court concluded that "[t]he equitable considerations underlying *Ferrell* would thus seem to be applicable here." *Id.* at 599–600.

Halliburton's reliance on *Ferrell* to argue that there is no requirement of showing due diligence to obtain relief under Rule 60(b)(2) fails. Subsequent case law has made it clear that *Ferrell* did not create an exception to the requirement of showing due diligence under Rule 60(b)(2).[17] Even if *Ferrell* could apply, the newly submitted documents are not the same type of "conclusive" evidence present in *Ferrell*. In *Ferrell*, there was proof of payment of a judgment, and the court found that allowing a judgment to stand that was contrary to such evidence would create a windfall for the opposing party. Here, in contrast, the newly submitted documents are not

---

[17] The other cases cited by Halliburton to support an exception to the requirement of showing due diligence do not support Halliburton's requested relief. In *Samuels v. Health & Hosp. Corp.*, 591 F.2d 195, 199 (2d Cir. 1979), in the context of a motion for judgment notwithstanding the verdict, the court found that it had authority to grant a new trial in the interest of justice. *Samuels* did not involve a motion under Rule 60(b) and should not be used to contradict direct authority discussing the limits on Rule 60(b) in this circuit. In *Ope Shipping, Ltd. v. Underwriters at Lloyd's*, 100 F.R.D. 428, 432 (S.D.N.Y. 1983), the court cited *Ferrell* for the proposition that a new trial may be granted to prevent a grave miscarriage of justice even if the newly discovered evidence would have been available upon the exercise of due diligence, if the evidence is practically conclusive. In *Ope Shipping*, the court concluded, in the context of a motion under Rule 59(a), that the evidence could not have been discovered prior to trial, *id.* at 433, and that even if it could have been discovered upon the exercise of due diligence, the motion for new trial would not be denied because of the "distinct possibility" that the plaintiffs knew of, and concealed, relevant information, and because the evidence was practically conclusive, *id.* at 434. In contrast, Halliburton could have discovered the newly submitted documents before arbitration, there is not evidence that the Tremont Parties wrongfully withheld them, and the documents are not practically conclusive.

evidence that Halliburton has satisfied its liability under the earlier judgment.  The newly submitted documents are not "conclusive" in the sense used in *Ferrell*.

Because there is no exception to the requirement of due diligence under Rule 60(b)(2) for "conclusive" evidence, and because Halliburton has not shown that the newly submitted documents are "conclusive," Halliburton must show that it exercised due diligence in order to obtain relief under Rule 60(b)(2).  The case law indicates that a party cannot show due diligence if the newly discovered evidence was available to that party during the proceeding.  In *Farm Credit Bank of Texas v. Guidry*, the court considered a motion for new trial under Rule 59 based on allegedly newly discovered evidence.  *Guidry*, 110 F.3d 1147, 1154–55 (5th Cir. 1997), *overruled on other grounds by In re Orso*, 283 F.3d 686, 696–97 (5th Cir. 2002).  The court held that "facts known to a party before trial, even though they were not disclosed to his attorney until after trial, need not be regarded as 'newly discovered' facts for purposes of Rule 59," *id.* at 1154, and noted that a court is not required "to order a new trial on the ground of newly discovered evidence in order to enable appellant to set forth facts within his own knowledge at the time of the trial, even though their existence may not have been known to his attorney then, and their significance was not known to himself," *id.* at 1154 n.28 (quoting *Roach v. Stastny*, 104 F.2d 559, 562 (7th Cir. 1939)).  The court held: "[W]e conclude that any loss by Guidry resulting from the professional deficiency in her attorney's failure to question her adequately when preparing her case for trial is a matter to be remedied between the two of them, not by putting FCBT and the district court through another trial." *Id.* at 1155.

Similarly, in *Atkinson v. Prudential Property Co.*, 43 F.3d 367 (8th Cir. 1994), the court denied relief under Rule 60(b)(2) because there was no reason to think that the new evidence would have made a difference in result, but noted with respect to the requirement that the evidence be

"newly discovered," that:

> [I]t is highly unlikely that Atkinson has shown that the evidence is "newly discovered" within the meaning of FED. R. CIV. P. 60(b)(2). *Atkinson was in possession of the letter the entire time. Where a party had possession of the evidence the entire time, the party's later "discovery" of the evidence is generally not sufficient to support a motion under Rule 60(b)(2). See, e.g.*, *Kansas City Area Transp. Auth. v. Missouri*, 640 F.2d 173, 175 (8th Cir. 1981); *Taylor v. Texgas Corp.*, 831 F.2d 255, 259 (11th Cir. 1987) (holding that "evidence cannot be 'newly discovered' under Rule 60 if it is in the possession of the moving party or that party's attorney prior to the entry of judgment"). Atkinson had the letter, bore the burden of proof, failed to produce the letter at trial, and should not be excused for his own careless filing system. Moreover, Atkinson has not shown that he could not have discovered the letter through the exercise of due diligence.

*Id.* at 371 n.3 (emphasis added); *see also Gov't Fin. Servs. One Ltd. P'ship v. Peyton Place, Inc.*, 62 F.3d 767, 772 (5th Cir. 1995) ("Peyton Place has never contended that it could not have obtained this information either before or during the trial. Therefore, we conclude that Peyton Place failed to demonstrate to the district court that it could not have obtained the information before or during the trial even if it had exercised due diligence, and hold that the district court did not abuse its discretion in refusing to grant Peyton Place's Rule 60(b)(2) motion.");[18] *Jordan v. Am. Suzuki Motor Corp.*, No. 2:07cv66-KS-MTP, 2007 WL 3231651, at *4 n.1 (S.D. Miss. Oct. 30, 2007) ("Certainly the bare minimum of diligence necessary under Rule 60(b)(2) requires a party to be familiar with documents that are in its own possession."); *id.* at *4 ("A careful reading of their own documents would have revealed the existence of the document that the Jordans' counsel now claims is indispensable."); *Smith v. Hall-Houston Oil Co.*, No. Civ. A. 98-3433, 2000 WL 1182438, at *5

---

[18] As the Tremont Parties point out, Halliburton's assertion of due diligence is even weaker than that in *Peyton Place*. (Docket Entry No. 350 at 33 ("The facts in *Peyton Place* were even more favorable to the party moving for Rule 60(b) relief, because the allegedly withheld documents were actually in [the] possession of a third party—and not in the actual hands of the movant—which here is Halliburton.")).

(E.D. La. Aug. 18, 2000) ("For the evidence to be considered 'newly discovered,' 'the evidence must have been in existence at the time of the trial, but if it was in the possession of the party before the judgment was rendered[,] it is not newly discovered and does not entitle the party to relief.'") (quoting 11 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 2859 (2d ed. 1995)); *accord State Street Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 178 (2d Cir. 2004) (affirming denial of a motion characterized under Rule 60(b)(2) because the defendants offered no explanation for their failure to discover the new document in their own files); *Alred (Gray) v. Fed. Express Corp.*, 112 F. App'x 420, 422 (6th Cir. 2004) (unpublished) (affirming denial of a Rule 60(b)(2) motion because the movant "both presumes that defendant was in possession of the documents and ignores her own possession of these documents").

Halliburton must show that it exercised due diligence in searching for documents but failed to find the newly submitted documents that were in its own files during the arbitration. The case law makes it clear that Halliburton cannot made this showing.[19]

---

[19] Halliburton argues that its counsel physically searched the files at the Malvern Site on several occasions and conducted numerous electronic index searches to locate relevant documents contained in tens of thousands of boxes in Halliburton's possession. (Docket Entry No. 341 at 30). Halliburton states that its in-house counsel directed Ms. Suttles, the senior legal assistant who had previously worked for NL, Baroid, and Dresser, to search thousands of files for documents related to the Malvern Site. (*Id.* at 27). Halliburton argues that the only way to find documents was to search indices, and that it believed its searches had caused it to produce all relevant documents. (*Id.* at 27–28). According to Halliburton, its counsel in this litigation came across the July 1997 letter, indicating that 21,108 boxes of documents were in NL's possession and that 648 boxes were in Halliburton's possession, on August 15, 2008, when Halliburton's trial counsel was working with Halliburton's in-house counsel assigned to the Gulf Nuclear claims asserted by Tremont against Halliburton in separate litigation pending in this court. (*Id.* at 28). Halliburton states that while searching for the 648 boxes in Halliburton's possession, its counsel in this case corresponded with a records manager in Halliburton's law department. (*Id.*). According to Halliburton, the records manager was given several search terms, and based on those searches, forwarded an index of boxes to Halliburton's counsel. (*Id.*). Halliburton explains that this process eventually led to the records department forwarding a large index of all boxes related to Baroid and Dresser in Halliburton's possession that were initially organized by business division or department, including an index of 38,378 boxes titled the "Northbelt" index. (Docket Entry No. 341 at 29). Halliburton states that its counsel then reviewed the Northbelt index, compared it with the NL index, and reviewed any potentially relevant boxes in Halliburton's possession. (*Id.* at 29). Halliburton states that this is how it eventually discovered Exhibit 10, which it alleges "clearly shows that 193 acres of the Malvern Site, presumed to equate to the 190 Acres, were intended to be transferred, and were in fact

### B.    The Materiality of the Newly Submitted Documents

Even if Halliburton could show that it exercised due diligence in searching for documents but nonetheless failed to locate the newly submitted documents, it is not entitled to relief under Rule 60(b)(2) because it has not shown that these documents would have changed the arbitration or confirmation proceedings.[20]

Halliburton has failed to show that the newly submitted documents are material, not cumulative or impeaching, and would have caused a different result at the arbitration.   In the Contract Award, the panel noted that the arbitration had "presented more inconsistencies and contradictions than any other matter in the collective experience of the panel members."  (Docket Entry No. 341, Ex. 1 at 1).  The panel explained:

> As detailed in exhibits and hearing testimony, both the Claimants ("Tremont Parties") and the Respondents ("Halliburton Parties") presented voluminous evidence which indicated that *both parties made specific representations to governmental agencies indicating ownership of portions of the mining property in Malvern, Arkansas*. Surprisingly, many of these inconsistencies continued for many years in the form of SEC filings (e.g., Tremont Corporation), and transfers of property as recently as 2003 (e.g., Halliburton).

(*Id.*, Ex. 1 at 1 (emphasis added)).  The panel noted that "[t]here was unquestionably uncertainty as

---

transferred, to TRE Management Company."  (*Id.* at 30).

This court is sympathetic to the difficulties of conducting "diligent" searches when the potentially responsive documents are voluminous.  According to Halliburton's motion, its in-house legal counsel initially requested a single legal assistant to search through these many thousands of files and gather all files related to the Malvern Site.  (*See id.* at 27).  Although the motion argues that Halliburton's in-house legal counsel reviewed the records collected and the records located at the Site, if the universe of potentially relevant documents was as staggering as Halliburton suggests, it is at least questionable whether assigning a single legal assistant to the task of searching to collect all relevant documents was sufficient.  This court need not determine whether the use of a single legal assistant to gather the documents constituted due diligence however, because the case law makes clear that the fact that Halliburton had the documents in its own files constitutes a lack of due diligence.

[20] This court could not have vacated the arbitration awards in the confirmation proceedings on the ground of newly discovered documents without a showing of fraud because neither the FAA nor the previous "manifest disregard" standard would allow for vacatur on that ground.

to the meaning of the term 'Mining Property, Malvern, Arkansas,' as reflected by the testimony of the principal architects of the [1990] Plan," (*id.*, Ex. 1 at 4), and that there was conflicting testimony regarding the meaning of the term "surplus," (*id.*, Ex. 1 at 6).  The panel attached an appendix to the Contract Award listing the exhibits, admissions, and actions that were inconsistent with the positions taken by the Tremont Parties, (*see id.*, Ex. 1 app. A), as well as an appendix listing the exhibits, admissions, and actions that were inconsistent with the positions taken by Halliburton, (*see id.*, Ex. 1 app. B).  While the newly submitted documents are relevant in the sense that they were created at or around the time of the 1990 Plan, the period to which the panel looked to determine the intent of the parties with respect to the meaning of "Mining property, Malvern, Arkansas," and "surplus real property," Halliburton has not shown that these documents would have done anything more than add to the list of conflicting evidence the panel examined.  To the extent that the newly submitted documents show any of the Tremont Parties taking responsibility for property in Malvern, the panel had other evidence showing the same thing.  The panel also had numerous conflicting documents in which Halliburton indicated that it owned or had responsibility for the property.

The panel had, and considered, other evidence that was at least as harmful to the Tremont Parties' position in the arbitration as the newly submitted documents.  This other evidence included maps contained in submissions to the Arkansas Department of Environmental Quality ("ADEQ"), which TRE Management signed off on as late as 2003, that allegedly showed that TRE Management owned the mine pit on the Site.  (*See* Docket Entry No. 350, Ex. C (Halliburton Arbitration Exhibit R137)).  In view of the enormous amount of conflicting evidence the panel considered in determining ownership, it is far from clear that the newly submitted documents would have caused the panel to reach a different result with respect to ownership of the Site.

Even if the newly submitted documents could have affected the result in the Contract Award

with respect to ownership, the Allocation Award makes clear that the arbitration panel allocated responsibility for the response costs by looking at the indemnity obligations under the relevant agreements.  The panel's allocation with respect to one of the disputed parcels of land, the "100 Acres," demonstrates the importance of the indemnity obligations.  In the Contract Phase, the panel had determined that "the 100 Acres was 'surplus real property' included within the 'mining property, Malvern, Arkansas,' on Exhibit A to the [1990] Plan, and thus excluded from the transfer to New Baroid [(Halliburton)]."  (Docket Entry No. 350, Ex. K at 28).  The panel unequivocally stated: "Concerning ownership of the 100 Acres, however, the evidence was clear that title is vested in HESI."  (*Id.*, Ex. K at 28).  In the Allocation Award, the panel indicated the because it had concluded in the Contract Phase that the 100 Acres constituted "surplus real property," which the parties intended to pass to the Tremont Parties under the 1990 Plan, the panel had concluded that the liabilities associated with the 100 Acres were subject to Old Baroid's (the Tremont Parties') indemnification obligations under the 1990 Plan.  (*Id.*, Ex. K at 28).  The panel noted that "as the successor to Old Baroid, Tremont is obligated to indemnify New Baroid (HESI) for all 'Obligations, . . . arising out of, or which are otherwise attributable to . . . [Old Baroid's] past, present or future operations, other than those Obligations Which Constitute Petroleum Services Obligations, . . . ." (*Id.*, Ex. K. at 28).  The panel explained that the 1990 Plan "contemplated the separation of NL's Petroleum Services Business, on the one hand, and NL's Titanium and Bentonite Business, on the other, into two publicly-traded companies," and that "[t]he obvious import of the respective indemnity obligations of both Old Baroid and New Baroid under the 1990 Plan was to allocate all liabilities and obligations associated with the respective businesses to the parties acquiring that business."  (*Id.*, Ex. K at 28).  The panel concluded that "Old Baroid was obligated to indemnify New Baroid with regard to all such liabilities and obligations related to the Titanium and Bentonite

Businesses, and likewise New Baroid was obligated to indemnify Old Baroid with respect to all liabilities and obligations attributable to the Petroleum Services Business." (*Id.*, Ex. K. at 28). Despite its holding that the 100 Acres was clearly owned by HESI, the panel concluded that "all environmental liability associated with the 100 Acres results from past mining and milling operations of NL, which unquestionably constituted petroleum services operations transferred from New Baroid and ultimately assumed by HESI." (Docket Entry No. 350, Ex. K at 29). The panel stated that it was

> satisfied that the 100 Acres constitutes one of the "sites or facilities or . . . operations attributable to the Petroleum Services Business," and that liability at issue in this arbitration with respect to the Site derives from "claims arising out of or relating to the deposit, placement or disposal of any material of any character whatsoever generated at such sites or by such operations," thereby subject to the indemnification obligations owed by HESI to the Tremont Parties under paragraph 12.(i). of the Plan.

(*Id.*, Ex. K at 29–30).

As the panel's allocation determination with respect to the 100 Acres shows, allocation of responsibility for response costs was not based only on ownership of the property in question. To the extent the newly submitted documents show that the Tremont Parties claimed ownership of the property around the time of the 1990 Plan, and even if the newly submitted documents might have influenced the arbitrators with respect to determining ownership of the Site, the arbitrators' allocation determination was based on the parties' indemnification obligations and on whether the obligations associated with the Site constituted part of the Petroleum Services Business, not on ownership.

In sum, Halliburton has not met its burden under Rule 60(b)(2). Halliburton's proposed exception to the requirement of showing of due diligence does not comport with the case law and

in any event would not apply under the facts here. Halliburton has not shown that it exercised due diligence, given that the newly submitted documents existed in its own files. Halliburton also has not shown that the newly submitted documents are material, not merely cumulative or impeaching, or would have changed the result in the arbitration or confirmation proceedings.

## VIII.   Rule 60(b)(5)

Rule 60(b)(5) permits the court to relieve a party from a judgment if it "has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable." FED. R. CIV. P. 60(b)(5). The first two grounds for relief in Rule 60(b)(5) do not apply here. Halliburton appears to request relief under the last ground. The requirements for relief under that provision of Rule 60(b)(5) are that "(1) the judgment has prospective application and (2) it is no longer equitable that it should so operate." *Kirksey v. City of Jackson*, 714 F.2d 42, 43 (5th Cir. 1983) (citing 11 CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 2863 (1973)). "Injunctions, orders of disbarment, and declaratory judgments have all been held to have prospective effect. The impact of such judgments is obviously continuing." *Id.* (internal citation omitted). "Rule 60(b)(5) on its face does not require that the evidence supporting the motion be 'newly discovered' or that the movant have exercised 'due diligence' to secure it." *Johnson Waste*, 611 F.2d at 599. "In reviewing a request for relief under Rule 60(b)(5), 'We are not framing a decree. We are asking ourselves whether anything has happened that will justify us now in changing a decree.'" *Western Water Mgmt., Inc. v. Brown*, 40 F.3d 105, 108 (5th Cir. 1994) (quoting *United States v. Swift & Co.*, 286 U.S. 106 (1932)).

As an initial matter, this court notes that it is anomalous to apply Rule 60(b)(5) to allow relief from judgment based on newly discovered evidence when the moving party has not met the requirements for relief under Rule 60(b)(2), the section that directly addresses newly discovered

56

evidence.  *Cf. Wilson-Simmons v. Lake County Sheriff's Dept.*, 42 F. App'x 754, 757 (6th Cir. 2002) (unpublished) ("This attempt to skirt the time limit of Rule 60(b)(2) was in error as Rule 60(b)(5) deals with changed circumstances, not newly discovered evidence.") (citation omitted).  In any event, Halliburton has not shown entitlement to relief under Rule 60(b)(5), even considering the newly submitted documents.

The request for relief under Rule 60(b)(5) could only be granted for that part of the arbitration award that could be construed as "prospective relief" if that relief is no longer equitable. Halliburton has not shown changed facts or law that make application of the prospective relief in the Allocation Award inequitable.  The "new" fact is that Halliburton has discovered documents in its own files that it believes would have been relevant to the arbitration.  Halliburton has not cited, and this court has not found, cases permitting relief under Rule 60(b)(5) under such circumstances. The *Johnson Waste* court permitted relief under Rule 60(b)(5) on the basis of documents in the moving party's possession, but in that case, the documents were conclusive evidence of payment, and reformation of the judgment was necessary to avoid a windfall to the opposing party.  *See Johnson Waste*, 611 F.2d at 600–01 ("Reducing the judgment here by the amount that defendants have already paid will not deprive the employees of the wages that they properly earned.  When defendants pay the remainder of the judgment, the employees will have received the full amount to which the trial court determined they were entitled.  They will only be denied a windfall recovery.") (footnote omitted).

In the context of a consent decree, the Supreme Court has explained that the standard for modification on equitable grounds is not a lenient one:

> "Life is never static, and the passing of a decade has brought changes
> to the grocery business as it has to every other.  The inquiry for us is
> *whether the changes are so important that dangers, once substantial,*

> *have become attenuated to a shadow.*  No doubt the defendants will
> be better off if the injunction is relaxed, but they are not suffering
> hardship so extreme and unexpected as to justify us in saying that
> they are the victims of oppression.  *Nothing less than a clear showing
> of grievous wrong evoked by new and unforeseen conditions* should
> lead us to change what was decreed after years of litigation with the
> consent of all concerned."

11 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE &
PROCEDURE § 2863 (2d ed. 1995) (quoting *United States v. Swift*, 286 U.S. 106, 119 (1932))
(emphasis added).  "Because the standard is an exacting one, many applications for relief on this
ground [Rule 60(b)(5)] are denied."  *Id.* (footnote omitted).  The examples of when courts have
found relief appropriate under Rule 60(b)(5) are limited: "subsequent legislation, a change in the
decisional law, or a change in the operative facts."  *Id.* (footnotes omitted).

Halliburton had the newly submitted documents in its own possession during the arbitration
and confirmation proceedings.  Halliburton has not shown the kind of changed circumstance
warranting relief under Rule 60(b)(5).  And, as discussed in the Rule 60(b)(2) analysis, it is far from
clear that the newly submitted documents would have affected the arbitration or the confirmation
proceedings.  The fact that the arbitration panel did not consider the newly submitted documents
does not make prospective application of the arbitration awards unjust.

A court considering relief under Rule 60(b) weighs the fairness of enforcing the judgment
against the interest in finality of judgments, *see Hesling*, 396 F.3d at 638.  Given that Halliburton
had these documents in its own files and that the documents do not conclusively resolve the issues
considered in the arbitration or confirmation proceedings, the equities favor maintaining the finality
of the arbitration awards and the order and judgment confirming those awards.

## IX.    Rule 60(b)(6)

Halliburton also requests relief under Rule 60(b)(6), which allows overturning a judgment

58

for "any other reason that justifies relief." FED. R. CIV. P. 60(b)(6).  As the Fifth Circuit explained in *Hesling v. CSX Transp., Inc.*, 396 F.3d 632 (5th Cir. 2005):

> "Rule 60(b)(6) 'is a grand reservoir of equitable power to do justice in a particular case when relief is not warranted by the preceding clauses.'  'The broad language of clause (6) gives the courts ample power to vacate judgments whenever such action is appropriate to accomplish justice.'"  *Harrell v. DCS Equip. Leasing Corp.*, 951 F.2d 1453, 1458 (5th Cir. 1992) (citations omitted).  However, "[r]elief under this section is granted 'only if extraordinary circumstances are present.'"  *American Totalisator Co., Inc. v. Fair Grounds Corp.*, 3 F.3d 810, 815 (5th Cir.1993) (citation omitted).

*Id.* at 642 (footnote omitted).  The Fifth Circuit has "consistently held that relief under 60(b)(6) is mutually exclusive from relief under sections (1)–(5)," and that "[t]he reason for relief set forth under 60(b)(6) cannot be the reason for relief sought under another subsection of 60(b)."  *Id.* at 643 (citations omitted).  Halliburton argues that relief is available under Rule 60(b)(2), (3), or (5), but seeks relief under Rule 60(b)(6) in the alternative.  (Docket Entry No. 341 at 13).  This court has determined that relief is not available under subsections (2), (3), or (5).  Halliburton's motion does not identify a separate ground for relief under Rule 60(b)(6).  Instead, Halliburton states that "in the event that this Court finds these sections [60(b)(3), 60(b)(2), and 60(b)(5)] inapplicable, Halliburton is entitled to relief under Rule 60(b)(6) based upon the extraordinary circumstances set out in this Motion."  (Docket Entry No. 341 at 34).  Because Halliburton has not stated a ground for relief that is separate from the grounds relied on in seeking relief under the other subsections of Rule 60(b), it cannot obtain relief under Rule 60(b)(6).  *See Cent. States, Southeast & Southwest Areas Pension Fund v. Cent. Cartage Co.*, 69 F.3d 1312, 1315 (7th Cir. 1995) ("Rule 60(b)(6) cannot be used to abrogate the limitations in Rule 60(b)(1) and (3)."); *Horphag Research Ltd. v. Henkel Corp.*, No. 00 Civ. 0438(MBM), 2004 WL 117601, at *3 (S.D.N.Y. Jan. 26, 2004) (citing *United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 391–92 (2d Cir. 2001), for the proposition that "a Rule 60(b)(6)

claim is properly rejected if the reasons given for relief from judgment under that clause can be considered in one of the more specific clauses of Rule 60(b)").

In addition, the fact that Halliburton relies on documents that it had in its own files during the arbitration is also likely to preclude relief under Rule 60(b)(6). In *Peyton Place*, the Fifth Circuit explained:

> Even if we assume what Peyton Place fails to argue, that Peyton Place has stated a Rule 60(b)(6) claim distinct from its Rule 60(b)(2) and (b)(3) claims, its Rule 60(b)(6) claim fails because we have expressly held that a district court's *equitable powers under section (b)(6) do not extend to considering evidence that could have been presented at trial*. "This clause of the Rule provides 'a grand reservoir of equitable power to do justice in a particular case,' but that well is not tapped by a request to present evidence that could have been discovered and presented at trial through the exercise of due diligence." *United States v. 329.73 Acres of Land, More or Less*, 695 F.2d 922, 926 (5th Cir. 1983) (quoting). Had it exercised due diligence, Peyton Place could have discovered and presented at trial the photocopied first page in the mortgage records, the RTC's seizure of the Oster & Wegener files, and the assignment of proceeds of contract referring to the forbearance agreement . . . . Therefore, the district court did not abuse its discretion in refusing to grant Peyton Place's Rule 60(b)(6) motion.

62 F.3d at 774 (citation omitted) (emphasis added).

Halliburton has not shown extraordinary circumstances that justify the relief it seeks. In *Atkinson v. Prudential Property Co.*, 43 F.3d 367 (8th Cir. 1994), the court held:

> "Exceptional circumstances" are not present every time a party is subject to potentially unfavorable consequences as a result of an adverse judgment properly arrived at. Rather, exceptional circumstances are relevant only where they bar adequate redress. As noted above, Atkinson had a full and fair opportunity to litigate his claim. The district court properly found that he had failed to comply with Minn. Stat. § 82.33, and the "newly-discovered" letter does not disturb that finding. Accordingly, Atkinson is not entitled to relief under FED. R. CIV. P. 60(b)(6).

*Id.* at 373–74 (footnote omitted).

60

Even if this court could grant relief on a ground that Halliburton used as a basis for requesting relief under one of the other subsections of Rule 60(b), the fact that Halliburton is relying on documents in its own files that it was not prevented from accessing during the arbitration does not warrant exercising this court's equitable powers to relieve Halliburton of the arbitration awards or the judgment confirming those awards. The equities weigh against reopening the judgment. The parties chose arbitration. They engaged in a thorough arbitration process in which the panel considered "millions of pages of documents in the form of over 600 exhibits," heard ten live witnesses, read many affidavits, and viewed at least seven videotaped witnesses. After arbitration, the parties thoroughly litigated the confirmation and vacatur issues in this court. They argued the appeal in the Fifth Circuit, which promptly affirmed the judgment confirming the arbitration awards. The Tremont Parties would clearly be prejudiced by reopening the judgment. Halliburton has not shown any basis to do so.

## X.     Halliburton's Motion for Discovery

Halliburton seeks discovery "relating to the knowledge of the Tremont Parties as to the existence of the [newly submitted] documents, the decision to withhold the documents, [and] the knowledge of the Tremont Parties in connection with the documents produced . . . ." (Docket Entry No. 342 at 1–2). Since it filed its original motion for discovery, Halliburton has filed a supplemental brief identifying the topics on which it seeks discovery. (Docket Entry No. 357 at 10–11). Halliburton "requests all documents that show the subject property was transferred to TRE Management Company and/or Tremont LLC." (*Id.* at 10). Halliburton requests depositions of corporate representatives of NL, Tremont, TRE Holding, TRE Management, and Valhi, Inc. who can provide testimony on enumerated topics, which generally relate to the process the Tremont Parties used to search for and produce documents in the arbitration. (*See id.* at 10–11). Halliburton

also wants to depose David Garten, Tremont's General Counsel.  (*Id.* at 10).

In response, the Tremont Parties point out that Halliburton's motion for discovery fails to point to a particular section of the Rules of Civil Procedure.  (Docket Entry No. 350 at 47).  The Tremont Parties argue that there is no authority for permitting discovery into alleged fraud during discovery in the arbitration after Halliburton's appeal from the judgment confirming the arbitration award has been dismissed.  (*Id.*).  The Tremont Parties contend that no amount of discovery now will change the fact that Halliburton had the newly discovered documents throughout.  (*Id.*).

Postjudgment discovery into alleged fraud is not appropriate unless there has been at least some showing of fraud.  In *Duhaime v. John Hancock Mutual Life Insurance Co.*, 183 F.3d 1 (1st Cir. 1999), the court stated:

> But after final judgment has entered, our strong interest in the finality of judgments leads courts to intervene in a search for evidence of fraud *only if there has been some showing that a fraud actually has occurred.  See H.K. Porter Co. v. Goodyear Tire & Rubber Co.*, 536 F.2d 1115, 1118–22 (6th Cir. 1976) (discovery in aid of a motion attacking a final judgment on the basis of fraud should be permitted only if there is some evidence of fraud); *see also Midwest Franchise Corp. v. Metromedia Restaurant Group, Inc.*, 177 F.R.D. 438, 440 (N.D. Iowa 1977) (prima facie showing of fraud required); *United States ex rel. Free v. Peters*, 826 F. Supp. 1153, 1154 (N.D. Ill. 1993) (same).  Plainly, there has been no such showing here. . . . Thus, [the court's obligation to scrutinize class-action settlements] does not open the door to post-judgment discovery where there is nothing more than speculation that a fraud might have occurred.

*Id.* at 7–8 (1st Cir. 1999); *see also H.K. Porter Co. v. Goodyear Tire & Rubber Co.*, 536 F.2d 1115, 1122 (6th Cir. 1976) ("Goodyear has made serious but unsupported charges of fraud, perjury, and subordination of perjury against Porter, the inventor, Caplan, and the attorney for Porter.  To permit discovery after judgment in addition to the extensive discovery ordered during the trial of the patent infringement case[,] it was at least necessary for Goodyear to present some proof to establish its

62

unsupported charges."); *Midwest Franchise Corp. v. Metromedia Rest. Group, Inc.*, 177 F.R.D. 438, 440 (N.D. Iowa 1997) ("'[A] [discovery] request for the purpose of attacking a final judgment involves considerations not present in pursuing discovery in a pending action prior to judgment. Primary among these considerations is the public interest of the judiciary in protecting the finality of judgments.'") (quoting *H.K. Porter*, 536 F.2d at 1118); *United States ex rel. Free v. Peters*, 826 F. Supp. 1153, 1154–55 (N.D. Ill. 1993) ("[P]arties seeking to avoid judgment on the basis of Rule 60(b)(3) ordinarily are required to make a prima facie showing of fraud in order to be entitled to discovery after judgment.  Likewise, those seeking post-judgment relief under Rule 60(b)(2) will not be afforded post-trial discovery unless, at a minimum, the newly discovered evidence relied upon 'could not have been discovered in time to move for a new trial under Rule 59(b).'") (internal citations omitted).

Similarly, in *O.R. Securities, Inc. v. Professional Planning Associates, Inc.*, 857 F.2d 742 (11th Cir. 1988), in the context of considering whether to permit discovery in connection with a motion to vacate an arbitration award, the court stated:

> [W]e find that the district court did not abuse its discretion in not permitting discovery or further proceedings in regard to the issue of the alleged false testimony by WZW's president [during the arbitration].  The truth or falsity of Mr. Weinrich's testimony was or should have been noticed by O.R. during the course of the arbitration proceedings.  As such, O.R. had the opportunity to cross-examine on the alleged false testimony.   Because the alleged fraud was discoverable during the arbitration proceedings, O.R. may not seek to vacate the judgment on that ground.

*Id.* at 749 (citing *Bonar*, 835 F.2d at 1383) (footnote omitted).  Because Halliburton had the newly submitted documents in its possession during the arbitration, it should not be permitted to challenge the arbitration awards or the judgment confirming those awards on the basis of alleged fraud that it had the ability to discover during the arbitration proceedings.

Halliburton relies on *MMAR Group, Inc. v. Dow Jones & Co., Inc.*, 187 F.R.D. 282 (S.D. Tex. 1999), to support its request for discovery. (Docket Entry No. 357 at 8–9). In *MMAR Group*, the court allowed discovery in furtherance of the defendants' Rule 60(b) motion after one of the plaintiff's employees notified the defendants of misconduct on the part of the plaintiff, including the withholding of relevant tapes. 187 F.R.D. at 286. *MMAR Group* does not support allowing discovery here because there has been no showing of fraud.

Halliburton's motion for postjudgment discovery is denied.

## XI.     Halliburton's Motion for a Protective Order and the Tremont Parties' Motion for an Order Requiring Halliburton Not to Transfer or Dissipate Any Assets

Halliburton has asked this court to enter an order protecting it from the Tremont Parties' postjudgment requests for information about Halliburton's assets. (Docket Entry No. 304). On July 3, 2008, the day after this court entered the Partial Final Judgment, the Tremont Parties served requests for production on Halliburton, seeking copies of Halliburton's:

> (1) tax returns; (2) bank account statements; (3) certificates evidencing ownership of securities; (4) contracts, agreements, promissory notes, CDs, commercial paper, repurchase obligations, negotiable instruments, pledge agreements and accounts receivable payable to Halliburton; (5) assignments related to documents identified in (2), (3), (4), (6), and (9); (6) deeds, contracts [of] sale, and/or title upon real property owned by Halliburton; (7) property assessment notices issued to Halliburton; (8) key(s) to all safe deposit boxes issued to or held in trust [for] Halliburton; (9) certificates of title and/or bills of sale to automobiles, vehicles, boats, aircraft, or any other personal property owned by Halliburton; (10) separate company, state income and/or franchise tax returns; (11) documentation for related party transfers in excess of $1,000,000; (12) fixed asset schedule[s]/depreciation schedules for any assets identified in (6) and (9); and (13) audited and/or unaudited consolidated financial statements (the "Asset Discovery").

(*Id.* at 2).

### A.     The Parties' Arguments

64

Halliburton argues that "the sole purpose of the requests is to aid in the execution of the monetary portion of this Court's Partial Judgment" and that "[b]ecause Plaintiffs have posted an approved supersedeas bond and this Court's Partial Judgment has been stayed, the Asset Discovery is improper . . . ." (Docket Entry No. 304 at 2).  Halliburton argues that Texas state law controls the discovery the Tremont Parties request and only allows discovery in aid of enforcement of a judgment if that judgment has not been suspended by a supersedeas bond.  (*Id.* at 3–4).  Halliburton argues:

> Because the monetary portions of the Partial Judgment are stayed and the Court has approved the supersedeas bond, Plaintiffs are entitled to a protective order disallowing any discovery into Plaintiffs' assets. Additionally, because the Tremont Parties have recorded the abstract of judgment and Plaintiffs' assets are irrelevant to the nonmonetary portion of the Partial Judgment, good cause exists to protect Plaintiffs from the Tremont Parties' Asset Discovery or any other discovery into Plaintiffs' financial condition while the appeal of the Partial Judgment is pending.

(*Id.* at 5).

In response, the Tremont Parties argue that not only should this court deny Halliburton's motion for a protective order, it should also issue an order pursuant to Federal Rule of Civil Procedure 69 prohibiting Halliburton from dissipating or transferring its assets.  (Docket Entry No. 309 at 1).  The Tremont Parties contend that "they are not seeking to execute upon or enforce any monetary portion of the Partial Final Judgment which has been stayed by this Court," and that they "merely wish to have discovery responses from Judgment Debtors to insure that Judgment Debtors do not dissipate or transfer assets to avoid Judgment Debtors' obligations under the Partial Final Judgment."  (*Id.* at 2–3).  The Tremont Parties contend that the monetary portion of the Partial Final Judgment—$11,092,640.09—"is merely the tip of the iceberg of the ultimate cost of remediating" the Site.  (*Id.* at 3).  The Tremont Parties argue that "[h]aving obtained the Partial Final Judgment,

pursuant to which the Tremont Parties are to be held harmless for any liabilities at the Magnet Cove Site, the Tremont Parties should not be left holding the bag for what Judgment Debtors have estimated will likely be an approximately $400 million cleanup." (*Id.*).  The Tremont Parties assert that "external factors" support granting the requested postjudgment discovery, including DII's bankruptcy filing in December of 2003; Halliburton Company's moving its corporate headquarters to Dubai; Halliburton Company's payment of fines to the Securities and Exchange Commission; and Halliburton Company's involvement in governmental investigations.  (*Id.* at 4).  The Tremont Parties also point out that the Texas property Halliburton identified as having significant value—the Oak Park Property—was transferred between various Halliburton entities right before DII's bankruptcy for $10, but Halliburton now claims it is worth tens of millions.  (*Id.* at 4).  Although Halliburton's represenative testified in this court in connection with the supersedeas bond that the Oak Park Property is owned "free and clear" and that Halliburton has no plans to get rid of that property and would notify this court and the Tremont Parties before any transfer, the Tremont Parties remain concerned about security for the judgment.  (*See* Docket Entry No. 309 at 4–5).  With respect to DII, the Tremont Parties assert that the only owned asset is an asbestos receivable allegedly valued over $60 million, and that DII should not be allowed to transfer out any asbestos-receivable money while the Partial Final Judgment is outstanding.  (*Id.* at 5).

Halliburton points out that the "external factors" were raised earlier and this court considered them in setting the bond.  (Docket Entry No. 323 at 5).  Halliburton contends that it offered evidence of the value of the Oak Park Property in connection with its request to stay enforcement of the judgment without a bond, and that because that request was denied and Halliburton paid the supersedeas bond, issues related to the Oak Park Property are irrelevant.  (*Id.*).  Halliburton further contends that the transfer of the Oak Park Property was done in the normal course of business, and

that the Texas Rules of Appellate Procedure prohibit the court from enjoining transfers of assets in the normal course of business.  (*Id.*).  With respect to DII's asbestos receivable, Halliburton argues that because it has fully bonded the monetary portion of the Partial Final Judgment, the status of this asset is irrelevant, and that there is no evidence that DII has done anything to dissipate the asset to avoid satisfaction of the judgment.  (*Id.*).

In addition to the "external factors" that the Tremont Parties identify, they also contend that Halliburton's actions in this case warrant the requested discovery and order preventing dissipation and transfer of assets.  (Docket Entry No. 309 at 5–8).  The Tremont Parties argue that Halliburton has proposed to the ADEQ alternatives to removing the acidic water from the pit lake at the Site, which the Tremont Parties assert is the only way to provide them relief from liability for the Site. (*Id.* at 6).  The Tremont Parties argue that Halliburton has created a picture for the ADEQ that the Tremont Parties have been uncooperative, and that Halliburton has sought to have the ADEQ hold the Tremont Parties responsible for obligations related to the Site.  (*Id.* at 6).  The Tremont Parties contend that as a result, the ADEQ has refused to release the Tremont Parties from a 2000 Administrative Settlement Agreement with the ADEQ.  (*See id.* at 7).  The Tremont Parties state that Halliburton has refused to pay legal bills the Tremont Parties incurred as a result of the ADEQ not releasing TRE Management from responsibility for the Site.  (*Id.*).  Halliburton responds that it is entitled to negotiate potential options for remediating the Site with the ADEQ and that the Tremont Parties have mischaracterized Halliburton's discussions with the ADEQ.  (Docket Entry No. 323 at 6).  Halliburton also states that it has recently sent the ADEQ a request that the Tremont Parties be removed from the terms of the 2000 Administrative Settlement Agreement.  (*Id.* at 7). Halliburton argues that this court's prior orders allowed it to supersede the judgment, that they have done so by posting a supersedeas bond, and that the Tremont Parties are again seeking to enforce

the judgment as a lien against Halliburton's assets, a request that this court has previously denied. (*Id.* at 3). Halliburton argues that the Texas rules and cases contemplate an order precluding dissipation of assets before allowing discovery and there is no basis for such an order because there is no likelihood that Halliburton will transfer or dissipate assets to avoid the judgment, given that it is in sound financial condition and has posted a supersedeas bond. (*See id.* at 7–10, 13–16).

## B.    Analysis

The posture of this case has changed since the parties briefed these issues. On July 16, 2008, this court entered an order staying enforcement of the monetary portion of the Partial Final Judgment pending appeal, conditioned on Halliburton posting a supersedeas bond in the amount of $14,342,640.09. This court denied Halliburton's request to stay the nonmonetary relief. (Docket Entry No. 291). The bond amount included the $11,092,640.09 the arbitrators awarded to compensate the Tremont Parties for past costs incurred through April 30, 2008; interest for the expected duration of appeal, which was estimated to be $2,000,000 for three years from the date of judgment;[21] $250,000 to cover costs on appeal; and $1,000,000 to secure future costs at the Site. Halliburton represented to this court that it had taken over Site remediation and would be paying future costs associated with the Site, subject to the appeal. This court concluded that "the risk that the Tremont Parties will have to pay future clean-up costs at the Site is minimal—unless the awards

---

[21] At the time of the order on the supersedeas bond, Halliburton had filed a motion to stay the appeal until all claims pending in this court involving disputes between Halliburton and the Tremont Parties over responsibility for environmental clean-up of properties other than the Site are resolved. The Fifth Circuit had advised Halliburton that its motion was improperly filed, and during the hearing on the stay and bond issues, Halliburton's counsel stated that it had not yet been decided whether to file another motion seeking to stay the appeal. In determining the amount of interest to be included in the bond, this court took into account the average time for appeal and the possibility that the appeal could be stayed pending resolution of the remaining claims, and concluded that the bond should include interest for three years from the date of judgment. Since the time of that order, the Fifth Circuit has affirmed the Partial Final Judgment. Because the Tremont Parties subsequently filed, and the Fifth Circuit granted, a motion for expedited consideration, and because the appeal was not stayed once this court denied Halliburton's request for a new trial, the appeal was resolved in approximately six months, rather than the estimated three years.

and judgment are reversed." (*Id.* at 8). The bond did not include the claims of third parties with respect to the Site, in part because the claims involving Georgia-Pacific and Milwhite were scheduled for mediation.[22] (*Id.* at 14). This court did not stay the nonmonetary portions of the Partial Final Judgment and held that the Tremont Parties were entitled to obtain an abstract of judgment and to record the judgment. (*Id.* at 16). This court found under Texas Property Code § 52.0011(a) that a lien on Halliburton's property was not necessary to protect the Tremont Parties' interests. (*Id.* at 17–18).

The Tremont Parties have sought postjudgment discovery pursuant to Rule 69(a)(2). That Rule states: "In aid of the judgment or execution, the judgment creditor . . . may obtain discovery from any person—including the judgment debtor—as provided in these rules or by the procedure of the state where the court is located." FED. R. CIV. P. 69(a)(2). The Tremont parties stated that they were seeking discovery merely to make sure that Halliburton would be able to fulfill the judgment once the appellate process was complete. The appeal was decided much more quickly than the parties anticipated. The Partial Final Judgment has now been affirmed by the Fifth Circuit and Halliburton's request for relief under Rule 60(b) has been denied by this court.

The record does not support the need for discovery or an order preventing transfer or dissipation of assets at this time. Halliburton has stated in open court that it has taken over responsibility for the remediation costs at the Site and will not seek payment for these costs from the Tremont Parties. (*See* Docket Entry No. 291 at 8, 12). Based on the present record, the risk that the Tremont Parties will have to pay future cleanup costs at the Site is minimal. The Tremont Parties have not presented evidence that the risk to them of being forced to pay the future costs at

---

[22] Since the order on the bond, the claims involving Georgia-Pacific and Milwhite were subject to mediation, but were not resolved in mediation, and remain pending.

the Site has increased since this court issued its opinion on the supersedeas bond.  If anything, that risk has decreased now that the Partial Final Judgment has been affirmed on appeal and this court has denied the request for relief under Rule 60(b).  In addition, the bond included an additional $1,000,000 to cover potential future costs, and, because the appeals process at the Fifth Circuit was shorter than anticipated at the time the amount of the supersedeas bond was set, the amount of estimated interest included in the bond covered a greater period of time than the actual time to appeal.

Federal Rule of Civil Procedure 26(c)(1) states that "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . ."  FED. R. CIV. P. 26(c)(1).  Rule 69(a)(1) states that "[t]he procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies."  FED. R. CIV. P. 69(a)(1).  Rule 69(a)(2) provides that discovery from a judgment debtor may be obtained "as provided in these rules or by the procedure of the state where the court is located."  FED. R. CIV. P. 69(a)(2).  A party seeking discovery under Rule 69(a) "may use the discovery devices provided in Civil Rules 26 to 37 or may obtain discovery in the manner provided by the practice of the state in which the district court is held."  12 CHARLES A. WRIGHT, ARTHUR R. MILLER & RICHARD L. MARCUS, FEDERAL PRACTICE & PROCEDURE § 3014 (2d ed. 1997).

Under Rule 621a of the Texas Rules of Civil Procedure,

> [a]t any time after rendition of judgment, and so long as said judgment has not been suspended by a supersedeas bond or by order of a proper court . . . , the successful party may, for purposes of obtaining information to aid in the enforcement of such judgment, initiate and maintain in the trial court in the same suit in which said judgment was rendered any discovery proceeding authorized by these rules for pre-trial matters.  Also, at any time after rendition of

> judgment, either party may, for the purpose of obtaining information relevant to motions allowed by Texas Rules of Appellate Procedure 47 and 49 [now Rule 24[23]] initiate and maintain in the trial court in the same suit in which said judgment was rendered any discovery proceeding authorized by these rules for pre-trial matters.

TEX. R. CIV. P. 621a.   Rule of Civil Procedure 621a authorizes postjudgment discovery in two specific instances.   First, postjudgment discovery is authorized "for the purpose of obtaining information to aid in the enforcement of [a] judgment," but only if the judgment has not been suspended by a supersedeas bond.   *In re Emeritus Corp.*, 179 S.W.3d 112, 114 (Tex. App.—San Antonio 2005, orig. proceeding [mand. dism'd]) (citation and internal quotation marks omitted). Second, Rule of Civil Procedure 621a authorizes postjudgment discovery "for the purpose of obtaining information relevant to motions allowed by Texas Rules of Appellate Procedure 47 and 49 [now Rule 24]."   *Id.* (citation and internal quotation marks omitted).   In *In re Emeritus*, both parties agreed that postjudgment discovery was not permissible in aid of enforcing the judgment because the judgment debtor had posted a cash deposit in the maximum amount required by Texas Rule of Appellate Procedure 24.   *Id.* at 114–15.   The court held that discovery under the second prong of Rule 621a, in furtherance of motions made under Texas Rule of Appellate Procedure 24, was not precluded by the posting of a supersedeas bond.   *See id.* at 115.   The court permitted discovery in that case to test the judgment debtor's compliance with a court-ordered injunction preventing the debtor from transferring or dissipating assets to avoid satisfaction of judgment.   *Id.* at 117.

---

[23] "The reference to Texas Rules of Appellate Procedure 47 and 49 is outdated.   Former Rules 47 and 49 are from the pre-1997 Rules of Appellate Procedure.   Rules 47 and 49 are now consolidated and found in Texas Rule of Appellate Procedure 24.   *See* TEX. R. APP. P. 24 cmt."   *In re Emeritus Corp.*, 179 S.W.3d 112, 114 n.3 (Tex. App.—San Antonio 2005, orig. proceeding [mand. dism'd]).   "Pursuant to Rule of Appellate Procedure 24, litigants are entitled to file motions relating to the type and sufficiency of bond posted to stay the execution of a judgment, as well as motions to enjoin a judgment debtor from dissipating or transferring its assets to avoid satisfaction of a judgment."   *Id.* (citing TEX. R. APP. P. 24).

Halliburton sought a protective order from the discovery on the basis that the Partial Final Judgment was suspended by the supersedeas bond. The supersedeas bond remains in place. The purpose for which the Tremont Parties stated they sought discovery—to learn information about Halliburton's assets *during appeal*—is significantly less important, given the swift progress of the appeal. The Tremont Parties also have not shown a basis for permitting the discovery under the second prong of Rule 621a, in connection with an order preventing Halliburton from transferring or dissipating assets. Whether to grant a postjudgment injunction under Texas Rule of Appellate Procedure 24 "is a factual matter requiring the trial court to determine whether the judgment debtor is likely to dissipate or transfer its assets to avoid satisfaction of the judgment. The trial court abuses its discretion in ordering a post-judgment injunction if the only reasonable decision that could be drawn from the evidence is that the judgment debtor would not dissipate or transfer its assets." *Emeritus Corp. v. Ofczarzak*, 198 S.W.3d 222, 227 (Tex. App.—San Antonio 2006, no pet.) (footnote omitted), *rev'd and remanded*, No. 04-05-00530-CV, 2006 WL 923534 (Tex. App.—San Antonio Apr. 5, 2006, no pet.) (per curiam) (reversed and remanded based on settlement agreement). In *Ofczarzak*, the appellate court affirmed the trial court's decision to enter a postjudgment injunction preventing the transfer or dissipation of assets, noting that the "trial court was aware that Emeritus initially sought to appeal without posting a bond based on a negative net worth in excess of $100,000,000.00, but then, in an apparent effort to resist discovery into its financial condition, posted a $1.7 million cash bond"; that "Emeritus had previously been sanctioned for its pre-trial attempts to avoid full disclosure of information"; that the trial court had entered sanctions based on the judgment debtor's misrepresentations regarding production of documents; that the judgment debtor had violated a previous court order compelling it to produce documents and refused to comply with a subpoena duces tecum; and that the judgment debtor had violated pretrial discovery

72

rules. *Id.* at 227–28.  The appellate court concluded that "[a]lthough the record contained no direct evidence that Emeritus had dissipated or transferred assets, given the information that was before the trial court, we cannot conclude that the trial court abused its discretion in determining that a likelihood existed that Emeritus would dissipate or transfer its assets to avoid satisfaction of the judgment." *Id.* at 228.        The record does not show a significant risk that the Tremont Parties will be "left holding the bag" for future costs at the Site.  There is no evidence that Halliburton has a significant negative net worth.  Halliburton has not previously been the subject of sanctions for reasons relevant to the issues present here.  Given the supersedeas bond, which includes some security for future costs; the fact that Halliburton has taken over the remediation at the Site; the affirmance of the Partial Final Judgment; and the lack of evidence that Halliburton has transferred or dissipated assets in order to avoid satisfaction of the judgment, there is no showing of a significant likelihood that Halliburton will dissipate or transfer assets in order to avoid satisfaction of future costs contemplated by the judgment.  As a result, discovery also is not permissible under the second prong of Rule 621a in aid of a motion to prevent transfer or dissipation of assets.[24]  The Tremont Parties' request for such an order under Rule 69 is denied.  Halliburton's request for a protective order is granted.[25]  *See* FED. R. CIV. P. 26(c)(1); TEX. R. CIV. P. 192.6(b).

---

[24] To the extent the requested discovery could be sought under the procedures in the Federal Rules without meeting the standards under the applicable state rules, discovery is not appropriate under the Federal Rules for similar reasons to those barring discovery under the state rules.  The supersedeas bond remains in place and there is not sufficient risk to the Tremont Parties of being held liable for future costs at the Site.  A protective order is necessary to protect Halliburton from annoyance and undue burden associated with the Asset Discovery, particularly in view of the fact that the original purpose for which the discovery was sought—to discover information about Halliburton's assets during appeal—has less importantance.  *See* FED. R. CIV. P. 26(c)(1).

[25] The parties discuss *Hebert v. Exxon Corp.*, 953 F.2d 936 (5th Cir. 1992), but that case does not bear on resolution of the issues here.  In *Hebert*, the court held that a declaratory judgment involving a monetary payment is subject to an automatic stay under Rule 62(d) if a supersedeas bond is posted.  *Hebert*, 953 F.2d at 938 ("We find no support for the proposition that a judgment for money is not entitled to an automatic stay pursuant to Rule 62(d) simply because it takes the form of a declaratory judgment.").  To the extent a stay of execution under Rule 60(d) also operates as a stay of discovery, the stay might apply to declaratory judgments for money.  *Hebert* does not require permitting

## XII.    Conclusion

Halliburton's motion for relief from this court's Confirmation Order and Partial Final Judgment, (Docket Entry No. 341), is denied.  Halliburton's motion for discovery, (Docket Entry No. 342), is denied.  Halliburton's motion for protective order, (Docket Entry No. 304), is granted, and the Tremont Parties' cross-motion for an order requiring judgment debtors not to dissipate any assets, (Docket Entry No. 309), is denied.

SIGNED on March 31, 2009, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

---

discovery here.  The parties also discuss *Alejandre v. Republic of Cuba*, 64 F. Supp. 2d 1245 (S.D. Fla. 1999), but that case does not resolve the issues here.  *Alejandre* allowed postjudgment discovery in connection with a writ of garnishment under Florida law.  That case was not decided under Texas or Fifth Circuit law and was based on different circumstances.