**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| HALLIBURTON ENERGY SERVICES, INC., *et al.*, | § § § | |
| Plaintiffs, | § § | |
| VS. | § § | CIVIL ACTION NO. H-05-4160 |
| NL INDUSTRIES, *et al.,* | § § | |
| Defendants. | § | |

| | | |
|---|---|---|
| TRE MANAGEMENT COMPANY, | § § | |
| Plaintiffs, | § § | |
| VS. | § § | CIVIL ACTION NO. H-06-3504 |
| GEORGIA-PACIFIC CORPORATION, *et al.*, | § § § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

This opinion addresses motions for partial summary judgment filed by Georgia-Pacific Corporation ("Georgia-Pacific") and Milwhite Inc. ("Milwhite"). Georgia-Pacific and Milwhite assert that, as a matter of law, they are not liable to Halliburton Energy Services, Inc. ("HESI") and DII Industries, LLC ("DII") (together, "Halliburton"), or to each other, under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA),[1] or under the Arkansas Remedial Action Trust Fund Act (RATFA).[2] The parties filed lengthy briefs and a large record, and

---

[1]   42 U.S.C. § 9601 *et seq.*

[2]   Ark. Code Ann., 8-7-501 *et seq.*

this court heard oral argument on the motions.

Based on the pleadings, the motions and briefs, the record, the arguments, and the applicable law, this court rules as follows:

- Georgia-Pacific's motion for partial summary judgment, (Docket Entry No. 189), is denied.

- Milwhite's motion for partial summary judgment, (Docket Entry No. 228), is denied.

- Halliburton's related motion for leave to file supplemental evidence in opposition to Georgia-Pacific's motion for summary judgment, (Docket Entry No. 332), is also denied.

- Milwhite's motion to supplement its summary judgment motion, (Docket Entry No. 363), is granted.

The reasons for these rulings are explained below. A scheduling conference is set for **September 18, 2009, at 10:00 a.m.**, to set deadlines for the work needed to resolve this case.

## I.   Factual and Procedural Background

This court's July 2006 Memorandum and Opinion set out the relevant background in detail. Only a summary is provided here. Briefly, Halliburton filed this suit in 2005 against the Tremont Parties—NL Industries, Inc. ("NL"),[3] Tremont, LLC ("Tremont"), TRE Holding Corporation ("TRE Holding"), and TRE Management Company ("TRE Management")—and against M-I, L.L.C. ("M-I"), Milwhite, and Georgia-Pacific. Halliburton filed this suit after entering into an Administrative Settlement Agreement in 2000 ("Administrative Settlement") and a Consent Administrative Order in 2003 ("Consent Order") with the Arkansas Department of Environmental Quality ("ADEQ"). Halliburton seeks to recover the money it spent investigating and remediating environmental

---

[3]   NL Industries, Inc. was previously known as National Lead Company. The company is referred to throughout this opinion as "NL," regardless of whether the company was referred to at the time as National Lead Company or NL Industries, Inc.

contamination near the towns of Magnet Cove and Malvern, Arkansas (the "Site"). The Site consists of approximately 600 acres located north of Magnet Cove, Arkansas, situated in Sections 10, 11, 14, and 15 of Township 3 South, Range 17 West in Hot Spring County.[4]

The Site was used for barite ore mining and milling by the Baroid Sales Division of NL and by Magnet Cove Barium Corporation ("Magcobar").[5] (*See* Docket Entry No. 189, Ex. 2 at 1; *id.*, Ex. 3 at ES-1). According to the Consent Order, "[n]o mining activity has been conducted at the Site since 1977." (*Id.*, Ex. 2 at 1). A Site Investigation Report prepared for Halliburton and TRE Management states that "[a]ll mining or milling activity at the Site had ceased by 1982." (Docket Entry No. 189, Ex. 3 at ES-1). The mining produced a large open pit, (*id.*, Ex. 2 at 1), as well as "a number of piles of mining spoils of unknown acreage . . . ," (*id.*, Ex. 1 at 1). According to the Consent Order, "[s]ubsequent to the cessation of mining activities at the Site, the mine pit began to fill with water." (*Id.*, Ex. 2 at 1). The pit "now forms a lake ('Pit Lake') that is approximately 90 acres in surface area and more than 400 feet deep at the deepest point." (*Id.*, Ex. 2 at 1). Some of the water in the Pit Lake "may pass over or through certain of the mining spoil piles." (*Id.*, Ex. 1

---

[4]    *See* Docket Entry No. 189, Ex. 1 at 1; *id.*, Ex. 2 at 1; *id.*, Ex. 3 at ES-1. References to particular sections at or near the Site are referred to in this opinion by section number without repeating the reference to "Township 3 South, Range 17 West in Hot Spring County." Georgia Pacific's motion for summary judgment is filed at Docket Entry Number 189. The motion was accompanied by the affidavit of B.D. Daniel, the affidavit of J. Mark Hollingsworth, and an appendix with fifty-six exhibits. Because the exhibits are large in both number and size, they are filed at Docket Entry Numbers 190–207. Some of the individual exhibits are large enough to take up more than one docket entry. In addition, Georgia-Pacific filed a memorandum in support of its motion for summary judgment, containing its legal argument and supporting authorities, at Docket Entry Number 208. Because of the numerous docket entries associated with Georgia-Pacific's motion, memorandum, and supporting exhibits, for ease of reference, citations to exhibits supporting the motion and memorandum will be cited to the main docket entry number for the motion, followed by the exhibit number, even though the exhibit itself is filed at a different docket entry number. For example, Exhibit 52 is cited as "Docket Entry No. 189, Ex. 52," even though Exhibit 52 actually appears at Docket Entry Number 207.

[5]    Magcobar was later acquired by Dresser Industries.

at 2).  "The water in the Pit Lake has a low pH and contains dissolved metals and minerals." (Docket Entry No. 189, Ex. 2 at 1).  The Consent Order states that without remedial action, "the Pit Lake will overflow in the near future and release untreated water into Chamberlain Creek and subsequently into other downstream waters to which Chamberlain Creek is a tributary."  (*Id.*, Ex. 2 at 1).

In 1988, NL entered into a restructuring plan (the "1988 Plan").  The 1988 Plan stated that NL was a holding company that conducted it operations through its wholly owned subsidiaries NL Chemicals, Inc. ("NLC") and Baroid Energy Services, Inc. ("Baroid Energy Services").  NLC owned and operated NL's titanium and dioxide pigments and specialty chemicals businesses, principally through subsidiaries.  Baroid Energy Services owned and operated NL's petroleum services business, principally through subsidiaries.  Through the 1988 Plan and related agreements, NL spun off Baroid Energy Services into a separate publicly traded company, first called NL Petroleum Services, Inc. ("NLPS") and later called Baroid Corporation ("Old Baroid").  Through a related Amended and Restated Formation Agreement, NL agreed to transfer to Old Baroid all assets related to the petroleum services business or to Titanium Metals Corporation of America ("TMCA"), including the outstanding shares of TMCA capital stock and the subsidiaries engaged in NL's petroleum services business.

Another restructuring followed in 1990.  Under the 1990 Plan, Old Baroid split its titanium and bentonite business from its "Petroleum Services Business."  The 1990 Plan stated that "[NL] has heretofore indirectly owned and operated its petroleum services operations (the 'Petroleum Services Business') principally through its subsidiaries . . . ."  Under the 1990 Plan, Old Baroid agreed to assign to a new entity called New Baroid Corporation ("New Baroid") its properties and assets attributable to its Petroleum Services Business, defined as the "Petroleum Services Assets,"

4

and its properties and assets attributable to its bentonite mining operations (the "Bentonite Business"), defined as the "Bentonite Assets."  New Baroid agreed to assume the liabilities and obligations of Old Baroid arising out of or attributable to the past, present, or future ownership or operations of the Petroleum Services Business, defined as "Petroleum Services Obligations." Through a series of transactions, the Bentonite Business was transferred back to Old Baroid. Ultimately, Old Baroid retained both its titanium metals operations, defined as the "Titanium Business," and its Bentonite Business.  New Baroid retained the Petroleum Services Business.  New Baroid is a predecessor of Halliburton.  Old Baroid is a predecessor of the Tremont Parties.

Under the 2000 Administrative Settlement with the ADEQ, HESI, TRE Management, and M-I agreed to investigate the Site condition, submit a report to the ADEQ, and do a feasibility study on ways to remediate the environmental contamination.  (*See* Docket Entry No. 189, Ex. 1).  In the meantime, HESI, TRE Management, and M-I had to perform "Interim Remedial Measures" under the Administrative Settlement.  (*Id.*, Ex. 1 at 2–4).  Under the May 2003 Consent Order, TRE Management and HESI constructed and paid for a water-treatment system for the Pit Lake.  (*See id.*, Ex. 2 at 1–2).

In April 2005, TRE Management and HESI entered into a Cost Sharing, Cooperation, and Final Allocation Process Agreement (the "2005 Cost Sharing Agreement").  (*Id.*, Ex. 6).  This Agreement included a procedure to allow the parties to cooperate in continuing to fund the response and remediation costs for the Site, "allocating on an interim basis."  (*Id.*, Ex. 6 at 1–2, 13–14).  The 2005 Cost Sharing Agreement also set out a procedure for the parties to reach a "Final Allocation" of "their and others' respective shares of such past, present, and future costs, expenses, liabilities, settlements, recoveries, or unpaid shares relating to the Site . . . ."  (*Id.*, Ex. 6 at 2, 6–9).  The 2005

Cost Sharing Agreement defined "Final Allocation" as a "full, final, and binding apportionment among the Parties to the Agreement," by agreement or by arbitration, of defined categories of costs, including future costs.  (Docket Entry No. 189, Ex. 6 at 6).  Under the 2005 Cost Sharing Agreement, if mediation did not result in "Final Allocation," the parties would participate in binding arbitration under the Commercial Arbitration Rules of the American Arbitration Association and the Federal Arbitration Act.  (*Id.*, Ex. 6 at 7).

The 2005 Cost Sharing Agreement recognized that there could be both arbitration among the signatories to the 2005 Cost Sharing Agreement and litigation with nonsignatories to resolve contribution disputes.  The 2005 Cost Sharing Agreement set out limits on the admissibility in arbitration of any "order, judgment, decree, or decision of any court in any contribution litigation under CERCLA or RATFA involving one or more Parties to this Agreement that allocates to the Parties responsibility, fair share, or liability relating to the Site . . . ."  (*Id.*, Ex. 6 at 10).  Under the Agreement, the result of such contribution litigation

> shall be ineffective, invalid, and of no force and effect as between the Parties and shall not be used or admissible as evidence in the Final Allocation Process by any Party or against any Party for any purpose other than establishing the amount of liability that has been finally allocated to non-Parties.  All allocation of responsibility, fair share, or liability relating to the Site as between the Parties, and all issues or disputes between the Parties relating to whether a cost or expense is a Shared Cost, the reasonableness of any cost or expense to be allocated in the Final Allocation, and the allocability or collectibility of any cost or expenses under CERCLA or RATFA, shall be determined in the Final Allocation Process pursuant to this Agreement without reference to, or consideration of, any arguments made or conclusions reached in any such contribution litigation.

(*Id.*, Ex. 6 at 10–11).  Georgia-Pacific and Milwhite were not signatories to the 2005 Cost Sharing Agreement.

6

In late 2005, Halliburton filed this suit against the Tremont Parties as prior owners and operators of the Site when hazardous substances were released or as successors-in-interest to such owners or operators.  Halliburton also sued Georgia-Pacific as a prior owner of property at the Site, and Milwhite as a prior owner and operator.  Halliburton asserted cost-recovery and contribution claims under CERCLA, 42 U.S.C. §§ 9607(a) and 9613(f)(3)(B), contribution claims under RATFA, ARK. CODE ANN. §§ 8-7-520, and a right to recover response and remediation costs under a state common-law unjust enrichment cause of action.  Halliburton also sought a declaratory judgment that the defendants were liable for future response and remediation costs at the Site and that Tremont was obligated to indemnify Halliburton for these costs under the contracts used to restructure the corporate predecessors-in-interest.   Georgia-Pacific and Milwhite counterclaimed against Halliburton and crossclaimed against each other and against their codefendants, the Tremont Parties, seeking contribution and indemnity.

On December 27, 2005, a few weeks after this lawsuit was filed, TRE Management—which was also a party to the 2000 Administrative Settlement Agreement and the 2003 Consent Order—sued Georgia-Pacific in the federal district court for the Western District of Arkansas, where the Site is located.  In that suit, TRE Management sought contribution under CERCLA and RATFA for Georgia-Pacific's "proportionate share of all costs and expenses TRE Management has incurred and will continue to incur in performing removal actions and remedial actions at the Site." (Docket Entry No. 38, Ex. E at 7–8).

In March 2006, after this lawsuit and the Arkansas lawsuit had been filed, Halliburton and the Tremont Parties entered into an agreement expanding the entities consenting to arbitrate the allocation of response and remediation costs at the Site.  In this 2006 Arbitration Agreement, the

parties agreed to "resolve through binding arbitration all claims between them related to the allocation of response and remediation costs incurred or to be incurred at the Site including the claims that have been asserted in the Texas Case or such claims that may be asserted in the Arkansas Case." (Docket Entry No. 189, Ex. 7 at 2). The arbitration was to be conducted in accordance with certain paragraphs of the 2005 Cost Sharing Agreement, including the provisions on related contribution litigation with nonsignatories. (*See id.*, Ex. 7 at 2). Georgia-Pacific and Milwhite were not parties to this Arbitration Agreement and did not participate in the arbitration.

The arbitration between Halliburton and the Tremont Parties was conducted in two phases and resulted in two awards. The panel allocated response costs between the parties to the arbitration, declining to "assess any liability to entities which are not signatories to the Cost Sharing Agreement," (*id.*, Ex. 9 at 34), including Georgia-Pacific and Milwhite. The arbitration panel allocated all response costs at the Site to Halliburton. This court confirmed the arbitration awards on March 31, 2008, and later entered final judgment under Federal Rule of Civil Procedure 54(b) on the claims resolved in the arbitration. Halliburton appealed the order confirming the awards and the final judgment on the confirmation order. The Fifth Circuit affirmed.

Georgia-Pacific seeks partial summary judgment that it is not liable to reimburse Halliburton for any of the response costs associated with the Site, past or future. Georgia-Pacific argues that it did not conduct mining or mine-waste disposal activities at the Site and was fully indemnified for such activities conducted by others on its property under leases that it signed. (*See id.* at 3). For similar reasons, Georgia-Pacific also moves for summary judgment dismissing Milwhite's cross-claim. (*Id.*). Georgia-Pacific also seeks summary judgment dismissing Halliburton's unjust enrichment claim under Arkansas law. (*Id.* at 3–4). Halliburton has opposed the motion. (Docket

Entry No. 218).

Milwhite responded to Georgia-Pacific's motion by stating that the primary purpose of the crossclaim "is that if Milwhite is found liable in any degree and the possible circumstance in which Georgia Pacific is responsible for any of [Halliburton's] damages, then Milwhite would be entitled to contribution and/or indemnity." (Docket Entry No. 213 at 2). Milwhite argues that neither it nor Georgia-Pacific is liable to Halliburton. "Should the Court decide that Georgia-Pacific does not have any liability in this matter, then Milwhite in turn, would not be entitled to any indemnity or contribution from Georgia-Pacific." (*Id.*). Georgia-Pacific has stipulated that it seeks no relief against the Tremont Parties in its motion for partial summary judgment and that the Tremont Parties need not respond. (Docket Entry No. 215).

Like Georgia-Pacific, Milwhite seeks summary judgment that it is not liable to reimburse Halliburton for past or future response costs associated with the Site, arguing that there is no evidence that Milwhite conducted mining or mine-waste disposal activities at the Site. (Docket Entry No. 228 at 3–4). For similar reasons, Milwhite moves for summary judgment denying Georgia-Pacific's cross-claim and denying Halliburton's claim for unjust enrichment. (*Id.* at 4). Halliburton has opposed the motion. (Docket Entry No. 233). Milwhite is not seeking relief against the Tremont Parties in its motion. (Docket Entry No. 232).

## II.   The Legal Standards

### A.   Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine

issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "'A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law.'" *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quoting *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (per curiam)), *petition for cert. filed*, 77 U.S.L.W. 3657 (U.S. Feb. 17, 2009) (No. 08-1438). "'If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response.'" *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *See Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007) (citation omitted). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all

reasonable inferences in the light most favorable to the nonmoving party. *Deville v. Marcantel*, 567 F.3d 156, 163–64 (5th Cir. 2009) (per curiam) (citing *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 325 (5th Cir. 2004)).

### B.     CERCLA Liability

Congress enacted CERCLA in 1980 in response to environmental and health dangers posed by property contamination from hazardous substances. *See United States v. Bestfoods*, 524 U.S. 51, 55 (1998) (citing *Exxon Corp. v. Hunt*, 475 U.S. 355 (1986)). The statute was amended by the Superfund Amendments and Reauthorization Act of 1986 (SARA), Pub. L. No. 99- 499, 100 Stat. 1613. CERCLA's "broad, remedial purpose is to facilitate the prompt cleanup of hazardous waste sites and to shift the cost of environmental response from the taxpayers to the parties who benefitted from the wastes that caused the harm." *OHM Remediation Servs. v. Evans Cooperage Co.*, 116 F.3d 1574, 1578 (5th Cir. 1997) (citing *Matter of Bell Petroleum Servs., Inc.*, 3 F.3d 889, 894 (5th Cir. 1993)). Section 107(a)(4) states that "covered persons" are liable for costs incurred by the federal or state government or Indian tribes in responding to the contamination and for response costs incurred by "any other person." 42 U.S.C. § 9607(a)(4)(A)–(B). Two contribution provisions, sections 113(f)(1) and 113(f)(3)(B), were added later, as part of SARA. Because CERCLA imposes strict liability, plaintiffs generally do not need to prove that the defendant caused the contamination, only that the defendant is a "covered person." *OHM Remediation Servs.*, 116 F.3d at 1578 (citing *United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 721 (2d Cir. 1993)). If the harm is indivisible, liability is joint and several. *Id.* at 1579 (citing *Bell Petroleum*, 3 F.3d at 903).

Section 107(a) identifies four categories of "covered persons" who may be liable for cleanup costs associated with the release or threatened release of hazardous substances. *See* 42 U.S.C. § 9607(a). "Covered persons" are: (1) owners and operators of facilities at which hazardous

11

substances are located; (2) past owners and operators of such facilities at the time that disposal of hazardous substances occurred; (3) persons who arranged for disposal or treatment of hazardous substances; and (4) certain transporters of hazardous substances.  *See* 42 U.S.C. § 9607(a)(1)–(4). "Covered persons" are also referred to as "potentially responsible parties" or "PRPs."  *See* ALFRED R. LIGHT, CERCLA LAW AND PROCEDURE 94 (BNA Books 1991) ("Under CERCLA, a person becomes a potentially responsible party by becoming an owner or operator at the time of disposal or the time of a response action, by arranging for treatment or disposal of substances that are sent to a facility, or transporting substances to the site that it selected for disposal.").  Unless a statutory defense or exclusion applies, covered persons are liable for "all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan," "any other necessary costs of response incurred by any other person consistent with the national contingency plan," "damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release," and "the costs of any health assessment or health effects study carried out under section 9604(i) . . . ."  42 U.S.C. § 9607(a).

Section 113, added in 1986 as part of SARA, contains the following subsection entitled "Contribution":

> Any person may seek contribution from any other person who is liable or potentially liable under [section 107(a)], during or following any civil action under [sections 106 or 107(a)] . . . .  In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate.  Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under [sections 106 or 107].

12

42 U.S.C. § 9613(f)(1).  "'[I]n enacting the contribution section, Congress also contemplated the 100% shifting of responsibility, by way of indemnification, should the facts so warrant.'  Section 113(f)(1) thus permits a court to deny contribution based on 'equitable factors.'"  LIGHT, *supra*, at 147 (footnotes omitted).

## III.   Georgia-Pacific's Motion for Partial Summary Judgment

Georgia-Pacific contends that it should not be held responsible for response costs at the Site because: it no longer owns property at the Site; it never owned property at the Site on which Magcobar or its successors conducted mining, ore-processing, or waste-disposal activities; and there is no evidence that it released any pollutant that necessitated the remediation and response efforts at the Site.  (Docket Entry No. 208 at 2).  Georgia-Pacific or its predecessor, Malvern Lumber Company ("Malvern Lumber"), leased property to NL or its predecessor.  (*Id.*).  According to Georgia-Pacific, all the leases contained indemnity clauses requiring NL to assume liability arising from activities that the leases permitted NL to conduct on the leased property.  (*Id.*).  Georgia-Pacific argues that "[t]aken together, (1) the indemnity provisions of the leases and (2) the absence of any physical connection between Georgia-Pacific and the contamination being  remediated at the Site are dispositive equitable factors that should preclude statutory recovery against Georgia-Pacific."  (*Id.* at 3).  Georgia-Pacific also argues that Halliburton's unjust enrichment claim is precluded because the leases explicitly allocated responsibility for activities on property Georgia-Pacific owned at the Site and because Georgia-Pacific will not receive anything of value as a result of the environmental response.  (*Id.*).

### A.   Factual Background Relevant to Georgia-Pacific's Motion

The following lease agreements are central to Georgia-Pacific's motion:

•   **The Mining Lease.**  Malvern Lumber, a predecessor of Georgia-Pacific, leased the

southwest 1/4 of the northeast 1/4 of Section 15 to H.A. Neustaedter in December 1939, for purposes of mining and waste disposal.  (*See* Docket Entry No. 189, Ex. 10).  Neustaedter assigned the lessee's rights and obligations under this lease to NL in 1940.  (*Id.*, Ex. 11 at 1).  This lease was subsequently amended several times.  (*See id.*, Exs. 12, 13, 14, and 15).  In 1969, Georgia-Pacific acquired all of the stock of Malvern Lumber, and all of Malvern Lumber's real estate within the Site was conveyed to Georgia-Pacific.  (*See id.*, Exs. 16, 17).  Georgia-Pacific and NL executed another amendment to this lease on March 10, 1972, which included an indemnity provision providing that "Lessee [NL] agrees that it will indemnify, defend, protect, hold and save harmless the Lessor [Georgia-Pacific] from and against any claims, loss, liability, attorney's fees, costs or any other expense arising out of or resulting from any injury, loss or damage to persons or property in, on or about the demised premises."[6]  (*Id.*, Ex. 18 at 3).  Georgia-Pacific states that under this lease, "NL dug the southwest corner of the mining pit deep into this tract, piled mining spoils around the pit, and constructed tailings ponds to dispose of mining wastes."  (Docket Entry No. 208 at 6 (citing Docket Entry No. 189, Exs. 3, 5)).

- **The 1946 Waste Disposal Lease.**  Malvern Lumber leased, among other tracts, the north 1/2 and the southeast 1/4 of the southwest 1/4 (except for three acres in the southeast corner previously acquired for a Powder House site) of Section 11 to NL for "the sole purpose of disposal of refuse and waste from [NL's] mining operations . . ." in July 1946.  (Docket Entry No. 189, Ex. 19 at 1).  The lease had a term of twenty-five years, with NL retaining the option to renew for five additional terms of five years each, and provided for the payment by NL of annual rental fees.  (*Id.*, Ex. 19 at 1, 2).  The lease contained an indemnity provision stating that "Lessee covenants and agrees that it will indemnify and save harmless Lessor against any

---

6  A subsection to the indemnity provision requires the lessee to obtain certain insurance:

> *For greater certainty, but not in limitation of the foregoing*, Lessee agrees that it will obtain and maintain during the life of this lease agreement, public liability insurance in the amount of not less than $100,000 *for any one person injured*, and $300,000 for any one *accident*, and *property damage insurance* in the amount of $100,000; and *vehicle liability insurance* on all owned, non-owned, and hired vehicles in the amount of not less than $100,000 for any one person injured and $300,000 for any one accident, and *property damage insurance* in the amount of $100,000; and that it will submit to Lessor a certificate from its insurance carrier showing these coverages to be in force and effect.

(Docket Entry No. 189, Ex. 18 at 3 (emphasis added)).  The insurance requirements seem to contemplate that the indemnity provision applies to personal injury and property damage more than environmental liability. Nonetheless, because the insurance subsection indicates that it is not a limitation on the indemnity provision, the insurance requirements are not read at this stage to limit the indemnity clause.

14

claims for damage either to person or property that may be asserted by third parties on account of Lessor's occupancy or operations on said Lands." (*Id.*, Ex. 19 at 2). As with the Mining Lease, Malvern Lumber conveyed the 1946 Waste Disposal Lease to Georgia-Pacific in 1969. (*Id.*, Ex. 17). NL extended this lease through at least June 1991. (*Id.*, Ex. 20). Based on an exhibit attached to the expert report of Dr. Daniel B. Stephens, one of Halliburton's experts in the arbitration, some piles of mining spoils deposited by NL on the adjacent tract within Section 11—the southwest 1/4 of the southwest 1/4 of Section 11—may have extended into the tract described in the 1946 Waste Disposal Lease.[7] (*See id.*, Ex. 5 at 1).

- **The 1947 Waste Disposal Lease.** In January 1947, Malvern Lumber leased the northwest ten acres of the southeast 1/4 of the northeast 1/4 of Section 15 to NL for "the sole purpose of disposal of refuse and waste from [NL's] mining operations . . . ." (Docket Entry No. 189, Ex. 21 at 1). This lease contained similar terms to those in the 1946 Waste Disposal Lease, and included a similar indemnity provision, stating: "Lessee covenants and agrees that it will indemnify and save harmless Lessor against any claims for damage either to person or property that may be asserted by third parties on account of Lessee's occupancy or operations on said lands." (*Id.*, Ex. 21 at 1). As with the 1946 Waste Disposal Lease, the lease had a term of twenty-five years, renewable for five five-year periods. (*Id.*, Ex. 21 at 1, 2). The lease was conveyed to Georgia-Pacific in 1969. (*Id.*, Ex. 17). Georgia-Pacific contends that the lease was extended until at least July 1990.[8] (Docket Entry No. 208 at 7 (citing Docket Entry No. 189, Ex. 22)). Based on the map attached to

---

[7]   Halliburton has submitted a letter showing that Malvern Lumber agreed to a request by NL to modify the lease "to release 40 acres, the SE 1/4 of the NW 1/4, Section 11, Township 3 South, Range 17 West, Hot Spring County, and substitute for it 40 acres, the NE 1/4 of the SE 1/4, Section 10[,] Township 3 South, Range 17 West, Hot Spring County Arkansas." (Docket Entry No. 218, Ex. M).

   The exhibits submitted with Halliburton's opposition to Georgia-Pacific's motion are submitted as exhibits to the Declaration of Duke McCall. For ease of reference, this opinion will refer to the exhibits attached to this McCall Declaration by referring to the Docket Entry Number for Halliburton's opposition (Docket Entry No. 218), followed by the exhibit letter.

[8]   It is not clear that the document Georgia-Pacific cites supports the proposition that the lease was extended until July 1990. The document cited is a January 7, 1986 letter from an accountant at NL Baroid to Rex Timber, Inc., regarding "Lease Dated January 2, 1947" and "Waste Disposal Area," stating: "Please find enclosed our check for $15.00 covering annual rental on said lease for period January 2, 1986 to January 2, 1987." (Docket Entry No. 189, Ex. 22). The original 25-year lease term would have expired January 2, 1972. This letter supports an inference that NL exercised the option to extend the lease for at least three of the five five-year extensions permitted in the lease. The first extension would have expired in 1977; the second extension would have expired in 1982; and the third extension would have expired in 1987. Because this letter indicates that payment was made through January 2, 1987, it is clear that the lease was extended until at least that date, but it is not clear whether it was extended until July 1990.

Stephens's expert report, it appears that NL deposited piles of mining spoils on this leased tract.  (Docket Entry No. 189, Ex. 5 at 1).

- **The Tailings Pond Lease.**  In November 1954, Malvern Lumber leased the northeast 1/4 of the southeast 1/4 of Section 15 to NL "for the sole purpose of disposal of mill tailings and waste from [NL's] mining and milling operations . . . ." (Docket Entry No. 189, Ex. 23 at 1).  As with the Waste Disposal Leases, the Tailings Pond Lease contained an indemnity clause stating: "Lessee covenants and agrees that it will indemnify and hold harmless Lessor against any claims for damage either to person or property that may be asserted by third parties on account of Lessee's occupancy or operations on said lands." (*Id.*, Ex. 23 at 3).  This lease also had an initial term of twenty-five years, with the option to renew for five additional five-year periods.  (*Id.*, Ex. 23 at 1–2).  The lease was conveyed from Malvern Lumber to Georgia-Pacific in 1969.  (*Id.*, Ex. 17).  According to the map attached to Stephens's expert report, it appears that NL constructed a tailings pond and may have deposited mining spoils on this leased tract.  (*Id.*, Ex. 5 at 1).

- **The Settling Pond Lease.**  In October 1971, Georgia-Pacific leased ten acres of the north side of the northwest 1/4 of the southwest 1/4 of Section 15 to NL "for the purpose of backing up waters and settling mine waters and waste from Lessee's mining operations . . . ." (Docket Entry No. 189, Ex. 24 at 1).  The lease had an initial term of ten years, with NL retaining the option to extend the lease for two additional terms of five years each.  (*Id.*, Ex. 24 at 1).  NL extended the lease until September 30, 1986.  (*Id.*, Ex. 26).  This lease also contained an indemnity clause stating: "Lessee agrees that it will indemnify, defend, protect, hold and save harmless Lessor from and against any claims, loss, liability, attorney's fees, costs or any other expense for any injury, loss or damage to persons or property arising out of or resulting from Lessee's operations hereunder or use of the leased premises." (*Id.*, Ex. 24 at 3).  Based on the map attached to Stephens's expert report, it appears that NL constructed a settling pond on this leased tract.  (*Id.*, Ex. 5 at 1, 2).  Georgia-Pacific points out that before allowing the lease to terminate, NL discontinued use of the pond and poured cement to prevent water from reaching the mining sludge at the bottom of the dried out ponds.  (*Id.*, Ex. 27).

Georgia-Pacific argues that the only activities at the Site that matter for environmental response costs are the mining activities.  (Docket Entry No. 208 at 8).  Georgia-Pacific points to the Administrative Settlement, which states that mining operations at the Site resulted in the Pit Lake and piles of mining spoils.  (*See* Docket Entry No. 189, Ex. 1 at 1–2).  Georgia-Pacific argues that the only evidence Halliburton submitted connecting Georgia-Pacific to mining activities or

16

contamination at the Site are the leases and Site Investigation Report.[9]  (*See* Docket Entry No. 189,

Ex. 28 at 4–8 (Responses to Interrogatories 3 and 6)).   Georgia-Pacific argues that it is not

mentioned in the Site Investigation Report and that no document shows that Georgia-Pacific

physically conducted any activity at the Site that would have contributed to the environmental

---

[9]  In its opposition to Georgia-Pacific's motion, Halliburton submitted several additional agreements relating to the Site.  (*See* Docket Entry No. 218, Ex. H (license agreement, dated February 9, 1940, granting from Malvern Lumber to Harold A. Neustaedter "the right to impound and take water from Scull Creek" from land in the east 1/2 of the northeast 1/4 of Section 14 (it is not clear whether this parcel of land falls within the Site); and a related easement in Section 14 for an electric power line and water line; containing an indemnity provision stating that "Licensor is to be held harmless by reason of the construction, maintenance and operation of said dam, and any and all other operations of the Licensee," and that "MALVERN LUMBER COMPANY shall in no way be liable to any person or persons for any damages that might occur by reason of the building of a dam, or muddying of water, or any damages that might occur in any way not expressly stated herein"); *id.*, Ex. I (license agreement, dated March 30, 1944, from Malvern Lumber to NL, granting the right to use the southeast 1/4 of the southeast 1/4 of Section 11, the east 1/2 of the northeast 1/4 and the north 1/2 of the southeast 1/4 of Section 14, and the southwest 1/4 of the northwest 1/4 of Section 13 (it is not clear whether this parcel of land falls within the Site); the right to "impound and take water from Scull Creek and from Reyburn Creek"; and a related easement across Sections 11 and 14 for an electric power line and water line; containing a similar indemnity provision to the indemnity provision in Exhibit H; and terminating the license agreement in Exhibit H); *id.*, Ex. J (license agreement, dated November 29, 1944, between Malvern Lumber and NL, granting the right "to impound and take water from Scull Creek and from Reyburn Creek", in certain land described as all of the southeast 1/4 of Section 11, the southwest 1/4 of the northwest 1/4 of Section 13, the east 1/2 of the northeast 1/4 and the north 1/2 of the southeast 1/4 of Section 14, and the southeast 1/4 of the northeast 1/4 of Section 15 (it is not clear if all of this parcel of land falls within the Site); a related right of way in Sections 11, 13, 14, and 15; the right to construct reclaim water ponds; and the right to impound ground mill tailings on the southeast 1/4 of the northeast 1/4 of Section 15; containing an indemnity provision matching the one in Exhibit H; and terminating the license agreement in Exhibit I); *id.*, Ex. K (lease from Malvern Lumber to NL, dated November 1, 1945, to the north 1/2 of the southwest 1/4 and the north 1/2 of the southeast 1/4 of the southwest 1/4 of Section 11, "for the sole purpose of disposal of refuse and waste from Lessee's mining operations . . . "; containing an indemnity provision stating that "Lessee covenants and agrees that it will indemnify and save harmless Lessor against any claims for damage either to person or property that may be asserted by third parties on account of Lessee's occupancy or operations on said lands"); *id.*, Ex. P (prospecting agreement and option for lease between Malvern Lumber and NL, dated January 2, 1947); *id.*, Ex. Q (easement between Malvern Lumber and NL, dated April 24, 1946); Docket Entry No. 218, Ex. R (lease between Malvern Lumber and NL, dated March 6, 1956); and *id.*, Ex. S (railroad right-of-way between Malvern Lumber and NL, dated June 24, 1947)). Although Halliburton argues that some of these additional agreements do not contain indemnity clauses, (*id.* at 10 (citing *id.*, Exs. P, Q, and S)), these additional agreements do not appear to be the agreements relied upon by Halliburton to place liability on Georgia-Pacific.  (*See* Docket Entry No. 189, Ex. 28 at 5–6 (Halliburton's discovery responses, pointing to leases and license agreements as examples showing that Georgia-Pacific was involved in mining, milling, and waste disposal at the Site, and failing to point to a prospecting agreement, an easement, or a railroad right-of-way)).

degradation caused by the mining activities.  (Docket Entry No. 208 at 10).  Georgia Pacific points

out that Halliburton has formally admitted that Georgia-Pacific: "did not physically conduct or direct

the excavation and removal of overburden or barite ore at the Site"; "did not physically conduct or

direct the milling of overburden or barite ore at the Site"; and "did not physically conduct the

transport of mine and mill wastes disposed of on Georgia-Pacific property on the Site."  (Docket

Entry No. 189, Ex. 28 at 4).

       Georgia-Pacific has presented evidence that NL and Magcobar were aware that mining

activities were polluting adjacent waters, and that NL "planned, but consciously declined to

implement, the very environmental remediation solutions that have been and will ultimately be

pursued under the ADEQ Settlement and the ADEQ Order."  (Docket Entry No. 208 at 11).

Georgia-Pacific presents the following chronology through a series of exhibits:

- In 1946, the Arkansas Fish and Game Commission accused NL and Magcobar of polluting Ouachita River with mine runoff and discharges.  (*See* Docket Entry No. 189, Ex. 29).  NL began monitoring the pH level in Chamberlain Creek, and the water samples showed low pH levels (acidic water).  (*See id.*, Ex. 30).

- In April 1962, state regulators inspected the mine.  NL concluded that there was nothing further to do to prepare for additional surveys, "except continue our present program of watching the Ouschita, continue to lime water pumped from the pit, and continue to slow down erosion from our strip dumps as much as possible."  (*Id.*, Ex. 31 at 2).  In June 1970, NL met with state regulators and was directed to submit a "letter of intent for more efficiently neutralizing, precipitating and removing the iron concentration of the mine and run off water presently being discharged from the Magnet Cove Mine into Chamberlain Creek."  (*Id.*, Ex. 32 at 1).  What appears to be a draft letter from the superintendent of the plant and mine to the Arkansas Pollution Control Commission describes plans for preventing further environmental effects from the mine.  The plans included designing a complete automated system for treating discharge water, for continually monitoring discharge water, and   for implementing clarification methods using settling ponds.  The plans would require purchasing additional land, leasing additional land, or obtaining the right-of-way for routing water from settling ponds back to Chamberlain Creek.  (*See id.*, Ex. 32).

- In November 1976, the Arkansas Department of Pollution Control and Ecology

18

approved of a plan by NL for treating and discharging waste water, subject to compliance with several additional requirements. (*Id.*, Ex. 33).  In January 1977, NL sent a confidential letter to the U.S. Environmental Protection Agency (EPA), stating that "[t]he significant capital required for the Magnet Cove water treatment facilities and the rather large annual expense incurred in water treatment and discharge has prompted our management to review the economics of maintaining production from the Magnet Cove underground mines beyond May 1977." (Docket Entry No. 189, Ex. 34).  This letter explained that "[i]f the decision is to cease the current mining operation then there will be no need to pump water and, therefore, no discharge from the property," and stated that "construction of the treatment facilities has been suspended for a period of 30 days until a decision is reached." (*Id.*, Ex. 34).

- In February 1977, state regulators advised NL that "Cove Creek was essentially 'sterile' from the junction of Cove-Chamberlain to the Ouchita River," and that "[n]o fish or aquatic species were found except for a mutated plankton." (*Id.*, Ex. 35 at 1).  An internal, confidential NL memorandum discussing the February 1977 communication from the state regulators indicated that NL had told the regulators of its decision to stop pumping water from the mine in the summer of 1977. (*Id.*, Ex. 35 at 1).  In July 1977, NL advised the EPA that it would terminate the mine drainage and rain runoff discharge, and that no further discharges from the mine would be made until a future time when a new mining program was initiated. (*Id.*, Ex 36 at 1).

Georgia-Pacific has submitted the April 1978 notes of F.R. Baser.  F.R. Baser appears to have been an NL employee.[10]  Georgia-Pacific argues that the notes support the argument that NL supplied regulators with water samples knowing that Chamberlain Creek upstream from the samples was contaminated.  (*See* Docket Entry No. 208 at 12).  It is not clear from these notes that NL provided samples of water knowing that a different area of the Chamberlain Creek was more contaminated.  The notes suggest that NL wanted to take samples from a different area of Chamberlain Creek because the area the regulators originally tested was not "indicative of discharge to the stream."  The notes, in relevant part, state:

---

[10]   Another exhibit submitted with Georgia-Pacific's motion indicates that Fred Baser was associated with NL Baroid – Hightstown in October 1981.  (*See* Docket Entry No. 189, Ex. 41).  A different exhibit indicates that F.R. Baser was associated with the Environmental Control Unit of NL in February 1982. (*Id.*, Ex. 42).

> The State of Arkansas tested not only the discharge from the site to the Chamberlain River but also the Chamberlain River itself and found very high concentrations of heavy metals and suspended solids. It was pointed out by NL that this was not indicative of the discharge to the stream and that the State should, in fact, measure up-stream from NL's discharge point. The State requested NL sample which NL has done knowing full well that the Chamberlain Creek up-stream was quite contaminated. This contamination is the result of leachate from the waste piles. The leachate contains heavy metals, sulfate, and is low in pH. During the years of operation of the mine, in excess of 30, over-burden was removed and piled in the area surrounding the pit covering many hundreds of acres. Dresser Industries, who operated a mine adjacent to NL's, also participated in the accumulation of waste piles [and] therefore has some liability.

(Docket Entry No. 189, Ex. 37 at 2–3).

In May 1978, NL advised Arkansas regulators that it intended to reopen the pit mine and build a comprehensive treatment plant. (*Id.*, Ex. 38). In May 1979, NL informed the regulators that in reactivating the mine, it intended to implement measures to protect nearby waters. (*Id.*, Ex. 39 at 2). These measures included reclaiming existing overburden piles and installing a multimillion dollar plant to treat water pumped from the open pit before discharge into Chamberlain Creek. (*Id.*, Ex. 39 at 2). The plant would first treat water that had been impounded in the pit since the mining operations ended in 1977 and then continue to treat water during normal mine operation. (*Id.*, Ex. 39 at 2). In connection with its proposed water treatment plan, NL asked state regulators to revise the water quality standards. NL stated that "without a change in the existing Water Quality Standards for sulfate and total dissolved solids (TDS) in the affected streams, limits would be written into a new NPDES Permit that could not be met," and that "there is no practicable technology for removal of sulfates from effluent streams in this instance." (*Id.*, Ex. 39 at 2). In November 1979, an NL consultant issued a "Conceptual Plan for Reclamation of Abandoned Mine Spoils Dump, Disposal of Mine Pit Water Treatment Sludge, and Disposal of Open-Cut

Overburden." (Docket Entry No. 189, Ex. 40).

In October 1981, NL stated in an internal memorandum that it had plans to close the barite plant. (*Id.*, Ex. 41). NL sought internal opinions about "responsibilities and possible liabilities as to reclaimation [sic] if [sic] any of the waste dumps; open pit and tailings ponds." (*Id.*, Ex. 41). An internal memorandum dated a few months later evaluated the potential for environmental liability associated with the mining operations, stating that "Chamberlin [sic] Creek originates in the vicinity of the plant and also receives significant non-point drainage of acidic leachate from the waste piles, including those on NL Industries' property." (*Id.*, Ex. 42 at 1). The memorandum noted that "[t]he cessation of mining activities precedes the enactment of [the Resource Conservation and Recovery Act (RCRA)] and corresponding State regulations," but that "clean-up requirements could be mandated under RCRA if the site were to be determined a 'substantial hazard' to human health or the environment." (*Id.*, Ex. 42 at 2). The memorandum concluded that "[s]uch a determination is not anticipated as other disposal sites may be more likely candidates for attention; the site has not yet been targeted for action under the 'Superfund' legislation." (*Id.*, Ex. 42 at 2). As to Closure/Post-Closure environmental requirements, the memorandum concluded that "[t]he only known requirement would be to comply with the terms of the NPDES permit if discharges were to continue from Tailings Pond No. 4." (Docket Entry No. 189, Ex. 42 at 3). The memorandum noted that "NL's prior discussion of a reclamation plan for the abandoned mine spoils dump, that was to be associated with the possible renewal of open pit mining operations, might have excessively kindled State interest in the existing acidic mine drainage," and that "[t]his could possibly precipitate some additional closure requirements or threats to list the site in accordance with the 'Superfund' legislation." (*Id.*, Ex. 42 at 3).

21

In February 1986, an internal NL memorandum with an "[u]pdated [o]pinion of [p]otential [e]nvironmental [r]equirements/[e]xposures" for Magnet Cove Barite Operations concluded as follows:

> The retention of leased property is not recommended unless it could be anticipated to be required for the siting of possible treatment facilities.  If the leases were to be discontinued, their renegotiation under such circumstances might not be possible under terms that were favorable to NL Baroid.  However, *if outrageous terms were to be required by a property owner, this might constitute a denial of access that, until resolved, would protect us from requirement to undertake related remedial action*.  It has been Environmental Control'[s] experience that this regional office of the USEPA may not be aggressive in forcing non-consenting property owners to grant access.

(*Id.*, Ex. 43 at 8 (emphasis added)).  Georgia-Pacific uses this memorandum to argue that NL concluded that terminating the leases might help forestall any required environmental response.  (Docket Entry No. 208 at 13).

On December 15, 1986, NL submitted notice terminating the 1939 Mining Lease.  (*See* Docket Entry No. 189, Ex. 45 at 1).  In an internal memorandum discussing the reasons, NL noted that even after lease termination, it should be granted "reasonable access for reclamation or environmental clean-up projects, if required."  (*Id.*, Ex. 44 at 1).

In June 1981, Georgia-Pacific conveyed certain Arkansas property, including property it owned at the Site, to its subsidiary Rex Timber Inc.  (*See id.*, Ex. 46).  Rex Timber conveyed certain property at the Site to the Taylor family in 1987.  (*See id.*, Ex. 47).  Rex Timber was merged into Georgia-Pacific in 1988.  (*See id.*, Ex. 48).  In 1990, Georgia-Pacific conveyed its remaining

interests at the Site to two individuals, W.R. Ward and Dorsey D. Glover.[11]  (*See id.*, Ex. 49).

The EPA eventually investigated the Site.  (*See* Docket Entry No. 189, Ex. 50 (Expanded Site Inspection Report for Magcobar Mine, Malvern, Hot Spring County, AR, dated December 1996)).  The Administrative Settlement and the Consent Order followed, and interim remedial procedures were implemented.

Georgia-Pacific contends that the environmental problems at the Site were caused by the mining activities conducted there.  (Docket Entry No. 208 at 14).  Georgia-Pacific points to parts of the Site Investigation Report prepared for Halliburton and TRE Management, which state:

> A natural phenomenon known as ARD occurs when air and water reach exposed rocks containing pyrite.  *This phenomenon generally occurs as the result of mining* and other activities that disturbed the surface of the earth, but natural occurrences of ARD are also documented . . . .   Where ARD is the result of manmade activities, it generally is the result of the acceleration of natural weathering processes, which occur when disturbed rocks containing sulfides, such as pyrite, are exposed to air and water.
> . . . .
>
> The primary adverse environmental effect caused by the DIM Mine Site (as named by the EPA) involves formation of low pH water that exits the Site in surface pathways and lowers pH in off-Site surface waters.  *The low pH water formed at the Site results from accelerated weathering processes that generate acidity and increase solubility of metals naturally present in some of the rock that was disturbed by mining.*

---

[11]   Georgia-Pacific has submitted a quitclaim deed, but parts are illegible.  (*See* Docket Entry No. 189, Ex. 49).  It is hard to determine which parcels were conveyed from Georgia-Pacific to Ward and Glover. However, Halliburton has not disputed that Georgia-Pacific transferred its remaining interests at the Site to Ward and Glover.  The EPA's Site Inspection Report is consistent.  (*See id.*, Ex. 50 at 2-1 ("The site is owned by four principal parties: the Tremont Corporation, Baroid Corporation, M-I Drilling, and Mr. Dorsey Glover and Mr. Ward (co-owners).")).  It does appear that Georgia-Pacific retained some mineral interests.  (*See id.*, Ex. 49 at 3 ("This conveyance excepts and GRANTOR reserves one-half of all oil, gas, and other materials (sand and gravel excluded) owned by GRANTOR situated in, on, or under the property described herein, together with the usual and customary rights of ingress and egress to and from said lands for the purpose of exploring, producing, sawing, transporting, and marketing said minerals.")).

. . . .

*The mine spoil and pit lake are the most environmentally significant features at the Site* because most of the ARD is produced in the spoil and enters the pit lake by seepage and runoff.  The pit lake serves as a storage reservoir for ARD historically produced on the Site.

. . . .

*Mine spoil present at the Site will produce ARD for decades*, though at a continually decreasing rate.

. . . .

Surficial runoff from the spoil piles produces ARD, but more concentrated ARD is produced by infiltration through the spoil piles.

. . . .

In its present condition the pit lake acts as a storage reservoir for ARD.  *Mine spoil is the primary ongoing source of ARD to the pit lake* (very small amounts of ARD may also originate from the small amount of exposed pit wall on the west side of the pit that is comprised primarily of Stanley Formation rocks).

. . . .

Runoff from the floatation tailings results in ARD that is transported to pooled areas on the tailings impoundments.  Water quality in the tailings ponds reflects this source and is acidic with elevated concentrations of metals and sulfate, consistent with ARD that has been diluted by precipitation.

(Docket Entry No. 189, Ex. 3 at 2-13, 8-1, 8-2, 8-3, 8-5, 8-7 (emphasis added)).  Georgia-Pacific

points out that "[t]he Report attributes no environmental issue to any activity other than mining,"

and that "[a]t least in this respect, ADEQ has approved the Report."  (Docket Entry No. 208 at 15).

Georgia-Pacific also points out that Halliburton's experts in the arbitration found that mining

had caused the environmental problems.  (*See* Docket Entry No. 189, Ex. 51 at 10 ("The primary

environmental impacts at Magnet Cove are the result of mining rocks of the Mississippian Stanley

Formation . . . . The process of stripping the Stanley Formation to access ore and placing it in piles

where it is exposed to the atmosphere and precipitation results in increased production of ARD.");

24

*id.*, Ex. 52 at 8 ("[T]he contamination at issue stems from mining operations conducted by NL and Magcobar.")).  Halliburton's counsel told the arbitrators that a "critical and important fact which I would suggest is not contested and has been recognized by all the parties and reflected in the SI report is that the production of acid rock drainage, ARD, and its migration compromises [sic] the primary environment[al] concern at this site." (*Id.*, Ex. 53 at 565).  Georgia-Pacific asserts that it is undisputed that the mining activity caused the Site contamination and that Georgia-Pacific did not conduct the mining operations.  (Docket Entry No. 208 at 15).  Georgia-Pacific argues that based on these uncontested facts, it is entitled to judgment that it is not liable, as a matter of law.  (*Id.*).

Except as noted below, Halliburton does not contest, for purposes of this motion, the facts Georgia-Pacific recited about the Site history, the Site characteristics, and regulatory response actions.  (Docket Entry No. 218 at 4).  Halliburton argues, however, that Georgia-Pacific is not entitled to the relief it seeks.

**B.      The Contribution Analysis**

**1.       Georgia-Pacific's Status as a Potentially Responsible Party Under Section 107(a) of CERCLA**

Under section 107(a)(1) of CERCLA, "the owner and operator of a . . . facility . . . shall be liable for . . . (B) any . . . necessary costs of response incurred by any . . . person . . . consistent with the national contingency plan." 42 U.S.C. § 9607(a)(1)(B).  For the purpose of its motion, Georgia-Pacific concedes: "(a) that Plaintiffs and Georgia-Pacific were owners or operators of the Site as a 'facility;' (b) that the costs incurred and to be incurred by Plaintiffs with respect to the Site were 'necessary' and 'consistent with the national contingency plan;' and (c) that Georgia-Pacific does not assert any defense to liability under CERCLA § 107(b)." (Docket Entry No. 208 at 16).  "In other words, Georgia-Pacific is willing to assume that it, Plaintiffs and Milwhite are all potentially

liable under section 107(a)." (*Id.*).

Georgia-Pacific focuses its arguments on section 113(f)(1), which provides in relevant part:

> Any person may seek contribution from any other person who is liable or potentially liable under section [107(a)], during or following any civil action under . . . section [107(a)]. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate.

42 U.S.C. § 9613(f)(1). The relevant provisions of RATFA are similar. RATFA's contribution provisions state:

> (a) Any person who has undertaken or is undertaking remedial action at a hazardous substance site in response to an administrative or judicial order initiated against such person . . . may obtain contribution from any other person who is liable for such hazardous substance site.
>
> (b) Any person who has resolved all or a portion of his liability for a hazardous substance site by undertaking remedial action pursuant to an administrative . . . settlement may obtain contribution from any person who is liable for such hazardous substance site and is not a party to the settlement.
>
> . . . .
>
> (d) . . . In resolving contribution claims, the court shall allocate the costs and expenses incurred or to be incurred by the contribution claimant or claimants for undertaking remedial action among all persons liable for the hazardous substance site, using such equitable factors as the court determines are appropriate.

ARK. CODE ANN. § 8-7-520. With respect to the RATFA claims, Georgia-Pacific concedes, for the purpose of its motion only, that:

> (1) the Site is a "hazardous substance site" within the meaning of sections 8-7-520(a) and (b); (2) the Halliburton Plaintiffs and TRE Management have standing under subsections (a) and (b); (3)

> Georgia-Pacific is a "person who is liable" for the Site within the meaning of subsections (a) and (b); and (4) [Georgia-Pacific] is not a party to the settlement giving Plaintiffs standing under subsection (b).

(Docket Entry No. 208 at 18).

As Georgia-Pacific points out, "CERCLA prevents double recovery.  If Plaintiffs recover under CERCLA, they cannot recover under RATFA; if they recover under RATFA, they cannot recover under CERCLA."  (*Id.* (citing 42 U.S.C. § 9614(b))).  Because the contribution provisions are similar under both CERCLA and RATFA, Georgia-Pacific does not separately address RATFA contribution.  This court focuses on contribution under CERCLA as well.

Halliburton responds that it has not argued that Georgia-Pacific is an "owner or operator" of the Site liable for costs under section 107(a)(1) of CERCLA.  (Docket Entry No. 218 at 6).  Instead, Halliburton argues that Georgia-Pacific is liable under sections 107(a)(2) and (3) of CERCLA (and the comparable sections of RATFA).  (*Id.*).  These sections cover persons who owned or operated a facility, where hazardous substances were disposed, at the time of disposal ("prior owners and operators"), and persons who arranged for disposal of hazardous substances ("arrangers").

The interplay between section 107(a) and section 113(f) is important to the pending motion. In *Cooper Industries, Inc. v. Aviall Services, Inc.*, 543 U.S. 157 (2004), the Supreme Court "concluded that CERCLA provided for a right of cost recovery in certain circumstances, referring to 42 U.S.C.A. § 9607(a), and separate rights to contribution in other circumstances, referring to 42 U.S.C.A. § 9613(f)(1) and 42 U.S.C.A. § 9613(f)(3)(B)."  John J. Dvorske, Annotation, *Right of Private Party to Seek Cost Recovery Under CERCLA § 107(a), 42 U.S.C.A. § 9607(a), or Contribution Under CERCLA § 113(f)(1), 42 U.S.C.A. § 9613(f)(1), in Connection with*

*Environmental Response—Post-Cooper Industries, Inc. v. Aviall Services, Inc.*, 543 U.S. 157, 125

S. Ct. 577, 160 L. Ed. 2d 548 (2004)*, 22 A.L.R. FED. 2D 233 at § 2 (2007).  One commentator has

explained:

> Under a § 107(a) "cost recovery" action, a party, such as a private
> party landowner or the United States government, who has incurred
> cleanup and remediation costs at a hazardous waste site, may seek to
> recover its full response costs from a party or parties who may be
> potentially responsible for the contamination.  The apportionment of
> liability under § 107(a) is strict, joint, and several—without regard to
> fault or willfulness, and thus, once liability is demonstrated, a
> defendant potentially responsible party may be held liable for the
> entire cost of cleanup, even if multiple potentially responsible parties
> are involved.  Under a § 113(f)(1) "contribution" action, a potentially
> responsible party is granted the right to recoup from other potentially
> responsible parties the portion of its cleanup and remediation costs
> which exceeds its fair share of the overall liability.  In other words,
> under § 113(f)(1), an individual potentially responsible party which
> has been left with the entire cleanup cost may seek contribution from,
> and attempt to apportion liability to, other potentially responsible
> parties.  In contrast to a § 107(a) action in which liability is joint and
> several, under § 113(f)(1), a court is called upon to allocate the
> response costs among the potentially responsible parties based upon
> each potentially responsible party's percentage of fault and, to do so,
> may use such equitable factors as the court determines are
> appropriate.

*Id.* at § 3 (footnote omitted).

The Supreme Court addressed the interplay between sections 107(a) and 113(f) in *United*

*States v. Atlantic Research Corp.*, 551 U.S. 128, 127 S. Ct. 2331 (2007).  In *Atlantic Research*, the

Court held that section 107(a) provides PRPs with a cause of action to recover costs from other

PRPs.  551 U.S. at 131.  The Court noted that it had previously held in *Cooper Industries* that "a

private party could seek contribution from other liable parties only after having been sued under §

106 or § 107(a)."  *Id.* at 133.  Atlantic Research leased property operated by the Department of

Defense.  *Id.*  After cleaning up environmental damage at the relevant site at its own expense,

Atlantic Research sought to recover some of its costs by suing the United States under both section 107(a) and section 113(f). *Id.* After the Court's *Cooper Industries* decision, the section 113(f) claim could not proceed. *Id.* Atlantic Research amended its complaint to seek relief only under section 107(a) and federal common law. *Id.*

The *Atlantic Research* Court pointed out that in *Cooper Industries*, it had "recognized that §§ 107(a) and 113(f) provide two 'clearly distinct' remedies." *Atlantic Research*, 551 U.S. at 138 (citing *Cooper Industries*, 543 U.S. at 163 n.3).[12] The *Atlantic Research* Court noted:

> Section 113(f) explicitly grants PRPs a right to contribution. Contribution is defined as the "tortfeasor's right to collect from others responsible for the same tort after the tortfeasor has paid more than his or her proportionate share, the shares being determined as a percentage of fault." BLACK'S LAW DICTIONARY 353 (8th ed. 1999). Nothing in § 113(f) suggests that Congress used the term "contribution" in anything other than this traditional sense. The statute authorizes a PRP to seek contribution 'during or following' a suit under § 106 or § 107(a). 42 U.S.C. § 9613(f)(1). Thus, § 113(f)(1) permits suit before or after the establishment of common liability. In either case, a PRP's right to contribution under § 113(f)(1) is contingent upon an inequitable distribution of common liability among liable parties.

*Id.* at 138–39 (footnote omitted). The Court distinguished section 113(f) liability from liability under section 107(a):

> By contrast, § 107(a) permits recovery of cleanup costs but does not create a right to contribution. A private party may recover under § 107(a) without any establishment of liability to a third party. Moreover, § 107(a) permits a PRP to recover only the costs it has "incurred" in cleaning up the Site. 42 U.S.C. § 9607(a)(4)(B). When a party pays to satisfy a settlement agreement or a court judgment, it does not incur its own costs of response. Rather, it reimburses other

---

[12]    *See also E.I. DuPont de Nemours & Co. v. United States*, 508 F.3d 126, 134 (3d Cir. 2007) ("[I]n *Atlantic Research Corp.* the Supreme Court concluded that PRPs may apply both §§ 107(a)(4)(B) and 113(f)(1) to recover cleanup expenses, but the two sections 'provide two "clearly distinct" remedies.'") (quoting *Atlantic Research*, 127 S. Ct. at 2337).

parties for costs that those parties incurred.

*Id.* at 139.

The *Atlantic Research* Court emphasized that while sections 107(a) and 113(f)(1) could overlap, the remedies are generally distinct and "complement each other by providing causes of action 'to persons in different procedural circumstances.'" *See id.* & n.6 (quoting *Consol. Edison Co. of N.Y. v. UGI Utils., Inc.*, 423 F.3d 90, 99 (2d Cir. 2005)) (additional citation omitted).  The Court explained:

> Section 113(f)(1) authorizes a contribution action to PRPs with common liability stemming from an action instituted under § 106 or § 107(a).  And § 107(a) permits cost recovery (as distinct from contribution) by a private party that has itself incurred cleanup costs.  Hence, a PRP that pays money to satisfy a settlement agreement or a court judgment may pursue § 113(f) contribution.  But by reimbursing response costs paid by other parties, the PRP has not incurred its own costs of response and therefore cannot recover under § 107(a).  As a result, though eligible to seek contribution under § 113(f)(1), the PRP cannot simultaneously seek to recover the same expenses under § 107(a).

*Id.*  The Court noted that at least in the case of reimbursement, a PRP does not have the option to choose the longer statute of limitations for cost-recovery claims over the shorter limitations period for section 113(f) claims.  *Id.* (footnote omitted).  Moreover, "a PRP could not avoid § 113(f)'s equitable distribution of reimbursement costs among PRPs by instead choosing to impose joint and several liability on another PRP in an action under § 107(a)."[13]  *Atlantic Research*, 551 U.S. at 140.  The Court also noted that "a defendant PRP in such a § 107(a) suit could blunt any inequitable distribution of costs by filing a § 113(f) counterclaim," and that "[r]esolution of a § 113(f) counter-

---

[13]   The Court "assume[d] without deciding that § 107(a) provides for joint and several liability."  *Atlantic Research*, 551 U.S. at 140 n.7.

claim would necessitate the equitable apportionment of costs among the liable parties, including the PRP that filed the § 107(a) action." *Id.* (citations omitted).[14]

    *Atlantic Research* makes clear that cost recovery under section 107(a) is a separate inquiry from equitable allocation in a contribution claim under section 113(f). Georgia-Pacific's motion asks this court to determine whether it is entitled to a judgment of zero liability, based on section 113(f)'s equitable allocation principles. Halliburton argues that the undisputed facts establish that Georgia-Pacific is liable for response costs under CERCLA sections 107(a)(2) and (3). Halliburton points to contracts between Georgia-Pacific and NL that allowed NL to dispose of mining wastes on property Georgia-Pacific owned at the Site,[15] and to a contract between Georgia-Pacific and NL that allowed the removal and disposal of overburden and waste rock from other property Georgia-

---

[14]   Courts have also recognized that a determination of liability under CERCLA does not resolve equitable allocation. *See Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 274 F.3d 1043, 1049 (6th Cir. 2001) ("A liability determination, however, is just the first element of a contribution claim under § 113(f). 'Recovery of response costs by a private party under CERCLA is a two-step process. Initially, a plaintiff must prove that a defendant is liable under CERCLA. Once that is accomplished, the defendant's share of liability is apportioned in an equitable manner.'") (citation omitted); *Envtl. Transp. Sys., Inc. v. Ensco, Inc.*, 969 F.2d 503, 507 (7th Cir. 1992) ("The [district] court stated that finding a party a 'responsible party' under CERCLA does not mean that all parties involved in a spill are equally responsible and should share costs on a pro rata basis. Such a finding, the district court determined, means only that a party is *potentially* liable for contribution under CERCLA, as 42 U.S.C. § 9613(f)(1), the section of CERCLA concerning contribution actions, specifically instructs the court to 'allocate response costs among liable parties using such equitable factors as the court determines are appropriate.'"); *cf. PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 615 (7th Cir. 1998) ("Although both parties are, as we said, strictly liable for the costs of cleaning up the toxic wastes at the site, CERCLA permits one of the 'responsible parties' (as liable parties are called under CERCLA) to sue the other (or others) for reimbursement of the costs of clean up that have been or will be borne by the plaintiff. 42 U.S.C. § 9607(a)(4)(B). In a suit of this sort between responsible parties, section 113(f)(1), 42 U.S.C. § 9613(f)(1), authorizes the district court to order 'contribution' based on the balance of the equities."); *Weyerhaeuser Co. v. Koppers Co.*, 771 F. Supp. 1420, 1423–24 (D. Md. 1991) ("The Court concludes that although Koppers's wood treatment operations caused the environmental contamination, Koppers is not to be faulted for its practices. This is, of course, irrelevant to the strict liability scheme of CERCLA but is relevant to allocating responsibility among the liable parties.") (footnote omitted).

[15]   Docket Entry No. 218 at 6 (citing *id.*, Ex. K at 1–2; *id.*, Ex. L. at 1–2; *id.*, Ex. M at 1; *id.*, Ex. N at 1–2; *id.*, Ex. O at 2; *id.*, Ex. T at 1).

Pacific owned at the Site.[16]

Georgia-Pacific concedes for purposes of this motion that it is a PRP under section 107(a) of CERCLA. (Docket Entry No. 208 at 16). This court need not determine whether Georgia-Pacific is in fact liable under section 107(a), and if so, under which subsection. Georgia-Pacific has "blunted" Halliburton's claim for cost recovery under section 107(a) with a counterclaim under section 113(f), and Halliburton has also asserted a claim for contribution under section 113(f). Assuming, for the purpose of this motion, that Georgia-Pacific is a PRP under section 107(a), the issue to be resolved is whether Georgia-Pacific is entitled to judgment of zero liability based on equitable allocation under section 113(f). *Cf. Kalamazoo*, 274 F.3d at 1047 ("A holding of potential liability does not preclude a zero allocation of response costs."); *Acushnet Co. v. Mohasco Corp.*, 191 F.3d 69, 77–78 (1st Cir. 1999) ("We therefore hold that a defendant may avoid joint and several liability for response costs in a contribution action under § 9613(f) if it demonstrates that its share of hazardous waste deposited at the site constitutes no more than background amounts of such substances in the environment and cannot concentrate with other wastes to produce higher amounts. This rule is not based on CERCLA's causation requirement, but is logically derived from § 9613(f)'s express authorization that a court take equity into account when fixing each defendant's fair share of response costs.") (footnote omitted).

### 2.    Equitable Allocation Under Section 113(f) of CERCLA

#### a.    The Factors to be Considered

Georgia-Pacific points out that before *Atlantic Research*, "it was generally accepted that the equitable '[f]actors which may be considered include the relative fault of the parties, . . .; relevant

---

[16]    Docket Entry No. 218 at 7 (citing *id.*, Ex. A at 1).

'Gore factors,' . . . ; and any contracts between the parties bearing on the allocation of cleanup costs.'" (Docket Entry No. 208 at 19 (quoting *Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321, 326 (7th Cir. 1994) (citations omitted))). In *Atlantic Research*, the Court commented that "[n]othing in § 113(f) suggests that Congress used the term 'contribution' in anything other than [the] traditional sense." *Atlantic Research*, 551 U.S. at 138. The Court stated that "[c]ontribution is . . . the 'tortfeasor's right to collect from others responsible for the same tort after the tortfeasor has paid more than his or her proportionate share, the shares being determined as a percentage of fault.'" *Id.* (quoting BLACK'S LAW DICTIONARY 353 (8th ed. 1999)). Georgia-Pacific argues that these statements establish that "[c]omparative fault is . . . the key consideration in equitable allocation under section 113(f)." (Docket Entry No. 208 at 19).

As Georgia-Pacific recognizes, the other factors discussed in *Kerr-McGee*, including the "Gore Factors"[17] and contracts between the parties bearing on allocation, should also be considered. The Gore Factors include:

> (1) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished;

> (2) the amount of the hazardous waste involved;

> (3) the degree of toxicity of the hazardous waste involved;

> (4) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;

---

[17]   The "Gore Factors" "originally were part of an amendment to the 1980 House Superfund Bill which did not pass. Congressman Albert Gore proposed the criteria as a moderate approach to joint and several liability, and the six criteria are often referred to as the 'Gore Factors.'" *Envtl. Transp. Sys.*, 969 F.2d at 508. "The legislative history of section 113(f) cites the[se] . . . criteria as factors courts may consider in deciding whether to grant apportionment in a contribution action." *Id.* (citing H.R. Rep. No. 99-253 (III), at 19 (1985), *as reprinted in* 1986 U.S.C.C.A.N. 3038, 3042).

> (5) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and
>
> (6) the degree of cooperation by the parties with Federal, State, or local officials to prevent any harm to the public health or the environment.

*Kerr-McGee*, 14 F.3d at 326 n.4.  This list is not exclusive.  Nor is a court required to analyze every factor in every case.  As one court has explained:

> [T]he language of section 9613(f) clearly indicates Congress's intent to allow courts to determine what factors should be considered in their own discretion without requiring a court to consider any particular list of factors. . . . [I]n any given case, a court may consider several factors, a few factors, or only one determining factor . . . , depending on the totality of the circumstances presented to the court.

*Envtl. Transp. Sys.*, 969 F.2d at 509.[18]  Comparative fault and the parties' intent to allocate liability among themselves are the most important of the equitable factors here.

### b.   Cooperation with Authorities and Ability to Distinguish Contribution

Georgia-Pacific argues that the first Gore Factor—the parties' ability to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished—is immaterial because CERCLA authorizes contribution without regard to the divisibility of the harm. (Docket Entry No. 208 at 20).  This court agrees that whether the parties can distinguish their contribution to the hazardous waste is not particularly relevant to the equitable analysis here.  The

---

[18]   *See also Beazer East, Inc. v. Mead Corp.*, 412 F.3d 429, 446 (3d Cir. 2005) ("Congress intended to grant the district courts significant flexibility in determining equitable allocations of response costs, without requiring the courts to prioritize, much less consider, any specific factor."); *United States v. R.W. Meyer, Inc.*, 932 F.2d 568, 572–73 (6th Cir. 1991) ("No exhaustive list of criteria need or should be formulated.  However, in addition to the [Gore Factors], the court may consider the state of mind of the parties, their economic status, any contracts between them bearing on the subject, any traditional equitable defenses as mitigating factors[,] and any other factors deemed appropriate to balance the equities in the totality of the circumstances.") (footnote omitted).

divisibility inquiry is part of the section 107(a) analysis, which, as discussed earlier, is not central to analyzing Georgia-Pacific's motion.

Georgia-Pacific points out that the last Gore Factor—the degree of cooperation by the parties with federal, state, or local officials to prevent any harm to the public health or the environment—is "meaningless" because "neither EPA nor ADEQ ever asked Georgia-Pacific to contribute to environmental response while Georgia-Pacific owned property at the Site." (*Id.* at 23). Halliburton responds that Georgia-Pacific has not cooperated with government officials in remediation despite the "substantial financial benefit from its involvement in the activities that led to the contamination of the Site." (Docket Entry No. 218 at 13). But there is no evidence that any government agency asked Georgia-Pacific to become involved in the cleanup process. Georgia-Pacific did not voluntarily offer assistance to the authorities in remediating a site where it previously owned property. But Georgia-Pacific did not itself participate in the activities necessitating the cleanup, believed itself indemnified for any potential liability, and was not asked by authorities to participate. The lack of cooperation is not a strong factor for allocating responsibility to Georgia-Pacific.

### c.      Comparative Fault

#### i.      The Parties' Contentions

Gore Factors two through five relate to the comparative fault inquiry. Georgia-Pacific argues that the pollution and remedial response at the Site are the direct result of mining activities conducted by others, specifically NL and Magcobar, the predecessors of Halliburton and TRE Management. (Docket Entry No. 208 at 22). Georgia-Pacific also argues that NL was aware of the environmental problems at the Site, devised remedial plans, and then chose to abandon the polluted Site. (*Id.*). Georgia-Pacific contends that under fundamental contribution principles, the facts that

35

it did not participate in any mining and did not generate any mining spoils or any pollutants at the Site warrants allocating it zero responsibility for response costs.  (*See id.*).

Halliburton responds that CERCLA and the case law do not support allocating zero responsibility based on the fact that a PRP did not conduct mining or generate mine spoils.  (Docket Entry No. 218 at 7).  Halliburton emphasizes cases holding a lessor responsible for cleanup costs.  (*Id.* at 8–9 (citing *United States v. R.W. Meyer, Inc.*, 932 F.2d 568, 571 (6th Cir. 1991); *Weyerhaeuser Co. v. Koppers Co.*, 771 F. Supp. 1420 (D. Md. 1991))).  Halliburton also argues that the cases Georgia-Pacific cites in which no response costs were allocated to a particular party involved exceedingly small amounts of contaminants linked to that party.  (*Id.* at 9).  In this case, Halliburton asserts that more than 25% of the total mine wastes were disposed of on Site property owned by Georgia-Pacific.  (*Id.* (citing *id.*, Ex. BB)).  Halliburton further argues, without citing evidence, that "an additional (as of yet unquantified) volume of mine wastes was excavated from Georgia-Pacific's property and disposed of elsewhere at the Site."  (*Id.*).  Halliburton also asserts that even if Georgia-Pacific did not conduct mining activities at the Site, its degree of involvement in the mining activities, its lack of care with respect to hazardous wastes disposed of on its property, and the economic benefit it received from the mining activities all support allocating some response costs to Georgia-Pacific.  (*Id.* at 12).[19]

---

[19]    Halliburton states:

> The undisputed evidence establishes that Georgia-Pacific was involved in and facilitated every aspect of NL's mining operations at the Site for half a century.  Through the numerous contracts entered into between the parties, Georgia-Pacific played a central role in NL's excavation of barite ore, the transport of excavated ore to NL's mill, the supply of water necessary for the operation of NL's mill, the disposal of tailings generated by the mill, the disposal of mine spoils, and ultimately, NL's initial attempts to stop the flow of contaminated water from the Site.

In reply, Georgia-Pacific contends that the case law permits allocating zero responsibility to a PRP in appropriate circumstances.  (Docket Entry No. 222 at 4–7).  Georgia-Pacific argues that undisputed record evidence shows that it: did not conduct or direct the excavation and removal of overburden or barite at the Site; did not physically conduct or direct milling of overburden at the Site; and did not transport mine and mill wastes disposed of on its property at the Site.  (*Id.* at 7–8).  Georgia-Pacific contends that Halliburton's attempt to create a fact issue fails because the document that Halliburton relies on to show the volume of waste disposed of on Georgia-Pacific's property, which is a document prepared by one of Halliburton's experts in the arbitration, is hearsay.  (*Id.* at 8).  Georgia-Pacific argues that the property transactions alone do not show that it was involved in the mining activities.  (*Id.*).  Georgia-Pacific also asserts that because of the admissions that it was not directly involved in the mining activities and because it was to be fully indemnified, its property transactions are not material.  (*Id.*).

## ii.    Analysis

It is permissible in certain circumstances to allocate zero response costs to a PRP.  *See Kalamazoo*, 274 F.3d at 1049 ("The district court's decision not to allocate any costs for the [Remedial Investigation and Feasibility Study] to Rockwell was based upon its finding that the KRSG was responsible for more than 99.9% of the PCBs in the River.  Although the KRSG challenges this finding . . . , it fails to show that the district court abused its discretion in looking to the relative quantities of PCBs released by the parties in allocating costs for the RI/FS."); *Acushnet*, 191 F.3d at 78 ("In an appropriate set of circumstances, a tortfeasor's fair share of the response costs may even be zero.") (citations omitted); *PMC*, 151 F.3d at 616 ("PMC's spills may have been too

(*Id.* at 12–13 (citing *id.*, Exs. A, C–T)).

37

inconsequential to affect the cost of cleaning up significantly, and in that event a zero allocation to PMC would be appropriate.  That was the district judge's judgment, and we cannot say that it was unreasonable.") (internal citations omitted).

Halliburton has not identified or presented evidence showing that Georgia-Pacific conducted mining activities at the Site.  Instead, Halliburton points out that NL contracted with Georgia-Pacific to use property Georgia-Pacific owned at the Site to dispose of mining wastes and that NL disposed of more than a minimal amount of waste on that property.  Halliburton cites *Weyerhaeuser* to argue that courts may allocate CERCLA responsibility to landowners/lessors even if the lessee/operator's activities were "'the sole cause of the environmental damage.'"  (*See* Docket Entry No. 218 at 8 (quoting *Weyerhaeuser*, 771 F. Supp. at 1427)).

In *Weyerhaeuser*, the court had previously found that "Weyerhaeuser owned the site at issue, that a release of hazardous materials had occurred on that site, that it was attributable to Koppers's wood treatment operations on the site, and that each party had incurred recoverable costs in response to the release."  771 F. Supp. at 1421 n.1.  Koppers Company manufactured treatment preservatives and operated wood-treatment plants on property it leased from Weyerhaeuser.  *Id.* at 1422.  The original lease between Weyerhaeuser and American Lumber and Treating Company ("AL & T"), a Koppers predecessor, was "for the purpose of erecting a wood treatment plant."  *Id.*  When they executed the original lease, Weyerhaeuser and AL & T entered into another agreement.  AL & T promised to build a treatment plant and to treat lumber and forest products delivered by Weyerhaeuser, and Weyerhaeuser promised to send AL & T all lumber shipped from Baltimore that needed treatment and to use its best efforts to promote the sale of lumber AL & T treated.  *Id.* at 1423.

The court concluded that the environmental contamination at the site was attributable to the wood treatment plant operated first by AL & T and later by Koppers.  *Id.*  (footnote omitted). Although the court attributed the contamination to plant operation, the case was "not [one] involving reckless or wanton contamination," and that AL & T and Koppers were not "unduly sloppy in their work."  *Id.*  The court stated that "Koppers was aware of the negative effects of the chemicals it used" because "[t]hese toxic properties, of course, were why these chemicals were used to preserve lumber."  *Weyerhaeuser*, 771 F. Supp. at 1424 n.7.  But the court concluded that "the containment methods used by Koppers, though maybe insufficient in these environmentally conscious times, were in accordance with common practices in those earlier times."  *Id.*

The court pointed out that Weyerhaeuser was not involved in the plant operation:

> Weyerhaeuser did not operate the wood treatment plant.  Koppers managed the delivery, unloading, storage, and use of the chemical preservatives used at the facility; Koppers controlled the daily operation of personnel at the facility; Koppers determined how much lumber to treat at any time and where and how to store the treated lumber; and Koppers maintained the treatment cylinders.

*Id.* at 1424.  But Weyerhaeuser was aware of the activities at the plant:

> Weyerhaeuser, however, was not ignorant of wood treatment processes.  Indeed, at the time that the parties contemplated the original Lease and Agreement, Weyerhaeuser expressed concern with committing itself to promoting AL & T's processes when it was anticipating possible development of its own.  Weyerhaeuser understood that the chemicals used were not benign and also accepted a certain amount of mess as intrinsic to the wood treatment process and not particularly remarkable.

*Id.*

The court pointed to facts showing that the relationship between Weyerhaeuser and AL & T was more than lessor/lessee.  Although the volume was not great, Weyerhaeuser did sell some

treated lumber and maintained a sales force at a terminal operated by Atlantic Terminal (a wholly

owned subsidiary of Weyerhaeuser) at the site; Weyerhaeuser used Koppers's brochures in its own

merchandising; Weyerhaeuser took personnel on field trips to the Koppers plant; early on, AL & T

had used some of Atlantic Terminal's equipment and personnel; the Atlantic

Terminal/Weyerhaeuser and the AL & T/Koppers properties were adjacent and personnel at both

properties were in fairly regular contact; and "Atlantic and Weyerhaeuser were generally aware of

what was happening at the [AL & T/Koppers] facility."  *Id.*  The court pointed out, however, that

"neither Weyerhaeuser nor Atlantic personnel controlled or concerned themselves with Koppers's

general safety practices or, more specifically, the safety practices regarding the treatment

chemicals."  *Id.*  When the lease ended, Weyerhaeuser visually inspected the property, observed

creosote staining on the ground, and approved the property's condition, but did not conduct any

environmental tests.  *Weyerhaeuser*, 771 F. Supp. at 1424–25.  The court noted that "[i]n 1977

[when the lease ended], it was not common business practice to look for possible environmental

ramifications."  *Id.* at 1425.

In examining CERCLA liability, the *Weyerhaeuser* court concluded that the environmental

harm was single and indivisible.  The court stated:

> Obviously, the hazardous substances were released because of
> Koppers's operation of its plant, but to hold Weyerhaeuser harmless
> based on a shallow cause-in-fact analysis is to completely undermine
> the provisions of CERCLA which impose strict liability on both the
> owner of the facility and the operator of the facility 'without
> reference to whether they caused or contributed to the release or
> threat of release.'   Accordingly, this Court must hold that
> Weyerhaeuser and Koppers are jointly and severally liable for the

environmental damage.[20]

*Id.* at 1425–26 (footnote and internal citation omitted).  While the court found that the single and indivisible injury required joint and several liability, the court explained that "[h]olding plaintiff and defendant jointly liable under CERCLA does not end the analysis."  *Id.* at 1426.  "In the statute, at 42 U.S.C. § 9613(f)(1), Congress specifically provided for actions for contribution in which equitable factors should be considered by the court."  *Id.* at 1426.  In analyzing the equities, the court found that because "Koppers's operations were the sole cause of the environmental damage[,] . . . Koppers must be allocated the lion's share of the responsibility," but that Weyerhaeuser should also be allocated some responsibility.  *Id.* at 1427.  The court explained:

> Weyerhaeuser not only knew of and acquiesced in Koppers's wood treatment activities but in fact required them as a condition of the Lease and Agreement: if the facility had not been built as anticipated or if treatment had not been undertaken, Weyerhaeuser would have been able to terminate the lease upon short notice.  Weyerhaeuser may not have benefitted so much as had been originally anticipated, but Weyerhaeuser did obtain some benefit from the proximity of Koppers['s] operations totally aside from the rent paid under the lease.

*Weyerhaeuser*, 771 F. Supp. at 1427 (footnote omitted).  The court continued:

---

[20]   Halliburton focuses on this quoted language in the case (with the exception of the last sentence, which Halliburton omits in the quotation used in its brief), to argue that a property owner is liable under CERCLA even if it did not operate the polluting facility.  As the last sentence of the quoted paragraph makes clear, in discussing the fact that property owners cannot escape CERCLA liability, the *Weyerhaeuser* court was analyzing whether there was a single and indivisible harm, resulting in joint and several liability, not apportioning response costs under section 113(f).  *See Weyerhaeuser*, 771 F. Supp. at 1426 ("Holding plaintiff and defendant jointly liable under CERCLA does not end the analysis."); *cf. Acushnet*, 191 F.3d at 72 ("[T]he district court ruled principally that the defendants deposited so little waste at the site that it could not reasonably be said that they caused plaintiffs to incur response costs.  To the extent that the court's ruling may be interpreted to incorporate into CERCLA a causation standard that would require a polluter's waste to meet a minimum quantitative threshold, we disagree.  Nevertheless, we conclude that the record was insufficient to permit a meaningful equitable allocation of remediation costs against any of these defendants under § 9613(f).") (footnote omitted).

> Weyerhaeuser was not duped by Koppers, [and] was not an
> innocent[], unsuspecting landlord. Both Weyerhaeuser and Koppers,
> in good faith, were content with Koppers's maintenance and use of
> the property.  As it happens, that maintenance was not sufficient to
> prevent the release of hazardous materials, but this was an event
> equally unanticipated by both sides.

*Id.*  The court allocated 60 percent of the responsibility to Koppers and 40 percent to Weyerhaeuser.

*Id.*

Halliburton also cites *R.W. Meyer*, 932 F.2d 568, in which the court allocated one-third of

the cleanup cost to the owner/lessor.  In *R.W. Meyer*, "[a]ll of the hazardous substances found at the

site were chemicals and by-products of metal electro-plating operations," which were conducted by

a lessee of the property at the site.  932 F.2d at 569.  The Sixth Circuit had previously affirmed the

trial court's finding that the site damage was indivisible as well as the trial court's imposition of

joint and several liability for removal costs.[21]  *Id.* at 570.  Although Halliburton presents this case

as an example of a situation in which the "owner/lessor bore significant responsibility 'simply by

virtue of being a landowner,'"[22] (Docket Entry No. 218 at 9 (quoting *R.W. Meyer*, 932 F.2d at 571)),

the court relied on factors beyond ownership in allocating responsibility to the landowner.  *See R.W.

Meyer*, 932 F.2d at 573 ("[T]he trial court quite properly considered here not only the *appellant's

contribution to the toxic slough* described above in a technical causative sense, but also its moral

contribution as the owner of the site.") (emphasis added).  A concurring opinion explained that

---

[21]    The court noted that "[j]oint and several liability may be imposed on a responsible party, even though
its role in creating the hazardous site was small, if the harm is indivisible.  [The responsible party] may then
seek contribution from other potential responsible parties . . . ."  *R.W. Meyer*, 932 F.2d at 570 n.2.

[22]    Halliburton has omitted the first portion of this sentence quoted from *R.W. Meyer*.  The full sentence
states: "The trial court found, however, that in addition to constructing the defective sewer line which
contributed to the contamination, appellant bore significant responsibility 'simply by virtue of being a
landowner.'"  *R.W. Meyer*, 932 F.2d at 571.  The full sentence makes clear that the appellant's landowner
status was not the only basis for assigning it liability.

owner status could be considered in the equitable analysis, noting that the owner had made other contributions to the contamination:

> Insofar as the court considered Meyer's landowner status as bearing on its relative contribution to the events necessitating the removal action, such consideration does not represent an abuse of discretion when the court viewed the landowner status *in combination with other relevant factors*. The district court's decision was not guided solely by Meyer's landowner status but, rather, by the actions he took or failed to take as the landowner. Landowner status provided Meyer with the opportunity to solicit Northernaire to conduct business on the site—business which involved the use of highly corrosive and caustic substances. Knowing the business to be conducted on its property, Meyer then built and leased to Northernaire a sewer line inadequately designed and constructed for the disposal of the waste generated by Northernaire's electroplating operations. Meyer's status as landowner, *when viewed in combination with actions taken by Meyer that determined the manner in which its property would be used*, is a permissible consideration in determining Meyer's degree of involvement in the events precipitating the removal action.

*R.W. Meyer*, 932 F.2d at 577 (Guy, J., concurring) (emphasis added). The concurrence explained that the landowner "was instrumental in efforts to bring Northernaire to Cadillac, was fully aware of the nature of the manufacturing to be conducted on the site, built the building that housed the facility, and failed to construct or maintain an adequate sewer line." *Id.* at 578 (Guy, J., concurring).

The facts in the *Weyerhaeuser* and *R.W. Meyer* cases are different in several respects from the facts shown in the summary judgment record here. In both *Weyerhaeuser* and *R.W. Meyer*, the landowner was more involved in the activities leading to contamination than Georgia-Pacific was in this case. For example, the landowner in *Weyerhaeuser* "understood that the chemicals used were not benign and also accepted a certain amount of mess as intrinsic to the wood treatment process." 771 F. Supp. at 1424. The landowner also received benefits from the contractual relationship, beyond rental fees; the landowner and lessee had an ongoing business relationship related to the

43

activity that ultimately caused the environmental damage; and the landowner approved of the property's condition when the lease ended despite observing chemical stains on the ground. In addition, the lessee in *Weyerhaeuser* was found not to be negligent. By contrast, Georgia-Pacific has presented uncontested evidence that its lessee, NL, knew about environmental problems when it discontinued its mining activities, developed a plan for remedying the waste, and then failed to implement the remedial plan. (*See* Docket Entry No. 189, Exs. 29–43). In *R.W. Meyer*, the landowner had built a defective sewer line that contributed to the contamination and the district court observed that the landowner had not assisted or cooperated with EPA officials during the investigation and cleanup. 932 F.2d at 571.

Although the facts in this case are distinguishable from those in *Weyerhaeuser* and *R.W. Meyer*, the record does show that Georgia-Pacific knew about the mining activities on its property, executed leases specifically allowing for the disposal of mining wastes on that property, and received lease payments.[23] Georgia-Pacific received benefits from facilitating NL's activities on its land.[24] However, Halliburton has not presented any evidence showing that Georgia-Pacific knew

---

[23]   Georgia-Pacific contends, without citation, that "fixed lease and royalty payments are made on the premise that the royalty owner will not bear any expenses associated with mineral extraction." (Docket Entry No. 208 at 23). Although it appears, at least in Texas, that a "non-participating royalty interest . . . does not entitle its owner to produce the minerals himself [, . . . but] merely entitles its owner to a share of the production proceeds, free of the expenses of exploration and production," *Plainsman Trading Co. v. Crews*, 898 S.W.2d 786, 789 (Tex. 1995), it is not clear that CERCLA response costs are within the scope of the expenses of exploration and production, especially when the owner of the mineral rights also owns the surface rights to the land that has been contaminated.

[24]   Halliburton contends that "more than 25% of the total mine wastes (5,648,304 cubic yards) and more than 50% of the mine tailings (2,403,916 cubic yards) were disposed of on property Georgia-Pacific owned at the Site." (Docket Entry No. 218 at 9 (citing *id.*, Ex. BB)). Georgia-Pacific contends that the document used to support Halliburton's assertion is an out-of-court statement by Halliburton's arbitration expert, and is therefore hearsay and inadmissible against Georgia-Pacific. (Docket Entry No. 222 at 8). Halliburton has submitted the affidavit of Matthew Low to overcome the hearsay objection. (Docket Entry No. 230, Ex. B). Low's affidavit purports to attach his expert allocation opinion from the arbitration, as well as a table showing the volume of spoils deposited on each parcel of property at the Site, but neither document appears to actually

that the disposal of mining wastes would cause an environmental problem.[25]

---

have been attached to the affidavit.  This court presumes that what Low's affidavit refers to as "Exhibit B" of his affidavit is the chart as to which there is an evidentiary dispute, which is attached as Exhibit BB to Halliburton's opposition to Georgia-Pacific's motion.  As Georgia-Pacific points out, Low admits in his affidavit "that his chart is merely a summary of the work of another consultant."  (Docket Entry No. 231 at 5; *see also* Docket Entry No. 230, Ex. B at 3 ("Using the calculations provided to me by Dr. Stephens, I developed the table attached as Exhibit B, which in addition to other information, shows the volume of spoils deposited on each parcel of property at the Site.").  Because Halliburton has not also submitted an affidavit from Stephens, Low's affidavit is not sufficient to cure the hearsay objection.  In addition, Low's affidavit does not explain how he came to the conclusion that "Georgia-Pacific was an owner of a significant portion of the Site on which more than 22% of all mining and milling wastes were disposed," (*see* Docket Entry No. 230, Ex. B. at 3), which differs from the statement in Halliburton's opposition that "more than 25% of the total mine wastes (5,648,304 cubic yards) and more than 50% of the mine tailings (2,403,916 cubic yards) were disposed of on property Georgia-Pacific owned at the Site," (Docket Entry No. 218 at 9).  In any event, Georgia-Pacific does not appear to dispute for purposes of this motion that it owned property at the Site when some of the mine wastes were disposed of on that property.  The chart Halliburton submitted is not necessary to make that point.  Knowing the exact percentage of property owned by Georgia-Pacific on which spoils and tailings were deposited is not necessary, given that Georgia-Pacific's motion is limited to seeking judgment that it has <u>zero</u> responsibility for cleanup costs at the Site despite its ownership of property there.

[25]     This court raised the potential lack of evidence that Georgia-Pacific knew of environmental contamination during the hearing on Georgia-Pacific's motion.  After the hearing, Halliburton filed a motion for leave to file supplemental evidence in opposition to Georgia-Pacific's motion, seeking to submit two additional documents that Halliburton contends show that Georgia-Pacific knew of the environmental conditions at the Site.  (Docket Entry No. 332).  Halliburton argues that the evidence "shows that (1) the Arkansas Pollution Control Commission ordered NL to clean, or raise the pH level of, the water being pumped out of NL's mine and (2) Georgia Pacific had knowledge of this order and allowed settling ponds to be constructed on its property 'to clarify' the mine water."  (*Id.*, Ex. A at 1–2).  The evidence that Halliburton seeks to submit includes internal NL memoranda dated September 9, 1971 and November 10, 1971.  Halliburton asserts that these memoranda are admissible as ancient documents under Federal Rule of Evidence 803(16).  (*Id.*, Ex. A at 2).  Georgia-Pacific opposes Halliburton's motion, arguing that Halliburton lacked diligence in submitting the material in opposition to the summary judgment motion, and that it would be futile to grant the motion because Halliburton has not established admissibility.  (Docket Entry No. 334 at 1).  Even if admissible, according to Georgia-Pacific, the documents are not new evidence of its knowledge that could raise a genuine issue of material fact.  (*Id.*).

        This court has discretion to permit the supplemental filing.  *See* FED. R. CIV. P. 56(e)(1) ("The court may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits."); S.D. TEX. L.R. 7.8 ("The Court may in its discretion, on its own motion or upon application, . . . request or permit additional authority or supporting material.").  Because the proposed supplemental evidence was submitted less than a week after this court specifically asked about evidence showing Georgia-Pacific's knowledge of environmental contamination at the Site, lack of diligence is not the issue.  Halliburton's motion is denied for other reasons.  Halliburton has not shown that the documents are admissible.  Halliburton contends that the documents are admissible under Federal Rule of Evidence 803(16), which provides an exception to the hearsay rule for "[s]tatements in a document in existence twenty years or more *the authenticity of which is established*."  FED. R. EVID. 803(16) (emphasis added).  "The requirement

A PRP need not be completely blameless to be allocated zero responsibility.  Instead, under section 113(f), the court is required to consider any appropriate equitable factors.  The mining activities at the Site were terminated in 1977.  Halliburton has presented no evidence showing that at the time of the leases and related mining activities, disposing of mining wastes was known to

---

of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  FED. R. EVID. 901(a).  The relevant Federal Rule of Evidence describes an example of proper authentication for ancient documents, including "[e]vidence that a document or data compilation, in any form, (A) is in such condition as to create no suspicion concerning its authenticity, (B) was in a place where it, if authentic, would likely be, and (C) has been in existence 20 years or more at the time it is offered."  FED. R. EVID. 901(b)(8).

Halliburton has submitted the affidavit of its trial counsel, Jenny Martinez, to authenticate the proposed new evidence.  In that affidavit, Martinez states that she is the custodian of records at her law firm for this lawsuit, and that the documents "are kept by the Firm in the regular course of business, and it was in the regular course of business of this office for an employee or representative of the Firm with knowledge of the act, event, or opinion recorded, to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter."  (Docket Entry No. 332, Ex. A-1 at 1).  Martinez also states that the records "are the original or exact duplicates of the original."  (Id., Ex. A-1 at 1).  Martinez's affidavit does not explain how her firm came to have the documents.  It is not clear how an employee at the law firm could have personal knowledge of the statements in the ancient documents, as they appear to be internal NL memoranda created long before this lawsuit.  In addition, it is not clear that the documents are originals or duplicates of an original, as stated in Martinez's affidavit, because both documents appear to have litigation control numbers at the bottom, which at least raises the question of whether they are originals or duplicates of originals.  Because the documents have not been properly authenticated, they are not admissible under the ancient document exception to the hearsay rule.

In addition, the documents do not provide evidence—beyond what is already in the record—that Georgia-Pacific knew of the environmental condition of the Site.  The first memorandum is an internal NL memorandum that states that Georgia-Pacific has agreed to lease land to NL "to build settling ponds to clarify the mine water that [NL] pump[ed]."  (Docket Entry No. 332, Ex. A-2).  While this document may show NL's internal reasons for building the settling ponds, it does not provide evidence of what Georgia-Pacific knew when it agreed to the Settling Pond Lease.  Further, the Settling Pond Lease itself provides that it was entered into "for the purpose of backing up waters and settling mine waters and waste from Lessee's mining operations . . . ," (Docket Entry No. 189, Ex. 24 at 1), and the internal NL memorandum provides no more evidence that Georgia-Pacific had knowledge of environmental problems at the Site than the Settling Pond Lease already in the record.  In addition, as Georgia-Pacific points out, there is no evidence in the record that the settling ponds have required environmental response.  To the contrary, it appears that the settling ponds may have been a means for clarifying the mine water, not a source of environmental contamination.  The second memorandum  only mentions Georgia-Pacific to note that Georgia-Pacific was leasing land to NL for settling ponds.  The newly-submitted documents would add nothing to the summary judgment record.

Halliburton's motion for leave is denied.

cause environmental damage.  Nor is there evidence that the disposal was contrary to prevailing practices.  *Cf. Weyerhaeuser*, 771 F. Supp. at 1424 n.7 ("[T]he containment methods used by Koppers, though maybe insufficient in these environmentally conscious times, were in accordance with common practices in those earlier times.").  In addition, Halliburton has not presented evidence that Georgia-Pacific played a role in the mining activities that led to the contamination and necessitated the environmental cleanup.

When a PRP contributes only minimally to the contamination at issue, it may be appropriate to allocate zero response costs to that party.  Georgia-Pacific argues that courts have allocated zero responsibility for *de minimis* polluters, and there is no evidence that Georgia-Pacific conducted activities that led to the Site contamination.

For example, in *Acushnet*, the First Circuit held, based on section 113(f), that "a defendant may avoid joint and several liability for response costs in a contribution action . . . if it demonstrates that its share of hazardous waste deposited at the site constitutes no more than background amounts of such substances in the environment and cannot concentrate with other wastes to produce higher amounts."  191 F.3d at 77.  The court "caution[ed], however, that not every *de minimis* polluter will elude liability in this way.  As always, an equitable determination must be justified by the record."  *Id.* at 78.  The court explained that "there is nothing to suggest that Congress intended to impose far-reaching liability on every party who is responsible for only trace levels of waste.  Several courts, albeit taking different paths to a similar result, have rejected the notion that CERCLA liability 'attaches upon release of *any* quantity of a hazardous substance.'"  *Id.* (quoting *Licciardi v. Murphy*

*Oil USA*, 111 F.3d 396, 398 (5th Cir. 1997)).[26]  The court concluded that "[t]he ultimate failure of

a contribution claim because someone did only a negligible amount of harm does not impede

enforcement by the EPA or frustrate any of CERCLA's objectives." *Id.* at 79.  The court affirmed

summary judgment in favor of one of the defendants because "even if NETT may be said to have

caused plaintiffs to incur response costs, plaintiffs have failed to rebut NETT's evidence showing

that it should bear no more than a *de minimis* share of the remediation expenditures under §

9613(f)." *Id.*  The court also affirmed the trial court's grant of judgment as a matter of law in favor

of the remaining defendants. *Id.* at 80.  With respect to one of those defendants, the court explained:

> Plaintiffs' evidence at trial tended to show that AFC was responsible
> for hazardous waste at Sullivan's Ledge on a scale "thousands of
> times less than the remaining contribution of others"; that, in terms
> of sheer mass, the two cubic yards of solid waste attributable to AFC
> constituted an insignificant amount of pollution when compared to
> over one million cubic yards of waste found at Sullivan's Ledge; that

---

[26]      The court noted that it believed "that the Fifth Circuit's approach, which demands a finding that
defendant's pollution 'posed a[ ] threat to the public or the environment' before it may be said that he has
caused plaintiff to incur response costs, goes too far." *Acushnet*, 191 F.3d at 78 n.9 (quoting *Amoco Oil Co.
v. Borden, Inc.*, 889 F.2d 664, 670 (5th Cir. 1989)).  In *Amoco Oil*, the court made the statement that "holding
parties liable who have not posed any threat to the public or the environment" would exceed CERCLA's
statutory purposes in the context of considering the defendant's assertion that CERCLA liability did not
attach because the plaintiff's remedial action was not justified by the hazard posed.  889 F.2d at 670.  The
court noted that "[s]everal courts have interpreted the causation requirement in a different context—for
determining the standard of proof necessary to show a defendant is responsible for the hazard that resulted
in response costs," and explained that "[f]or that purpose, the causation requirement has been interpreted in
a somewhat relaxed manner due to difficult proof problems inherent in toxic waste cases and CERCLA's
broad liability provisions." *Id.* at 670 n.9.  The court also noted that "parties falling within the statutory
definition of responsible persons are strictly liable for 'a release or threat of release, without regard to
causation.'" *Id.* (quoting *State of N.Y. v. Shore Realty Corp.*, 759 F.2d 1032, 1044 (2d Cir. 1985)).  The
*Amoco Oil* holding that the release must have been large enough to pose some threat to the public or the
environment in order for CERCLA liability to attach has been questioned and disagreed with by some other
courts.  *See, e.g.*, *A & W Smelter & Refiners, Inc. v. Clinton*, 146 F.3d 1107, 1110–11 (9th Cir. 1998) (finding
that "[t]he Fifth Circuit has imposed a minimum level requirement through the back door" by holding "that
the release causes the EPA's response only if it poses a serious enough threat to justify the response," and
concluding that "this reads too much into the word 'causes' in section 9607(a)(4)" and that "[w]here a party
is responsible for a particular release, that party is a cause of any response to that release, although on
occasion EPA overzealousness may be another cause as well") (footnote omitted).

> the remediation plan was largely driven by the presence of hazardous substances other than copper and zinc; and that the materials attributable to AFC [were] not as toxic as the other substances discovered at the site . . . .  Taking at face value plaintiffs' own estimates of the costs of remediation, AFC's share of response costs, in the most generous formulation, would amount to no more than 1/500,000 of $50 million[,] amounting to less than $100.

*Acushnet*, 191 F.3d at 80–81.

Similarly, in *Kalamazoo*, the court held:

> The district court's decision not to allocate any costs for the [Remedial Investigation and Feasibility Study] to Rockwell was based upon its finding that the KRSG was responsible for more than 99.9% of the PCBs in the River.  Although the KRSG challenges this finding, . . . , it fails to show that the district court abused its discretion in looking to the relative quantities of PCBs released by the parties in allocating costs for the RI/FS.

*Kalamazoo*, 274 F.3d at 1049.

The cases allocating zero responsibility to *de minimis* polluters do not resolve the issue presented here.  In those cases, the courts attributed zero responsibility to the *de minimis* polluters because, beyond their slight contribution to the contamination, the polluters had no other reason to be held liable for the cleanup costs.  In some cases, the *de minimis* polluter had never owned the property at the site at issue.[27]  In another case, the *de minimis* polluter had owned the property only

---

[27]   *See, e.g.*, *Kalamazoo*, 274 F.3d at 1045–47 (the contaminated site was a portion of the Kalamazoo River, and the *de minimis* polluter was a manufacturer, not an owner); *United States v. Davis*, 261 F.3d 1, 49, 51–52 (1st Cir. 2001) (party found liable under CERCLA as an "arranger," but allocated zero responsibility because there was no evidence regarding the volume of that party's waste transported to the site); *Acushnet*, 191 F.3d at 79–81 (none of the parties were described as owners of the site; one defendant was entitled to summary judgment because the plaintiff had failed to adequately rebut evidence that the defendant had contributed only trace amounts of pollution, and other defendants were entitled to judgment as a matter of law because they had contributed only a small amount of hazardous substances to the site); *Envtl. Transport. Sys., Inc.*, 969 F.2d at 504–05 (none of the parties owned the site, and the parties allocated zero responsibility had contracted for disposal of waste, but were not responsible for the accident that caused contamination).

after all but an inconsequential amount of contamination had occurred.[28]  While Georgia-Pacific may

not have been actively involved in the activities that led to the contamination, it owned property at

the Site during the mining activities that led to the contamination, and it leased the property for the

purpose of facilitating those mining activities.  Georgia-Pacific has not pointed to cases holding that

a party that owned land during the disposal of the hazardous waste causing the contamination should

be allocated zero responsibility because it did not actively participate in the activity causing the

contamination.[29]  Nor has Georgia-Pacific cited cases allocating zero responsibility when the

---

[28]  *See PMC*, 151 F.3d at 616 (property owner took over site after the defendant had polluted it, and owner was allocated zero response costs despite admitting to spills during ownership because its "spills may have been too inconsequential to affect the cost of cleaning up significantly . . .").

[29]  One court has stated: "'[I]n an appropriate case, [a] court might properly exercise its discretion under § 113(f)(1) to allocate a smaller portion or even no portion of the cleanup cost to a non-polluting PRP landowner . . . .'"  *Seneca Meadows, Inc. v. ECI Liquidating, Inc.*, 427 F. Supp. 2d 279, 292 (W.D.N.Y. 2006) (quoting *W. Props. Serv. Corp. v. Shell Oil Co.*, 358 F.3d 678, 690 (9th Cir. 2004)).  However, this statement is dicta in the *Seneca Meadows* case, and the case that *Seneca Meadows* relies on for this proposition—*Western Properties Service Corp. v. Shell Oil Co.*, 358 F.3d 678 (9th Cir. 2004), *abrogation on other grounds recognized by Kotrous v. Goss-Jewett Co. of Northern California*, 523 F.3d 924, 931, 932 & n.8 (9th Cir. 2008) (citing *Cooper Industries*, 543 U.S. at 160–61 (2004); *Atlantic Research*, 551 U.S. 128)—analyzed whether a non-polluting PRP landowner could sue under section 107(a) for full joint-and-several recovery, and discussed an allocation of no responsibility to a non-polluting landowner in the context of an unsuspecting landowner who purchased polluted property:

> There is some attraction, in certain circumstances, to a broad innocent-landowner rule for non-polluting landowners who are not statutorily innocent under § 101(35).  The attractiveness is equitable, not textual, and the contribution statute already allows for equity to be taken into account.  Suppose a person bought a lot on which to build a home, not knowing that some years ago a truck had overturned and spilled hazardous substances into the ground, which had seeped down into the water table.  Suppose further that by due diligence he could have found out and is deemed to have had reason to know, so he is not a statutory innocent owner.  In such a case, the district court would be able to consider the equities, as between the almost-innocent PRP landowner and the company whose truck had overturned, using its § 113(f)(1) authority to "allocate response costs among liable parties using such equitable factors as the court determines are appropriate."

*W. Props. Serv.*, 358 F.3d at 690 (footnotes omitted).

landowner specifically leased its property for purposes of allowing the lessee to perform the activities that caused the contamination.[30] *Cf. Metro. Water Reclamation Dist. of Greater Chicago v. Lake River Corp.*, 365 F. Supp. 2d 913, 917 (N.D. Ill. 2005) (finding—in the context of analyzing whether the party was an "innocent landowner" permitted to seek direct recovery against other PRPs under section 107(a) rather than section 113(f)(1)—that the landowner had "entered into a long-term lease with a party it knew intended to keep and process chemical materials," and that the case was "clearly distinct from cases where a plaintiff had little or no warning that the property could have been or was being contaminated" because while the landowner "did not itself contaminate the property, it did drastically increase the risk of contamination by leasing the property to Lake River").

The decision in *Bedford Affiliates v. Sills*, 156 F.3d 416 (2d Cir. 1998), *overruled on other grounds by W.R. Grace & Co.–Conn. v. Zotos Int'l, Inc.*, 559 F.3d 85, 90 (2d Cir. 2009), involved facts more analogous to those presented here. In *Bedford Affiliates*, the property owner leased property to a lessee that built a retail dry cleaning store and then sublet the property. 156 F.3d at 420. The dry cleaning operations contaminated the property, but the sublessee did not disclose the spills and leaks, and the landowner did not learn of the contamination until years later. *Id.* After learning about the contamination, the landowner sent letters to the primary lessee demanding that the problem be fixed. *Id.* at 421. The lessee did not do so, but the landowner did not terminate the

---

[30]  In *United States v. Davis*, 31 F. Supp. 2d 45, 66–67 (D.R.I. 1998), *aff'd*, 261 F.3d 1 (1st Cir. 2001), the court declined to allocate certain response costs to property owners, one of whom oversaw all of the dumping on his property, but relied on its determination that it was "doubtful that [the owners] . . . will be able to pay in full that portion of the response costs attributable to all of the hazardous wastes for which they are accountable," and its determination that "the generator defendants [were] in a far better position to absorb the response costs attributable to the hazardous wastes that they produced." The owners of the property were still allocated some percentage of responsibility for the overall cleanup costs, with the owner who exercised control over disposal allocated a substantial share of responsibility and the owner who was only minimally involved in the site's operation allocated 1% of the responsibility. *See id.* at 67.

lease until a year and a half after the first letter was sent.  *Id.*  The landowner ultimately remediated

the site and sued the lessee and one of the sublessees for, among other claims, cost recovery under

section 107(a) and for contribution under section 113(f)(1).  *Id.* at 421–22.  The trial court found the

polluting sublessee at fault and allocated him 95% of the response costs.  *Id.* at 422.  The court also

allocated 5% to the landowner.  *Bedford Affiliates*, 156 F.3d at 422.  The landowner appealed.  The

Second Circuit upheld the allocation, stating:

> [W]e find no abuse of discretion in the district court's decision to
> hold Bedford responsible for five percent of the contamination.
> Bedford faces CERCLA liability as a result of its status as a
> landowner throughout Sills'[s] tenancy—the period of contamination.
> *See* CERCLA § 107(a)(2), 42 U.S.C.§ 9607(a)(2).   Moreover,
> Bedford [the landowner] is not truly blameless for the Site's
> contaminated state.  Upon learning that the Site was contaminated in
> 1990, plaintiff waited almost three years to hire [an environmental
> contractor] and contact a government agency to begin cleanup.
> While this inaction is not tantamount to pollution, it serves as an
> independent basis for imposing some liability on Bedford.  Had it
> acted quicker, the contamination might have been less.  *See* H.R.
> Rep. No. 99-253(III), at 19 (1985), *reprinted in* 1986 U.S.C.C.A.N.
> 3038, 3042 (permitting courts to consider the degree of care
> exercised by the parties when apportioning liability).

*Id.* at 430.[31]

_____

[31]    Other courts have also held landowners responsible for some share of cleanup costs even without
evidence that the landowner participated in the contamination.  *See Durham Mfg. Co. v. Merriam Mfg. Co.*,
294 F. Supp. 2d 251, 270 (D. Conn. 2003) (allocating 5% of response costs to owner of premises on which
waste discharges took place, despite the lack of evidence that the owner exercised domination or control over
the corporation that contaminated property and the lack of evidence that he was personally involved in the
use, handling, or disposal of the hazardous substances) (citing *Bedford Affiliates*, 156 F.3d at 431; *Waste
Mgmt. of Alameda County, Inc. v. East Bay Reg'l Park Dist.*, 135 F. Supp. 2d 1071, 1099 (N.D. Cal. 2001));
*cf. Burlington N. & Santa Fe Ry. Co. v. United States*, 129 S. Ct. 1870, 1882–83 (2009) (affirming, in the
context of analyzing divisibility of harm (not equitable contribution), an allocation of 9% of remediation costs
to railroads that owned part of the site both currently and during period of contamination and that leased the
site to the polluters, despite fact that railroads did not contribute to contamination); *Alcan-Toyo Am., Inc. v.
N. Ill. Gas Co.*, 881 F. Supp. 342, 347 (N.D. Ill. 1995) (allocating 10% of future response costs to current
property owner "as a result of its ownership of the property" even though owner did not dispose of hazardous
substances on the site, noting that "[u]nder the doctrine of *caveat emptor*, Alcan-Toyo bore the burden of any
defect in the property it purchased," and that the owner would also "reap the benefits of the environmental

In the present case, Halliburton has not presented evidence showing that Georgia-Pacific knew of the contamination and did nothing. But the record does show that Georgia-Pacific leased property at the Site specifically to allow mining and disposing of mine spoils and tailings. CERCLA does not require that the direct polluter be responsible for all response costs. *See Beazer East*, 412 F.3d at 446–47 ("[T]he 'polluter pays' principle has no canonical or transcendent importance under § 9613(f)(1); it is certainly not the 'primary policy' of contribution claims, as implied by the District Court. It is simply one of many factors that may or may not bear on a given equitable allocation determination.") (citing *Kerr-McGee*, 14 F.3d at 326).

Before considering the indemnity provisions in the relevant leases, the equitable factors addressing comparative fault do not clearly establish, as a matter of law, that Georgia-Pacific should be allocated zero responsibility. While Georgia-Pacific's involvement appears to be small in comparison to those parties who were directly responsible for polluting the Site, it is not *de minimis* and does not support summary judgment of zero liability.

### d.    The Contractual Intent to Allocate Responsibility

### i.    The Parties' Contentions

Geogia-Pacific also argues that the broad indemnity clauses in the relevant leases protect it

---

cleanup of its property").

In *Burlington Railway*, the Supreme Court noted that "[t]he District Court criticized the Railroads for taking a "scorched earth,' all-or-nothing approach to liability,' failing to acknowledge any responsibility for the release of hazardous substances that occurred on their parcel throughout the 13-year period of B&B's lease." 129 S. Ct. at 1881. The Court also explained that the apportionment analysis is different from the equitable allocation analysis: "Equitable considerations play no role in the apportionment analysis; rather, apportionment is proper only when the evidence supports the divisibility of the damages jointly caused by the PRPs." *Id.* at 1882 n.9 (citations omitted). The Court noted that "'[a]pportionment . . . looks to whether defendants may avoid joint and several liability by establishing a fixed amount of damage for which they are liable,' while contribution actions allow jointly and severally liable PRPs to recover from each other on the basis of equitable considerations." *Id.* (citations omitted).

53

from liability for any claims arising out of the mining and waste disposal activities on the leased properties, and that the clauses are an additional equitable factor weighing in favor of allocating zero responsibility to Georgia-Pacific. (Docket Entry No. 208 at 23). Georgia-Pacific acknowledges that NL made lease payments and paid fixed per-ton royalties for barite produced on one tract, but argues that the rule that royalty owners do not bear the expenses associated with mineral extraction was "already implicit in the mineral leases executed by Malvern Lumber and Georgia-Pacific, [and] was explicitly confirmed by the indemnity terms of those leases." (*Id.*). Georgia-Pacific asserts that "[t]he parties' intent was to allocate to NL all liability for mining-related activities on land leased from Georgia-Pacific." (*Id.*).

In response, Halliburton points to the following contracts between Georgia-Pacific and NL relating to the Site that had no indemnity provisions: (1) a prospecting agreement and option for lease between Malvern Lumber and National Lead Company, dated January 2, 1947, (Docket Entry No. 218, Ex. P);[32] (2) an agreement dated April 24, 1946, in which Malvern Lumber granted an easement to NL, (*id.*, Ex. Q); and (3) an agreement, dated June 24, 1947, in which Malvern Lumber granted a railroad right-of-way to NL, (*id.*, Ex. S). Halliburton argues that the Mining Lease's

---

[32]   While this agreement does not contain an indemnity clause, it is only a prospecting agreement, giving NL the right "to explore and prospect [specific land] for minerals and mineral substances, according to customary mining methods . . . ." (Docket Entry No. 218, Ex. P at 1). The agreement also provides NL with the option to lease the described property, and provides that if NL exercises this option, Malvern Lumber will execute a lease in the form attached to the prospecting agreement. (*Id.*, Ex. P at 1–2). The form of lease attached to the prospecting agreement contains an indemnity provision, stating: "Lessee hereby agrees to save and hold Lessor free and harmless from all damages to persons and/or property and claims therefor, arising out of its possession or use of said demised premises." (*Id.*, Ex. P at 6). Exhibit P to Halliburton's response does not support a finding that Georgia-Pacific was linked to mining without indemnity protection. The prospecting agreement and the option to lease clearly contemplated that Malvern Lumber (Georgia-Pacific's predecessor) would be provided with some indemnity protection in the event that NL decided to lease the land and go forward with mining activities on the land. The prospecting agreement by itself did not give NL the right to conduct mining on the property at the Site.

indemnity provision was limited to claims for premises liability and that "[e]ven those lease agreements that arguably contain broad indemnity language indicate that (with perhaps one exception) the duty to indemnify terminated with the expiration or termination of the lease agreement." (*Id.* at 10–11 (citing *id.*, Ex. L at 1, 3 ("providing that 'this lease shall be and remain in full force and effect for a period of Twenty-Five years' and upon cancellation 'shall be *null and void* except as to rentals then due and unpaid'") (emphasis added by Halliburton); *id.*, Ex. O at 4 ("providing that upon termination '*Lessee shall not be liable or obligated to Lessor by reason of any of the terms, provisions, covenants, or agreements herein* . . . provided, however, that nothing herein contained shall release Lessee from the payment of any rental that may then be due'") (emphasis added by Halliburton); *id.*, Ex. T at 3 ("providing that upon termination 'Lessee shall not be liable or obligated to Lessor by reason of any of the terms, provisions, covenants, agreements herein; . . . provided . . . that *nothing herein shall deprive Lessor of any right of action it may have hereunder against the Lessee*'") (emphasis added by Halliburton))).[33] Halliburton argues that the leases do not establish that NL is obligated to indemnify Georgia-Pacific for response costs or that the parties intended to allocate responsibility for such costs to NL. (Docket Entry No. 218 at 11). In the alternative, Halliburton argues that the parties' conflicting contract interpretations presents a genuine issue of material fact that precludes summary judgment. (*Id.*).

Georgia-Pacific argues that there is no need to analyze the legal applicability and enforceability of the indemnity clauses. Instead, Georgia-Pacific relies on the clauses to show the

---

[33]   Halliburton suggests comparing the language in Exhibits L and O with the language in Exhibit T, presumably conceding that the language in Exhibit T allows for indemnification obligations to extend beyond the term of the lease. Presumably Halliburton suggests comparing Exhibit T with Exhibits L and O to argue that the language in Exhibits L and O is more limited than the language in Exhibit T, and therefore extinguished indemnity obligations upon termination of those leases.

parties' intent to allocate liability, as part of the equitable allocation analysis.  Georgia-Pacific cites

*Beazer East* and *Kerr-McGee* to support its argument that the enforceability of the indemnity

provisions is irrelevant.  In *Kerr-McGee*, the court noted:

> Since the district court did not believe the indemnification agreement
> applied to the cleanup costs at issue, the court ignored the agreement
> when allocating responsibility for cleanup costs.  This was an error.
> Although contractual arrangements between parties are not
> necessarily determinative of statutory liability, Lefton's intent to
> indemnify Kerr-McGee should be considered in the allocation of
> cleanup costs.

14 F.3d at 326.  The *Kerr-McGee* court "ultimately concluded that the indemnification provision *did*

cover CERCLA liability, so no equitable allocation proceeding was required."  *Beazer East*, 412

F.3d at 447 n.20 (citing *Kerr-McGee*, 14 F.3d at 327–28).  The *Beazer East* court emphasized that

equitable allocation based on intent to indemnify is separate from the legal determination as to

enforceability of an indemnity provision:

> *Beazer I* dealt with the *legal* interpretation of Paragraph 4(c).  As a
> matter of *equity*, however, the intent of the parties, which is
> manifested by their actions and in the written agreement, can be taken
> into account—no matter what our *legal* conclusion was in *Beazer I*.
> *Beazer I* does not tip the *equitable* scales one way or the other.  In
> *Beazer I*, we determined that the 1974 agreement was governed by
> Alabama law, 34 F.3d [206,] 211–15 [(3d Cir. 1994)], and that
> indemnification agreements are enforceable under Alabama law only
> if they contain "a plain and unambiguous expression of intent to
> cover the cost of liability in question."  *Id.* at 216.  Applying this
> standard, we concluded that "nothing in this agreement demonstrates
> a clear and unambiguous intent to transfer all CERCLA liability to
> [KCI]."  *Id.* at 219.  The Magistrate Judge correctly reasoned that
> *Beazer I* reached no conclusion regarding the parties' actual intent;
> only that, as a matter of Alabama law, the contract did not contain a
> sufficiently clear expression that KCI would indemnify MEAD
> against all environmental liability associated with the site.  *See id.*
> Thus, the Magistrate Judge concluded that "there is no inherent
> inconsistency in the ruling made on appeal and a decision by this
> court that, as a matter of equity, the parties' intentions concerning

56

> indemnity, to the extent they can be divined from both the document
> and any other evidence offered by the parties, should be considered
> in equitable allocation."

*Id.* at 447 (footnote omitted).

Georgia-Pacific asserts that although it "believes that it would be entitled to summary judgment on the basis of the indemnity clause, it has not (yet) moved for that relief."[34]  (Docket Entry No. 222 at 10).  Instead Georgia-Pacific argues that the parties' intent to allocate liability is important in the equitable allocation analysis.  (*Id.*).

### ii.     Analysis

The analysis of the lease indemnity provisions is limited to determining whether the parties intended NL to indemnify Georgia-Pacific for environmental claims and, if so, how that affects the equitable allocation of response costs.[35]  The indemnity provision associated with the principal

---

[34]   Section 107(e)(1) of CERCLA addresses contractual allocation of CERCLA responsibility separately from any effect that contractual indemnity may have on equitable allocation under section 113(f)(1).  Section 107(e)(1) provides:

> No indemnification, hold harmless, or similar agreement or conveyance
> shall be effective to transfer from the owner or operator of any vessel or
> facility or from any person who may be liable for a release or threat of
> release under this section, to any other person the liability imposed under
> this section. Nothing in this subsection shall bar any agreement to insure,
> hold harmless, or indemnify a party to such agreement for any liability
> under this section.

42 U.S.C. § 9607(e)(1).

[35]   Halliburton's argument that termination clauses in the lease agreements make the indemnity clauses unenforceable does not need to be resolved as part of the equitable allocation analysis.  Without regard to enforceability, the termination provisions could potentially show the parties' intent to terminate indemnity obligations.  However, the termination provisions do not affect the equitable analysis here because they do not show an intent to terminate the indemnity obligations with respect to actions or events occurring during the time the leases were in effect.  Halliburton relies on *Twitchell v. Town of Pittsford*, 483 N.Y.S.2d 524, 106 A.D.2d 903 (App. Div. 4th Dep't 1984), *aff'd*, 489 N.E.2d 250 (N.Y. 1985), noting that the court found that "'[w]hen a contract is terminated, such as by expiration of its own terms, the rights and obligations thereunder cease,'" and held that there is no duty to indemnify after the expiration of a contract. (Docket

57

Mining Lease covers "any claims . . . arising out of or resulting from any injury, loss or damage to persons or property in, on or about the demised premises."[36]  (Docket Entry No. 189, Ex. 18 at 3).[37]

  The indemnity provisions in the Mining Lease, the Waste Disposal Leases, the Tailings Pond Lease, and the Settling Pond Lease were agreed to before CERCLA's enactment.  But some courts have found that an indemnity provision predating CERCLA can apply to CERCLA liability.  *See, e.g.*, *SmithKline Beecham Corp. v. Rohm & Haas Co.*, 89 F.3d 154, 159 (3d Cir. 1996) ("[A]n agreement can require one party to indemnify another against CERCLA response costs even if it was executed before the enactment of CERCLA.") (citation omitted); *Kerr-McGee*, 14 F.3d at 327 ("That

_____

Entry No. 218 at 11 (quoting *Twitchell*, 106 A.D.2d at 904)).  *Twitchell* simply held that after a contract containing an indemnity provision covering premises liability expired, there was no obligation to indemnify for a claim involving an incident that occurred after the contract expired, despite the fact that the parties continued to deal with each other informally.  *Twitchell*, 483 N.Y.S.2d at 525.  *Twitchell*'s holding does not support the proposition that a party would escape indemnity obligations with respect to events occurring while the contract was still in effect.

[36] The 1972 amendment to the Mining Lease also contains the following provision:

> Lessee agrees, as evidenced by its acceptance hereof, that it shall be responsible for and shall obtain and pay for any necessary licenses, permits, or other papers required by any governmental authority, whether state, federal or local.  Lessee further agrees to indemnify, protect, defend, hold and save harmless the Lessor against payment for or liability for any such licenses, permits, or other papers, or any fines or penalties levied by reason of the failure of the Lessee to comply with applicable ordinances, laws or regulations.

(Docket Entry No. 189, Ex. 18 at 3).  Georgia-Pacific has not raised this particular indemnity provision as a basis for granting summary judgment.

[37] The indemnity provisions in the 1946 Waste Disposal Lease, the 1947 Waste Disposal Lease, and the Tailings Pond Lease cover "any claims for damage either to person or property that may be asserted by third parties on account of Lessee's occupancy or operations on said Lands."  (Docket Entry No. 189, Ex. 19 at 2; *id.*, Ex. 21 at 1; *id.*, Ex. 23 at 3).  The indemnity provision in the Settling Pond Lease covers "any claims, loss, liability, attorney's fees, costs or any other expense for any injury, loss or damage to persons or property arising out of or resulting from Lessee's operations hereunder or use of the leased premises."  (*Id.*, Ex. 24 at 3).  As discussed earlier, Halliburton has also submitted several additional agreements relating to using land at the Site.  Several of these additional agreements also contain indemnity language.  (*See* Docket Entry No. 218, Ex. H at 3; *id.*, Ex. I at 3; *id.*, Ex. J at 4; *id.*, Ex. K at 2).

the indemnity provision was agreed to prior to CERCLA's enactment should not, however, have affected the district court's reading of the agreement."); *Olin Corp. v. Consol. Aluminum Corp.*, 5 F.3d 10, 15–16 (2d Cir. 1993) ("Notwithstanding the fact that CERCLA did not exist at the time these contracts were executed, we hold that as to the Hannibal site, these contractual provisions are sufficiently broad to encompass CERCLA liability."); *but see Chrysler Corp. v. Ford Motor Co.*, 972 F. Supp. 1097, 1108–10 (E.D. Mich. 1997) (concluding, in the context of a pre-CERCLA merger in which the surviving company contractually assumed existing (but not future-arising) liabilities, whether absolute or contingent, that CERCLA liability was not included, and disagreeing with and distinguishing cases that "have held that a broad pre-CERCLA assumption of contingent liabilities can include CERCLA").[38]  The case law describes the factors a court is to consider in

---

[38]  The *Chrysler* court noted that the cases finding broad pre-CERCLA assumption of contingent liabilities, including *Beazer East, Inc. v. Mead Corp.*, 34 F.3d 206, 211 (3d Cir. 1994); *SmithKline Beecham*, 89 F.3d 154; *Kerr-McGee*, 14 F.3d 321; and *U.S. v. Hardy*, 916 F. Supp. 1385 (W.D. Ky. 1996), "for the most part concern indemnification agreements, rather than direct assumption of liability."  *Chrysler*, 972 F. Supp. at 1109 n.9.  The *Chrysler* court distinguished these cases, noting that "[a]lthough CERCLA was not yet in force at the time of the contracts in [those] cases, all of these agreements were made in an era when Congress had undertaken far-reaching environmental legislation, and any corporation would be cognizant of environmental costs."  *Id.* at 1109 (footnote omitted).  The court explained that "[g]iven the awareness of pollution costs in the 1970s, a broad acceptance of all contingent liabilities at that time likely included environmental cleanup, and thus might be said to include CERCLA liability even before that legislation had been enacted."  *Id.*  The court also explained that in these other cases, there was an awareness of environmental costs, noting that "[i]n *Beazer*, the buyer agreed to assume obligations for ongoing compliance with environmental regulations"; "[i]n *SmithKline*, the seller had undertaken some remediation and pollution was discussed at the time of sale"; "[t]he provision in *Kerr-McGee Chemical* promised to assume losses resulting from 'the maintenance of any . . . claim . . . concerning pollution or nuisance . . .'"; and "[t]he contract in *Hardy* assumed costs 'resulting directly or indirectly from the collection, transportation, and disposal [of hazardous materials].'"  *Id.* at 1109–10 (citations omitted).  The court found it "strange, indeed, that the courts in these cases so broadly interpreted the concept of existing contingent liability, rather than relying upon the facts presented to them to link the contractual language to the awareness and expectations of the parties as to those liabilities."  *Id.* at 1110.  The *Chrysler* court found it important in the case before it that the asset purchase "took place decades before federal environmental enforcement became a reality," and that "[n]either the language nor the implied intentions of the parties indicate[d] any reference to environmental costs whatsoever."  *Id.*  The court concluded:

> [E]ven under *Beazer's* formulation that a pre-CERCLA contract can include CERCLA liability, if it is "either specific enough to include CERCLA liability or general enough to

determining whether an indemnity provision includes CERCLA liability.  In *Blackstone Valley Electric Co. v. Stone & Webster, Inc.*, 867 F. Supp. 73 (D. Mass. 1994), the court found the following factors relevant under Massachusetts law:

> whether any language dealt with CERCLA-type liabilities, whether the scope of the contractual language permitted an inference regarding assumption of future-arising liabilities, whether the agreement predated or post-dated CERCLA's enactment, whether clean up issues were addressed in the parties' negotiations, whether the parties knew of the presence of hazardous wastes on the site, and whether any separate consideration was paid for the release of liability.

*Id.* at 78 (quoting *John Boyd Co. v. Boston Gas Co.*, Civ. A. No. 89-675-T, 1992 WL 212231, at *3 (D. Mass. Aug. 18, 1992) (internal quotation marks omitted), *aff'd*, 992 F.2d 401 (1st Cir. 1993)); *accord United States v. Hardy*, 916 F. Supp. 1385, 1389 (W.D. Ky. 1996) (quoting *Blackstone*, 867 F. Supp. at 78).  Another court has explained that  "[a] pre-CERCLA indemnification provision covers response costs if it is either 'specific enough to include CERCLA liability or general enough to include any and all environmental liability . . . .'"  *SmithKline Beecham*, 89 F.3d at 159 (quoting *Beazer East, Inc. v. Mead Corp.*, 34 F.3d 206, 211 (3d Cir. 1994)).  "The key is whether there is language limiting the indemnity and whether the language shows an intent to allocate all possible liabilities among the parties.  If there is limiting language, the clause does not cover CERCLA."  *Am. Nat'l Bank & Trust Co. of Chicago as Trustee for Ill. Land Trust No. 120658-01 v. Harcros Chems.,*

---

include any and all environmental liability," 89 F.3d at 211, there would be no CERCLA liability in the instant case.  An assumption of all existing contingent liabilities might be considered "general enough to include . . . environmental liability" in an era when such liability is a generally understood contingency.  In 1956, this simply was not the case.

*Chrysler*, 972 F. Supp. at 1110. The court also noted that "[o]f course, a party may contractually accept all future-arising liabilities, and thus accept liabilities not existing in either contingent or absolute form at the time of the contract," but concluded that "[i]n the present case . . . , there was no such language." *Id.*

*Inc.*, No. 95 C 3750, 1997 WL 281295, at *16 (N.D. Ill. May 20, 1997) (citing *Elf Atochem N. Am.*

*v. United States*, 866 F. Supp. 868, 870–71 (E.D. Pa. 1994)).

The indemnity provision in the Mining Lease does not specifically include CERCLA

liability.  But the breadth of the indemnity provision is important.  The question is whether the

parties intended to encompass future environmental liability arising from NL's activities on the

leased property.[39]  Although the issue is not whether the indemnity provisions apply to this case or

are enforceable, but what the parties intended as to allocation, it is helpful to look at cases examining

whether indemnity provisions covered CERCLA liability, even if those cases were focused on the

legal issue of whether an indemnity provision covered a CERCLA claim rather than equitable

allocation under section 113(f).  On the present record, the indemnity provision in the Mining Lease

does not appear to be as broad as some other indemnity clauses—many of which were agreed to

before CERCLA's enactment—that have been held to encompass CERCLA claims in contexts other

than equitable allocation.[40]

---

[39]  Contractual intent is ordinarily determined under state law.  *See Olin*, 5 F.3d at 15 ("While it is clear that federal law governs the validity of releases of federal causes of action, we concluded [in *Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 51 (2d Cir. 1993)] without discussion that we would look to state law to provide the content of federal law.") (internal citations omitted); *Harcros Chems.*, 1997 WL 281295, at *15 ("In order to determine whether CERCLA can be read into the lease, the scope of the indemnification agreement must be examined in light of applicable state law governing indemnification agreements.") (citations omitted); *A-C Reorganization Trust v. E.I. DuPont de Nemours & Co.*, No. 94-C-574, 1997 WL 381962, at *4 (E.D. Wis. Mar. 10, 1997) ("A claim that an indemnification agreement does not cover CERCLA liability is an issue of state law.") (citation omitted).  Because the applicability or enforceability of the indemnity agreements is not at issue, a choice-of-law analysis is not required.

[40]  *See, e.g.*, *Fina, Inc. v. ARCO*, 200 F.3d 266, 270 (5th Cir. 2000) (indemnity agreement covering "'all claims, actions, demands, losses or liabilities arising from the use or operation of the Assets . . . and accruing from and after Closing'" covered CERCLA liability under Delaware law); *SmithKline Beecham*, 89 F.3d at 159–60 (concluding under New Jersey law that cross-indemnity provisions "divid[ing] 'all' of the 'liabilities' concerning the 'operation of the Business'" between two parties was the "sort of broad language in pre-CERCLA contracts [that] has been construed by courts to encompass CERCLA liability," and finding that the "indemnity provisions clearly expresse[d] the parties' intent to allocate all present and future liabilities," and that "[e]nvironmental liabilities [we]re among the future unknown liabilities allocated by the parties");

In *Harcros Chemicals*, for example, the court considered whether two lease indemnity provisions covered CERCLA claims.  The first provision stated:

---

*Kerr-McGee*, 14 F.3d at 327 (indemnity provision assuming liability for "losses resulting from 'the maintenance of any . . . claim . . . concerning pollution or nuisance . . .'" "cover[ed] all pollution and nuisance claims without limitation," including CERCLA claims, despite the fact that the agreement was entered into before CERCLA's enactment); *Olin Corp.*, 5 F.3d at 15–16 (agreement to indemnify for "'*all liabilities*, obligations and indebtedness of Olin related to [its aluminum business] . . . as they exist on the Closing Date or *arise thereafter*'"; agreement to indemnify for "'*all liabilities* (*absolute or contingent*), obligations and indebtedness of Olin related to [the aluminum business] . . . as they exist on the Effective Time or *arise thereafter with respect to actions or failures to act occurring prior to the Effective Time*'"; and release of "'*all claims of any nature which Conalco now has or hereafter could have against Olin* . . . whether or not previously asserted'" were "sufficiently broad to cover CERCLA liability . . . ," "[n]otwithstanding the fact that CERCLA did not exist at the time these contracts were executed . . .") (emphasis added by *Olin Corp.* court); *Smithson v. Wolfe*, No. C94-1015 MJM, 1999 WL 33656866, at *1, 3–4 (N.D. Iowa July 19, 1999) (concluding that tenant's agreement to indemnify landlord for "'any expenses incurred by landlord for costs, expenses, attorney's fees, or any judgment rendered against landlord arising out of or occasioned by tenant's occupancy or possession of the premises or the use of the premises by the tenant, other than through the negligence of landlord'" encompassed CERCLA liability under Iowa law, and noting that there was "no restrictive language which limit[ed] the indemnification agreement to certain types of liabilities"); *A-C Reorganization*, 1997 WL 381962, at *5–6 (indemnification agreement for "'all debts, obligations, contracts and liabilities . . . arising out of or relating to the [acquired] business and assets . . . and of any kind, character or description, whether accrued, absolute, contingent or otherwise" covered CERCLA liability that would later accrue for a predecessor's previous acts, under New York law); *Hardy*, 916 F. Supp. at 1388 n.2, 1389–91 (indemnity agreement covering "'any and all loss, damage, injury, liability, and any claim or claims therefor, including claims for injury or death to any and all persons or property . . . , howsoever caused, resulting directly or indirectly by the collection, transportation, and disposal by the undersigned, its employees, agents, or independent contractors, of certain flammable or otherwise hazardous waste chemicals or material from Dow Corning's premises and plant . . . ,'" coupled with evidence that the parties discussed possible damage to animals and property near the site and that both parties knew that some of Dow Corning's materials were hazardous and flammable, covered CERCLA liability); *Dent v. Beazer Materials & Servs., Inc.*, 993 F. Supp. 923, 933, 939–41 (D.S.C. 1995) (provision in lease agreement that lessee would save lessor harmless from "any and all claims arising from [lessor's] use of the leased property" covered CERCLA claims under South Carolina law), *aff'd*, 156 F.3d 523 (4th Cir. 1998); *Helix v. S. Pac. Transp. Corp.*, No. C-92-2312 DLJ, 1995 WL 381976, at *3, *5–6 (N.D. Cal. June 20, 1995) (agreement releasing party from "'any and all actions, causes of action, claims, demands, debt, sums of money, accounts, compensation, contracts, controversies, promises, damages, costs, losses and expenses, . . . , known or unknown, arising from any cause whatsoever,'" together with stated acknowledgment that parties knowingly agreed despite the possibility that unknown facts might give rise to liability, was broad enough to cover environmental claims, including CERCLA claims) (emphasis omitted); *cf. Georgia Ports Auth. v. Diamond Mfg. Co.* (*In re Diamond Mfg. Co.*), 164 B.R. 189, 204–05 (Bankr. S.D. Ga. 1994) (the lessee's agreement to cover all costs arising out of the lessee's failure to comply with all present and future laws, coupled with an agreement to indemnify and hold harmless "'from loss, damage or injury *from any act or omission* of the lessee . . . to the person or property of the parties hereto . . . ,'" covered environmental claims under Georgia law) (emphasis added by *Diamond Mfg. Co.* court).

> Lessee shall and does hereby indemnify and agree to save and hold harmless lessor against and from any and all loss, liability, claims, damages, costs and expenses of suit, interest, fines and penalties which Lessor may suffer or incur arising out of Lessee's failure to comply with [all present and future] laws, rules, orders, ordinances, regulations or zoning regulations . . . .

*Harcros Chems.*, 1997 WL 281295, at *16 (quotation marks omitted).  The court held that "[t]his provision contains no limiting language, but contemplates *all* present and future laws," and found the provision "broad enough to cover CERCLA liability."  *Id.*  The court then examined a second indemnity provision containing some similarities to the provision in the Mining Lease in the present case.  The court concluded that this second provision was neither "broad [n]or specific enough to include indemnity for CERCLA liability."  *Id.*  Under this second indemnity provision, the lessee agreed to "indemnify lessor and lessor's beneficiaries, if lessor is an Illinois Land Trust," as follows:

> from and against all liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses . . . imposed upon or incurred by or asserted against Lessor by reason of (a) *any accident, injury to or death of persons or loss of or damage to property occurring on or about the demised premises or any part thereof* or the adjoining properties, sidewalks, curbs, streets or ways; (b) any failure on the part of Lessee to perform or comply with any of the terms of this Lease; or (c) performance of any labor or services or the furnishings of any material or other property in respect of the demised premises or any part thereof.

*Id.* (emphasis added) (quotation marks omitted).  The court concluded that "[t]his provision specifically limits the types of situations in which indemnity may be found and thus is not broad enough to cover CERCLA liability."  *Id.* (citations omitted); *see also Blackstone Valley Elec.*, 867 F. Supp. at 78 (holding that an indemnification agreement that predated CERCLA's enactment and did not mention "'CERCLA-type'" liabilities, coupled with a lack of evidence that the parties considered cleanup issues, as well as affidavits by both parties suggesting that the agreements were

signed without contemplating possible environmental liabilities, did not cover CERCLA liability).

The *Harcros Chemicals* court concluded that this second indemnity provision also was "not specific

enough to include CERCLA liability because the three situations which are listed make no reference

to environmental or related liability."[41]   *Harcros Chems.*, 1997 WL 281295, at *17 (citation

omitted); *see also BP Amoco Chem. Co. v. Sun Oil Co.*, 166 F. Supp. 2d 984, 995–96 (D. Del. 2001)

(warranty clauses agreed to before CERCLA's enactment, which did not refer to environmental

liability or state that the warrantor would assume future liabilities that might arise out of the

transaction, did not cover CERCLA liability), *reconsideration granted in part on other grounds*, 200

---

[41]   The court made the determination that this indemnity provision was neither broad nor specific enough to cover CERCLA liability in the context of considering the plaintiffs' request for summary judgment on the defendants' contribution counterclaim, based on indemnity provisions in a lease. *See Harcros Chems.*, 1997 WL 281295, at *15.  It appears that the court had bifurcated the liability and damages phases of the CERCLA claims, and was only considering liability for purposes of its memorandum and order. *See id.* at *6.  The court separately considered the plaintiffs' request for summary judgment on their claims that the defendants owed them indemnity for the costs the plaintiffs incurred in responding to the contamination at the site. *See id.* at *18.  In that context, the court rejected the defendants' argument that soil contamination did not constitute property damage, concluding that "contamination of soil by hazardous substances is a physical injury and thus constitutes property damage." *Id.* at *19 (citations omitted).  Because Georgia-Pacific has moved for summary judgment based on equitable allocation under CERCLA and not based on contractual indemnity, the portion of the *Harcros Chemicals* opinion focusing on the CERCLA claims, rather than the portion discussing the contractual indemnity claim, appears more relevant for purposes of Georgia-Pacific's present motion.

An indemnity provision covering claims for property damage might cover CERCLA liability in some contexts. *See, e.g.*, *Hartford Fire Ins. Co. v. Guide Corp.*, No. IP 01-572-C-Y/F, 2005 WL 5899840, at *2, *8 (S.D. Ind. Feb. 14, 2005) (unpublished) (holding that an insurance policy covering "sums in excess of the Retained Limit that the Insured becomes legally obligated to pay by reason of liability imposed by law or assumed by the Insured under an Insured Contract because of Bodily Injury, Property Damage, Personal Injury or Advertising Injury that takes place during the Policy Period and is caused by an Occurrence happening anywhere in the world," and defining "Property Damage" to include, in part, "[p]hysical injury to tangible property," covered a civil penalty imposed in a consent decree resolving environmental claims, including CERCLA claims, because the court found "persuasive those decisions that have found that contamination or pollution of property constitutes 'physical injury to tangible property'") (citations and emphasis omitted).  However, on the present record, there is not sufficient evidence to conclude that any intention of the parties to allocate CERCLA responsibility is sufficiently clear to warrant summary judgment allocating zero responsibility to Georgia-Pacific based on equitable considerations.

F. Supp. 2d 429 (D. Del. 2002).[42]

The case law does not support Georgia-Pacific's argument that the indemnity provision associated with the Mining Lease shows an intent that Geogia-Pacific be indemnified for future environmental liabilities, such that it would be inequitable to allocate any response costs to Georgia-Pacific. Unlike some of the very broad provisions that have been held to encompass CERCLA liability in contexts other than equitable allocation, on the present record it is not clear that the indemnity provision in the Mining Lease covers environmental clean-up. The provision states that indemnity applies to claims "arising out of or resulting from any injury, loss or damage to persons or property in, on or about the demised premises." The indemnity provision in the Mining Lease does not refer to environmental liability. Georgia-Pacific has not submitted evidence showing that the parties contemplated including future environmental liability in this indemnity provision.[43] Because Halliburton has asserted that mining conducted under this Mining Lease contributed to the Site contamination, the lack of evidence that the parties intended NL to indemnify Georgia-Pacific for claims such as the CERCLA claims here weighs against allocating zero responsibility to

---

[42]   *But cf. CMC Heartland Partners v. Gen. Motors Corp.*, No. 92 C 4449, 1994 WL 498357, at *9–11 (N.D. Ill. Aug. 30, 1994). In *CMC Heartland Partners*, the court analyzed an indemnification provision in which the lessee agreed to indemnify the lessor "'against all loss, damage or injury, caused by or resulting from any act or omission of the Lessee . . . , to the person or property of the parties . . . , and to the person or property of any other person or corporation, while on or about said demised premises . . . .'" *Id.* at *9. In considering whether this indemnification provision entitled the lessor to recover response costs and attorneys' fees from the lessee and precluded the lessee from any claim for contribution against the lessor, the court denied summary judgment because the lessor's own contribution to contamination would not be covered by the lessee's indemnity obligations, but did not question whether the indemnity language covered CERCLA claims. *See id.* at *10–11.

[43]   In addition, the indemnity provision associated with the Mining Lease was added as an amendment to the original lease in 1972, nearly 33 years after the original lease was executed. Even if the indemnity provision were broad enough to cover CERCLA liability, it is not clear that the parties intended to cover CERCLA liability for activities engaged in prior to the amendment.

Georgia-Pacific at this stage.[44]

The present record does not support finding the indemnity provisions to be a strong equitable factor for allocating zero responsibility to Georgia-Pacific. *See CMC Heartland Partners*, 1994 WL 498357, at *19 ("For the purpose of this motion [for summary judgment], [the nonmovant] only had to come forward with some evidence that, if believed, would permit the court to allocate some fraction of the costs of remediation to [the movant].").  The evidence that the mining activities were the main cause of the Site contamination and the lack of evidence that the parties intended the indemnity provision in the Mining Lease to cover environmental claims weigh against allocating zero response costs to Georgia-Pacific at this stage.

It is worth emphasizing that the only decision is that the parties' intent, as evidenced in the indemnity provisions, does not tip the balance of equities in favor of allocating zero response costs to Georgia-Pacific.  The legal questions of whether the indemnity agreements are enforceable, or whether those agreements on their own would relieve Georgia-Pacific of all response costs, are not addressed.

### e.      The Lessee's Duty to Clean Up the Leased Premises

### i.      The Parties' Contentions

Georgia-Pacific also argues that Arkansas law obligates a lessee to clean up pollution on leased premises after the lease terminates, relying on *Bonds v. Sanchez-O'Brien Oil & Gas Co.*, 715 S.W.2d 444 (Ark. 1986).  In response, Halliburton asserts that the "implied duty to restore the land

---

[44]    Because the indemnity provision associated with the principal Mining Lease does not weigh in favor of allocating zero responsibility to Georgia-Pacific, this court does not need to analyze the indemnity clauses in the other leases.  Even if those other indemnity provisions showed an intent to allocate responsibility under CERCLA, the equities would not favor allocating zero response costs to Georgia-Pacific at this stage because Georgia-Pacific might be allocated some share of response costs for activities conducted under the Mining Lease.

surface has not been extended by Arkansas courts to mining operations, and it cannot logically be applied where, as here, the express terms of the lease agreements contemplate the permanent alteration of the land surface through excavation and the disposal of mine wastes."  (Docket Entry No. 218 at 12 n.5).  Georgia-Pacific contends that Halliburton's argument "that Arkansas oil and gas law does not apply to a mining lease is sufficiently specious to require no detailed reply."  (Docket Entry No. 222 at 10 n.2).

ii.      Analysis

In *Bonds*, the court held that under an oil and gas lease, the lessee had to clean up abandoned sites.  The court reasoned that allowing the lessee to use the land without cleaning up "would constitute an unreasonable surface use, and no rule is more firmly established in oil and gas law than the rule that the lessee is limited to a use of the surface which is reasonable."  *Bonds*, 715 S.W.2d at 446.  "[T]he duty to restore the surface, as nearly as practicable, to the same condition as it was before drilling is implied in the lease agreement."  *Id.*

*Bonds* was based on the rule that in an oil and gas lease, the lessee is limited to a "reasonable" use of the surface land in conducting the drilling permitted under the lease.  *Bonds* may not provide a basis to find an implied duty to clean up surface land in the present case.  The leases at issue here were not solely for excavating underground natural resources.  The leases permitted such activities as:

> [p]rospecting, developing, mining, digging, taking and checking samples, excavating, extracting and otherwise producing and removing therefrom any and all mineral substances of whatsoever nature, together with the right of ingress and egress to and from said lands, and the right to build ore and refuse dumps, run water mains, tracks and pipe fuel, and to build suitable plants for proper milling and treating of ores, together with the right to free use of such water as may be found or developed on or under said lands for processing

67

> and treating such ores as may be found, (and the rights to impound such water)[45] and the free use of roads and rights of way for removing and transporting any of said ores or mineral substances and equipment incident to the mining, removal and transportation of same
> . . . .

(Docket Entry No. 189, Ex. 10 at 1).  The leases also permitted "disposal of refuse and waste from Lessee's mining operations . . . ," (*see id.*, Ex. 19 at 1; *id.*, Ex. 21 at 1); "disposal of mill tailings and waste from Lessee's mining and milling operations . . . ," (*id.*, Ex. 23 at 1); and "backing up waters and settling mine waters and waste from Lessee's mining operations . . . ," (*see id.*, Ex. 24 at 1).  Unlike the lessee in *Bonds*, the lessee in the present case had the right to use the leased premises, including the surface, for activities far beyond drilling for underground minerals.  The implied duty under Arkansas law to clean up the surface on termination of an oil and gas lease is not a strong equitable factor favoring allocating zero response costs to Georgia-Pacific.

### f.      Halliburton's Arguments in the Arbitration

Finally, Georgia-Pacific contends that this court should consider statements by Halliburton's experts in the arbitration that they would allocate no response costs to Georgia-Pacific.  Dr. Daniel Stephens testified in the arbitration that allocation should be based on the relative volume of spoils and tailings the party generated.  (Docket Entry No. 208 at 23; Docket Entry No. 189, Ex. 51 at 11–12).  In response to a question from the Tremont Parties' counsel about whether Georgia-Pacific would be allocated zero responsibility under this allocation theory, Stephens testified: "[A]ssuming Georgia-Pacific didn't have anything to do with the site involving vegetation or any other activity out there, they probably wouldn't be given an allocation share in a model such as I developed." (*Id.*, Ex. 55 at 1098).  The arbitration panel adopted the allocation approach advocated by Stephens.  (*Id.*,

---

[45]    The parenthetical text is handwritten into the lease.  (Docket Entry No. 189, Ex. 10 at 1).

Ex. 9 at 8 ("Based on the expert testimony, the Panel believes that Dr. Stephens['s] July 5, 2007 report reflects the proper basis for allocation.")).  Georgia-Pacific also points out that in the arbitration, Halliburton's counsel argued that allocation based on the volume of mining waste generated was appropriate.  (*See id.*, Ex. 54 at 1–2 ("Because it bears a close relationship to the degree of environmental harm caused by each party and provides a good measure of the costs attributable to each party's conduct, the relative volume or mass of wastes contributed by parties is the starting point for virtually every allocation of response costs under CERCLA and comparable state-law statutes.") (footnote omitted); *id.*, Ex. 56 at 3 ("[T]he relative volume or mass of wastes contributed by parties is the starting point for virtually every allocation of response costs under CERCLA and comparable state-law statutes.")).  Georgia-Pacific argues that it would be inequitable to use a different allocation approach in this litigation than that urged by Halliburton and adopted by the panel in the arbitration.  (Docket Entry No. 208 at 24).

Halliburton disputes that its experts' opinions in the arbitration are relevant to allocating the response costs in this litigation.  (Docket Entry No. 218 at 9–10).  Halliburton points out that its experts were only asked to allocate environmental harm and response costs between the parties to the arbitration.  (*Id.* at 10).  Halliburton also points out that those parties were the successors to the mine operators that generated the mine wastes.  (*Id.*).  Halliburton argues that the experts did not opine on allocating response costs to other entities who did not participate in the arbitration and who had a different involvement with the Site.  (*Id.*).  The arbitration panel did not allocate liability beyond the parties before it.  (*See id.*, Ex. AA at 32 (noting that no evidence was presented regarding the liability of nonparties and questioning the panel's authority to make any allocation as to nonparties)).

The arguments Halliburton's experts presented in the arbitration do not weigh strongly in favor of allocating zero response costs to Georgia-Pacific, which was not a party to that proceeding. The fact that Halliburton argued in the arbitration for allocation between it and the Tremont Parties based on the volume of mining waste generated does not make it inequitable to consider allocating some response costs to other entities that were not directly involved in generating mining wastes, such as Georgia-Pacific.

In sum, weighing the equities, this court concludes that fact issues remain as to the proper allocation of response costs to Georgia-Pacific under section 113(f)(1). While Georgia-Pacific's responsibility is likely to be small in comparison to that of the parties that directly polluted the Site, on the present record, Georgia-Pacific has not shown that it is entitled to judgment allocating it zero responsibility for response costs. Georgia-Pacific's motion for partial summary judgment that it has zero liability based on equitable considerations is denied.

### C.    Halliburton's Unjust Enrichment Claim

#### 1.    The Parties' Contentions

Georgia-Pacific also seeks summary judgment on Halliburton's unjust enrichment claim. Georgia-Pacific argues that responsibility for response costs are the subject of written leases between NL and Georgia-Pacific. (Docket Entry No. 208 at 24–25). In addition, because Georgia-Pacific no longer owns property at the Site, Georgia-Pacific asserts that it has received no benefit from Halliburton's payment of response costs. (*Id.*). In response, Halliburton contends that the leases do not support Georgia-Pacific's argument that they obligate NL to indemnify Georgia-Pacific for response costs. (Docket Entry No. 218 at 14). As a result, according to Halliburton, the leases are not "'valid, legal, and binding contract[s]' that would preclude an unjust enrichment

claim." (*Id.*).  Halliburton also argues that even though Georgia-Pacific no longer owns Site property and would not benefit from an increase in the property's value, Georgia-Pacific was unjustly enriched by avoiding paying response costs for which it shares some responsibility. (*Id.*).

2.    **Analysis**

Georgia-Pacific relies on *Varner v. Peterson Farms*, 371 F.3d 1011 (8th Cir. 2004), to support the argument that unjust enrichment does not apply if there is a valid and binding contract between the parties.  In *Varner*, the plaintiffs had borrowed money from a bank to upgrade real estate for use as a poultry-production facility.  371 F.3d at 1014.  After default, the bank filed foreclosure actions.  *Id.* at 1015.  The plaintiffs filed a federal lawsuit against the bank, a property appraiser, and another party they had contracted with to produce poultry.  *Id.* at 1014.  The claims included one for unjust enrichment, based on the assertion that the defendants had been unjustly enriched from the poultry production contracts and the loan contracts.  *Id.* at 1015.  The district court dismissed the unjust enrichment claim, explaining that "this equitable doctrine did not apply where valid, legal, and binding contracts existed."  *Id.*  The Eighth Circuit agreed, explaining that "[o]ne who is free from fault cannot be held to be unjustly enriched merely because one has chosen to exercise a legal or contractual right."  *Id.* at 1018 (citation omitted).  The court held that the plaintiffs' failure to plead that their contracts with the bank or the poultry producer were illegal defeated the unjust enrichment claim.  *Varner*, 371 F.3d at 1018.

*Varner* does not resolve the issue here.  In *Varner*, the bank and poultry-producer defendants had valid contracts with the plaintiffs.  The plaintiffs' unjust enrichment claim was based solely on the premise that these defendants were unjustly enriched by those contracts.  The plaintiff failed to state a claim for unjust enrichment because the defendants acted under binding legal contracts.  In

this case, by contrast, Halliburton does not claim that Georgia-Pacific was unjustly enriched as a result of actions taken under the leases between Georgia-Pacific and NL. Instead, Halliburton contends that Georgia-Pacific was unjustly enriched by Halliburton's payment of cleanup costs for which Georgia-Pacific has some responsibility. Under *Varner*, the fact that there may be a valid, legal, and binding lease from Georgia-Pacific to NL does not prevent Halliburton's unjust enrichment claim if the claim is not based on that lease. Halliburton does not claim that Georgia-Pacific was unjustly enriched by the lease or lease payments. In addition, Georgia-Pacific has not moved for summary judgment based on the indemnity clauses in the leases. Instead, Georgia-Pacific relies on the indemnity clauses to show the parties' intent as part of analyzing the equitable factors. Whether the indemnity clauses in fact cover the response costs at issue is not resolved. Those clauses do not preclude Halliburton's unjust enrichment claim.

Georgia-Pacific also contends that it has not received anything of value. Georgia-Pacific has conceded for the purpose of its summary judgment motion that it is a PRP under CERCLA's statutory liability scheme. This court has determined that Georgia-Pacific has not shown its entitlement to summary judgment of zero responsibility for the response costs based on equitable allocation. Because Georgia-Pacific may be responsible for some amount of response costs, it may have been unjustly enriched by Halliburton's payment of Georgia-Pacific's share. As a result, Georgia-Pacific is not entitled to judgment that it has not been unjustly enriched by Halliburton's payment of cleanup costs. *See Day v. Case Credit Corp.*, 427 F.3d 1148, 1154 (8th Cir. 2005) ("The party claiming unjust enrichment must prove another's receipt of 'something of value to which he is not entitled and which he should restore.'") (quoting *Smith v. Whitener*, 856 S.W.2d 328, 329 (Ark. Ct. App. 1993)). Georgia-Pacific's motion for summary judgment on Halliburton's unjust

enrichment claim is denied.[46]

### D.    Halliburton's Request for Additional Discovery

Because this court has determined that summary judgment of zero liability is not appropriate

on the present record, a continuance under Federal Rule of Civil Procedure 56(f) is not necessary.

## IV.    Milwhite's Motion for Partial Summary Judgment

---

[46]    Halliburton's unjust enrichment claim may involve other issues not raised by the parites, such as the possibility of preemption. *See Calabrese v. McHugh*, 170 F. Supp. 2d 243, 270 (D. Conn. 2001) (noting that some "courts have pointed to the carefully crafted settlement scheme of CERCLA, and have held that CERCLA preempts the state-law remedies of restitution and indemnification," because "[t]o hold otherwise would allow plaintiffs to bypass the statutory scheme of CERCLA simply by asserting their claims under the state common law") (citation omitted); *Continental Title Co. v. Peoples Gas Light & Coke Co.*, No. 96 C 3257, 1999 WL 753933, at *4–5 (N.D. Ill. Sept. 15, 1999) (granting summary judgment on a state law restitution claim, and noting that "[i]t is true that CERCLA, in the opinion of most courts facing the issue, does not expressly preempt state law or occupy the field of environmental contamination," but that "the statute prohibits compensatory recovery for the same response costs under both CERCLA and state or other federal laws," and finding that the restitution claim was duplicative of the CERCLA private cost recovery cause of action).  In addition, some courts have held that an unjust enrichment claim is precluded when a PRP is subject to a legal obligation to pay response costs.  *See, e.g.*, *Ford Motor Co. v. Edgewood Props., Inc.*, Nos. 06-1278, 06-4266, 2008 WL 4559770, at *11 (D.N.J. Oct. 16, 2008) ("'Courts addressing common law claims for restitution based on unjust enrichment in the context of CERCLA have consistently held that where the plaintiff has a legal duty to clean up waste on a contaminated site, recovery based on unjust enrichment is foreclosed.'") (quoting *In re Energy Co-op, Inc.*, No. 92-2392, 1995 WL 330876, at *8 (N.D. Ill. May 30, 1995)) (additional citations omitted); *Calabrese*, 170 F. Supp. 2d at 270 (same) (citations omitted); *Cooper Indus., Inc. v. Agway, Inc.*, 987 F. Supp. 92, 104 (N.D.N.Y. 1997) (noting that "[o]ther district courts have held that unjust enrichment claims should be dismissed in CERCLA cases, when, as here, plaintiffs have a duty, pursuant to an administrative order, to clean up the contaminated site," because "a defendant is not enriched simply because the EPA may order a plaintiff to remediate a site") (citations omitted); *Chem-Nuclear Sys., Inc. v. Arivec Chems., Inc.*, 978 F. Supp. 1105, 1110 (N.D. Ga. 1997) ("[T]he majority of courts that have addressed the issue have rejected claims for unjust enrichment in the context of CERCLA §§ 113 and 107 litigation.  Generally, these courts have concluded that when a PRP is under a legal duty to remediate a contaminated site, this remediation does not unjustly enrich other PRPs.") (citation omitted); *see also Canadyne-Georgia, Corp. v. Bank of Am.*, 174 F. Supp. 2d 1360, 1367 n.6 (M.D. Ga. 2001) ("The Court notes that Plaintiff had a legal duty to clean up the contaminated site and therefore cannot succeed in its unjust enrichment claim.") (citation omitted); *Lenox Inc. v. Reuben Smith Rubbish Removal*, 91 F. Supp. 2d 743, 753 (D.N.J. 2000) ("[E]ven if it were not preempted, plaintiffs' claim for unjust enrichment would be dismissed" because "plaintiffs had an independent duty, pursuant to the . . . Administrative Consent Order, to cleanup the Site.") (citations omitted).  The parties did not address these issues in their briefs, with the exception of one opaque reference, without citation to legal authority, in Georgia-Pacific's reply brief. (*See* Docket Entry No. 222 at 11 ("[A] claim *for* contribution to response costs is necessarily a claim *in* contribution, not unjust enrichment.")).  Because these issues have not been briefed by the parties, this opinion does not address or resolve them.

Milwhite has moved for summary judgment denying Halliburton's claim for past or future response costs and denying Georgia-Pacific's crossclaim for contribution. Milwhite asserts that there is no competent evidence that it participated in mining or mine-waste disposal at the Site. (Docket Entry No. 228 at 3–4). Milwhite also moves for summary judgment denying Halliburton's claim for unjust enrichment, raising the same arguments as Georgia-Pacific. (*Id.* at 4).

## A.     Factual Background Relevant to Milwhite's Motion

Milwhite has presented evidence of additional facts relevant to its motion. Milwhite submitted the agreements that it asserts are its only connections to the Site:

- **The Jernigan Lease.** On December 20, 1938, Albert and Eva Jernigan and W.S. and Mabel Richardson leased the east 1/2 of the southeast 1/4 of Section 10 to Roy G. Smith for the right to core drill, mine, and store barite and bauxite. (Docket Entry No. 228, Ex. B at 1). The lease was for a term of ten years "and as long thereafter as barite or bauxite shall be produced from said land in [illegible] quantities." (*Id.*, Ex. B at 1). Much of the copy of the lease submitted by Milwhite is illegible, but it appears that Smith agreed to pay the lessors royalties under the terms of the lease. (*See id.*, Ex. B at 2). The lease contained an indemnity provision, stating: "Lessee shall pay for all damages caused by all operations to growing crops on said lands and agrees not to use the said lands except for the purpose of prospecting and mining for barite or bauxite and receiving the same therefrom. Lessee shall not be liable for any damage to the land occasioned by its mining operations conducted in the usual and customary manner." (*Id.*, Ex. B at 4). Smith assigned this lease to Milwhite on or before March 31, 1939. (*Id.*, Ex. E at 1).[47] On May 6, 1941, the Jernigans, the Richardsons, and Smith agreed to an amendment to the lease that included a price to be paid by the lessee for concentrated barite. (*Id.*, Ex. F at 1). Smith assigned the amendment to Milwhite on that same day. (Docket Entry No. 228, Ex. G).[48]

---

[47]   At one point in its brief, Milwhite states that the Jernigan Lease was assigned to Milwhite on March 31, 1939 and cites Exhibit E of its motion, (Docket Entry No. 229 at 5), but at another point, Milwhite states that the Jernigan Lease was assigned to Milwhite on February 2, 1939, citing to Exhibit D of its motion, (*id.* at 6). Exhibit D is a separate mining lease, and not an assignment of the Jernigan Lease. Exhibit E appears to assign the Jernigan Lease to Milwhite. Exhibit E contains two documents purporting to assign the Jernigan Lease to Milwhite. The first document is dated March 31, 1939; the second document is dated December 20, 1938, the same date the Jernigan Lease was executed.

[48]   On page five of its brief, Milwhite cites Exhibit G for the proposition that the lease amendment was assigned to Milwhite, but on page six Milwhite cites Exhibit F for the same proposition. Exhibit F is the

- **The Collie Lease.**  On February 2, 1939, W.R. Collie, Jr. and his wife leased the southwest 1/4 of the southwest 1/4 of Section 11 to Smith for the purposes of prospecting and mining for barite or other minerals, exclusive of oil and gas.  (*Id.*, Ex. D at 1).  The lease had a term of 10 years, "and so long thereafter as such mineral substances including Barite may be found therein in paying quantities, provided the lessee or their successors are continuing to mine and market such minerals as may be found in and to" the leased tract of land.  (*Id.*, Ex. D at 1).  Smith assigned this lease to Milwhite on February 13, 1939.  (*Id.*, Ex. C).[49]

- **The Milwhite/NL Contract.**  On August 2, 1943, Milwhite agreed to assign to NL all rights and interests under certain mining leases, assignments, and options by special warranty.[50]  (*Id.*, Ex. H).  Included in the assigned agreements are, among others, the Jernigan Lease, and its assignments and amendment, and the Collie Lease and its assignment.  (*Id.*, Ex. H at 1–3).  The Milwhite/NL Contract also states that Milwhite agrees to grant to NL the surface rights that Milwhite acquired from Malvern Lumber in the southeast 1/4 of the southeast 1/4 of Section 10.  (Docket Entry No. 228, Ex. H at 3).  Under the contract, Milwhite was to obtain a yearly royalty per ton of barite mined, to be paid monthly, amounting to "6.45% of the actual net selling price on ground barytes, f.o.b. Butterfield, Arkansas."  (*Id.*, Ex. H at 5).  The contract was to "continue in force so long as it is possible commercially to produce ground barytes at the rate of at least 2500 tons per month from any or all of the premises covered by the instruments described in paragraph I hereof unless [NL] shall cease to produce barytes within the State of Arkansas."  (*Id.*, Ex. H at 7).  This contract was modified on July 30, 1959,[51] with the modification noting that the reserve of crude baryte ore on the leased premises was almost depleted, modifying the minimum royalty and tonnage provisions for the following fifteen months, and terminating the contract on December 31, 1960.  (*Id.*, Ex. L at 1–2).

---

amendment to the lease.  Exhibit G is the assignment of the amendment to Milwhite.

[49]   At one point in its brief, Milwhite states that this lease was assigned to it on February 13, 1939 and cites Exhibit D of its motion, (Docket Entry No. 229 at 5), but at another point Milwhite also cites Exhibit D to support its statement that an assignment of a mining lease occurred on February 2, 1939, (*id.* at 6).  Exhibit D appears to be the February 2, 1939 Collie Lease.  Exhibit C appears to be the assignment of that lease, dated February 13, 1939.

[50]   The copy of this contract submitted by Milwhite is not signed by either party.  The parties have not asserted that the contract is unenforceable on this basis.

[51]   This modification mentions an earlier modification of the original contract on July 29, 1950, but the 1950 modification has not been submitted by Milwhite.  According to the 1959 amendment, in the 1950 amendment, NL agreed "to pay royalty on barytes recovered from tailing ponds if and when such tailings are processed and marketable barytes recovered therefrom."  (Docket Entry No. 228, Ex. L at 2).

- **The 1940 Warranty Deed.**  On July 22, 1940,[52] Malvern Lumber conveyed by warranty deed 40 acres in the southeast 1/4 of the [south]east[53] 1/4 of Section 10 to Milwhite.  (Docket Entry No. 228, Ex. J).

- **The 1943 Deed.**  On November 9, 1943, Milwhite transferred 40 acres to NL in the southeast 1/4 of the southeast 1/4 of Section 10.  (*Id.*, Ex. I).

Milwhite has also pointed to a "flow sheet of barite," dated January 1943,[54] arguing that the sheet indicates only 10- and 37- foot mining depths.[55]  (Docket Entry No. 229 at 6).  Milwhite contends that there is no competent evidence that it conducted mining or mine waste disposal at the Site.  (*Id.* at 7).  Milwhite also states that by July 30, 1959, it was not receiving royalties from the leases.[56]  (*Id.*).

Like Georgia-Pacific, Milwhite argues that the only activities at the Site that matter are

---

[52]   Milwhite states in its brief that this warranty deed was dated January 1, 1944, (Docket Entry No. 229 at 6), but the agreement submitted is dated July 22, 1940.  Presumably, the statement in Milwhite's brief is a typographical error, as the warranty deed also states that the notary public's commission expires on January 1, 1944.  (Docket Entry No. 228, Ex. J).

[53]   The first part of this word is illegible on the document submitted by Milwhite, but is presumably "south," based on the legible conveyance of the same property from Milwhite to NL.  (*See* Docket Entry No. 228, Ex. I).

[54]   Milwhite states in its brief that this document is dated 1945.  (Docket Entry No. 229 at 6).  While the cover letter is dated February 3, 1945, the attached chart appears to be dated January 1943.  (Docket Entry No. 228, Ex. K).

[55]   The chart Milwhite has submitted in support of this proposition appears to show barite and other materials at other depths as well.  (*See* Docket Entry No. 228, Ex. K at 2).

[56]   The amendment to the Milwhite/NL Contract, signed July 30, 1959, does not state that Milwhite was not receiving any further royalties from the leases.  Instead, it suspended the minimum royalty and tonnage payments provided for in the original contract, and stated that during the following fifteen months, NL would pay the per ton royalty "on only that tonnage of ground barytes, if any, actually shipped in said month with no monthly or annual minimums applicable."  (Docket Entry No. 228, Ex. L at 2).  The amendment provided that the original contract would terminate December 31, 1960.  (*Id.*, Ex. L at 2).  As a result, the amendment to the original contract is not evidence that Milwhite stopped receiving royalties by July 30, 1959.

mining and mine-waste disposal activities, pointing to the ADEQ Settlement.[57]  Milwhite points to

the Site Investigation Report prepared for Halliburton and the Tremont Parties and approved by the

ADEQ, which describes the historical mining and milling activities engaged in by NL and Magcobar

from the 1930s to the 1970s.[58]  Milwhite also emphasizes the statements by Halliburton's experts

in the arbitration that they believed mining to be the primary cause of the contamination.[59]  Milwhite

argues that there is no genuine issue of material fact as to the contamination's source.

Halliburton does not contest Milwhite's description of the Site characteristics and regulatory

response actions.  (Docket Entry No. 233 at 3–4).  Halliburton does dispute Milwhite's version of

its involvement at the Site.  Milwhite asserted in its brief that Halliburton admitted that Milwhite

"'did not physically conduct or direct the excavation and removal of overburden or barite ore at the

Site'"; "'did not physically conduct or direct the milling of overburden at the Site'"; and "'did not

physically conduct the transport of mine and mill wastes disposed of on Milwhite's property on the

Site.'"  (Docket Entry No. 229 at 10–11).  Milwhite states in its brief that it is quoting from

Halliburton's response to a request for admission from Milwhite.  (*Id.* at 11).  In fact, Halliburton

specifically stated that "upon information and belief, this request is *denied*."  (Docket Entry No. 228,

Ex. N at 6 (emphasis added)).  Halliburton explained why it denied the request for admission, as

follows:

> Plaintiffs are informed and believe that Milwhite engaged in mining
> activities at the Site.  Evidence supporting this belief includes the
> following: (i) Milwhite was formed "to transact a manufacturing,

[57]   Docket Entry No. 229 at 8 (citing Docket Entry No. 189, Ex. 1).

[58]   *Id.* at 9–10 (citing Docket Entry No. 189, Ex. 3 at 2–3, 2–4, 2–5, 4–7, and 4–42).

[59]   *Id.* at 15.

mining and refining business" (Bates Nos. 105688–105692, copy enclosed); (ii) Milwhite acquired mining leases for portions of the Site beginning in 1938 (Bates Nos. 003046-003054); (iii) Milwhite acquired property at the Site beginning in 1940 (Bates Nos. 105693–105694, copy enclosed); (iv) Milwhite held a mining permit in Arkansas (*See* Bates No. 003033); (v) Milwhite conducted drilling activities on portions of the Site (Bates No. 024610); (vii) photographic evidence shows additional mining activities on properties owned or leased by Milwhite; and (viii) Milwhite announced plans to open a barite processing facility near the Site (Bates No. 008274).

(Docket Entry No. 233, McCall Decl., Ex. 1 at 7).[60]

Milwhite also discusses NL's response to the environmental issues at the Site, citing exhibits submitted by Georgia-Pacific in support of its motion for partial summary judgment. The facts relevant to NL's environmental response have already been discussed in connection with Georgia-

---

[60]     In connection with Halliburton's response to Milwhite's motion for partial summary judgment, Halliburton has submitted three separate declarations, with exhibits attached to each. Because the exhibits are voluminous, they span several docket entries. For ease of reference, the exhibits attached to the declaration of Duke K. McCall, III are cited by the docket entry of the brief (Docket Entry No. 233), McCall Decl., and the exhibit number. To support its denial of Milwhite's request for admission, Halliburton cites: Docket Entry No. 233, McCall Decl., Ex. 1 at 7 (Halliburton's response to Milwhite's interrogatory regarding denial of a request for admission); *id.*, McCall Decl., Ex. 2 at 1 (Charter for The Milwhite Co., Inc.); *id.*, McCall Decl., Exs. 3–7 (Jernigan Lease; assignment of Jernigan Lease; Collie Lease; assignment of Collie Lease; lease dated November 7, 1939 from Helen K. Cooper to Roy G. Smith (the "Cooper Lease"); and assignment of Smith's interest in the Cooper Lease to Milwhite); *id.*, McCall Decl., Ex. 8 (1940 Warranty Deed); *id.*, McCall Decl., Ex. 9 (letter discussing prospecting permit issued to Milwhite and assigned to NL); *id.*, McCall Decl., Ex. 10 (chart dated January 1943 showing drilling activity by Milwhite under the Collie Lease); Docket Entry No. 233, McCall Decl., Ex. 11 (memo discussing article announcing Milwhite's tentative plans to open a barite processing plant in Gurdon, Arkansas).

Halliburton also cites the declaration of Daniel Stephens, Ph.D., P.Hg., P.G., to justify its denial of Milwhite's request for admission. Although this declaration appears at a different docket entry than the response brief, exhibits to Stephens's declaration will be cited to the docket entry number for Halliburton's brief (Docket Entry No. 233), Stephens Decl., and the exhibit number. Halliburton cites Docket Entry No. 233, Stephens Decl. at ¶ 8, which discusses photographs showing mining activities on certain property at the Site. Halliburton also cites Exhibit B to Stephens's declaration—Stephens's list of expert testimony—but it is not clear how this is evidence of Milwhite's involvement at the Site. However, according to Stephens's declaration, Exhibits C–E show that mining activity occurred on certain portions of the land, and it appears that the portions referenced were owned or leased by Milwhite.

Pacific's motion.

      **B.**     **Milwhite's Evidentiary Objections**

     In response to Milwhite's motion, Halliburton has submitted the declaration of Duke McCall and attached exhibits.  Milwhite argues that Halliburton's discovery responses—which Milwhite previously submitted as summary judgment evidence—are inadmissible, self-serving statements as submitted with the McCall Declaration, and that the remainder of the exhibits attached to the McCall Declaration are hearsay.  (Docket Entry No. 237 at 2).  Milwhite asserts that because the exhibits are inadmissible, Halliburton has failed to create a fact issue precluding summary judgment. Milwhite alleges that "Mr. McCall simply provided 'unsubstantiated assert[ion]s' which cannot amount to competent summary judgment evidence." (*Id.* at 3).  The exhibits attached to the McCall Declaration, if admissible, may support a finding that Milwhite was involved in mining activities at the Site, an important consideration in determining whether Milwhite is entitled to a judgment of zero responsibility for response costs.

     Milwhite has objected to documents that Milwhite also submitted to support its own motion. Exhibits 1–6, 8, 10, 12, and 14 to the McCall Declaration have been submitted by Milwhite in connection with its own motion.[61]  Milwhite's objections are overruled.

     Exhibit 1 to the McCall Declaration includes Halliburton's answers to interrogatories and

---

[61]   Exhibit 1 to the McCall Declaration appears to be included as part of Exhibit N to Milwhite's motion; Exhibit 2 to the McCall Declaration appears to be the same as Exhibit A to Milwhite's motion; Exhibit 3 to the McCall Declaration appears to be the same agreement in Exhibit B to Milwhite's motion; Exhibit 4 to the McCall Declaration appears to be the same as Exhibit E to Milwhite's motion; Exhibit 5 to the McCall Declaration appears to be the same as Exhibit D to Milwhite's motion; Exhibit 6 to the McCall Declaration appears to be the same as Exhibit C to Milwhite's motion; Exhibit 8 to the McCall Declaration appears to be included in Exhibits I and J to Milwhite's motion; the relevant part of Exhibit 10 to the McCall Declaration appears to be included in Exhibit K to Milwhite's motion; Exhibit 12 to the McCall Declaration appears to be the same as Exhibit H to Milwhite's motion; and Exhibit 14 to the McCall Declaration appears to be the same as Exhibit L to Milwhite's motion.

responses to requests for admission.  McCall is one of Halliburton's lawyers.[62]  Milwhite argues that

using the McCall Declaration to submit Halliburton's discovery responses is impermissible and self-

serving.  (Docket Entry No. 237 at 2).  Putting aside the fact that Milwhite submitted the same

discovery responses as part of its own summary judgment evidence, Halliburton's submission of the

discovery responses is not objectionable.  *See* FED R. CIV. P. 56(c) ("The judgment sought should

be rendered if the pleadings, *the discovery and disclosure materials on file*, and any affidavits show

that there is no genuine issue as to any material fact . . . .") (emphasis added); *see also Bartucci v.*

*Jackson*, No. 04-2977, 2006 WL 2631925, at *3 (E.D. La. Sept. 13, 2006) ("It has long been

established that, if they comply with the evidentiary standards of Rule 56(e) . . . , a party's verified

answers to interrogatories may serve as support or rebuttal of a motion for summary judgment.")

(citation omitted), *aff'd*, 246 F. App'x 254 (5th Cir. 2007) (unpublished) (per curiam), *cert. denied*,

128 S. Ct. 1897 (2008); *Snelling v. Fall Mountain Reg'l Sch. Dist.*, No. Civ. 99-448-JD, 2001 WL

276975, at *4 n.4 (D.N.H. Mar. 21, 2001) (unpublished) ("The plaintiffs' chart of abuse, which the

defendants criticize as 'self serving,' was submitted to the defendants as part of the plaintiffs' sworn

answers to interrogatories, which are competent evidence in the context of summary judgment.")

(citing FED. R. CIV. P. 56(c) and (e)).

The discovery responses are not "self-serving" on this record.  Halliburton used the

responses to show that Milwhite misrepresented Halliburton's discovery response.  Milwhite

asserted that Halliburton had admitted that Milwhite did not conduct or direct excavation and

removal of overburden or barite at the Site, did not conduct or direct milling of overburden at the

---

[62]   McCall was an attorney of record for Halliburton in this litigation but withdrew while Georgia-Pacific's
and Milwhite's motions for summary judgment were pending.  (*See* Docket Entry No. 262).

Site, and did not conduct the transport of mine and mill wastes disposed of at the Site.  (*See* Docket

Entry No. 229 at 10–11).  The discovery responses show that Milwhite's description was inaccurate.

Nor are the discovery responses hearsay.  Halliburton has not submitted the discovery

responses to prove the truth of the assertions made in the responses, but to show that Milwhite

misrepresented Halliburton's responses.  *See* FED. R. EVID. 801(c) ("'Hearsay' is a statement, other

than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove

the truth of the matter asserted.").  Exhibit 1 to the McCall Declaration is admissible for summary

judgment purposes.

Milwhite separately submitted as summary judgment evidence the documents attached as

Exhibits 2–6, 8, 10, 12, and 14 to the McCall Declaration.  In his affidavit submitted in support of

Milwhite's motion, Douglas Sutter (Milwhite's counsel) states that the exhibits submitted with

Milwhite's motion are true and correct copies of documents produced in discovery.  (Docket Entry

No. 228, Ex. O at 2).  Under Federal Rule of Evidence 901(a), "[t]he requirement of authentication

or identification as a condition precedent to admissibility is satisfied by evidence sufficient to

support a finding that the matter in question is what its proponent claims."  FED. R. EVID. 901(a).

In at least some circumstances, production in discovery may be sufficient to authenticate a

document.  *See MGE UPS Sys., Inc. v. Fakouri Elec. Eng'g, Inc.*, No. 4:04-CV-445-Y, 2006 WL

680513, at *5 (N.D. Tex. Mar. 14, 2006) ("MGE does not dispute that it produced these bills during

discovery; thus, its argument that the exhibit is not properly authenticated is meritless.").

Production in discovery may not always be sufficient to authenticate a document.  *See*

*Madison One Holdings, LLC v. Punch Int'l, NV*, No. 4:06-cv-3560, 2009 WL 911984, at *10 (S.D.

Tex. Mar. 31, 2009) (sustaining an objection to an exhibit submitted in support of the defendant's

motion for summary judgment even though one of the plaintiffs may have produced the document during discovery because the defendants failed to provide the court with an affidavit or testimony from a witness with personal knowledge of the document's authenticity).  But the documents at issue here also qualify as ancient documents and Milwhite has not identified any basis for suspicion about their authenticity.  The documents were in the hands of Milwhite and/or Halliburton, who were involved, or whose predecessors were involved, in activities at the Site during the time the documents were created.  Halliburton's attorney has submitted a declaration stating that the exhibits are true and correct copies.  There is not reason to doubt the documents' authenticity, the documents were "in a place where [they], if authentic, would likely be," and the dates indicate that they are more than 20 years old.[63]  *See* FED. R. EVID. 803(16) (providing an exception to hearsay rule for "[s]tatements in a document in existence twenty years or more the authenticity of which is established"); FED. R. EVID. 901(b)(8) (describing authentication of an ancient document, including that it "is in such a condition as to create no suspicion concerning its authenticity," "was in a place where it, if authentic, would likely be," and "has been in existence 20 years or more at the time it is offered.").  Exhibits 2–6, 8, 10, 12, and 14 to the McCall Declaration are properly authenticated and are within the ancient document exception to the hearsay rule.  The exhibits are properly considered on summary judgment.

---

[63]  Although "it cannot be assumed that the 20-year requirement may be satisfied based merely on the date that a document bears on its face," evidence of age may come from "aspects of an item's appearance that are readily apparent to laypersons, such as visible marks of aging and archaic styles of penmanship, spelling or phraseology," and "the contents of a document might permit an inference as to its age, as where the document refers to events or persons contemporaneous with its creation."  31 CHARLES A. WRIGHT & VICTOR J. GOLD, FEDERAL PRACTICE AND PROCEDURE § 7113 (2000).  Here, although it is difficult to discern the quality of electronically filed documents, the documents at issue appear to have marks of aging and appear to be typed on a typewriter (with the exception of Exhibit 10 to the McCall Declaration, which is handwritten).  The documents also refer to events occurring during the time period of their stated dates.  There is no reason here to doubt that the dates on the documents are the true dates of creation.

Exhibits 7, 9, 11, and 13 to the McCall Declaration are also within the ancient document exception to the hearsay rule.  They are dated over 20 years ago.  Their appearance and the events they discuss support the conclusion that these dates are the true dates of creation.  There is no reason to suspect the authenticity of these exhibits.  It is not surprising that Halliburton would have these documents in its possession, either by virtue of corporate and property transactions, or by virtue of document production in litigation.  Halliburton's counsel has declared that the submitted documents are true and correct copies.  Exhibits 9, 11, and 13 all have litigation control numbers on the bottom indicating that they may have been produced in this litigation.  The objections to Exhibits 7, 9, 11, and 13 to the McCall Declaration are overruled.

Milwhite argues that Exhibits 15–18, which include testimony and reports by Halliburton's experts in the arbitration, are inadmissible hearsay.  Yet in its own summary judgment motion, Milwhite relies on the testimony and reports of Halliburton's experts from the arbitration.  (Docket Entry No. 229 at 23–24).[64]  Moreover, Halliburton submitted declarations executed by Stephens and Low—in which they stated that they did not develop or offer opinions in the arbitration about allocating response costs to entities that were not parties to the arbitration—and Milwhite has not objected to those declarations.  Halliburton submitted Exhibits 15–18 to the McCall Declaration for the same purpose, to show that Stephens and Low only allocated environmental harm and response costs between and among the parties to the arbitration.

It is not clear whether Milwhite objects to Exhibit 19 to the McCall Declaration, an excerpt

---

[64]  Milwhite cites to the expert report of Dr. Daniel B. Stephens dated July 5, 2007 and revised July 13, 2007, (Docket Entry No. 229 at 23–24 (citing Docket Entry No. 189, Ex. 51)), and to excerpts from the transcript of the arbitration hearing conducted on August 2, 2007, including Stephens's testimony, (*id.*, (citing Docket Entry No. 189, Ex. 55)).  Milwhite's brief references Exhibit 54 of Georgia-Pacific's motion as including Stephens's testimony, but the quotation Milwhite uses comes from Exhibit 55.

from the allocation award from the arbitration.  Milwhite states that "[i]n Exhibit 19, the excerpt from the arbitration allocation award dated September 10, 2007, even the arbitrators refused to allocate any alleged responsibility on the part of Milwhite," and concludes that "[a]s such, these Exhibits constitute inadmissible hearsay and are of no probative value in this proceeding." (Docket Entry No. 237 at 2).  It is not clear whether Milwhite's objection to "these Exhibits" refers to Exhibits 15–18 only, or if it also includes Exhibit 19.  In any event, the excerpt from the arbitration award is appropriately considered.  *See Pickard v. Potter*, No. Civ. A. 401CV0375BE, 2003 WL 21448593, at *2 (N.D. Tex. Mar. 24, 2003) (overruling hearsay objection to arbitration award submitted in support of defendant's motion for summary judgment, and noting that "[a]rbitration decisions are not necessarily excluded, absent some proof of untrustworthiness," and that "[c]omplaints of the use of possible hearsay in the abstract are not sufficient grounds for exclusion") (citations omitted).

In summary, Milwhite's hearsay objections are conclusory, unsupported, and inconsistent with its own submission or reliance on the same evidence.  The objections are overruled.

### C.     The Contribution Analysis

#### 1.     Milwhite's Status as a Potentially Responsible Party Under Section 107(a) of CERCLA

Milwhite concedes for the purpose of its motion:

> (a) that Plaintiffs and Milwhite were owners or operators of the Site as a "facility;" (b) that the costs incurred and to be incurred by Plaintiffs with respect to the Site were "necessary" and "consistent with the national contingency plan;" and, (c) that Milwhite does not assert any defense to liability under CERCLA § 107(b).

(Docket Entry No. 229 at 16).  "In other words, Milwhite is willing to assume that it, Plaintiffs[,] and Georgia-Pacific are all potentially liable under Section 107(a)." (*Id.*).  Like Georgia-Pacific,

84

Milwhite focuses its arguments on equitable allocation under section 113(f) and the corresponding RATFA provision.  With respect to the RATFA claims, Milwhite concedes for the purpose of its motion that:

> (1) the Site is a "hazardous substance site" within the meaning of Sections 8-7-520(a) and (b); (2) the Halliburton Plaintiffs and TRE Management have standing under subsections (a) and (b); (3) Milwhite is a "person who is liable" for the Site within the meaning of subsections (a) and (b); and (4) [Milwhite] is not a party to the settlement giving Plaintiffs standing under subsection (b).

(*Id.* at 18).

Halliburton does not contend that Milwhite is liable under section 107(a)(1) as an "owner or operator" of the Site.  (Docket Entry No. 233 at 5).  Instead, Halliburton contends that Milwhite is responsible for cleanup costs as a prior owner or operator under section 107(a)(2), and as an arranger under section 107(a)(3).  (*Id.* at 5–6).  Halliburton asserts that Milwhite has not disputed that it owned property at the Site when hazardous substances were disposed of there.  (*Id.* at 6).  Milwhite has admitted that it owned 40 acres at the Site between 1940 and 1943, and Halliburton argues that "mining, ore processing and mining waste disposal activities" were occurring at the Site beginning in 1940.  (*Id.*).  Halliburton argues that aerial photographs taken in 1940 show that the mining activities were occurring on property that Milwhite owned at the Site, pointing to Stephens's declaration, which states that aerial photographs show mining activities in part of Section 10 as of October 8, 1940, and to deeds showing that this part of Section 10 was conveyed to Milwhite as of July 22, 1940.  (Docket Entry No. 233 at 6 (citing *id.*, Stephens Decl. at ¶ 8; *id.*, McCall Decl., Ex. 8; *id.*, McCall Decl., Ex. 12 at 3)).

Halliburton also asserts that even after Milwhite transferred fee-simple title to the 40 acres it owned at the Site and assigned its leasehold interests to NL, Milwhite still retained mineral rights in approximately 440 acres.  (*See id.* at 6–7 (citing *id.*, McCall Decl., Ex. 12)).  Halliburton contends that Milwhite's retention of the mineral rights in property at the Site from 1943 until at least 1960[65]—during which time substantial quantities of mine wastes were disposed of—also constitutes "property ownership" giving rise to statutory liability under section 107.  (Docket Entry No. 233 at 7 (citing *City of Grass Valley v. Newmont Mining Corp.*, No. 2:04-cv-00149-GEB-DAD, 2007 WL 4287603, at *4 (E.D. Cal. Dec. 4, 2007) (holding that under California law, mineral rights ownership interests were sufficient to make a party an "owner" subject to liability under CERCLA))).  Halliburton argues that it has presented evidence that Milwhite conducted mining activities on the properties it owned and leased at the Site, including drilling for barite, excavating and stockpiling barite ore, and constructing roads on property it owned at the Site using excavated material.  (*Id.* (citing *id.*, McCall Decl., Ex. 10 (chart, dated January 1943, showing record of drilling by Milwhite under the Collie Lease); *id.*, McCall Decl., Ex. 13 (correspondence regarding the Jernigan Lease))).  Halliburton argues that these activities give rise to liability under section 107(a)(2).

Halliburton also argues that Milwhite is liable as an arranger under section 107(a)(3).  (*Id.* at 7–8.  Halliburton relies on the Milwhite/NL Contract, which was made "for the purpose of 'min[ing], process[ing] and sell[ing of] barytes' from properties Milwhite owned and leased at the Site." (Docket Entry No. 233 at 7 (citing *id.*, McCall Decl., Ex. 12 at 4–5)).  Halliburton argues that "[a] party is statutorily liable as an arranger under CERCLA section 107(a)(3), where the party

_____

[65]   The modification of the Milwhite/NL Contract indicated that the contract would terminate on December 31, 1960.  (Docket Entry No. 233, McCall Decl., Ex. 14 at 2).

retains an ownership interest in a product being processed at a facility, the generation of hazardous substances is inherent in the processing of the product, and hazardous substances actually are generated and disposed of at the facility as a result of processing of the product."  (*Id.* at 7). Halliburton asserts that "[i]t is undisputed that . . . Milwhite retained an ownership interest in the finished barite mined and milled at the Site, that the generation of hazardous substances was inherent in the mining and milling of the barite ore to produce finished barite, and that hazardous substances were generated and disposed of at the Site as part of the mining and milling operations."  (*Id.* at 8 (citing *id.*, McCall Decl., Ex. 12 at 5–6 (discussing royalties to be paid by NL to Milwhite for barite); *id.*, McCall Decl., Ex. 14 (modifying NL's royalty payments to Milwhite for stated period))).

As with Georgia-Pacific's motion, this court need not resolve whether Milwhite is liable under section 107(a) or which subsection of section 107(a) applies.  Milwhite has conceded for the purpose of its motion that it is a statutorily liable party under section 107(a).[66]  (*See* Docket Entry No. 229 at 16).  Milwhite seeks summary judgment that it is not liable under section 113(f) even assuming it is a statutorily liable party under section 107(a).  The issue is whether an equitable allocation of response costs would result in allocating zero costs to Milwhite.

---

[66]  On May 7, 2009, Milwhite filed a motion to supplement its motion for summary judgment, requesting that this court consider the recent Supreme Court holding in *Burlington Northern & Santa Fe Railway Co. v. United States*, 129 S. Ct. 1870 (2009).  (Docket Entry No. 363).  Halliburton contends that *Burlington Railway* has no impact on Milwhite's pending summary judgment motion.  (Docket Entry No. 364). Milwhite's motion to file the supplemental authority is granted.  In its letter, Milwhite states that in the *Burlington Railway* case, the evidence showed that the alleged arranger was aware of minor, accidental spills, but the Court held that "mere knowledge of continuing spills and leaks was insufficient grounds for concluding that [the alleged arranger] had 'arranged for' disposal." (Docket Entry No. 363 at 1).  Halliburton argues that *Burlington Railway* is irrelevant because Milwhite had more involvement in the contamination than the defendant in *Burlington Railway*, making Milwhite liable as an arranger.  (Docket Entry No. 364 at 3–4).  But arranger liability is not the issue in Milwhite's summary judgment motion.  Because Milwhite has admitted for purposes of its motion that it is a responsible party under section 107(a), and only seeks judgment that it is not responsible under the equitable analysis of section 113(f), the analysis in *Burlington Railway* regarding arranger liability under section 107(a)(3) is irrelevant.

## 2. Equitable Allocation Under Section 113(f) of CERCLA

Like Georgia-Pacific, Milwhite contends that it should not be required to contribute to the response costs at the Site as a matter of equitable allocation. Milwhite asserts that comparative fault is the "touchstone" in the equitable allocation analysis. The Gore Factors do not support Milwhite's arguments.

### a. Cooperation with Authorities and Ability to Distinguish Contribution

The first Gore Factor, the parties' ability to demonstrate that their contribution to a discharge, release, or disposal of a hazardous waste can be distinguished, is not particularly relevant to the equitable analysis here. The divisibility inquiry is part of the section 107(a) analysis, which is not the pertinent inquiry in evaluating Milwhite's motion.

The last Gore Factor, the degree of cooperation by the parties with federal, state, or local officials to prevent any harm to the public health or the environment, is also unhelpful. Milwhite contends that it was not asked by either the EPA or the ADEQ to incur response costs at the Site. (Docket Entry No. 229 at 23). Halliburton has not presented evidence to the contrary. As with Georgia-Pacific, whether Milwhite has cooperated with authorities in the Site cleanup is not helpful because there is no evidence that any of the environmental authorities ever asked Milwhite to become involved in the cleanup process. The lack of cooperation with authorities is not a strong factor in favor of allocating response costs to Milwhite.

### b. Comparative Fault

### i. The Parties' Contentions

Like Georgia-Pacific, Milwhite argues that the pollution and cleanup directly resulted from mining conducted by others, specifically NL and Magcobar, the predecessors of Halliburton and

88

TRE Management; that NL was fully aware of the environmental issues at the Site and failed to implement remedial plans; and that Milwhite did not participate in any mining and did not generate mining spoils or pollutants. (Docket Entry No. 229 at 22–23). Milwhite asserts that "[n]o fault whatsoever can be assigned to Milwhite for the pit lake or the mining spoils generated at the Site, under the Gore factors or otherwise." (*Id.* at 23). Milwhite acknowledges that it was compensated by NL for the leases and that NL paid Milwhite a fixed per-ton royalty with respect to barite production on one tract. (*Id.*). But Milwhite argues that "[b]y their very nature, . . . fixed lease and royalty payments are made on the premise that the royalty owner will not bear any expenses associated with mineral extraction or ever be involved in them." (*Id.*).

In response, Halliburton submits evidence connecting Milwhite with mining activities at the Site during the relevant period. The evidence includes the following:

- The charter for Milwhite, stating that "[t]he purpose for which this corporation is formed is to transact a manufacturing, mining and refining business and especially the manufacturing, mining and refining of clay and clay products and the purchase and sale of goods, wares and merchandise used for such business . . . ." (Docket Entry No. 233, McCall Decl., Ex. 2 at 3).

- The Jernigan Lease, dated December 20, 1938, which leased property at the Site to Roy G. Smith "for the purpose of prospecting, exploring by use of core drill or otherwise, to mine, operate, produce, store and remove therefrom, all barite and bauxite in and upon" the leased property, in exchange for royalty payments. (*Id.*, McCall Decl., Ex. 3 at 1).

- The assignment of the Jernigan Lease from Smith to Milwhite, dated March 31, 1939. (*Id.*, McCall Decl., Ex. 4).

- The Collie Lease, dated February 2, 1939, which leased property at the Site to Roy G. Smith "for prospecting and mining for Barite, exclusive of oil and gas from the date hereof for a period of 10 years, and so long thereafter as such mineral substances including Barite may be found therein in paying quantities . . . ," in exchange for a royalty. (*Id.*, McCall Decl., Ex. 5 at 1).

- The assignment, dated February 13, 1939, from Smith to Milwhite, of Smith's

interest in the Collie Lease.  (*Id.*, McCall Decl., Ex. 6).

•   The Cooper Lease, dated November 7, 1939, which leased property at the Site to Roy G. Smith "for prospecting, mining and operating for all forms of Barite Ore and all other valuable mineral substances of every kind and character, for Five years . . . ," in exchange for royalty payments.[67]  (*Id.*, McCall Decl., Ex. 7 at 1).  The lease provided that "Lessee shall pay for damages caused by his operations to growing crops on said land, but shall not be liable for any damages or injury caused by or resulting from the subsidence of the surface or soil, or for damage to surface of the leased premises by reason of any surface or subsurface mining operations." (Docket Entry No. 233, McCall Decl., Ex. 7 at 2).

•   The 1940 Warranty Deed, dated July 22, 1940, transferring 40 acres of property at the Site from Malvern Lumber to Milwhite.  (*Id.*, McCall Decl., Ex. 8).

•   A December 23, 1958 letter discussing payment for the period from December 31, 1958 to December 31, 1959 for an Arkansas prospecting permit issued to Milwhite and assigned to NL.  (*Id.*, McCall Decl., Ex 9).

•   A chart showing a record of drilling by Milwhite under the Collie Lease, dated January 1943.  (*Id.*, McCall Decl., Ex. 10 at 1).  This document also includes a chart showing test holes drilled by Milwhite under a "Tate Lease" in an area near the Site (the northeast 1/4 of the northwest 1/4 of Section 11) and indicating no barite.  (*Id.*, McCall Decl., Ex. 10 at 2).

•   An August 19, 1946 letter discussing a newspaper article regarding the possibility of Milwhite opening a barite processing plant in Gurdon, Arkansas to process barite ore mined in Montgomery County.[68]  (*Id.*, McCall Decl., Ex. 11 at 1).

•   A Milwhite/NL Contract, dated August 2, 1943, in which Milwhite agreed to assign and convey all its rights and interests in certain mining leases, assignments and options by special warranty, and to convey the surface rights to 40 acres at the Site to NL.  (Docket Entry No. 233, McCall Decl., Ex. 12 at 3).  The stated purpose of the

---

[67]   The Cooper Lease provided rights to the lessee to use the east 1/2 of the northwest 1/4 and the west 1/2 of the northeast 1/4 of Section 14.  Halliburton has not presented evidence that mining or waste disposal occurred on this property.  The map attached to Stephens's report, dated January 14, 1976, shows very little, if any, mining or waste disposal on this tract of land.  (*See* Docket Entry No. 189, Ex. 5 at 1).

[68]   The newspaper article discusses a plant in Gurdon, Arkansas and states that the ore would mined in Montgomery County.  (Docket Entry No. 233, McCall Decl., Ex. 11 at 1).  This court takes judicial notice that Gurdon is located in Clark County, Arkansas.  Because the Site is located in Hot Spring County, the discussion in this article of a plant in Gurdon and mining in Montgomery County may not support the proposition that Milwhite conducted mining at the Site.

contract was for NL to "acquire deposits of, mine, process, and sell barytes." (*Id.*, McCall Decl., Ex. 12 at 4–5).  The contract provides for NL to pay Milwhite a royalty per ton of finished oil well barytes, and sets a minimum royalty. (*Id.*, McCall Decl., Ex. 12 at 5–6).

• A July 30, 1959 modification of the Milwhite/NL Contract, stating that there was not sufficient crude barytes ore to permit NL to meet the minimum amount of ground barytes required in the Milwhite/NL Contract, suspending for fifteen months the minimum royalty and tonnage provisions in the original contract, and providing for termination of the contract and all mining operations on leased premises by December 31, 1960. (*Id.*, McCall Decl., Ex. 14).

• Correspondence about the Jernigan Lease, including:

(1) a letter agreement, dated February 26, 1943, from F.A. Frank at Milwhite to L.M. Mange, regarding royalty payments under the Jernigan Lease, and providing that Milwhite "will forward . . . the amounts due you at the present time and, at the same time, give you authority to cash the royalty checks that have accumulated since last June";

(2) a letter, dated October 30, 1943, from F.A. Frank at Milwhite to C.R. Forbes at the Baroid Sales Division, regarding a negative of a drawing on the Jernigan Pit and storage of Jernigan ore;

(3) a letter, dated November 1, 1943, from NL's Baroid Sales Division to Milwhite, regarding stockpiling of dump material from the Jernigan Lease, and discussing royalties paid to Milwhite and the Jernigans;

(4) a letter, dated November 9, 1943, from Milwhite to NL's Baroid Sales Division, discussing treatment of Jernigan ore from a Magcobar plant, and indicating concern with low percentages of recovery from the NL plant;

(5) an NL Baroid Sales Division memorandum, dated November 11, 1943, discussing payments to the Jernigans and Roy Smith on a crude ore basis under the Jernigan Lease acquired from Milwhite, and noting a possible need to make an agreement with Milwhite to pay on a crude ore basis rather than for finished Baroid;

(6) an NL Baroid Sales Division memorandum, dated November 19, 1943, discussing payment of minimum royalties to lessors under the Jernigan Lease, and mentioning remittance made by Milwhite to

91

lessors;

(7)     a letter, dated November 22, 1943, from NL Baroid Sales Division to L.M. Mange, regarding payment to lessors of royalties under the Jernigan Lease and referencing payment made by Milwhite to lessors;

(8)     a letter, dated November 22, 1943, from NL Baroid Sales Division to Milwhite, explaining why NL's recovery of barite was lower than Magcobar's;

(9)     a letter, dated November 29, 1943, from NL Baroid Sales Division to Milwhite, discussing a letter from Milwhite regarding "stockpiling of low grade material from the Jernigan pit";

(10)    a letter, dated December 4, 1943, from O.J. Benston (an NL Baroid employee) to Milwhite, discussing stockpile of Jernigan ore, and stating that it "is not one of the controversial stockpiles which are wholly south of the present pit" and that "[i]t will be quite some time before it will be necessary to move the latter . . . ," and discussing possible milling of materials formerly used for road building;

(11)    a letter, dated August 8, 1944, from O.J. Benston to Milwhite, stating that they "are now nearing the end of the old ore-waste piles and the old roadway," and discussing royalties to the Jernigans, Roy Smith, and Milwhite for crude ore, ore-waste piles, and old roadway;

(12)    a letter, dated August 9, 1944, from Milwhite to O.J. Benston, stating that Milwhite has not paid the Jernigans and Roy Smith royalties on the ore waste piles, and that Milwhite has "settled in full with the Jernigans and Roy G. Smith on the royalty for all material used in building the old road and they have no further interest in this ore";

(13)    an NL Baroid Sales Division memorandum, dated August 11, 1944, discussing "trouble between the Milwhite Company and the Jernigans concerning the Barytes ore used by the Milwhite Company in building roadways," and discussing Milwhite's payment to the Jernigans and whether NL has mined and removed ore used for road building;

(14)    an NL memorandum, dated August 14, 1944, stating that "[t]he ore that has been used for road building purposes is currently being milled along with the ore-waste piles," and that NL "expect[ed] both the road material and the ore-waste piles [would] be cleaned up [that] month."

(Docket Entry No. 233, McCall Decl., Ex 13).

- A declaration by Stephens stating that photographs taken of certain property at the Site (which appears to have been owned or leased by Milwhite) showed mining activities on that property.  (*Id.*, Stephens Decl. at ¶ 8; *see also id.*, Stephens Decl., Exs. C–E (photographs taken of the Site in 1938, 1940, and 1950)).

Halliburton argues that this evidence shows that Milwhite participated in mining and disposal activities at the Site.   Halliburton argues that Milwhite's contract with NL covered mining, processing, and selling barite from Milwhite's property at the Site, and that no evidence shows Milwhite took action to prevent the release of hazardous substances at the Site.  (*See* Docket Entry No. 233 at 9, 13).   Halliburton also asserts that even if Milwhite had not engaged in mining and disposal activities, it should still bear some response costs, citing cases Halliburton alleges allocated responsibility to PRPs who did not participate in the activities causing the environmental harm.  (*Id.* at 9–10 (citing *Weyerhaeuser Co. v. Koppers Co.*, 771 F. Supp. 1420 (D. Md. 1991); *United States v. R.W. Meyer, Inc.*, 932 F.2d 568 (6th Cir. 1991))).   Halliburton argues that no cases have found that an owner and/or arranger PRP should be allocated zero response costs because that PRP did not actively and directly participate in the disposal activities causing the environmental harm.  (*Id.* at 10).   Halliburton distinguishes the cases Milwhite cites, arguing that in allocating zero responsibility to  PRPs, the courts found that "only a minute fraction, or trace amount, of the total volume of contaminants at the Site could be attributed to the party awarded a zero allocation."  (*Id.* at 10–11 (citing *Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 274 F.3d 1043 (6th Cir. 2001); *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 616 (7th Cir. 1998); *United States v. Davis*, 261 F.3d 1, 52 (1st Cir. 2001); *Acushnet Co. v. Mohasco Corp.*, 191 F.3d 69, 78 (1st Cir. 1999))).   Halliburton argues that here, "[a]pproximately 4,000,000 cubic yards of the mine spoils generated at the Site—almost 22% of the total mine spoils generated at the Site—were removed from property in

which Milwhite held a mineral rights interest and from which Milwhite arranged for the removal and disposal of hazardous substances." (*Id.* at 11 (citing *id.*, Low Decl. at ¶ 5)).[69] Halliburton points to Low's opinion that Milwhite should be allocated a meaningful share of response costs for the Site. (Docket Entry No. 233 at 14 (citing *id.*, Low Decl. at ¶ 5)).

In reply, Milwhite does not deny that it misrepresented Halliburton's discovery response. Milwhite stated in its brief accompanying its motion that Halliburton had admitted that Milwhite did not conduct mining activities at the Site, and Halliburton challenged that description in its opposition. Milwhite's response is to argue that every exhibit attached to the McCall Declaration is inadmissible. (*See* Docket Entry No. 237 at 2). Milwhite's evidentiary objections are overruled.

In the alternative, Milwhite argues that courts have approved allocations of zero response costs even to PRPs who released pollutants. (*Id.* at 3). Milwhite argues that "[b]ecause the statute gives the Court broad discretion to decide which equitable factor or factors should govern allocation, a legitimate decision to focus on a key equitable factor like fault can make disputed fact issues immaterial and make summary judgment entirely appropriate." (*Id.* (citing *United States v. Atlantic Research Corp.*, 551 U.S. 128, 127 S. Ct. 2331, 2337–38 (2007); *United States v. Colo. & E.R.R. Co.*, 50 F.3d 1530, 1536 (10th Cir. 1995); *Envtl. Tranport. Sys., Inc. v. Ensco, Inc.*, 969 F.2d 503, 509 (7th Cir. 1992))).

### ii.  Analysis

Although courts have allocated zero responsibility to a PRP in some circumstances, those

---

[69]  Halliburton has submitted the declaration of Matthew Low with its opposition to Milwhite's motion for partial summary judgment. As a result of the number and length of the attachments to Halliburton's response, this declaration appears at a different docket entry than Halliburton's brief. For ease of reference, the declaration will be cited to the docket entry for Halliburton's response brief (Docket Entry No. 233), Low Decl.

circumstances are not present on this record.  Halliburton has presented evidence that Milwhite was involved in the mining activities at the Site.  Milwhite was assigned the lessee's rights under the Jernigan Lease, which leased property at the Site for prospecting, exploring, mining, operating, producing, storing, and removing barite and bauxite from property at the Site.  (*See* Docket Entry No. 233, McCall Decl., Ex. 3 at 1 (Jernigan Lease); *id.*, McCall Decl., Ex. 4 (assignment of Jernigan Lease to Milwhite)).  The Jernigan Lease was assigned to Milwhite by March 31, 1939.  (*Id.*, McCall Decl., Ex. 4).  Milwhite did not convey its interest in that lease to NL until at least August 2, 1943.  (*See id.*, McCall Decl., Ex. 12).  The Jernigan Lease gave the lessee the right to prospect, explore, mine, operate, produce, store and remove barite and bauxite on the east 1/2 of the southeast 1/4 of Section 10.  (*Id.*, McCall Decl., Ex. 3 at 1).  The Stephens Declaration states that "mining activities were occurring at [the Site] in the Southeast 1/4 of the Southeast 1/4 of Section 10 . . . as of October 8, 1940."  (*Id.*, Stephens Decl. at ¶ 8).  Milwhite's charter states that the company was created to transact a manufacturing, mining, and refining business.  (Docket Entry No. 233, McCall Decl., Ex. 2 at 3).  In February 1943, Milwhite signed a letter agreement clarifying royalties to be paid to the Jernigans under the Jernigan Lease for materials such as "material removed from the mine crushed and washed at Hot Springs and shipped to destination," and also noting that it would forward amounts already due to the Jernigans.  (*Id.*, McCall Decl., Ex. 13 at 1–2).

"All reasonable inferences are drawn in favor of the nonmovant."  *See CQ, Inc. v. TXU Mining Co., L.P.*, 565 F.3d 268, 273 (5th Cir. 2009) (citing *Robinson v. Orient Marine Co. Ltd.*, 505 F.3d 364, 366 (5th Cir. 2007)).  It is reasonable to infer that as the lessee under a lease allowing for mining on property at the Site, Milwhite—which was formed for the purpose of transacting a manufacturing, mining, and refining business—did conduct mining activities that occurred on the

property it leased.[70]  This weighs against allocating zero response costs to Milwhite.

In addition, under the 1939 Collie Lease, which was assigned to Milwhite on February 13, 1939, Milwhite was the lessee to the southwest 1/4 of the southwest 1/4 of Section 11, to prospect and mine for barite.  (*See* Docket Entry No. 228, Ex. D at 1).  Halliburton has presented a chart showing drilling Milwhite conducted under the Collie Lease as of January 1943.  (Docket Entry No. 233, Ex. 10 at 1).  The fact that Milwhite conducted drilling at property at the Site under the Collie Lease also weighs against allocating it zero responsibility.

In addition to using property at the Site as a lessee, Milwhite also owned property at the Site when mining activities occurred.  Milwhite received from Malvern Lumber by warranty deed on July 22, 1940, the land located in the southeast 1/4 of the southeast 1/4 of Section 10.  (*See id.*, McCall Decl., Ex. 8 at 1).  Milwhite retained that property until November 9, 1943, when it transferred the property to NL.  (*See id.*, McCall Decl., Ex. 8 at 2).  Stephens states in his declaration that "mining activities were occurring at [the Site] in the Southeast 1/4 of the Southeast 1/4 of Section 10 . . . as of October 8, 1940," (*id.*, Stephens Decl. at ¶ 8; *see also id.*, Stephens Decl., Ex. C (showing no activity in the southeast 1/4 of the southeast 1/4 of Section 10 on July 4, 1938); *id.*, Stephens Decl., Ex. D (showing changes to land in the southeast 1/4 of the southeast 1/4 of Section 10 as of October 8, 1940)).  This evidence supports a finding that mining and/or waste disposal occurred on property that Milwhite owned at the Site before Milwhite transferred the property to NL.

---

[70]   Although the Jernigan Lease contains an indemnity provision providing that "Lessee shall not be liable for any damage to the land occasioned by its mining operations conducted in the usual and customary manner," (Docket Entry No. 228, Ex. B at 4), Milwhite has not argued that the indemnity provision is an equitable factor favoring an allocation of zero responsibility based on its own activities as lessee, perhaps because it seeks to hold NL, which was ultimately assigned Milwhite's interest in the Jernigan Lease, liable.

Even after Milwhite transferred the leases and property it owned at the Site to NL in 1943,

Milwhite retained the right to receive royalties for barite production under the transferred leases.[71]

---

[71]   Halliburton asserts that Milwhite retained mineral rights in approximately 440 acres in and around the Site. (Docket Entry No. 233 at 6–7, 11 (citing *id.*, McCall Decl., Ex. 12; *id.*, Low Decl. at ¶ 5)). Halliburton does not explain the basis for this statement, but Milwhite has not contested it.  Halliburton cites the Milwhite/NL Contract, but that contract does not expressly reserve mineral rights for Milwhite.  The contract does provide that NL will pay a royalty per ton of finished oil well barytes, amounting to 6.45% of the actual net selling price on ground barytes.  (*Id.*, McCall Decl., Ex. 12 at 5).  It is not clear whether the royalty described in the Milwhite/NL Contract was intended to retain a mineral-rights interest for Milwhite.  *See Clampitt v. Ponder*, 91 F. Supp. 535, 542 (W.D. Ark. 1950) (finding it "significant that the grantor . . . used 'royalty' in the reservation rather than the usual language of 'minerals' or 'mineral rights' when a mineral fee is intended," and concluding that "the intention was to reserve a perpetual royalty interest merely and not a mineral fee"); *Hanson v. Ware*, 274 S.W.2d 359, 362 (Ark. 1955) ("[S]ome jurisdictions hold that a conveyance of royalty transfers title to the minerals in place; but this is not the law in Arkansas.  We have recently observed that one who retained only a royalty interest 'reserved no minerals or mineral rights.'") (quoting *Davis v. Collins*, 245 S.W.2d 571, 572 (Ark. 1952)).  As one court has explained: "The difficulties presented in determining whether a mineral fee or royalty interest is conveyed by an instrument arise from justifiably different understandings of the meaning of the word 'royalty' and from lack of precise terminology to describe the interest intended, and the courts can only arrive at the correct meaning in any particular instrument by considering it from its four corners and by resort to other aids commonly employed to construe ambiguous contracts and arrive at the intention of the parties." *Wynn v. Sklar & Phillips Oil Co.*, 493 S.W.2d 439, 444 (Ark. 1973) (citations omitted).  The *Wynn* court noted that "[e]ven though the use of the word 'royalty' to describe an interest in minerals in place is a loose one, it is well recognized that such a definition is properly ascribed to the word under appropriate circumstances," and that "[i]t has also been held in other jurisdictions that the interest conveyed is to be determined by the language of the instrument of conveyance, rather than the title denominating it as a royalty deed." *Id.* at 446.

Halliburton also does not explain how it arrived at the 440 acres in which it asserts Milwhite retained mineral rights.  Assuming each 1/4 of 1/4 of a section equals approximately 40 acres, the leases conveyed in paragraph I of the Milwhite/NL Contract appear to cover approximately 360 acres (or 558 acres if the option contract is included).  The royalty appears to be based on the production from the premises in the leases and options in paragraph I of the Milwhite/NL Contract, (*see* Docket Entry No. 233, McCall Decl., Ex. 12 at 5), but the contract also obligates Milwhite to convey land acquired from Malvern Lumber through a July 22, 1940 deed, which, according to the Milwhite/NL Contract, included the surface rights in the southeast 1/4 of the southeast 1/4 of section 10, (*see id.*, McCall Decl., Ex. 12 at 3).  The July 22, 1940 warranty deed conveying the southeast 1/4 of the southeast 1/4 from Malvern Lumber to Milwhite does not expressly reserve any rights in the land or indicate that only the surface rights are being conveyed. (*See id.*, McCall Decl., Ex. 8 at 1).  The deed conveying that same property from Milwhite to NL also does not expressly reserve any mineral rights for Milwhite. (*See id.*, McCall Decl., Ex. 8 at 2).  To the extent Halliburton is relying on the statement in the Milwhite/NL Contract that the surface rights in that land would be conveyed to NL to support the proposition that Milwhite retained mineral interests in the conveyed property, it is not clear whether that interpretation is supported by the corresponding deeds.

In resolving Milwhite's motion, this court need not decide whether the royalties payable to Milwhite under the Milwhite/NL Contract constitute a retention of mineral-rights interests.  Nor is it necessary to

(Docket Entry No. 233, McCall Decl., Ex. 12 at 5).  Halliburton has presented evidence that after Milwhite transferred certain rights in leases and property at the Site to NL, mining occurred on at least some of the property covered by the leases for which Milwhite was to receive royalties under the Milwhite/NL Contract.  (*See id.*, McCall Decl., Ex. 12 at 1 (Milwhite/NL Contract discussing Milwhite's ownership of certain leases, including the Jernigan Lease, which covered the east 1/2 of the southeast 1/4 of Section 10); *id.*, McCall Decl., Ex. 12 at 5 (Milwhite/NL Contract obligating NL to pay royalties to Milwhite for barite mined under the leases described in paragraph I of the contract); *id.*, Stephens Decl., Ex. E (showing mining activity in the southeast 1/4 of the southeast 1/4 of Section 10 on May 19, 1950); *see also id.*, McCall Decl., Ex. 13 at 3–14 (correspondence regarding NL activity under the Jernigan Lease)).  And even after Milwhite transferred certain rights to NL in August 1943, Milwhite continued to be involved in overseeing mining activities on the property.[72]

---

decide the precise acreage in which these rights may have been maintained.  To decide the present motion, it is sufficient that the Milwhite/NL Contract gave Milwhite the right to receive royalties based on NL's production under the leases transferred under that contract.

[72] *See, e.g.*, Docket Entry No. 233, McCall Decl., Ex 13 at 3 (letter from Milwhite to NL, dated October 30, 1943, discussing storage of Jernigan ore); *id.*, McCall Decl., Ex. 13 at 4 (letter from NL to Milwhite, dated November 1, 1943, about stockpiling dump material from the Jernigan Lease and royalties paid by NL to Milwhite and the Jernigans); *id.*, McCall Decl., Ex. 13 at 5–6 (letter from Milwhite to NL, dated November 9, 1943, discussing treatment of Jernigan ore from a Magcobar plant and indicating concern with low percentages of recovery from an NL plant); *id.*, McCall Decl., Ex. 13 at 7 (NL Baroid Sales Division memorandum, dated November 11, 1943, discussing royalties under the Jernigan Lease, royalties paid to Milwhite, and possibility of adjusting royalties paid to Milwhite); *id.*, McCall Decl., Ex. 13 at 11 (letter from NL Baroid Sales Division to Milwhite, dated November 22, 1943, explaining why NL's recovery of barite was lower than Magcobar's); *id.*, McCall Decl., Ex. 13 at 12 (letter from NL Baroid Sales Division to Milwhite, dated November 29, 1943, discussing letter from Milwhite regarding "stockpiling of low grade material from the Jernigan pit"); Docket Entry No. 233, McCall Decl., Ex. 13 at 13 (letter from NL to Milwhite, dated December 4, 1943, discussing stockpile of Jernigan ore, and stating that it "is not one of the controversial stockpiles which are wholly south of the present pit" and that "[i]t will be quite some time before it will be necessary to move the latter . . . ," and discussing possible milling of materials formerly used for road building); *id.*, McCall Decl., Ex. 13 at 14 (letter from NL to Milwhite, dated August 8, 1944, stating that NL was "now nearing the end of the old ore-waste piles and the old roadway," and discussing royalties

The record also contains evidence that Milwhite received substantial royalty payments for transferring its rights under the leases to NL.  The July 30, 1959 modification of the Milwhite/NL Contract, which states that there was not sufficient crude barytes to permit NL to meet the minimum amount of ground barytes required under that contract, supports an inference that NL had been conducting mining activities at the Site and paying royalties to Milwhite from the time the Milwhite/NL Contract became effective.  (Docket Entry No. 233, McCall Decl., Ex. 14 at 1 (discussing obligation under the Milwhite/NL Contract for NL to pay Milwhite a royalty per ton on a minimum of 30,000 tons of ground barytes per year, and stating that "[i]t is now believed that there will not be remaining on said leased premises as of October 1, 1959, the starting date of the next contract year, sufficient crude barytes to permit [NL] to manufacture 30,000 tons of ground barytes during the next contract year . . ."))  The correspondence presented by Halliburton also shows that Milwhite received royalties from NL's mining activities at the Site.  (*See id.*, McCall Decl., Ex. 13 at 7, 14).  Halliburton has presented Low's declaration stating that approximately 3,889,659 cubic yards of mine spoils (almost 22% of the total mine spoils generated at the Site) were removed from property in which Milwhite retained a mineral-rights interest, and that Milwhite "may have received approximately $1.7 million in royalties as payment for the barite ore mined from this property." (*Id.*, Low Decl. at ¶ 5).  The facts that mining activity occurred on property that Milwhite leased or owned at the Site during the period in which Milwhite was either the lessee or the owner, and that Milwhite received royalties for transferring its property rights, weigh against allocating zero

---

to the Jernigans, Roy Smith, and Milwhite for crude ore, ore-waste piles, and old roadway); *id.*, McCall Decl., Ex. 13 at 16 (NL memorandum, dated August 11, 1944, discussing "trouble between the Milwhite Company and the Jernigans concerning the Barytes ore used by the Milwhite Company in building roadways," and discussing Milwhite's payment to the Jernigans and whether NL has mined and removed ore used for road building).

response costs to Milwhite.

The evidence in the present record shows that Milwhite was significantly more than a passive owner of property on which contamination occurred. The evidence gives rise to factual disputes as to whether Milwhite conducted mining and waste-disposal activities on property it leased and owned at the Site. There are also factual disputes about the extent of Milwhite's involvement in the mining and disposal activities at the Site after it transferred most of its interests to NL in 1943, and the amount of royalties Milwhite received for allowing use of Site property for excavation, mining, and storage of barite.

The evidence does not show that, as a matter of law, Milwhite is a blameless PRP. Nor does the evidence establish that Milwhite's activities—either in conducting mining activities and waste disposal or in overseeing such activities on property it owned or leased and transferred in exchange for royalties—only contributed *de minimis* amounts of contamination to the Site. As a result, Milwhite's activities are not analogous to the activities of PRPs allocated zero response costs because those PRPs contributed minimal amounts of pollution. And even if the evidence showed that Milwhite did not itself participate in the mining activities but allowed NL to conduct mining activities in exchange for substantial royalties, that would be sufficient to deny a summary judgment motion seeking an allocation of zero response costs to Milwhite. The cases allocating zero responsibility involve PRPs that contributed so little to the pollution as to make allocating liability for response costs inequitable. Those cases did not involve PRPs that received royalties in exchange for transferring property interests to allow others to conduct the polluting activities. Based on the evidence in the record, there is a much stronger basis for allocating at least some of the response costs

100

to Milwhite than in the cases it cites.[73]  The comparative fault analysis does not result in an allocation of zero responsibility to Milwhite.

### c.        The Lessee's Duty to Clean Up Leased Premises

Like Georgia-Pacific, Milwhite has argued that it should be allocated zero responsibility because under Arkansas law, the lessee is obligated to clean up pollution on the leased property when the lease terminates.  (Docket Entry No. 229 at 23).  Halliburton makes the same arguments it raised in response to Georgia-Pacific's similar motion, that the lessee's implied duty in an oil and gas lease to clean up when the lease ends does not apply to mining operations, and that any such duty does not apply here because the express terms of the lease agreements contemplated the permanent alteration of the land surface through mining activities.  (Docket Entry No. 233 at 12).  Halliburton also contends that even if NL had an obligation as a lessee to clean up the leased premises, that obligation would not absolve Milwhite of its legal and equitable obligations under CERCLA and RATFA with respect to the properties it leased or its obligations to contribute to the costs of cleaning up property that it owned at the Site.  (*See id.*).

The relevant leases are the Jernigan Lease, the Collie Lease, and the Cooper Lease, all of which Smith assigned to Milwhite.  Under Milwhite's theory, as lessee, it arguably had to clean up the Site at the end of the leases.  Presumably Milwhite is arguing that under the Milwhite/NL Contract, NL became the lessee under these leases and therefore had the clean-up obligation.  Under the Milwhite/NL Contract, Milwhite assigned and conveyed these leases by special warranty, and NL obligated "itself to perform all of the conditions, covenants, and obligations imposed upon the

---

[73]    Unlike Georgia-Pacific, Milwhite has not argued that indemnity provisions in the relevant agreements warrant allocating zero responsibility to Milwhite.

lessee or assignee by the [leases conveyed]."  (Docket Entry No. 233, McCall Decl., Ex. 12 at 4).

Even if Milwhite had an implied duty under the leases to clean up the leased properties, and that implied duty transferred to NL under the Milwhite/NL Contract, it is not clear that the case Milwhite cites—*Bonds v. Sanchez-O'Brien Oil & Gas Co.*, 715 S.W.2d 444 (Ark. 1986)—supports an equitable allocation of zero responsibility to Milwhite.  As discussed in connection with Georgia-Pacific's motion, *Bonds* rested on the premise that in an oil and gas lease, the lessee is limited to a use of the surface land that is reasonable to conduct the drilling permitted under the lease.  It is more difficult to find an implied duty to clean up the surface under the Georgia-Pacific or Milwhite leases because they clearly contemplated surface damage and permitted a broader set of activities than merely drilling for underground minerals.  Under the Jernigan Lease, for example, the lease was for:

> the purposes of prospecting, exploring by use of core drill or otherwise, to mine, operate, produce, store and remove therefrom, all barite and bauxite in and upon the . . . described property with the right of moving, either during or after the terms thereof, all and any improvements placed or created on the premises, . . . , together with the rights of ingress and egress at all times, to produce, save, take care of, manufacture, treat and transport said barite [and Bauxite][74] . . . .

(Docket Entry No. 233, McCall Decl., Ex. 3 at 1).  The Jernigan Lease also provided that the lessee would not be liable for "any damage to the land occasioned by its mining operations conducted in the usual and customary manner."  (*Id.*, McCall Decl., Ex. 3 at 4).  It does not appear that NL assumed an implied duty to clean up the surfaces by obtaining rights under the Jernigan Lease.

The Collie Lease was entered into for the purposes of "prospecting and mining for Barite,

---

[74]   The bracketed language is included in the contract by handwritten note.

exclusive of oil and gas."  This lease provided:

> the exclusive right and license to prospect and mine said land for
> Barite or other minerals [sic] substances therein mentioned, and
> thereon exclusive of oil and gas; The right to erect such buildings and
> machinery on said lands and preparing for market and disposing of
> ores mined with the right to remove same at any time during the life
> of this lease or within ninety days after its termination; Also right of
> way for roadways and railways and right to use land for stores, shops
> and dwelling.

(Docket Entry No. 233, McCall Decl., Ex. 5 at 1).  Although the Collie Lease did not contain the

same "hold harmless" language as the Jernigan Lease, the activities permitted were more extensive

than drilling for underground minerals.  The Collie Lease provided the lessee with the right, but not

the obligation, to remove certain items placed on the land.  It is not clear that the lessee had an

implied duty to clean up the premises.

Similarly, the Cooper Lease provided:

> the exclusive right and license to prospect and mine[ ]said land for all
> forms of Barite Ore and all other valuable mineral substances,
> together with the right and license to prepare for market on said
> premises and remove and sell all forms of  Barite Ore and all other
> valuable mineral substances mined or produced thereon, with the
> right to construct buildings and other structures, including power
> plants, stations, pipe-lines, tracks, fences, roadways and all other
> things essential to the production of said Barite Ore and all other
> valuable mineral substances thereon, and to make excavations,
> opening, stockpiles, dumps, ditches, drains, ponds and other
> improvements upon said premises, including the use of water in said
> mining operations, and to place such machinery and equipment
> thereon as Lessee may deem necessary for efficiently prospecting and
> mining said lands and for preparing for market and disposing of all
> Barite Ore and all other valuable mineral substances of every kind or
> character mined or produced thereon, with the right to Lessee to
> remove all property placed thereon at any time during or within one
> year after the date of termination of this lease.

(*Id.*, McCall Decl., Ex. 7 at 1).  Far from having an implied duty to clean up the leased premises, the

Cooper Lease appears to have given the lessee the right to use the land for ditches and dumps. The lessee had the option, but not the obligation, to remove property placed on the leased premises. The Cooper Lease required the lessee "to fill, fence, or properly cover all prospect holes larger than six inches square, after samples are taken in prospecting," but provided that the lessee would "not be liable for damages or injury caused by or resulting from the subsidence of the surface or soil, or for damage to surface of the leased premises by reason of any surface or subsurface mining operations." (*Id.*, McCall Decl., Ex. 7 at 2).

The relevant leases do not easily accommodate an implied duty on the lessee to clean up the surface. Even if an implied duty could be imposed on NL, that would not absolve Milwhite of all responsibility because there is at least some evidence that Milwhite conducted mining activities under the leases before assigning its rights to NL. There is also evidence that Milwhite conducted mining activities on property that it owned (not leased) at the Site before transferring that property to NL. The implied duty under Arkansas law to clean up the surface after termination of an oil and gas lease is not a strong equitable factor favoring allocating zero responsibility to Milwhite in this case.

### d.      Halliburton's Arguments in the Arbitration

Milwhite points to the expert testimony from Stephens that Halliburton presented in the arbitration, that allocation should be based on the relative volume of spoils and tailings generated. (Docket Entry No. 229 at 23–24 (citing Docket Entry No. 189, Ex. 51 at 11–12)). During the arbitration hearing, in response to a question from the Tremont Parties' counsel as to whether Georgia-Pacific would be allocated zero responsibility under Stephens's allocation theory, Stephens responded: "[A]ssuming Georgia-Pacific didn't have anything to do with the Site involving

vegetation or any other activity out there, they probably wouldn't be given an allocation share in a model such as I have developed."  (Docket Entry No. 189, Ex. 55 at 1098).  Milwhite also points out that in the arbitration, Halliburton argued for allocation based on volume of mining waste generated.  (*See* Docket Entry No. 229 at 24 (citing Docket Entry No. 189, Ex. 54 at 1–2; *id.*, Ex. 56 at 2)).  Halliburton responds that the arbitration was limited to allocation of response costs to parties to the arbitration.  (*See* Docket Entry No. 233 at 11).

Like Georgia-Pacific, Milwhite was not a party to the arbitration.  As discussed in connection with Georgia-Pacific's motion, the experts in the arbitration did not express opinions on allocating liability to nonparties.  The statements made by the experts in the arbitration do not favor allocating zero responsibility to Milwhite.  The fact that Halliburton argued in the arbitration that allocation ought to be based on volume of mining waste generated between the Tremont Parties and Halliburton—each of which was accused by the other of being the successor to the NL division that conducted mining at the Site—does not make it inequitable to allocate some portion of the response costs to Milwhite.

Milwhite has not shown its entitlement to summary judgment allocating it zero response costs under section 113(f)(1).  Milwhite's share of responsibility may be smaller than other entities that were more directly responsible for larger amounts of mining at the Site.  But there is record evidence that Milwhite was involved in the mining activities at the Site that caused contamination, and that Milwhite transferred the right to conduct mining activities at the Site to NL in exchange for substantial royalties.  Milwhite's motion for partial summary judgment requesting that it be allocated zero responsibility based on equitable considerations is denied.

**D.    Halliburton's Unjust Enrichment Claim**

Milwhite also seeks summary judgment denying Halliburton's unjust enrichment claim. Like Georgia-Pacific, Milwhite argues that responsibility for response costs are the subject of written leases between NL and Milwhite.[75]  (Docket Entry No. 229 at 25 (citing *Varner v. Peterson Farms*, 371 F.3d 1011, 1018 (8th Cir. 2004)).  Milwhite points out that its leases were only in place for a short period, long before Halliburton incurred any response costs at the Site.  (*Id.*)  Milwhite argues that it has not and will not receive anything of value as a result of Halliburton's response at the Site. (*Id.*).  Halliburton argues that "'[t]he mere fact that there is a contract between the parties does not prevent the grant of restitution in an appropriate case.'"  (Docket Entry No. 233 at 15 (quoting *Friends of Children, Inc. v. Marcus*, 876 S.W.2d 603, 605 (Ark. Ct. App. 1994)).  Halliburton asserts that the leases and their assignment to NL did not and could not address allocating responsibility between Milwhite and NL for environmental costs incurred years later.  (*Id.*).  Halliburton argues that because there was no agreement between the parties regarding allocation of costs for future CERCLA and RATFA claims, there is no "valid, legal, and binding contract" that would preclude an unjust enrichment claim.  (*Id.*).  Halliburton also argues that Milwhite has received value because Halliburton has paid response costs for which Milwhite bears some responsibility.  (*Id.* at 15–16).

Like Georgia-Pacific, Milwhite relies on *Varner v. Peterson Farms*, 371 F.3d 1011 (8th Cir. 2004).  *Varner* does not resolve the unjust enrichment claim here, for the reasons discussed in connection with Georgia-Pacific's motion.  In *Varner*, the bank and poultry-producer defendants had valid contracts with the plaintiffs, and the plaintiffs argued that these defendants were unjustly

---

[75]  Milwhite assigned its rights and obligations as lessee in certain leases to NL pursuant to the Milwhite/NL Contract.

enriched by the contracts themselves.  Having failed to plead that the contracts were illegal, the court

concluded that the plaintiff had failed to state a claim for unjust enrichment because the defendants'

actions were taken pursuant to the contracts.  In this case, in contrast, Halliburton is not claiming

that Milwhite was unjustly enriched by actions taken pursuant to the contract between Milwhite and

NL.  Instead, Halliburton contends that Milwhite has been unjustly enriched by Halliburton's

payment of cleanup costs at the Site, for which Milwhite owes some responsibility.  The contract

governing Milwhite's transfer of certain property rights to NL does not preclude Halliburton's unjust

enrichment claim.[76]

Like Georgia-Pacific, Milwhite argues that it received nothing of value that could support

an unjust enrichment claim.  Like Georgia-Pacific, to the extent that Milwhite is responsible for

cleanup costs at the Site under CERCLA or RATFA, it benefits from Halliburton's payment of those

costs.  *See Day v. Case Credit Corp.*, 427 F.3d 1148, 1154 (8th Cir. 2005) ("The party claiming

---

[76]   Halliburton cites *Friends of Children* for the proposition that "'[t]he mere fact that there is a contract
between the parties does not prevent the grant of restitution in an appropriate case.'"  (Docket Entry No. 233
at 15).  In *Friends of Children*, the court explained that "[a]ppropriate cases include those in which there has
been a rescission at law; where a contract has been discharged by impossibility or frustration of purpose; or
where the parties to a contract find they have some fundamental mistake about something important in their
contract."  876 S.W.2d at 605 (internal citations omitted).  The court explained that the case relied upon for
the theory that "'[t]here can be no 'unjust enrichment' in contract cases'"—*Lowell Perkins Agency v. Jacobs*,
250 Ark. 952, 469 S.W.2d 89 (1971)—had recognized this statement only as an expression of the general rule
that "'where there is an express contract the law will not imply a quasi or constructive contract.'"  *Friends
of Children*, 876 S.W.2d at 605 (quoting *Lowell Perkins*, 250 Ark. at 959).  In *Friends of Children*, the parties
had "effectively rescinded the transaction by agreement."  *Id.* at 606.  Here, the contract has not been
rescinded or discharged by impossibility or frustration of purpose, and there is no fundamental mistake.  To
the contrary, the parties to the Milwhite/NL Contract appear to have fully performed.  The rationale discussed
in *Friends of Children* does not apply here.  Nonetheless, Halliburton's unjust enrichment claim is not
precluded by the contract between NL and Milwhite because Halliburton is not claiming that Milwhite has
been unjustly enriched as a result of that contract and the contract arguably does not cover allocation of future
CERCLA or RATFA cleanup costs.  *See Klein v. Arkoma Prod. Co.*, 73 F.3d 779, 786 (8th Cir. 1996)
("[W]hen an express contract does not fully address a subject, a court of equity may impose a remedy to
further the ends of justice.") (citing *Roberson Enters., Inc. v. Miller Land & Lumber Co.*, 700 S.W.2d 57, 59
(Ark. 1985)).

unjust enrichment must prove another's receipt of 'something of value to which he is not entitled and which he should restore.'") (quoting *Smith v. Whitener*, 856 S.W.2d 328, 329 (Ark. Ct. App. 1993)).   Milwhite has conceded for purposes of its motion that it is a PRP under CERCLA's statutory liability scheme, and, as discussed earlier, Milwhite is not entitled to summary judgment of zero responsibility.   As a result, Milwhite is also not entitled to judgment that it has not been unjustly enriched by Halliburton's payment of cleanup costs.   Milwhite's motion for summary judgment on Halliburton's unjust enrichment claim is denied.[77]

### E.    Halliburton's Request for Additional Discovery

Halliburton has requested that if this court determines that summary judgment would be appropriate on the present record, that this court deny or continue Milwhite's motion to permit Halliburton to conduct additional discovery.   (Docket Entry No. 233 at 16).   Milwhite has not specifically responded to Halliburton's request for additional discovery.   Because this court has determined that Milwhite is not entitled to summary judgment of zero responsibility on the present record, a continuance under Federal Rule of Civil Procedure 56(f) is not necessary.

### V.    Conclusion

Georgia-Pacific's motion for partial summary judgment, (Docket Entry No. 189), and Milwhite's motion for partial summary judgment, (Docket Entry No. 228), are denied.   Halliburton's motion for leave to file supplemental evidence in opposition to Georgia-Pacific's motion, (Docket Entry No. 332), is denied.   Milwhite's motion to supplement its motion for partial summary judgment, (Docket Entry No. 363), is granted.   A scheduling conference is set for **September 18,**

---

[77]    As noted in connection with Georgia-Pacific's motion, Halliburton's claim for unjust enrichment may involve additional issues, such as the possibility of preemption or the possibility of preclusion of unjust enrichment claims where the plaintiff has a legal obligation to pay response costs.  Because the parties did not address these issues, they are not resolved in this opinion.

**2009, at 10:00 a.m.**, to set deadlines for the work needed to resolve this case.

SIGNED on August 18, 2009, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge